**DOCKET NOS. 14-11942(L), 14-12163**

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————◆———————

NATIONAL MINING ASSOCIATION; ALABAMA COAL ASSOCIATION;
WALTER ENERGY, INC., and WARRIOR INVESTMENT CO., INC.,
and
MURRAY ENERGY CORPORATION, et al.,

*Petitioners,*

*v.*

MINE SAFETY AND HEALTH ADMINISTRATION and THOMAS E. PEREZ, SECRETARY,
UNITED STATES DEPARTMENT OF LABOR, et al.,

*Respondents.*

———————————————

ON PETITION FOR REVIEW OF A FINAL RULE OF THE FEDERAL MINE SAFETY AND
HEALTH ADMINISTRATION

## PETITIONERS' JOINT APPENDIX
## VOLUME ONE OF ELEVEN

HENRY CHAJET
AVIDAN MEYERSTEIN
COLLIN O'CONNOR UDELL
GENEA O. BELL
ROSS J. WATZMAN
JACKSON LEWIS P.C.
10701 Parkridge Boulevard
Suite 300
Reston, Virginia 20191
(703) 483-8300

KATIE SWEENEY
NATIONAL MINING ASSOCIATION
101 Constitution Ave, N.W.
Suite 500 East
Washington, D.C. 20001
(202) 463-2600

*Counsel for Petitioners*
*National Mining Association, et al.*

THOMAS C. MEANS
EDWARD M. GREEN
DANIEL W. WOLFF
JESSE J. KIRCHNER
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500

MICHAEL O. MCKOWN
GARY M. BROADBENT
MURRAY ENERGY CORPORATION
46226 National Road
St. Clairsville, Ohio 43950
(740) 338-3386

*Counsel for Petitioners*
*Murray Energy Corporation, et al.*

# INDEX

## Volume One (Pages 1-240)

**CERT. INDEX:** Certified Index to Materials Comprising
Administrative Record Filed Pursuant to Rules 16 and 17
of the Federal Rules of Appellate Procedure
        Filed June 13, 2014 ..........................................................................1

**PFR-11942:** Petition for Review in Case 14-11942
        Filed May 1, 2014 ........................................................................140

**PFR-12163:** Petition for Review in Case 14-12163
        Filed May 1, 2014 ........................................................................146

**I-2-FR-1**: U.S. Department of Labor, Mine Safety and Health
Administration. Lowering Miners' Exposure to Respirable Coal Mine
Dust, Including Continuous Personal Dust Monitors, Final Rule,
Federal Register Notice, 79 FR 24814
        May 1, 2014..................................................................................149

## Volume Two (Pages 241-485)

**I-2-FR-1**: Continued - U.S. Department of Labor, Mine Safety and
Health Administration. Lowering Miners' Exposure to Respirable Coal
Mine Dust, Including Continuous Personal Dust Monitors, Final Rule,
Federal Register Notice, 79 FR 24814
        May 1, 2014..................................................................................241

**V-FR-1**: Coal Mine Respirable Dust Standard Noncompliance
Determinations. Notice. Federal Register, 59 FR 8356
        February 18, 1994

        U.S. Department of Labor and U.S. Department of Health and
        Human Services. Mine Shift Atmospheric Conditions; Respirable
        Dust Sample. Notice. Federal Register, 59 FR 8357
                February 18, 1994 ................................................................331

**V-BKG-78**: National Institute for Occupational Safety and Health (NIOSH). Criteria for a Recommended Standard: Occupational Exposure to Respirable Coal Mine Dust. U.S. Department of Health and Human Services. Public Health Service. Center for Disease Control and Prevention. Cincinnati, OH

     1995 (excerpts)..............................................................................334

**V-FR-5**: U.S. Department of Labor and U.S. Department of Health and Human Services. 1998. Mine Shift Atmospheric Conditions; Respirable Dust Sample. Final notice of joint finding. Federal Register, 63 FR 5664

     February 3, 1998 .......................................................................343

**V-FR-7**: U.S. Department of Labor and U.S. Department of Health and Human Services. 2000. Determination of Concentration of Respirable Coal Mine Dust. Proposed Rule; notice of hearings. Federal Register, 65 FR 42068

     July 7, 2000....................................................................................367

**VI-FR-1**: 30 CFR Parts 70, 75 and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust; Proposed Rule. Federal Register, 65 FR 42122

     July 7, 2000....................................................................................422

### Volume Three (Pages 486-726)

**III-FR-1**: Proposed rule; notice of reopening of record; request for comments; notice of public hearings; correction; close of record. Federal Register, 68 FR 10940

     March 6, 2003 ................................................................................486

**IV-FR-1**: 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling; Proposed Rule. Federal Register, 68 FR 10784

     March 6, 2003 ................................................................................499

**III-FR-5**: Proposed rule; Extension of comment period; reopening of the record. Federal Register, 68 FR 47886
August 12, 2003 ............................................................................. 600

**I- QRA-25**: U.S. Department of Labor, Mine Safety and Health Administration (2010). Quantitative Risk Assessment in Support of Proposed Respirable Coal Mine Dust Rule. Jon Kogut, Statistical Methods and Analysis, MSHA Contract DOLJ094R22516
September 2010 ............................................................................. 602

### Volume Four (Pages 727-960)

**I- QRA-25**: Continued - U.S. Department of Labor, Mine Safety and Health Administration (2010). Quantitative Risk Assessment in Support of Proposed Respirable Coal Mine Dust Rule. Jon Kogut, Statistical Methods and Analysis, MSHA Contract DOLJ094R22516
September 2010 ............................................................................. 727

**I-PREA-10**: Preliminary Regulatory Economic Analysis (PREA) for Lowering Miners' Exposure
September 2010 ............................................................................. 762

### Volume Five (Pages 961-1205)

**I-FR-1**: 30 CFR Parts 70,71,72,75, and 90. Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule. Federal Register Notice, 75 FR 64412
October 19, 2010 ............................................................................. 961

**I- PH1-1**: Transcript of Proceedings. Lowering Miners' Exposure to Respirable Coal Mine Dust. Public Hearing, Beaver, WV
December 7, 2010 (excerpts) ...................................................... 1057

**I-PH7-1**: Transcript of Proceedings and Hearing Submissions. Lowering Miners' Exposure to Respirable Coal Mine Dust. Public Hearing, Arlington, VA
February 15, 2011 (excerpts) ...................................................... 1080

**I-PH7-4**: Hearing Submission. National Mining Association. Analysis of MSHA Coal Dust Sampling Data Base and the Impact of the MSHA Proposed Rule. Presented by Mark Watson and Heath Lovell, Alliance Coal, LLC. Public Hearing, Arlington, VA

     February 15, 2011 .................................................................1156

## Volume Six (Pages 1206-1445)

**I-COMM-77**: Jeffery L. Kohler, Associate Director for Mining, and Director, Office of Mine Safety and Health Research, National Institute for Occupational Safety and Health, Centers for Disease Control and Prevention. "NIOSH Analysis of Comments Questioning the Use of the CPDM."

     May 24, 2011..................................................................1206

**I- FR-7**: 30 CFR Parts 70,71,72,75, and 90. Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule, extension of comment period. Federal Register Notice, 76 FR 30878

     May 27, 2011..................................................................1214

**I-COMM-57**: Edward M. Green, Crowell & Moring LLP, on behalf of Alliance Coal, Alpha Natural Resources, Arch Coal, BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy, with attachments

     June 20, 2011..................................................................1215

**I-COMM-57-1**: John F. Gamble, PhD, Curriculum Vitae

     2006.............................................................................1258

**I- COMM-57-2**: Robert Bernier Reger, Curriculum Vitae ..................1267

**I-COMM-57-3**: Robert E. Glenn, CIH, MPH, Glen Consulting Group, LLC, Curriculum Vitae ............................................................1272

**I-COMM-57-4**: Suarthana, E., A.S. Laney, E. Storey, J.M. Hale, and M.D. Attfield. 2011. "Coal Workers' Pneumoconiosis in the United States: Regional Differences 40 Years after Implementation of the 1969 Federal Coal Mine Health and Safety Act." Occup Environ Med (2011). doi: 10.1136/oem.2010.063594. Epub 2011

    May 19, 2011 ................................................................1280

**I-COMM-57-5**: Robert E. Glenn. 2011. A Critical Review of the Paper "Coal Workers' Pneumoconiosis in the United States: Regional Differences 40 Years after Implementation of the 1969 Federal Coal Mine Health and Safety Act" By Suarthana, et al.

    June 10, 2011 ...............................................................1288

**I-COMM-57-6**: Energy West Mining Company's Petition for Rulemaking to Amend 30 CFR Part 70 Mandatory Health Standards – Underground Coal Mines, To Allow Use Of Airstream Helmets Or Other NIOSH-Approved Powered Air-Purifying Respirators As A Supplemental Means Of Compliance With Respirable Dust Standards

    September 10, 1997 .....................................................1301

**I-COMM-57-7**: John F. Gamble, PhD; Robert B. Reger, PhD; Robert E. Glenn, MPH, CIH. "A Critical Review of the Scientific Basis for MSHA's Proposal for Lowering the Coal Mine Dust Standard."

    May 27, 2011 ...............................................................1345

### Volume Seven (Pages 1446-1689)

**I-COMM-57-7**: Continued - John F. Gamble, PhD; Robert B. Reger, PhD; Robert E. Glenn, MPH, CIH. "A Critical Review of the Scientific Basis for MSHA's Proposal for Lowering the Coal Mine Dust Standard."

    May 27, 2011 ...............................................................1446

**I-COMM-58**: Bruce Watzman, Senior Vice President, Regulatory Affairs, National Mining Association, with attachments

    June 20, 2011 ...............................................................1514

**I-COMM-58-4**: A. Scott Laney, Edward L. Petsonk, and Michael Attfield. 2009. "Pneumoconiosis among Underground Bituminous Coal Miners in the United States: Is Silicosis Becoming More Frequent?" Occup. Environ. Med, doi:10.1136/oem.2009.04716. Epub
      September 22, 2009 ...................................................................1571

**I-COMM-58-9**: National Mining Association. Analysis of MSHA Coal Dust Sampling Data Base and the Impact of the MSHA Proposed Rule. Presented by Mark Watson and Heath Lovell, Alliance Coal, LLC, at MSHA's Public Hearing on Proposed Coal Dust Regulations
      February 15, 2011 .....................................................................1590

**I-COMM-58-13**: National Mining Association. 2011. "Flaws in MSHA's Support for Its Proposed Rule on Respirable Dust."
      June 20, 2011...............................................................................1639

**I-COMM-58-14**: Sciences International, Inc. 1994. "Will Single Full-Shift Samples of Respirable Dust Accurately Represent the Long-Term Compliance Status For Respirable Coal Mine Dust Exposures?" Prepared for the National Coal Association, Washington, DC.
      May 18, 1994................................................................................1654

### Volume Eight (Pages 1690-1932)

**I- COMM-68**: David M Young, President, BCOA, and Dennis O'Dell, Administrator, UMWA Department of Occupational Health and Safety, submitted by UMWA (identical to Comm-72, infra)
      June 20, 2011...............................................................................1690

**I-COMM-73**: John Heard, Legislative Counsel, The Virginia Coal Association, Inc.
      June 20, 2011...............................................................................1697

**I-COMM-74**: J. Clifford Forrest, President, Rosebud Mining Company
      June 20, 2011...............................................................................1703

**I-COMM-75**: Alan Matta, Production Manager, Thermo Fisher
Scientific
> June 20, 2011 ............................................................................1710

**I-COMM-76**: Robert E. Murray, Chairman, President and Chief
Executive Officer, Murray Energy Corporation, with Attachments
> June 20, 2011 ............................................................................1718

**I-COMM-76-1**: Attachment A. Specific Comments on Preliminary
Regulatory Economic Analysis, Prepared by Robin C. Cantor, Ph.D.,
Exponent, Inc., for Murray Energy Corporation
> April 27, 2011 ............................................................................1728

**I-COMM-76-2**: Attachment B. Specific Comments on Quantitative
Risk Assessment, Prepared by Richard Reiss, ScD, MS, and Kenneth
Bogen, DrPH, MPH, DABT, Exponent, Inc., for Murray Energy
Corporation
> April 27, 2011 ............................................................................1790

**I-COMM-76-3**: Attachment C. Comments Specific to Industrial
Hygiene and Medical Surveillance Issues, Prepared by Michael N.
Cooper, MPH, CIH, and Sheila McCarthy, MHS, CIH, Exponent, Inc.,
for Murray Energy Corporation
> April 28, 2011 ............................................................................1843

**I- COMM-76-4**: Attachment D.1. Comments Specific to Laboratory
testing of continuous personal dust monitor (CPDM). Prepared by
Michael Cooper, CIH, and Sheila McCarthy, CIH, Exponent, Inc., for
Murray Energy Corporation, Alliance Natural Resources, Arch Coal,
Inc., Illinois Coal Association, and Indiana Coal Council
> April 28, 2011 ............................................................................1886

## Volume Nine (Pages 1933-2173)

**I-COMM-76-5**: Attachment E. Specific comments on MSHA review of medical monitoring and epidemiologic studies, Prepared by Michael Kelsh, PhD, MPH, and Martha L. Doemland, PhD, MS, Exponent, Inc., for Murray Energy Corporation
April 28, 2011 ...........................................................................1933

**I-COMM-76-6**: Attachment F. Comments of Janet Torma-Krajewski, PhD, CIH, CPE, Industrial Ergonomics, Inc .......2005

**I-COMM-76-7**: Attachment G. Additional Comments of Murray Energy Corporation ............................................................................2035

**I-2-QRA-26**: U.S. Department of Labor, Mine Safety and Health Administration (2013), Quantitative Risk Assessment in Support of the Final Respirable Coal Mine Dust Rule
December 2013 .........................................................................2062

## Volume Ten (Pages 2174-2414)

**I-2-QRA-26**: Continued - U.S. Department of Labor, Mine Safety and Health Administration (2013), QRA in Support of Final Rule
December 2013 .........................................................................2174

**I-REA-16**: Regulatory Economic Analysis (REA) for Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Final Rule
March 2014 ...............................................................................2259

## Volume Eleven (Pages 2415-2619)

**I-REA-16**:  Continued - Regulatory Economic Analysis (REA) for Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous  Personal Dust Monitors, Final Rule
March 2014 ...............................................................................2415

**TAB A** - S. Comm. on Labor and Public Welfare, Federal Coal Mine Health and Safety Act Of 1969, House Debate on Coal Mine Health and Safety Act (October 27, 1969), reprinted in 1 Legislative History of the Federal Coal Mine Health and Safety Act of 1969 (1975) (excerpts) ...................................................................................2526

**TAB B** - S. Comm. on Labor and Public Welfare, Federal Coal Mine Health and Safety Act of 1969, H.R. Rep. 91-761 (1969), reprinted in 1 Legislative History of The Federal Coal Mine Health and Safety Act of 1969 (1975) (excerpts) ...........................................2530

**TAB C** - S. Comm. on Labor and Public Welfare, Federal Coal Mine Health and Safety Act of 1969, S. 2917, reprinted in 1 Legislative History Of The Federal Coal Mine Health and Safety Act of 1969 (1975) (excerpts) ....................................................2537

**Tab D:** H.R. 5663, 111th Cong. § 504 (2010) ......................................2545

**Tab E:** H.R. 3697, 112th Cong. § 503 (2011) ......................................2550

**Tab F:** S. 3443, 112th Cong. § 504 (2012).............................................2553

**Tab G**: S. 805, 113th Cong. § 504 (2013) .............................................2557

**Tab H**: Novak et al., Respirable Dust Study for Kentucky Coal Mines (2013), available at http://energy.ky.gov/resources/Documents/Respirable%20Dust%20-%20Final%20Report%20-%20NOVAK.PDF
            (last accessed July 27, 2014)......................................................2560

**Tab I**: U.S. Chamber of Commerce comments and testimony of Robert Lieckfield, see OSHA-2010-0034-2259, available at http://www.regulations.gov/#!documentDetail;D=OSHA-2010-0034-2259
            (last accessed July 27, 2014)......................................................2593

**Tab CS**: Certificate of Service

CERT. INDEX

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

—————————————————————————

Nos. 14-11942 and 14-12163 (Consolidated)

—————————————————————————

NATIONAL MINING ASSOCIATION *et al.*,

and

MURRAY ENERGY CORPORATION *et al.*,

Petitioners

v.

SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF
LABOR
AND MINE SAFETY AND HEALTH ADMINISTRATION,

Respondents

—————————————————————————

Certified Index to Materials Comprising Administrative Record
Filed Pursuant to Rules 16 and 17 of the Federal Rules of Appellate
Procedure

—————————————————————————

CONTENTS

I.  INDEX FOR: LOWERING MINERS' EXPOSURE TO
     RESPIRABLE COAL MINE DUST, INCLUDING
     CONTINUOUS PERSONAL DUST MONITORS ("LOWERING
     EXPOSURE"), RIN: 1219-AB64.................................................................. 1

II.  INDEX FOR: REQUEST FOR INFORMATION CONTINUOUS
      PERSONAL MONITORS ("CPDM"), RIN: 1219-AB48............................ 53

III. INDEX FOR: DETERMINATION OF CONCENTRATION OF
      RESPIRABLE COAL MINE DUST ("2003 SINGLE SAMPLE"),
      RIN: 1219-AB18 ........................................................................... 56

IV. INDEX FOR: VERIFICATION OF UNDERGROUND
     COAL MINE OPERATORS' DUST CONTROL PLANS AND
     COMPLIANCE SAMPLING FOR RESPIRABLE DUST,
     ("2003 PLAN VERFICATION"), RIN: 1219-AB14 .................................... 71

V.  INDEX FOR: DETERMINATION OF CONCENTRATION
     OF RESPIRABLE COAL MINE DUST ("2000 SINGLE SAMPLE"),
     RIN: 1219-AB18 ........................................................................... 94

VI. INDEX FOR: VERIFICATION OF UNDERGROUND COAL MINE
     OPERATORS' DUST CONTROL PLANS AND COMPLIANCE
     SAMPLING FOR RESPIRABLE DUST, ("2000 PLAN
     VERIFICATION"), RIN: 1219-AB14 ........................................................ 116

# I.

## LOWERING MINERS' EXPOSURE TO RESPIRABLE COAL MINE DUST, INCLUDING CONTINUOUS PERSONAL DUST MONITORS ("LOWERING EXPOSURE")

RIN: 1219-AB64
Rule Proposed October 19, 2010

**MSHA FEDERAL REGISTER NOTICES**
<u>Proposed Rule</u>

FR-1:  30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule.  <u>Federal Register Notice</u>, 75 FR 64412, October 19, 2010.

FR-2:  30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule, notice of public hearings; corrections.  <u>Federal Register Notice</u>, 75 FR 69617, November 15, 2010.

FR-3:  30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule, rescheduling of public hearings; correction. <u>Federal Register Notice</u>, 75 FR 73995, November 30, 2010.

FR-4:  30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule, extension of comment period; request for comments.  <u>Federal Register Notice</u>, 76 FR 2617, January 14, 2011.

FR-5:     30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal

Dust Monitors, Proposed Rule, request for comment.  <u>Federal Register Notice</u>, 76 FR 12648, March 8, 2011.

FR-6:    30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule, extension of comment period.  <u>Federal Register Notice</u>, 76 FR 25277, May 4, 2011.

FR-7:    30 CFR Parts 70,71,72,75, and 90.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule, extension of comment period.  <u>Federal Register Notice</u>, 76 FR 30878, May 27, 2011.

<u>Final Rule</u>

2-FR-1:    U.S. Department of Labor, Mine Safety and Health Administration.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Final Rule, <u>Federal Register Notice</u>, 79 FR 24814, May 1, 2014.

ECONOMIC ANALYSES
<u>Proposed Rule</u>

PREA-1:   Hintermann, B., A. Alberini, and A. Markandya. 2010. "Estimating the Value of Safety with Labour Market Data: Are the Results Trustworthy?" *Applied Economics*, 42(9): 1085-1100.

PREA-2:   Magat, W.A., W.K. Viscusi, and J. Huber. 1996. "A Reference Lottery Metric for Valuing Health." *Management Science*, 42(8), 1118-1130.

PREA-3:   Sunstein, C.R. 2004. "Valuing Life: A Plea For Disaggregation." *Duke Law Journal*, 54: 385-445.

PREA-4:   U.S. Bureau of Economic Analysis. 2010. National Income and Product Accounts Table: Table 1.1.9. Implicit Price Deflators for Gross Domestic Product [Index numbers, 2005=100].  May 27, 2010.

PREA-5:   U.S. Department of Energy, Energy Information Administration.  "Annual Coal Report - Table 28."  DOE/EIA-0584, October 2009.

PREA-6:   U.S. Department of Labor, Mine Safety and Health Administration.  *Data Files: Lowering Miners' Exposure to Respirable Coal Mine Dust Proposed Rule.*
- 2009 Surface Coal Dust Samples (Inspector).xls;
- 2009 Surface Coal Dust Samples (Operator).xls;
- 2009 UG Coal Dust Samples (Inspector).xls;
- 2009 UG Coal Dust Samples (Operator).xls;
- CY 2009 Avg. Production Data by MMU.xls;
- Mine Avg. Shift Lengths FY2009 & 4-9-10.xls;
- Oct. 2009 Dust Sampling & Tonnage Data.xls.

PREA-7:   U.S. Environmental Protection Agency.  2003.  "National Primary Drinking Water Regulations, Stage 2 Disinfectants and Disinfection Byproducts Rule, National Primary and Secondary Drinking Water Regulations, Approval of Analytical Methods For Chemical Contaminants, Proposed Rule."  <u>Federal Register Notice</u>, 68 FR 49548, August 18, 2003.

PREA-8:   Viscusi, W., and J. Aldy.  2003.  "The Value of a Statistical Life:  A Critical Review of Market Estimates Throughout the World."  *Journal of Risk and Uncertainty*, 27(1):5-76.

PREA-9:   Volkwein, J.C., V.P. Vinson, S.J. Page, L.J. McWilliams, G.J. Joy, S.E. Mischler, and D.P. Tuchman.  2006.  "Laboratory and Field Performance of a Continuously Measuring Personal Respirable Dust Monitor." DHHS (NIOSH) Publication No. 2006-145, *CDC Report of Investigations 9669.*

PREA-10   Preliminary Regulatory Economic Analysis (PREA) for Lowering Miners' Exposure

3

to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Proposed Rule.  September 2010.


Final Rule

REA-1:    Attfield, M.D., K.M. Bang, E.L. Petsonk, P.L. Schleiff, and J.M. Mazurek. 2009.  "Trends in Pneumoconiosis Mortality and Morbidity for the United States, 1968-2005, and Relationship with Indicators of Extent of Exposure."  In Proceedings of Inhaled Particles X, Manchester, UK.  Journal of Physics:  Conference Series 151, 012051, September 23-25, 2008.  doi:10.1088/1742-6596/151/1/012051.

REA-2:    Blanchette, C.M., B. Gutierrez, C. Ory, E. Chang, and M. Akazawa. 2008.  Economic Burden in Direct Costs of Concomitant Chronic Obstructive Pulmonary Disease and Asthma in a Medicare Advantage Population.  *Journal of Managed Care Pharmacy*, Vol. 14, No. 2: 176-185.

REA-3:    Jayaraman N.I., R.A. Jankowski, and J.A. Organiscak. 1992. Update on Stage Loader Dust Control in Longwall Operations. Longwall U.S.A. Conference. Pittsburgh, PA, June 16 18, 1992.

REA-4:    Jayaraman N.I., R.A. Jankowski, and J.A. Organiscak. 1992. Update on Longwall Dust Control Research. Midwest Mine Health & Safety Conference. Marion, IL, July 22-23, 1992.

REA-5:    Miravitlles, M., C. Murio, T. Guerrero, R. Gisbert. 2003. Costs of Chronic Bronchitis and COPD – A 1-Year Follow up Study. *Chest,* 2003; 123:784-791.

REA-6:    Nicholson, W.J., G. Perkel, and I.J. Selikoff.  1982. Occupational Exposure to Asbestos: Population at Risk and Projected Mortality – 1980-2030. *American Journal of Industrial Medicine*, 3:259-311. 1982. doi: 10.1002/ajim.4700030305.

4

6

REA-7:     U.S. Department of Agriculture.  2012.  Risk Assessment of the Potential Human Health Effect of Applying Continuous Inspection to Catfish.  July 2012. http://www.fsis.usda.gov/wps/wcm/connect/80a428f3-43fb-4421-b97d-885909e5a228/Catfish_Risk_Assess_July2012.pdf?MOD=AJPERES, pp. 39-43.

REA-8:     U.S. Department of Energy, Energy Information Administration.  2010.  Annual Coal Report. http://www.eia.gov/coal/annual/archive/05842010.pdf.

REA-9:     U.S. Environmental Protection Agency, Office of Air and Radiation.  2011.  Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States; Correction of SIP Approvals for 22 States.  Docket ID No. EPA-HQ-OAR-2009-0491.  June 2011. http://www.epa.gov/airtransport/pdfs/FinalRIA.pdf.

REA-10:    U.S. Department of Health & Human Services, Agency for Healthcare Research and Quality. Medical Expenditure Panel Survey (MEPS) HC 146: 2011 Medical Conditions File. http://meps.ahrq.gov/mepsweb/data_stats/download_data_files_detail.jsp?cboPufNumber=HC-146&prfricon=yes

REA-11:    U.S. Department of Labor, Mine Safety and Health Administration.  2012.  Number of Shifts Required to Meet Specified Production Criteria, Statistical Methods and Analysis.  March 1, 2012.

REA-12:    U.S. Department of Labor, Mine Safety and Health Administration.  2012.  Addendum to Number of Shifts Required to Meet Specified Production Criteria.  Statistical Methods and Analysis. March 16, 2012.

REA-13:    U.S. Department of Labor, Occupational Safety and Health Administration.  2006.  Final Economic and Regulatory Flexibility Analysis for OSHA's Final Standard for Occupational Exposure to Hexavalent Chromium (Docket H054A, Exhibit 49), Chapter VI: Benefits and Net Benefits.  February 23, 2006.

5

7

REA-14:    U.S. Office of Management and Budget. 2003. "Regulatory Analysis." Circular A4, September 17, 2003.

REA-15:    Viscusi, W.K., W.A. Magat, and J. Huber. 1991. "Pricing Environmental Health Risks: Survey Assessments of Risk - Risk and Risk - Dollar Trade-Offs for Chronic Bronchitis." *Journal of Environmental Economics and Management*, 21: 32-51.

REA-16:    Regulatory Economic Analysis (REA) for Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Final Rule. March 2014.


QUANTITATIVE RISK ASSESSMENTS (QRA)
Proposed Rule


QRA-1:    U.S. Department of Labor, Mine Safety and Health Administration (2010). Quantitative Risk Assessment, Dust Data Files, *InspSamp.txt, InspSamp.zip, OpSamp.txt, and OpSamp.zip*, March 2010.

QRA-2:    U.S. Department of Labor, Occupational Safety and Health Administration, Directorate of Standards and Guidance (2010). Peer Review Comments Submitted by V. Schaeffer, N. Davis, J. Coble, OSHA. "OSHA Review of Draft Quantitative Risk Assessment In Support of the Mine Safety and Health Administration Proposed Rule for Respirable Coal Mine Dust." April 23, 2010.

QRA-3:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (CDC), National Institute for Occupational Safety and Health (NIOSH), Office of Mine Safety and Health Research (OMSH) (2010). Peer Review Comments Submitted by Memorandum from M.I. Chovanec, OMSH, to Patricia Silvey, MSHA, Subject: MSHA coal risk assessment, May 03, 2010.

QRA-4:     E-Mail dated December 20, 2011, from Michael Attfield to MSHA contractor (Jon Kogut), Subject: Relative Risk for COPD mortality.

QRA-5:     E-Mail dated December 21, 2011, from Michael Attfield to MSHA contractor (Jon Kogut), Subject: Another Request, Re: Standard Errors of Estimated Coefficients Related to Cumulative Respirable Coal Mine Dust Exposure in Attfield-Kuempel NMRD Mortality Model for Anthracite, East Appalachia, West Appalachia, and Midwest Regions.

QRA-6:     Aitchison, J., and J.A.C. Brown. 1957. *The Lognormal Distribution*. Cambridge University Press.

QRA-7:     Attfield, M.D., and N.S. Seixas. 1995. "Prevalence of Pneumoconiosis and Its Relationship to Dust Exposure in a Cohort of U.S. Bituminous Coal Miners and Ex-Miners. *American Journal of Industrial Medicine*, 27:137-151.

QRA-8:     Attfield, M.D., V. Castranova, and G. Wagner. 2007. "Respiratory Disease in Coal Miners." Chapter 22 in *Environmental and Occupational Medicine*, 4th edition, W.N. Rom, ed.

QRA-9:     Attfield, M.D., and E.D. Kuempel. 2008. Mortality among U.S. Underground Coal Miners, A 23-Year Follow-Up. *American Journal of Industrial Medicine*, 51(4):231-245; with Erratum. 2010. *American Journal of Industrial Medicine,* 53(5):550.

QRA-10:     Box, G.E.P., and D.R. Cox. 1964. "An Analysis of Transformations." *Journal of the Royal Statistical Society*, Series B, 26:211-252.

QRA-11:     Coggon, D., and A. Newman-Taylor. 1998. "Coal Mining and Chronic Obstructive Pulmonary Disease: A Review of the Evidence." *Thorax*, 53:398-407.

QRA-12:     Cohen, R.A., A. Patel, and F.H. Green. 2008. "Lung Disease Caused By Exposure to Coal Mine and Silica Dust." *Seminars in*

7

9

*Respiratory and Critical Care Medicine*, 29(6):651-661.  E-pub. Feb 16, 2009.

QRA-13:    Cowie, H., B.G. Miller, and C.A. Soutar. 1999.  "Dust Related Risks of Clinically Relevant Lung Functional Deficits." *Institute of Occupational Medicine*, Research Report TM/99/06.

QRA-14:    Kogut, J.  Unpublished PowerPoint presentation, "Setting Priorities for Coal Mine Dust Sampling: An Exploratory Data Analysis," Bruceton, PA, November 5, 2003.

QRA-15:    Kuempel, E.D., V. Vallyathan, and F.H.Y. Green.  2009.  "Emphysema and Pulmonary Impairment in Coal Miners: Quantitative Relationship with Dust Exposure and Cigarette Smoking."  In *Proceedings of Inhaled Particles X*, Manchester, UK.  *Journal of Physics:  Conference Series 151*, 012014, September 23-25, 2008. doi:10.1088/1742-6596/151/1/012024.

QRA-16:    Kuempel, E.D., R.J. Smith, M.D. Attfield, and L.T. Stayner. 1997.  "Risks of Occupational Respiratory Diseases among U.S. Coal Miners." *Applied Occupational and Environmental Hygiene*, 12(12):823-831.

QRA-17:    Kuempel, E.D., M.W. Wheeler, R.J. Smith, V. Vallyathan, and F.H.Y Green. 2009.  "Contributions of Dust Exposure and Cigarette Smoking to Emphysema Severity in Coal Miners in the United States." *Am J Respir Crit Care Med*, 180(3): 257-264.

QRA-18:    Miller, B.G., L. MacCalman, and P.A. Hutchison. 2007. "Mortality Over An Extended Follow-Up Period In Coal Workers Exposed To Respirable Dust And Quartz." *Institute of Occupational Medicine*, Research Report TM/07/06.

QRA-19    Soutar, C.A, J.F. Hurley, B.G. Miller, H.A. Cowie, and D. Buchanan. 2004.  "Dust Concentrations and Respiratory Risks In Coalminers: Key Risk Estimates From the British Pneumoconiosis Field Research."  *Occup Environ Med*, 61(6):477-481.

8

QRA-20:    Taylor, J. 1986. "The Retransformed Mean After A Fitted Power Transformation." *Journal of the American Statistical Association*, 81(393):114-118.

QRA-21:    U.S. Department of Labor, Mine Safety and Health Administration. 1993. *Report of the Statistical Task Team of the Coal Mine Respirable Dust Task Group*. Washington, DC.

QRA-22:    U.S. Department of Labor, Mine Safety and Health Administration. 1996. *Report of the Secretary of Labor's Advisory Committee on the Elimination of Pneumoconiosis Among Coal Mine Workers*. Washington, DC.

QRA-23:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH). 1995. "Criteria for a Recommended Standard: Occupational Exposure to Coal Mine Dust." DHHS (NIOSH) Publication No. 95-106, Cincinnati, OH, 1995.

QRA-24:    U.S. Department of Labor and U.S. Department of Health and Human Services. 2003. "Determination of Concentration of Respirable Coal Mine Dust, Proposed rule, reopening of record, request for comments, notice of public hearings, correction, close of record." *Federal Register*, 68 FR 10940, March 6, 2003.

QRA-25:    U.S. Department of Labor, Mine Safety and Health Administration (2010). Quantitative Risk Assessment in Support of Proposed Respirable Coal Mine Dust Rule. Jon Kogut, Statistical Methods and Analysis, MSHA Contract DOLJ094R22516, September 2010.

Final Rule

2-QRA-26: U.S. Department of Labor, Mine Safety and Health Administration (2013).

9

Quantitative Risk Assessment in Support of the Final Respirable Coal Mine Dust Rule, December 2013.

PAPERWORK PACKAGES
Proposed Rule

PRA-1:    U.S. Department of Labor, Mine Safety and Health Administration (2010). Paperwork Reduction Act Supporting Statement for RIN 1219-AB64, Information Collection Requirement Reference Number 201012-1219-003, December 2010.

Final Rule

PRA-2    U.S. Department of Labor, Mine Safety and Health Administration (2014). Information Collection Request 1219-0NEW Unique Associated RIN: 1219-AB64, March 2014.


CORRESPONDENCE

CORR-1:   Appalachian Citizens' Law Center, Inc., and Charles Scott Howard, Petition for Rulemaking to Reduce the Level of Respirable Coal Mine Dust, to Gregory R. Wagner, M.D., Mine Safety and Health Administration, Deputy Assistant Secretary for Policy, September 1, 2009.

CORR-2:   U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated September 24, 2009, from Gregory R. Wagner, M.D., Deputy Assistant Secretary for Policy, to Stephen A. Sanders, Attorney at Law, Appalachian Citizens' Law Center, Inc., interim response regarding the September 1, 2009, petition for rulemaking.

CORR-3:   Stephen Sanders, Appalachian Citizens' Law Center, Request for hearing in Eastern Kentucky, November 15, 2010.

CORR-4:   U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances

10

(OSRV). Reply dated December 14, 2010, from Patricia W. Silvey, Director, OSRV, to Appalachian Citizens' Law Center (Stephen Sanders) regarding November 15, 2010, letter to MSHA.

CORR-5:   Joseph Lamonica, Bituminous Coal Operator's Association (BCOA), Request for extension of comment period, November 22, 2010.

CORR-6:   U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances (OSRV). Reply dated December 14, 2010, from Patricia W. Silvey, Director, OSRV, to BCOA (Joseph Lamonica) regarding November 22, 2010, letter to MSHA.

CORR-7:   Bruce Watzman, National Mining Association (NMA), Request for extension of comment period, November 22, 2010.

CORR-8:   U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances (OSRV). Reply dated December 14, 2010 from Patricia W. Silvey, Director, OSRV, to NMA (Bruce Watzman) regarding November 22, 2010 letter to MSHA.

CORR-9:   Dennis O'Dell, United Mine Workers of America (UMWA), Request for extension of comment period, November 22, 2010.

CORR-10:       U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances (OSRV). Reply dated December 14, 2010 from Patricia W. Silvey, Director, OSRV, to UMWA (Dennis O'Dell) regarding November 22, 2010, letter to MSHA.

CORR-11:       Bruce Watzman, National Mining Association (NMA), Request that MSHA revoke its certification that the proposed rule would not have a significant economic impact on a substantial number of small entities and convene a panel of experts to consider impact on small coal mine operators, February 24, 2011.

CORR-12:        U.S. Department of Labor, Mine Safety and Health Administration. Reply dated April 12, 2011 from Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, to Bruce Watzman, NMA, regarding February 24, 2011 letter to MSHA.

CORR-13:        Judy Rivlin, Counsel, United Mine Workers of America (UMWA), on behalf of UMWA and Bituminous Coal Operators' Association, Request for extension of comment period, April 14, 2011.

CORR-14:        Bill Bissett, President, Kentucky Coal Association, Request for extension of comment period, April 15, 2011.

CORR-15:        Michael T.W. Carey, President, Ohio Coal Association, Request for extension of comment period, April 15, 2011.

CORR-16:        George Ellis, President, Pennsylvania Coal Association, Request for extension of comment period, April 15, 2011.

CORR-17:        Phillip M. Gonet, President, Illinois Coal Association, Request for extension of comment period, April 15, 2011.

CORR-18:        David A. Gooch, President, Coal Operators & Associates, Inc., Request for extension of comment period, April 15, 2011.

CORR-19:        Chris R. Hamilton, Vice President, West Virginia Coal Association, Request for extension of comment period, April 15, 2011.

CORR-20:        J. Nathan Noland, President, Indiana Coal Council, Inc., Request for extension of comment period, April 15, 2011.

CORR-21:        Stuart A. Sanderson, President, Colorado Mining Association, Request for extension of comment period, April 15, 2011.

CORR-22:        Bruce Watzman, National Mining Association (NMA), Request for extension of comment period, April 15, 2011.

CORR-23:    U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated May 4, 2011, from Patricia W. Silvey, Deputy Assistant Secretary for Operations, to NMA (Bruce Watzman) regarding April 15, 2011, letter to MSHA.

CORR-24:  David Roberson, President, Alabama Coal Association, Request for extension of comment period, April 18, 2011.

CORR-25:    David M. Young, President, Bituminous Coal Operators' Association, Inc. (BCOA), on behalf of BCOA and the United Mine Workers of America, Request for extension of comment period, April 21, 2011.

CORR-26:  Rand Paul, United States Senator, Request for extension of comment period, May 9, 2011.

CORR-27:  U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated June 17, 2011 from Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, to the Honorable Rand Paul regarding May 9, 2011 letter to MSHA.

CORR-28:  Bruce Watzman, National Mining Association (NMA), Re: clarification on posting support materials for the proposed rule, September 12, 2011.

CORR-29:    U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances (OSRV).  Reply dated October 17, 2011, from Roslyn B. Fontaine, Acting Director, OSRV, to NMA (Bruce Watzman) regarding September 12, 2011, letter to MSHA.
CORR-30:  Bruce Watzman, National Mining Association (NMA), Request to reopen comment period, February 15, 2013.

CORR-31:  U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated March 29, 2013 from Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, to National Mining Association (Bruce Watzman) regarding February 15, 2013 letter to MSHA.

13

15

CORR-32:  Stephen A. Sanders, Appalachian Citizens' Law Center, Inc., Re: Schedule for publication of final rule, January 2, 2013

CORR-33:  U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances (OSRV).  Reply dated January 29, 2013 from George Triebsch, Director, Office of Standards, Regulations and Variances, to Appalachian Citizens' Law Center, Inc. (Stephen A. Sanders) regarding January 2, 2013 letter to MSHA.

CORR-34:  Representative Larry Bucshon and forty-five Congressional Representatives, Request to reopen comment period, April 12, 2013.

CORR-35:  U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated June 26, 2013 from Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, to the Honorable Larry Bucshon and forty-five Congressional Representatives regarding April 12, 2013 letter to MSHA.

CORR-36:  Congresssman H. Morgan Griffith, Re: concern with proposed rule for Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, June 5, 2013.

CORR-37:  U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated August 26, 2013 from Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, to the Honorable H. Morgan Griffith regarding June 5, 2013 letter to MSHA.

CORR-38:  Representative Larry Bucshon and three Congressional Representatives, Request to reopen comment period, July 22, 2013.

CORR-39:  U.S. Department of Labor, Mine Safety and Health Administration.  Reply dated February 7, 2014 from Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health, to Representative Larry Bucshon and three Congressional Representatives regarding July 22, 2013 letter to MSHA.

14

CORR-40:  Bruce Watzman, National Mining Association (NMA), Re: the technological feasibility of the proposed rule for Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, and the expert panel convened by GAO to discuss technological options, December 19, 2013

CORR-41:  Bruce Watzman, National Mining Association (NMA), Re: Government Accountability Office's April 2014 Report to Congressional Requesters, "Basis for Proposed Exposure Limit on Respirable Coal Mine Dust and Possible Approaches for Lowering Dust Levels, and technological feasibility of the proposed rule", April 10, 2014.


## BACKGROUND DOCUMENTS
Proposed Rule

BKG-1:    Akkoca, Yildiz O., G.B. Eris, B. Gulbay, S. Saryal, and G. Karabiyikoglu. 2007.  "Evaluation of the Relationship between Radiological Abnormalities and Both Pulmonary Function and Pulmonary Hypertension in Coal Workers' Pneumoconiosis." *Respirology*, 12(3):420-426.

BKG-2:    Altin, R., F. Armutcu, L. Kart, A. Gurel, A. Savranlar, and H. Ozdemir. 2004.  "Antioxidant Response At Early Stages And Low Grades of Simple Coal Worker's Pneumoconiosis Diagnosed By High Resolution Computed Tomography."  *International Journal of Hygiene and Environmental Health*, 207(5):455-62.

BKG-3:    Altin, R., A. Savranlar, L. Kart, K. Mahmutyazicioglu, H. Ozdemir, B. Akdag, and S. Gundogdu. 2004.  "Presence and HRCT Quantification of Bronchiectasis in Coal Workers."  *European Journal of Radiology*, 52(2):157-63.

BKG-4:    Industrial Union Department, AFL-CIO, *et al.* v. James D. Hodgson, Secretary, U.S. Department of Labor.  499 F.2d 467 (D.C. Cir. 1974).

15

17

BKG-5:    American Society for Quality. 2008.  *American National Standard, Sampling Procedures and Tables for Inspection by Attributes*.  ANSI/ASQ Z1.4-2008.  Milwaukee: Quality Press.

BKG-6:    Antao, V.C. dos S., E.L. Petsonk, L.Z. Sokolow, A.L. Wolfe, G.A. Pinheiro, J.M. Hale, and M.D. Attfield. 2005.  "Rapidly Progressive Coal Workers' Pneumoconiosis in the United States: Geographic Clustering and Other Factor*s." Occup Environ Med*, 62(10):670-674.

BKG-7:    Antao, V.C., E.L. Petsonk, and M.D. Attfield. 2006. "Advanced Cases of Coal Workers' Pneumoconiosis, Two Counties, Virginia." *Morbidity and Mortality Weekly Report*, 55(33):909-913.

BKG-8:    Ashford, J.R., J.W. Fay, and C.S. Smith. 1965.  "The Correlation of Dust Exposure with Progression of Radiological Pneumoconiosis in British Coal Miners."  *American Industrial Hygiene Association Journal*, Jul-Aug, 26(4):347-61.

BKG-9:    Attfield, M.D., and E.L. Petsonk. 2007.  Advanced Pneumoconiosis Among Working Underground Coal Miners - Eastern Kentucky and Southwestern Virginia. 2006."  *Morbidity and Mortality Weekly Report*, 56(26):652-655.

BKG-10:    Attfield, M.D., and E.D. Kuempel. 2003.  "Commentary – Pneumoconiosis, Coalmine Dust, and the PFR."  *The Annals of Occupational Hygiene*, 47(7):525-529.

BKG-11:    Attfield, M.D., and E.D. Kuempel. 2008.  "Mortality among U.S. Underground Coal Miners, A 23-Year Follow-Up."  *American Journal of Industrial Medicine*, 51(4):231-245; with Erratum. 2010. *American Journal of Industrial Medicine*, 53(5):550.

BKG-12:    Bang, K.M., R. Althouse, J. Kim, and S. Game. 1999. "Recent Trends of Age-Specific Pneumoconiosis Mortality Rates in the United States, 1985-1996:  Coal Workers' Pneumoconiosis, Asbestosis, and Silicosis."  *International Journal of Occupational and Environmental Health*, 5:251-255.

16

BKG-13:   Bickel, P., and K. Doksum. 1981. "An Analysis of Transformations Revisited." *Journal of the American Statistical Association*, June 1981, 76:374.

BKG-14:   Boschetto, P., S. Quintavalle, D. Miotto, N. Cascio, E. Zeni, and C. Mapp. 2006. "Chronic Obstructive Pulmonary Disease (COPD) and Occupational Exposures." *Journal of Occupational Medicine and Toxicology*, 1:11. doi:10.1186/1745-6673-1-11.

BKG-15:   Brichet, A., A.B. Tonnel, E. Brambilla, G. Devouassoux, M. Rémy-Jardin, M.C. Copin, and B. Wallaert. Groupe d'Etude en Pathologie Interstitielle (GEPI) de la Société de Pathologie Thoracique du Nord. 2002. "Chronic Interstitial Pneumonia with Honeycombing in Coal Workers." *Sarcoidosis, Vasculitis, and Diffuse Lung Diseases*, 19(3):211-9.

BKG-16:   British Standards Institute. 2006. "British Standard -- Workplace Atmospheres - General Requirements for the Performance of Procedures for the Measurement of Chemical Agents." *British Standards*, BS EN 482:2006.

BKG-17:   Cochrane, A.L., R.G. Carpenter, F. Moore, and J. Thomas. 1964. "The Mortality of Miners and Ex-Miners in the Rhondda Fach." *British Journal of Industrial Medicine*, 21(1):38-45.

BKG-18:   Cohn, C., R. Laffers, S. Simon, T. O'Riordan, and M. Schoonen. 2006. "Role of Pyrite in Formation of Hydroxyl Radicals in Coal: Possible Implications for Human Health." *Particle and Fibre Toxicology*, 3(16):1-10.

BKG-19:   Consolidation Coal Company v. Federal Mine Safety and Health Review Commission, *et al.*, 824 F.2d 1071, (D.C. Cir. 1987).

BKG-20:   Cowie, H.A., B.G. Miller, R.G. Rawbone, and C.A. Soutar. 2006. "Dust Related Risks of Clinically Relevant Lung Functional Deficits." *Occup Environ Med*, 63(5):320-325.

BKG-21:    De Andrade Jr., D., R. De Souza, S. Dos Santos, and D. De Andrade. 2005.  "Oxygen Free Radicals and Pulmonary Disease." *J Brasileiro de Pneumologia*, 31(1):60-8.

BKG-22:    Green, Francis H.Y., R. Althouse, J. Parker, J. Kahn, K. Weber, and V. Vallyathan. 1998.  "Trends in the Prevalence of Coal Workers' Pneumoconiosis in U.S. Autopsied Coal Miners." In: *Advances in the Prevention of Occupational Respiratory Diseases: Proceedings of the 9th International Conference on Occupational Respiratory Diseases,* October 13-16, 1997, edited by K. Chiyotani, Y. Hosoda, and Y. Aizawa.  Kyoto, Japan:  145-148.

BKG-23:    Green, Francis H.Y., P.L. Brower, V. Vallyathan, and M. Attfield. 1998.  "Coal Mine Dust Exposure and Type of Pulmonary Emphysema in Coal Workers."  In:  *Advances in the Prevention of Occupational Respiratory Diseases:  Proceedings of the 9th International Conference on Occupational Respiratory Diseases,* October 13-16, 1997, edited by K. Chiyotani, Y. Hosoda, and Y. Aizawa. Kyoto, Japan:  948-953.

BKG-24:    Groneberg, D., D. Nowak, A. Wussow, and A. Fischer. 2006. "Chronic Cough Due To Occupational Factors."  *Journal of Occupational Medicine and Toxicology*, 1:3.  doi:10.1186/1745-6673-1-3.

BKG-25:    Hatch, T.F., and P. Gross.  American Industrial Hygiene Association.  1964.  *Pulmonary Deposition and Retention of Inhaled Aerosols.*  New York: Academic Press Inc.

BKG-26:    Heppleston, A.G. 1988.  "Prevalence and Pathogenesis of Pneumoconiosis in Coal Workers."  *Environmental Health Perspectives*, 78:159-70.

BKG-27:    Huang, X., W. Li, M.D. Attfield, A. Nadas, K. Frenkel, and R.B. Finkelman. 2005.  "Mapping and Prediction of Coal Workers' Pneumoconiosis with Bioavailable Iron Content in the Bituminous Coals."  *Environmental Health Perspectives,* 113(8):964-968.

BKG-28:    Hurley, F., L. Kenny, and B. Miller. 2002. "Health Impact Estimates of Dust-Related Disease in UK Coal Miners:  Methodological and Practical Issues." *The Annals of Occupational Hygiene*, 46(Supplement 1): 261-264.

BKG-29:    World Health Organization, International Agency for Research on Cancer (IARC).  1997.  "Silica, Some Silicates, Coal Dust and Para-Aramid Fibrils."  *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, Volume 68.

BKG-30:    Isidro, M.I., F.G. Rego, J. Reguero, M.A. Cosío Mir, E. García-Ordás, J.L. Antón Martínez, and G. C. Martínez.  2004. "Respiratory Disease in a Cohort of 2,579 Coal Miners Followed Up over a 20-Year Period."  *Chest*, 126(2):622-9.

BKG-31:    Peters, Bob, C. Vaught, E. Hall. 2007. Joseph A. Holmes Safety Association, National Meeting and Training Seminar. June 5-7, 2007.  PowerPoint presentation, "Miners' Response to Personal Dust Monitors."

BKG-32:    Kennecott Greens Creek Mining Company v. MSHA and Secretary of Labor, 476 F.3d 946 (D.C. Cir. 2007).

BKG-33:    Kenny, L.C., F. Hurley, and N.D. Warren. 2002. Estimation of the Risk of Contracting Pneumoconiosis in the UK Coal Mining Industry. The Annals of Occupational Hygiene, 46(Supplement 1):257-60.

BKG-34:    Kizil, G.V., and A.M. Donoghue. 2002.  "Coal Dust Exposures in the Longwall Mines of New South Wales, Australia: A Respiratory Risk Assessment."  *Occup Med*, 52(3):137-49.

BKG-35:    Kuempel, E.D., M.D. Attfield, V. Vallyathan, N.L. Lapp, J.M. Hale, R.J. Smith, and V. Castranova.  2003.  "Pulmonary Inflammation and Crystalline Silica In Respirable Coal Mine Dust: Dose-Response."  *Journal of Biosciences*. 28(1):61-69.

19

BKG-36:   Kuempel, E.D., C.L. Tran, A.J. Bailer, R.J. Smith, D.A. Dankovic, and L.T. Stayner. 2001.  "Methodological Issues of Using Observational Human Data in Lung Dosimetry Models for Particulates."  *The Science of the Total Environment*, 274(1-3), 67-77.

BKG-37:   Laney, A., E. Petsonk, and M. Attfield.  2009. "Pneumoconiosis among Underground Bituminous Coal Miners in the United States: Is Silicosis Becoming More Frequent?" published online September 22, 2009; doi:10.1136/oem.2009.047126.

BKG-38:   Lee, H.S., W.H. Phoon, and  T.P. Ng. 2001.  "Radiological Progression and Its Predictive Risk Factors in Silicosis."  *Occup Env Med,* 58(7):467–471.

BKG-39:   Li, C.Y., and F.C. Sung. 1999.  "A Review of the Healthy Worker Effect in Occupational Epidemiology."  *Occup Med,* 49(4), 225-229.

BKG-40:   Luppi, F., and P. Hiemstra, 2007.  "Epithelial Responses to Oxidative Stress in Chronic Obstructive Pulmonary Disease:  Lessons from Expression Profiling."  *Am J Respir Crit Care Med*, 175(6):527-528.

BKG-41:   MacCalman, L. and B. Miller. 2009.  "Mortality in an Extended Follow-Up of British Coal Workers."  In *Proceedings of Inhaled Particles X*, Manchester, UK.  *Journal of Physics:  Conference Series 151* (2009), 012050, September 23-25, 2008.  doi:10.1088/1742-6596/151/1/012050.

BKG-42:   Maher, Kris. 2009.  "Black Lung on Rise in Mines, Reversing Trend."  *The Wall Street Journal,* December 15, 2009.

BKG-43:   Marek, K., and K. Lebecki. 1999.  "Occurrence and Prevention of Coal Miners' Pneumoconiosis in Poland."  *American Journal of Industrial Medicine*, 36(6):610-617.

BKG-44:   Mamuya, S.H.D., M. Bråtveit, Y. Mashalla, and B.E. Moen. 2007.  "High Prevalence of Respiratory Symptoms among Workers in

20

22

the Development Section of a Manually Operated Coal Mine in a Developing Country: A Cross Sectional Study." *BMC Public Health*, 7:17. doi:10.1186/1471-2458-7-17.

BKG-45:   McCunney, R., P. Morfeld, and S. Payne. 2009. "What Component of Coal Causes Coal Workers Pneumoconiosis?" *Journal of Occupational and Environmental Medicine,* 51(4):462-471.

BKG-46:   Miller, B.G., D. Buchanan, J. Hurley, P. Hutchison, C. Soutar, A. Pilkington, and A. Robertson. 1997. "The Effects of Exposure to Diesel Fumes, Low-Level Radiation, and Respirable Dust and Quartz, on Cancer Mortality in Coalminers." *Institute of Occupational Medicine*, Historical Research Report TM/97/04.

BKG-47:   Miller, B.G., and L. MacCalman. 2009. "Cause-specific Mortality In British Coal Workers and Exposure to Respirable Dust and Quartz." *Occup Environ Med,* 2010; 67:270-276; E-pub October 2009.

BKG-48:   Miyazaki, M., and H. Une. 2001. "Risk of Lung Cancer Among Japanese Coal Miners On Hazard Risk And Interaction Between Smoking And Coal Mining." *J Occup Health*, 43:225-230.

BKG-49:   Morfeld, P., J. Ambrosy, U. Bengtsson, H. Bicker, B. Kalkowsky, A. Kosters, H. Lenaerts, M. Ruther, H.J. Vautrin, and C. Piekarski. 2002. "The Risk of Developing Coal Workers' Pneumoconiosis in German Coal Mining Under Modern Mining Conditions." *The Annals of Occupational Hygiene*, 46(Supplement 1): 251-253.

BKG-50:   Naidoo, R.N., T.G. Robins, M. Becklake, N. Seixas, and M.L. Thompson. 2007. "Cross-Shift Peak Expiratory Flow Changes Are Unassociated With Respirable Coal Dust Exposure Among South African Coal Miners." *American Journal of Industrial Medicine*, 50(12):992-998.

BKG-51:   Naidoo, R.N., T.G. Robins, N. Seixas, U.G. Lalloo, and M. Becklake. 2005. "Differential Respirable Dust Related Lung Function Effects Between Current And Former South African Coal Miners."

21

*International Archives of Occupational and Environmental Health*, 78(4):293-302.

BKG-52:    Naidoo, R.N., T.G. Robins, N. Seixas, U.G. Lalloo, and M. Becklake. 2006.  "Respirable Coal Dust Exposure And Respiratory Symptoms in South-African Coal Miners: A Comparison of Current And Ex-Miners*."* Journal of Occupational and Environmental Medicine. 48(6):581-90.

BKG-53:    Naidoo, R.N., T.G. Robins, A. Solomon, N. White, and A. Franzblau. 2004.  "Radiographic Outcomes among South African Coal Miners."  *International Archives of Occupational and Environmental Health,* 77(7):471-81.

BKG-54:    National Mining Association v. Mine Safety and Health Administration and Secretary of Labor, 116 F.3d 520 (D.C. Cir. 1997).

BKG-55:    National Mining Association, *et al.* v. Secretary of Labor, *et al.* 153 F.3d 1264 (11th Cir. 1998).

BKG-56:    National Petrochemical & Refiners Association v. Environmental Protection Agency, 287 F.3d 1130 (D.C. Cir. 2002).

BKG-57:    Newman-Taylor, A., and D. Coggon. 1999.  "Industrial Injuries Benefits for Coal Miners with Obstructive Lung Disease."  *Thorax*, 54(3):282.

BKG-58:    Page, S., D. Tuchman, and R. Vinson. 2007.  "Thermally Induced Filter Bias in TEOM Mass Measurement."  *Journal of Environmental Monitoring*, 9(7), 760-767.

BKG-59:    Peng, K.L., M.L. Wang, Q.G. Du, Y.D. Li, M.D. Attfield, G.H. Han, E.L. Petsonk, S.K. Li, and Z.E. Wu. 2005.  "Early Change of Pulmonary Ventilation in New Coal Miners."  *Chinese Journal of Industrial Hygiene and Occupational Diseases*, Abstract Plus, 23:105-108.

24

BKG-60:    Peters, R.H., C. Vaught, E. Hall, and J. Volkwein. 2007. "Miners' Views About Personal Dust Monitors." *Journal of the International Society for Respiratory Protection*, Vol. 24, Fall/Winter 24(III-IV), 74-92.

BKG-61:    Peters, R.H., C. Vaught, E. Hall, and J. Volkwein. 2008. "Miners' Views About Personal Dust Monitors." *Information Circular 9501*, Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 2008-110.

BKG-62:    Peters, T., and J.C. Volkwein. 2003. "Analysis of Sampling Line Bias on Respirable Mass Measurement." *Applied Occupational and Environmental Hygiene*, 18(6):458-465.

BKG-63:    Pollock, D.E., J.D. Potts, G.J. Joy. 2009. "Investigation into Dust Exposures and Mining Practices In Mines In The Southern Appalachian Region." SME Annual Meeting and Exhibit, February 22-25, 2009, Denver, CO. NIOSHTIC-2 No. 20035147.

BKG-64:    Pon, M.R.L., R.A. Roper, E.L. Petsonk, M.L. Wang, R.M. Castellan, M.D. Attfield, and G.R. Wagner. 2003. "Pneumoconiosis Prevalence Among Working Coal Miners Examined In Federal Chest Radiograph Surveillance Programs – United States, 1996-2002." *Morbidity and Mortality Weekly Report*, 52(15):336-340.

BKG-65:    Reed, W.R., J.C. Volkwein, and G.J. Joy. 2007. "A Company-Perspective Cost Analysis of The Personal Dust Monitor (PDM)." *The International Journal of Mineral Resources Engineering*, 12(3):179-202.

BKG-66:    Ross, M.H, and J. Murray, 2004. "Occupational Respiratory Disease in Mining." *Occupational Medicine*, 54(5):304-310.

BKG-67:    Scarisbrick, D.A., and R.M. Quinlan, 2002. "Health Surveillance For Coal Workers' Pneumoconiosis in the United Kingdom 1998–2000." *The Annals of Occupational Hygiene*, 46(Supplement 1):254-256.

23

BKG-68:    Seaton, A. 1995. "Coal Workers' Pneumoconiosis." In: *Occupational Lung Diseases*, 3rd edition, edited by W.K.C. Morgan and A. Seaton, Philadelphia: W.B. Saunders Co., 374-406.

BKG-69:    Secretary of Labor v. Excel Mining LLC, 334 F.3d 1 (D.C. Cir. 2003).

BKG-70:    Secretary of Labor v. Keystone Coal, 16 FMSHRC 6 (1994).

BKG-71:    Scott, D.F., R.L. Grayson, E.A Metz. 2004. "Disease and Illness in U.S. Mining, 1983-2001." *Journal of Occupational and Environmental Medicine*, 46(12) 1272-1277.

BKG-72:    Smith, D.R., and P.A. Leggat. 2006. "24 Years of Pneumoconiosis Mortality Surveillance in Australia." *J Occup Health*, 48(5):309-13.

BKG-73:    Soutar, C., S. Campbell, D. Gurr, M. Lloyd, R. Love, H. Cowie, and A. Seaton. 1993. "Important Deficits of Lung Function in Three Modern Colliery Populations, Relations With Dust Exposure." *American Review of Respiratory Disease*, 147(4):797-803.

BKG-74:    Thermo Scientific and NIOSH. 2009. PowerPoint Presentation at PDM 3600 Workshop, May 28, June 8, and June 16, 2009.

BKG-75:    Thermo Fisher Scientific, 2008. "PDM 3600 Instruction Manual: Personal Dust Monitor. 13 May 2010.

BKG-76:    Todilto Exploration and Development Corporation v. Secretary of Labor, MSHA, 5 FMSHRC 1894 (1983).

BKG-77:    Tuchman, D.P., J.C. Volkwein, and R.P. Vinson. 2008. "Implementing Infrared Determination Of Quartz Particulates On Novel Filters For A Prototype Dust Monitor." *Journal of Environmental Monitoring*, 10(5):671-678.

BKG-78:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.  "Personal Dust Monitor, A Tool To Empower Miners To Protect Their Health."  *Fact Sheet*.

BKG-79:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH). 2007.  "Facilitating the Use of Personal Dust Monitors."  Hall, E., C. Vaught, and B. Peters, PowerPoint presentation at TRAM/National Mine Instructors Seminar, Beaver, WV, October 9-11, 2007.

BKG-80:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH).  "MSHA Training Personal Dust Monitor: The Basics."  Peters, B., C. Vaught, B. Vinson, and E. Hall, PowerPoint presentation.

BKG-81:    U. S. Department of Health and Human Services, Centers for Disease Control and Prevention. 2004.  "Changing Patterns of Pneumoconiosis Mortality-United States, 1968-2000."  *Morbidity and Mortality Weekly Report*, 53(28): 627-632.

BKG-82:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH). 2004.  "NIOSH Research in Coal Dust and Explosions."  In: *Proceedings of the 13th International Conference on Coal Research*, edited by F. Weitang (Shanghai, China, October 26-29, 2004).  Beijing, China:  China National Coal Association, Department of International Cooperation, 179-186.

BKG-83:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH). 2008.  "Continuous Personal Dust Monitor Accuracy Testing."  June 23, 2008.

BKG-84:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational

25

27

Safety and Health (NIOSH). 2008. "Work-related Lung Disease Surveillance Report, 2007, Volume 1." NIOSH Publication No. 2008-143a. Morgantown, WV. On the web: http://www.cdc.gov/niosh/docs/2008-143/

BKG-85:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH). 2010. "Best Practices For Dust Control In Coal Mining." *Information Circular 9517.* DHHS (NIOSH) Publication No. 2010-110.

BKG-86:    U.S. Department of Health and Human Services, Public Health Service. 2010. 42 CFR Part 37-"Specifications for Medical Examinations of Underground Coal Miners."

BKG-87:    U.S. Department of Labor, Mine Safety and Health Administration. 1996. "Calibration and Maintenance Procedures for Coal Mine Respirable Dust Samplers." *Informational Report 1240.*

BKG-88:    U.S. Department of Labor, Mine Safety and Health Administration. Memo to Docket for "Proposed Rule, Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, Regulation identifier number (RIN) 1219-AB64," incorporating dockets for (1) RIN 1219-AB14 (Plan verification); (2) RIN 1219-AB18 (Single-sample); and (3) RIN 1219-AB48 (CPDM).

BKG-89:    U.S. Department of Labor, Mine Safety and Health Administration. 2003. "Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust, Proposed rule, notice of public hearings, close of record." *Federal Register*, 68 FR 10784, March 6, 2003.

BKG-90:    U.S. Department of Labor, Mine Safety and Health Administration. 2010. Compact Disk, 2009 Mine, Employment, and Production Data.

BKG-91:    U.S. Department of Labor, Mine Safety and Health Administration. 2008. Program Policy Letter, P08-III-01, "Replacing

26

Social Security Numbers With A Unique Identifier - MSHA Individual Identification Number (MIIN)," April 21, 2008.

BKG-92:   U.S. Department of Labor, Mine Safety and Health Administration. 2009. "Respirable Coal Mine Dust: Continuous Personal Dust Monitor (CPDM), Request for Information." Federal Register Notice, 74 FR 52708, October 14, 2009.

BKG-93:   United Steelworkers of America, AFL-CIO-CLC v. Secretary of Labor, U.S. Department of Labor *et al.*, 647 F.2d 1189 (D.C. Cir. 1980).

BKG-94:   Vallyathan, V., F. Green, P. Brower, and M. Attfield. 1997. "The Role of Coal Mine Dust Exposure in the Development of Pulmonary Emphysema." *Ann Occup Hyg*, 41(Supplement 1):352-357.

BKG-95:   Vaught, C., R.H. Peters, E. Hall, J.C. Volkwein. 2008. "Coal Miner Responses to the Personal Dust Monitor." *Coal Age*, 113(4)42-47.

BKG-96:   Vinson, R., J. Volkwein, and L. McWilliams. 2007. "Determining the Spatial Variability of Personal Sampler Inlet Locations." *Journal of Occupational and Environmental Hygiene*, 4:708-714.

BKG-97:   Volkwein, J.C., D.P. Tuchman, and R.P. Vinson. 2002. "Performance of a Prototype Personal Dust Monitor For Coal Mine Use." *Mine Ventilation*, De Souza ed., 633-639, ISBN 90-5809-3875.

BKG-98:   Volkwein, J.C. 2008. "Analysis of Particulate Contamination In Personal Dust Monitor Sampling. In: *12th U.S./North American Ventilation Symposium*, Reno, Nevada, June 9-11, 2008. Wallace, Jr. K.G. ed., ISBN 978-0-615-20009-5.

BKG-99:   Volkwein, J.C., S.E. Mischler, E.D. Thimons, R.J. Timko, and F.N. Kissell. 2005. "State of the Art in Monitoring Respirable Mine Aerosols." Paper presented at *31st Biennial International Conference of Safety in Mines Research Institutes*, Health and Safety

Mining Research for a Sustainable Future, Brisbane, Queensland, Australia, 2-5 October 2005, 1-10.

BKG-100:  Volkwein, J.C., E. Thimons, D. Dunham, H. Patashnick, and E. Rupprecht.  2004.  "Development and Evaluation of a New Personal Dust Monitor for Underground Mining Applications."  In:  *Proceedings of the 29th International Technical Conference on Coal Utilization & Fuel Systems*, Clearwater, Florida, April 18-22, 2004.

BKG-101:  Volkwein, J.C., E. Thimons, C. Yanak, D. Dunham, H. Patashnick, and E. Rupprecht.  2004.  "Implementing a New Personal Dust Monitor as an Engineering Tool."  *Coal Age*, December 2004, 26-29.

BKG-102:  Wang, M.L., E.L. Petsonk, L.A. Beeckman, and G.R. Wagner.  1999.  "Clinically Important $FEV_1$ Declines Among Coal Miners:  An Exploration of Previously Unrecognized Determinants."  *Occup Environ Med*, 56(12):837-844.

BKG-103:  Wang, M.L., Z.E. Wu, Q.G. Du, K.L. Peng, Y.D. Li, S.K. Li, G.H. Han, and E.L. Petsonk.  2007.  "Rapid Decline in Forced Expiratory Volume in 1 Second ($FEV_1$) and the Development of Bronchitic Symptoms among New Chinese Coal Miners."  *J Occup Environ Med*, 49(10):1143-8.

BKG-104:  Wang, M.L., Z.E. Wu, Q.G. Du, E.L. Petsonk, K.L. Peng, Y.D. Li, S.K. Li, G.H. Han, and M.D. Attfield.  2005.  "A Prospective Cohort Study among New Chinese Coal Miners:  The Early Pattern of Lung Function Change."  *Occup Environ Med*, 62(11):800-805.

BKG-105:  Wang, X., I.T.S. Yu, T.W. Wong, and E. Yano.  1999.  "Respiratory Symptoms and Pulmonary Function in Coal Miners:  Looking Into the Effects of Simple Pneumoconiosis."  *American Journal of Industrial Medicine*, 35(2):124-131.

BKG-106:  Wu, H., A.D.S. Gillies, J.D. Volkwein, and J. Noll.  2009.  "Real-Time DPM Ambient Monitoring In Underground Mines."  In:  Proceedings of Ninth International Mine Ventilation Congress, *Mine*

28

*Ventilation*, Volume 2, Panigrahi, D.C. ed., New Hampshire: Science Publishers, 822-830.

BKG-107:  Yang, S.C., and S.P. Yang.  2003.  "Ventilatory Function of Progressive Massive Fibrosis among Bituminous Coal Miners in Taiwan."  *Archives of Environmental Health*, May 2003, 58(5):290-297.

BKG-108:  Yeoh, C.I., and S.C. Yang.  2002.  "Pulmonary Function Impairment in Pneumoconiotic Patients with Progressive Massive Fibrosis."  *Chang Gung Medical Journal*, 25(2):72-80.

BKG-109:  Young, R.C. Jr., R.E. Rachal, P.G. Carr, and H.C. Press. 1992.  "Patterns of Coal Workers' Pneumoconiosis in Appalachian Former Coal Miners."  *Journal of the National Medical Association*, 84(1):41-48.

BKG-110:  Yucesoy, B., V.J. Johnson, M.L. Kashon, K. Fluharty, V. Vallyathan, and M.I. Luster.  2005.  "Lack of Association between Antioxidant Gene Polymorphisms and Progressive Massive Fibrosis in Coal Miners."  *Thorax*, 60(6):492-5.

BKG-111:  Zhang, Q., J. Dai, A. Ali, L. Chen, and X. Huang.  2002. "Roles of Bioavailable Iron and Calcium in Coal Dust-Induced Oxidative Stress: Possible Implications in Coal Workers' Lung Disease."  *Free Radical Research*, 36(3):285-94.

BKG-112:  Zhang, Q., and X. Huang.  2005.  "Addition of Calcite Reduces Iron's Bioavailability in the Pennsylvania Coals – Potential Use of Calcite for the Prevention of Coal Workers' Lung Diseases."  *Journal of Toxicology and Environmental Health*, Part A, 68(19):1663-79.

BKG-113:  U.S. Department of Labor, Mine Safety and Health Administration.  *Environmental Assessment for Proposed Rule on Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors*.

<u>Final Rule</u>

2BKG-114:     Alli, B.O.  2008.  *Fundamental Principles of Occupational Health and Safety*, Second edition, International Labour Office, Geneva, Switzerland.

2BKG-115:     Attfield, M.D., E.D. Kuempel, and G. Wagner.  1997. "Exposure-Response for Coal Workers' Pneumoconiosis in Underground Coal Miners:  A Discussion of Issues and Findings."  *Annals of Occupational Hygiene*, 41(Supplement 1): 341-345.

2BKG-116:     Bailer, A.J., L.T. Stayner, R.J. Smith, E.D. Kuempel, M.M. Prince.  1997.  "Estimating Benchmark Concentrations and Other Noncancer Endpoints in Epidemiology Studies."  *Risk Analysis*, 17(6):771-780.

2BKG-117:     Bates, D.V., Q.T. Pham, N. Chau, C. Pivoteau, J. Dechoux, and P. Sadoul.  1985.  "A Longitudinal Study of Pulmonary Function in Coal Miners in Lorraine, France."  *American Journal of Industrial Medicine*, 8:21-32.

2BKG-118:     Boden, L.  1986.  "Evaluating Dust Exposure Using Operator-Reported Data."  *Ann Am Conf Gov Ind Hyg*, 14:521-526.

2BKG-119:     Brower, P.S., and M.D. Attfield.  1998.  "Reliability of Reported Occupational History Information for US Coal Miners, 1969-1977."  *Am J Epidemiol*, 148(9):920-926.

2BKG-120:     Dempsey, P.G., M.M. Ayoub, T.M. Bernard, M.R. Endsley, W. Karwowski, C.L. Lin, and J.L. Smith.  1996.  "Ergonomic Investigation of Letter-Carrier Satchels: Part I: Field Study."  *Applied Ergonomics*, 27(5):303-313.

2BKG-121:     International Council on Mining & Metals.  2009. *Good Practice Guidance on Occupational Health Risk Assessment*, London, United Kingdom.

2BKG-122:    International Labour Office.  2002.  "Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses, 2000 edition." *Occupational Safety and Health Series No. 22,* Geneva, Switzerland.

2BKG-123:    International Labour Office.  2011.  "Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses, 2011 edition." *Occupational Safety and Health Series No. 22,* Geneva, Switzerland.

2BKG-124:    Kuempel, E.D., E.J. O'Flaherty, L.T. Stayner, M.D. Attfield, F.H.Y. Green, and V. Vallyathan.  1997.  "Relationships between Lung Dust Burden, Pathology and Lifetime Exposure in an Autopsy Study of U.S. Coal Miners." *Ann Occup Hyg*, 41(Supplement 1):384-389.

2BKG-125:    Leidel, N., K. Busch, and J. Lynch.  1977. *Occupational Exposure Sampling Strategy Manual.*  DHHS (NIOSH) Publication No. 77-173.  U.S. Department of Health, Education and Welfare, Public Health Service, Centers for Disease Control, National Institute for Occupational Safety and Health, Cincinnati, OH 45226.

2BKG-126:    Lin, C.J., P.G. Dempsey, J.L. Smith, M.M. Ayoub, and T.M. Bernard.  1996.  "Ergonomic Investigation of Letter-Carrier Satchels:  Part II.  Biomechanical Laboratory Study." *Applied Ergonomics*, 27(5):315-320.

2BKG-127:Lyons, J.P., and H. Campbell.  1981.  "Relation between Progressive Massive Fibrosis, Emphysema, and Pulmonary Dysfunction in Coalworkers' Pneumoconiosis." *Br J Ind Med,* 38:125-129.

2BKG-128:    Mazurek, J.M., A.S. Laney, and J.M. Wood.  2009. "Coal Workers' Pneumoconiosis-Related Years of Potential Life Lost Before Age 65 Years - United States, 1968-2006." *Morbidity and Mortality Weekly Report*, 58(50);1412-1416.

2BKG-129:    Miller, B.G., S. Hagen, R.G. Love, H.A. Cowie, M.W. Kidd, S. Lorenzo, E.L.J.P. Tielemans, A. Robertson, and C.A. Soutar.

31

1995.  *Historical Research Report, A Follow-Up Study of Miners Exposed to Unusual Concentrations of Quartz.*  Research Report TM/95/03:164.  Edinburgh: Institute of Occupational Medicine.

2BKG-130:    Neter, J., M.H. Kutner, C. Nachtsheim, and W. Wasserman.  1996.  *Applied Linear Statistical Models*, 4th edition. Boston:WBC-McGraw-Hill.

2BKG-131:    Peters, R. H., B. Fotta, and L.G. Mallett.  2001.  "The Influence of Seam Height on Lost-Time Injury and Fatality Rates at Small Underground Bituminous Coal Mines."  *Appl Occup Environ Hyg*, 16(11):1028-34.

2BKG-132:    Pollock, D., J. Potts, and G. Joy.  2010.  "Investigation into Dust Exposures and Mining Practices in Mines in the Southern Appalachian Region."  *Mining Engineering*, 62:44-9.

2BKG-133:    Rider, J.P., and J.F. Colinet.  2011.  "Benchmarking Longwall Dust Control Technology and Practices."  U.S. DHHS, CDC, NIOSHTIC2 Number 20039782.  *Mining Engineering*, 63(9):74-80.

2BKG-134:    Rubin, R.  2012.  *Rubin's Pathology: Clinicopathologic Foundations of Medicine*, 6th edition.  Lippincott Williams and Wilkins.

2BKG-135:    State of West Virginia, Governor's Independent Investigation Panel.  2011.  *Report to the Governor, Upper Big Branch, The April 5, 2010, Explosion: A Failure of Basic Coal Mine Safety Practices.*

2BKG-136:    Taylor, D.G., R.E. Kupel, and J.M. Bryant.  1977. *Documentation of the NIOSH Validation Tests*, U.S. Department of Health, Education, and Welfare, Public Health Service, Centers for Disease Control, NIOSH, DHEW (NIOSH) Publication No. 77-185, April 1977, pp. 1-5.

2BKG-137:    U.S. Department of Defense.  2000.  *Test Method Standard for Environmental Engineering Considerations and*

*Laboratory Tests*, MIL-STD-810F (Superseded MIL-STD-810E, 14 July 1989), January 1, 2000.

2BKG-138:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH).  2007.  *NIOSH Respiratory Diseases Research Program Evidence Package for the National Academies' Review, 2006-2007, 3.1a) Verification that the Enacted Coal Mine Dust Standard Protects Miners.*
http://www.cdc.gov/niosh/nas/rdrp/ch3.1a.htm

2BKG-139:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (NIOSH).  2010.  *Engineering Controls – NIOSH Workplace Safety and Health Topic.*
http://www.cdc.gov/niosh/topics/engcontrols, June 25, 2010.

2BKG-140:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.  2011.  Letter dated September 6, 2011, from Steven E. Mischler, *et al.* to Alan Matta, Product Manager, Air Quality Instruments, Thermo Fisher Scientific, Inc., re: Approval of the model PDM 3600 TEOM instrument.

2BKG-141:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.  2011.  *Current Intelligence Bulletin 64, Coal Mine Dust Exposure and Associated Health Outcomes, A Review of Information Published Since 1995.*  DHHS Publication No. 2011-72.

2BKG-142:    U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.  2011. *Coal Workers' Health Surveillance Program (CWHSP), Statistics for Underground Miners Working In MSHA Districts 01 to 11*, from Data Queries: February 13, 2011.

33

2BKG-143:     U.S. Department of Labor, Division of Coal Mine Workers' Compensation, Black Lung Program Statistics.  2012.  *Black Lung Program Benefit Payment Totals By Year, 1970-2011.* http://www.dol.gov/owcp/dcmwc/statistics/TotalBenefitsPayment.htm.

2BKG-144:     U.S. Department of Labor, Mine Safety and Health Administration.  2011.  *Infrared Determination of Quartz in Respirable Coal Mine Dust.*  MSHA Method No. P-7, September 2011.

2BKG-145:     U.S. Department of Labor, Mine Safety and Health Administration, Coal Division of Health.  2012.  *CY 2009 Operator Dust Sample Count by Void Code.*  March 20, 2012.

2BKG-146:     U.S. Department of Labor, Mine Safety and Health Administration, Coal Division of Health.  2012.  *MSHA Longwall Surveys with Adjusted Concentrations of 1.5 mg/m³ Dust Controls, Oct–Dec 2009.*  April 17, 2012.

2BKG-147:     U.S. Department of Labor, Mine Safety and Health Administration, Coal Division of Health.  2012.  *MSHA Random Non-Longwall Surveys with Adjusted Concentrations of 1.5 mg/m³ Dust Controls, Oct–Dec 2009.*  April 17, 2012.

2BKG-148:     U.S. Department of Labor, Mine Safety and Health Administration, Pittsburgh Safety and Health Technology Center. 2012.  *Gravimetric Determination of Mine Dust Collected on Tared Filter Cassettes.*  MSHA Method No. P-19, November 2012.

2BKG-149:     U.S. Department of Labor, Mine Safety and Health Administration.  2009.  "Operator Respirable Dust Sampling Requirements."  Program Information Bulletin No. P09-31, August 25, 2009.

2BKG-150:     U.S. Department of Labor, Mine Safety and Health Administration.  *Environmental Assessment for Final Rule on Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors.*

34

2BKG-151:     U.S. Department of Labor, Office of Workers' Compensation Programs, Black Lung Benefits Act: Standards for Chest Radiographs, Direct final rule, request for comments, 20 CFR § 718.304, Irrebuttable presumption of total disability or death due to pneumoconiosis.  Federal Register Notice, 78 FR 35549, 35556, June 13, 2013.

2BKG-152:     Wade, W.A., E.L. Petsonk, B. Young, and I. Mogri. 2011.  "Severe Occupational Pneumoconiosis among West Virginian Coal Miners: One Hundred Thirty-eight Cases of Progressive Massive Fibrosis Compensated Between 2000 and 2009."  *Chest*, 139(6):1458-62. Epub 2010 Sep 30, 2010.

2BKG-153:     Wagner, G.R., M.D. Attfield, R.D. Kennedy, and J.E. Parker.  1992.  "The NIOSH B Reader Certification Program.  An Update Report."  *Journal of Medicine,* 34(9):879-884.

2BKG-154:     West, J.B.  2013.  *Pulmonary Pathophysiology: The Essentials*, 8th edition.  Lippincott Williams & Wilkins, 2013.

COMMENTS

COMM-1:  John Taylor Bielecki, MD, MPH, Maine General Medical Center, Workplace Health, November 1, 2010.

COMM-2:  Fred Rweru, Eastern Kentucky University, November 15, 2010.

COMM-3:  David Fitzpatrick, Five Star Mining, Inc., November 15, 2010.

COMM-4:  Brandon Tackett, December 2, 2010.

COMM-5:  Mac B. Porter, December 3, 2010.

COMM-6:  Leonard Fleming, February 15, 2011.

35

COMM-7:  Keith Laslow, PG, Vice President, Independent Miners & Associates, Inc., Anthracite Underground Miners, February 15, 2011.

COMM-8:  Alfred J. Brown, President, Independent Miners & Associates, Inc., Anthracite Underground Miners, February 22, 2011.

COMM-9:  Katherine H. Kirkland, MPH, Executive Director, Association of Occupational and Environmental Clinics, February 24, 2011.

COMM-10:    Natalie P. Hartenbaum, MD, MPH, FACOEM, President, American College of Occupational and Environmental Medicine, February 28, 2011.

COMM-11:    Ron Slaton, March 3, 2011.

COMM-12:    Wesley T. Campbell, Manager of Safety and Training, Tri County Coal Co., LLC, Crown III Mine, March 4, 2011.

COMM-13:    John D. Blankenship, TECO Energy, March 11, 2011.

COMM-14:    Mark McCowan, March 14, 2011.

COMM-15:    Joe Smith, March 22, 2011.

COMM-16:    Ashanta Evie Lena Savage, March 30, 2011.

COMM-17:    Perry County Coal Corporation, April 8, 2011.

COMM-18:    Beau Zoeller, Indiana University School of Law, April 15, 2011.

COMM-19:    Carol Rice, PhD, CIH, Professor, Department of Environmental Health, University of Cincinnati, May 2, 2011.

COMM-20:    Shelly Rigsby, Program Coordinator, Southern Illinois and Southwest Indiana Respiratory Disease Program, May 2, 2011.

36

COMM-21:      Joe Massie, President, National Black Lung Association, May 2, 2011.

COMM-22:      Robert Cohen, MD, FCCP, Director, Pulmonary and Critical Care Medicine, Cook County Health and Hospitals System, May 3, 2011.

COMM-23:      Hannah Morgan, Field Organizer in southwest Virginia Coalfields, Sierra Club, May 3, 2011.

COMM-24:      Michael T. Brandt, DrPH, CIH, PMP, President, American Industrial Hygiene Association (AIHA), May 5, 2011.

COMM-25:      Paul A. Schulte, Ph.D., Director, Education and Information Division, National Institute for Occupational Safety and Health (NIOSH), May 5, 2011, with attachment: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health. 2011. *Current Intelligence Bulletin 64, Coal Mine Dust Exposure and Associated Health Outcomes, A Review of Information Published Since 1995.* DHHS Publication No. 2011-72.

COMM-26:      Dean E. Schraufnagel, MD, President, American Thoracic Society (ATS), May 5, 2011.

COMM-27:      Robert A. Weber, Manager, Regulatory Affairs, Quality Assurance and Technical Service, 3M Occupational Health & Environmental Safety Division, May 5, 2011.

COMM-28:      Frank Barker, May 16, 2011.

COMM-29:      Thomas E. McNider, Walter Energy, Jim Walter Resources, May 18, 2011.

COMM-30:      Irene Estep, May 18, 2011.

COMM-31:      Edgar J. Huggins, May 20, 2011.

COMM-32:        Chester Baker, May 20, 2011.

COMM-33:        Ample Hill, May 20, 2011.

COMM-34:        Floyd Ratliff, May 20, 2011.

COMM-35:        Anna Mae Holt, May 20, 2011.

COMM-36:        Billy J. Maggard, May 20, 2011.

COMM-37:        Don Hayes Sr., May 20, 2011.

COMM-38:        Erik Vermulen, CIH, May 20, 2011.

COMM-39:        Mrs. Young, May 23, 2011.

COMM-40:        Stephen A. Sanders, Attorney at Law, Appalachian
Citizens' Law Center, Inc., May 23, 2011.

COMM-41:        Bobby D. Branham, May 23, 2011.

COMM-42:        Ralph Varney, May 23, 2011.

COMM-43:        Ronald Martin, May 23, 2011.

COMM-44:        Lois J. Belcher, May 23, 2011.

COMM-45:        Black Panther Mining, Inc., May 23, 2011.

COMM-46:        Five Star Mining, Inc., May 23, 2011.

COMM-47:        Stephen A. Sanders, Attorney at Law, Appalachian
Citizens' Law Center, Inc., May 23, 2011.

COMM-48:        Thurman Holcomb, Arch Coal, May 25, 2011.

COMM-49:        Paul Burke, May 26, 2011.

COMM-50:      Helen Taylor, May 31, 2011.

COMM-51:      Randall Hall, May 31, 2011.

COMM-52:      Clarrice Howard, June 2, 2011.

COMM-53:      Novella Mullis, June 6, 2011.

COMM-54:      Leslie I. Boden, PhD; Richard Clapp, DSc, MPH; Andrea M. Hricko, MPH; Katherine H. Kirkland, DrPH, MPH; Charles Levenstein, PhD, MSOH; Gerald Markowitz, PhD; J. Davitt McAteer, JD; Celeste Monforton, DrPH, MPH; Karen B. Mulloy, DO; David Ozonoff, MD, MPH; Carol Rice, PhD, CIH; Anthony Robbins, MD, MPA; Beth Rosenberg, ScD, MPH; David Rosner, PhD; and David H. Wegman, MD, MPH, June 10, 2011.

COMM-55:Anthony S. Bumbico, Vice President of Safety, Arch Coal, Inc., June 14, 2011.

COMM-56:Mark O. Eslinger, PE, General Safety Manager, Five Star Mining, Inc., Black Panther Mining, LLC, June 15, 2011.

COMM-57:Edward M. Green, Crowell & Moring LLP, on behalf of Alliance Coal, Alpha Natural Resources, Arch Coal, BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy, June 20, 2011, with attachments.

COMM-57-1:      John F. Gamble, PhD, Curriculum Vitae, 2006.

COMM-57-2:      Robert Bernier Reger, Curriculum Vitae.

COMM-57-3:      Robert E. Glenn, CIH, MPH, Glen Consulting Group, LLC, Curriculum Vitae.

COMM-57-4:      Suarthana, E., A.S. Laney, E. Storey, J.M. Hale, and M.D. Attfield.  2011.  "Coal Workers' Pneumoconiosis in the United States:  Regional Differences 40 Years after Implementation of the 1969

39

41

Federal Coal Mine Health and Safety Act." *Occup Environ Med* (2011). doi: 10.1136/oem.2010.063594.  Epub 2011, May 19, 2011.

COMM-57-5:    Robert E. Glenn.  2011.  A Critical Review of the Paper "Coal Workers' Pneumoconiosis in the United States:  Regional Differences 40 Years after Implementation of the 1969 Federal Coal Mine Health and Safety Act" By Suarthana, *et al.*  June 10, 2011.

COMM-57-6:    Energy West Mining Company's Petition for Rulemaking to Amend 30 CFR Part 70 Mandatory Health Standards – Underground Coal Mines, To Allow Use Of Airstream Helmets Or Other NIOSH-Approved Powered Air-Purifying Respirators As A Supplemental Means Of Compliance With Respirable Dust Standards, September 10, 1997.

COMM-57-7:    John F. Gamble, PhD; Robert B. Reger, PhD; Robert E. Glenn, MPH, CIH.  "A Critical Review of the Scientific Basis for MSHA's Proposal for Lowering the Coal Mine Dust Standard."  May 27, 2011.

COMM-58:Bruce Watzman, Senior Vice President, Regulatory Affairs, National Mining Association, June 20, 2011, with attachments.

COMM-58-1:    John D. Meyer, Syed S. Islam, Alan M. Ducatman, and Robert J. McCunney.  1997.  "Prevalence of Small Lung Opacities In Populations Unexposed To Dusts: A Literature Analysis." *Chest*, 111:404-410.

COMM-58-2:    Coal Workers' Pneumoconiosis Prevalence, Centers for Disease Control: Enhanced Coal Workers' Health Surveillance Program (2007-2009).

COMM-58-3:    E. Suarthana, A.S. Laney, E. Storey, J.M. Hale, and M.D. Attfield.  2011.  "Coal Workers' Pneumoconiosis in the United States:  Regional Differences 40 Years after Implementation of the 1969 Federal Coal Mine Health and Safety Act." *Occup Environ Med* (2011). doi: 10.1136/oem.2010.063594.  Epub May 19, 2011.

COMM-58-4:    A. Scott Laney, Edward L. Petsonk, and Michael Attfield.  2009.  "Pneumoconiosis among Underground Bituminous Coal Miners in the United States: Is Silicosis Becoming More Frequent?" *Occup. Environ. Med,* dol:10.1136/oem.2009.04716.  Epub September 22, 2009.

COMM-58-5:    John F. Gamble, PhD; Robert Reger, PhD; and Robert E. Glenn, MPH.  2011.  "A Review of the Scientific Basis for MSHA's Proposal for Lowering the Coal Mine Dust Standard."

COMM-58-6:    An Evidence Based Review of the Literature Supporting the Mine Safety and Health Administration Proposed Coal Mine Dust Rule.  Prepared for the National Mining Association by Dr. David Rosenberg, April 18, 2011.

COMM-58-7:    Bruce Watzman, Senior Vice President, National Mining Association (NMA).  Comments on "A Review of Information Published Since 1995 on Coal Mine Dust Exposures and Associated Health Outcomes."  September 24, 2010.

COMM-58-8:    A Critical Review of the Data Used to Support the Articles' Findings.  2011.  "Advanced Cases of Coal Workers' Pneumoconiosis--Two Counties, Virginia," By Antao, *et al.*, *Morbidity and Mortality Weekly Report*, 55(33):909-913.

COMM-58-9:    National Mining Association.  Analysis of MSHA Coal Dust Sampling Data Base and the Impact of the MSHA Proposed Rule. Presented by Mark Watson and Heath Lovell, Alliance Coal, LLC, at MSHA's Public Hearing on Proposed Coal Dust Regulations, February 15, 2011.

COMM-58-10:    "A Critical Review of MSHA's Proposal For Control Measures To Be Employed In Lowering Miners' Exposure To Respirable Coal Mine Dust; Comments on Requirements for Designated Area Sampling and for Personal Sampling Devices To Remain with the Occupation or Designated Area Being Sampled."  Prepared by Robert E. Glenn, MPH.  May 4, 2011.

41

43

COMM-58-11:    Comments on One Provision of the Proposed Rules for "Lowering Miners' Exposure to Respirable Coal Mine Dust."  Gary M. Hartsog, PE, PS (SU), Alpha Engineering Services, Inc., Beckley, WV. February 15, 2011.

COMM-58-12:    Dr. Tony Cox, Cox & Associates, on behalf of the National Mining Association.  2011.  Comments on "MSHA's Draft Quantitative Risk Assessment (QRA) of RCMD:  Current Flaws and Possible Fixes."  February 15, 2011.

COMM-58-13:    National Mining Association.  2011.  "Flaws in MSHA's Support for Its Proposed Rule on Respirable Dust."  June 20, 2011.

COMM-58-14:    Sciences International, Inc.  1994.  "Will Single Full-Shift Samples of Respirable Dust Accurately Represent the Long-Term Compliance Status For Respirable Coal Mine Dust Exposures?" Prepared for the National Coal Association, Washington, DC.  May 18, 1994.

COMM-58-15:    Industrial Hygiene Specialty Resources, LLC.  2011.  A Review and Critique of the MSHA Proposed Regulation (October 19, 2010) for evaluation and control of respirable coal mine dust exposures. April 26, 2011.

COMM-58-16:    Industrial Hygiene Specialty Resources, LLC.  2010. An Evaluation of Suggestions of Rapidly Progressing Coal Mine Workers Pneumoconiosis (CWP) Supporting Major U.S. Policy Changes. October 25, 2010.

COMM-58-17:    Louis Anthony (Tony) Cox Jr., Cox Associates.  2011. Comments on MSHA's Quantitative Risk Assessment (QRA) for RCMD, Final Report to the National Mining Association.  March 11, 2011.

COMM-59:J. Nathan Noland, President, Indiana Coal Council, Inc., June 20, 2011.

COMM-60:Phillip M. Gonet, President, Illinois Coal Association, June 20, 2011.

COMM-61:     David Hales, Manager, Safety and Regulatory Compliance, San Juan Coal Company, June 20, 2011.

COMM-62:     David Gooch, President, Coal Operators & Associates, Inc., June 20, 2011.

COMM-63:     Bill Bissett, President, Kentucky Coal Association, June 2011.

COMM-64:     Chris Hamilton, Senior Vice President, West Virginia Coal Association, June 20, 2011.

COMM-65:     John Gallick, Vice President - Safety and Health, Alpha Natural Resources Services, Inc., June 20, 2011.

COMM-66:     Norma Thomas, June 20, 2011.

COMM-67:     Linda Raisovich-Parsons, United Mine Workers of America, June 20, 2011.

COMM-68:     David M Young, President, BCOA, and Dennis O'Dell, Administrator, UMWA Department of Occupational Health and Safety, submitted by UMWA, June 20, 2011. (identical to Comm-72, infra)

COMM-69:     Randel K. Johnson, Senior Vice President, Labor, Immigration and Employee Benefits, and Marc Freedman, Executive Director, Labor Law Policy, Immigration and Employee Benefits, U.S. Chamber of Commerce, June 20, 2011.

COMM-70:     George Ellis, President, Pennsylvania Coal Association (PCA), letter dated June 13, 2011, to Ms. Roslyn Fontaine, Acting Director, OSRV, MSHA, re: Proposed Rulemaking on Respirable Coal Mine Dust, February 8, 2011 Public Hearing.

COMM-70-1:     Letter dated February 16, 2011, from Dale Broadwater, Executive Director, Coal Mine Compensation Rating Bureau of Pennsylvania to George Ellis, President, PA Coal Association,

43

Re: PA Bituminous Underground, Surface, and Prep Plant Classes, Federal Black Lung Claims Activity, Data Source: Exhibit V111-B2, pages 1-3 from CM-1-2010.

COMM-71:    David M Young, President, Bituminous Coal Operators' Association, Inc. (BCOA), June 20, 2011.

COMM-72:    David M Young, President, BCOA, and Dennis O'Dell, Administrator, UMWA Department of Occupational Health and Safety, submitted by BCOA, June 20, 2011.

COMM-73:    John Heard, Legislative Counsel, The Virginia Coal Association, Inc., June 20, 2011.

COMM-74:    J. Clifford Forrest, President, Rosebud Mining Company, June 20, 2011.

COMM-75:    Alan Matta, Production Manager, Thermo Fisher Scientific, June 20, 2011.

COMM-76:    Robert E. Murray, Chairman, President and Chief Executive Officer, Murray Energy Corporation, June 20, 2011, with attachments.

COMM-76-1:    Attachment A.  Specific Comments on Preliminary Regulatory Economic Analysis, Prepared by Robin C. Cantor, Ph.D., Exponent, Inc., for Murray Energy Corporation.  April 27, 2011.

COMM-76-2:    Attachment B.  Specific Comments on Quantitative Risk Assessment, Prepared by Richard Reiss, ScD, MS, and Kenneth Bogen, DrPH, MPH, DABT, Exponent, Inc., for Murray Energy Corporation.  April 27, 2011.

COMM-76-3:    Attachment C.  Comments Specific to Industrial Hygiene and Medical Surveillance Issues, Prepared by Michael N. Cooper, MPH, CIH, and Sheila McCarthy, MHS, CIH, Exponent, Inc., for Murray Energy Corporation.  April 28, 2011.

COMM-76-4:     Attachment D.1.  Comments Specific to Laboratory testing of continuous personal dust monitor (CPDM).  Prepared by Michael Cooper, CIH, and Sheila McCarthy, CIH, Exponent, Inc., for Murray Energy Corporation, Alliance Natural Resources, Arch Coal, Inc., Illinois Coal Association, and Indiana Coal Council.  April 28, 2011.

COMM-76-4.1:   Attachment D.2.
     Final Test Report No. 2341-B, "Environmental Test Report for Settling Dust, Temperature/Humidity, Drop, Shock, and Radiated Susceptibility Testing Applied to Four (4) Personal Dust Monitors P/N 42-009904 In Accordance With MIL-STD-810F."  Environmental Engineering Considerations and Laboratory Tests, Dated 1 January 2000, and Customers Verbal Instructions, Submitted to: Exponent Failure Analysis Associates, by Kenneth C. Malley Jr., CEO, E-LABS, Inc., April 20, 2011.

     Vantal C®6H-II Specification Sheet, R.T. Vanderbilt Company, Inc., 2005.

     Gravimetric Analysis of Air Filters, Forensic Analytical Laboratories Report, 2011.

COMM-76-5:     Attachment E.  Specific comments on MSHA review of medical monitoring and epidemiologic studies, Prepared by Michael Kelsh, PhD, MPH, and Martha L. Doemland, PhD, MS, Exponent, Inc., for Murray Energy Corporation.  April 28, 2011.

COMM-76-6:     Attachment F.  Comments of Janet Torma-Krajewski, PhD, CIH, CPE, Industrial Ergonomics, Inc.

COMM-76-7:     Attachment G.  Additional Comments of Murray Energy Corporation.

COMM-77:     Jeffery L. Kohler, Associate Director for Mining, and Director, Office of Mine Safety and Health Research, National Institute for Occupational Safety and Health, Centers for Disease Control and

45

Prevention.  "NIOSH Analysis of Comments Questioning the Use of the CPDM."  May 24, 2011.

PUBLIC MEETINGS
Proposed Rule

Arlington, Virginia
MEET-1:   Memorandum for the Record, October 20, 2010, re: Stakeholders meeting on the proposed rule.  List of attendees and conference call participants attached.

MEET-2:   Memorandum for the Record, October 20, 2010, re: Congressional briefing on the proposed rule.  List of attendees attached.

PUBLIC HEARINGS

Beaver, West Virginia
PH1-1:      Transcript of Proceedings.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Beaver, WV, December 7, 2010.

PH1-2:      Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Beaver, WV, December 7, 2010.

PH1-3:      PowerPoint presentation by Mr. Robert Thaxton, MSHA. Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors.  Public Hearing, Beaver, WV, December 7, 2010.

Evansville, Indiana
PH2-1:      Transcript of Proceedings and Hearing Submissions. Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Evansville, IN, January 11, 2011.

PH2-2:      Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Evansville, IN, January 11, 2011.

PH2-3:     PowerPoint presentation by Dr. Wagner, Deputy Assistant Secretary of Labor, MSHA.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Evansville, IN, January 11, 2011.

PH2-4:     Hearing Submission. Comments of the American College of Occupational and Environmental Medicine prepared by William Eschenbacher, MD, Chair, Lung Disorders Committee, ACOEM. Public Hearing, Evansville, IN, January 11, 2011.

PH2-5:     Hearing Submission. Testimony of Edwin P. Brady and Murray Energy Corporation prepared by Edwin P. Brady, Manager of Safety and Regulatory Affairs, Murray Energy Corporation.  Public Hearing, Evansville, IN, January 11, 2011.

Birmingham, Alabama
PH3-1:     Transcript of Proceedings and Hearing Submissions. Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Birmingham, AL, January 13, 2011.

PH3-2:     Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Birmingham, AL, January 13, 2011.

PH3-3:     PowerPoint presentation by Dr. Wagner, Deputy Assistant Secretary of Labor, MSHA.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Birmingham, AL, January 13, 2011.

PH3-4:     Hearing Submission.  U.S. Department of Labor, Mine Safety and Health Administration. 1996.  "Report of the Secretary of Labor's Advisory Committee on the Elimination of Pneumoconiosis Among Coal Mine Workers."  Washington, DC, submitted by Matthew Little, UMWA.  Public Hearing, Birmingham, AL, January 13, 2011.

PH3-5:     Hearing Submission. "Black Lung on Rise in Mines, Reversing Trend" from The Wall Street Journal, WSJ.com, December 15, 2009, submitted by Dwight Cagle, UMWA Local 2397.  Public Hearing, Birmingham, AL, January 13, 2011.

Salt Lake City, Utah

PH4-1:    Transcript of Proceedings and Hearing Submissions. Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Salt Lake City, Utah, January 25, 2011.

PH4-2:    Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Salt Lake City, Utah, January 25, 2011.

PH4-3:    PowerPoint presentation by Dr. Wagner, Deputy Assistant Secretary of Labor, MSHA.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Salt Lake City, Utah, January 25, 2011.

PH4-4:    Hearing Submissions.  Michael A. Kelsh PhD, MPH, MA, Exponent, Inc.  Public Hearing, Salt Lake City, Utah, January 25, 2011.
        a.    Michael A. Kelsh PhD, MPH, MA, Exponent, Inc., Professional profile.
        b.    M. Kelsh and M. Doemland.  PowerPoint presentation, "Comments on Lowering Miners' Exposure to Respirable Coal Mine Dust: Health Effects."
        c.    R. McCunney, P. Morfeld, and S. Payne.  2009.  "What Component of Coal Causes Coal Workers Pneumoconiosis?" *Journal of Occupational and Environmental Medicine,* 51(4):462-471.
        d.    A. Laney, E. Petsonk, and M. Attfield.  2009. "Pneumoconiosis Among Underground Bituminous Coal Miners in the United States: Is Silicosis Becoming More Frequent?"  *Occup. Environ. Med,* 2010, 67: 652-656.  Published online September 22, 2009.
        e.    A. Laney and M. Attfield.  2010.  "Coal Workers' Pneumoconiosis and Progressive Massive Fibrosis Are Increasingly More Prevalent Among Workers in Small Underground Coal Mines in the United States.  *Occup. Environ. Med*, 2010, 67: 428-431.

PH4-5:    Hearing Submissions.  Janet Torma-Krajewski, PhD, CIH, CPE, Industrial Ergonomics, Inc.  Public Hearing, Salt Lake City, Utah, January 25, 2011.

48

      a.    Comments on Part 70 – Mandatory Health Standards for Underground Coal Mines.

      b.    References list.

<u>Washington, Pennsylvania</u>
PH5-1:    Transcript of Proceedings and Hearing Submissions. Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Washington, PA, February 8, 2011.

PH5-2:    Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Washington, PA, February 8, 2011.

PH5-3:    PowerPoint presentation by Dr. Wagner, Deputy Assistant Secretary of Labor, MSHA.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Washington, PA, February 8, 2011.

PH5-4:    Hearing Submission.  George Ellis, President, Pennsylvania Coal Association, testimony, Proposed Rulemaking on Respirable Coal Mine Dust.  Public Hearing, Washington, PA, February 8, 2011.

PH5-5:    Hearing Submission.  Mike Cooper, MS, MPH, CIH, and Sheila McCarthy, MSH, CIH, Exponent, Inc.  Public Comments on NPRM – Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors, An Industrial Hygiene Viewpoint.  Public Hearing, Washington, PA, February 8, 2011.

<u>Prestonsburg, Kentucky</u>
PH6-1:    Transcript of Proceedings and Hearing Submission. Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Prestonsburg, KY, February 10, 2011.

PH6-2:    Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Prestonsburg, KY, February 10, 2011.

PH6-3:    PowerPoint Presentation by Dr. Wagner, Deputy Assistant Secretary of Labor, MSHA.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Prestonsburg, KY, February 10, 2011.

PH6-4:    Hearing Submission.  Wes Addington, Appalachian Citizens' Law Center Inc.  Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors.  Public Hearing, Prestonsburg, KY, February 10, 2011.

Arlington, Virginia
PH7-1:    Transcript of Proceedings and Hearing Submissions.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-2:    Request to Speak and Sign-In-Sheets.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-3:    PowerPoint Presentation by Dr. Wagner, Deputy Assistant Secretary of Labor, MSHA.  Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-4:    Hearing Submission.  National Mining Association.  Analysis of MSHA Coal Dust Sampling Data Base and the Impact of the MSHA Proposed Rule.  Presented by Mark Watson and Heath Lovell, Alliance Coal, LLC.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-5:    Hearing Submission.  Gary M. Hartsog, Alpha Engineering Services, Inc.  Comments on One Provision of the Proposed Rule for Lowering Miners' Exposure to Respirable Coal Mine Dust.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-6:    Hearing Submission.  National Mining Association.  Comments of Dr. Tony Cox, Cox & Associates, on MSHA's Draft Quantitative Risk Assessment (QRA) of RCMD: Current Flaws and Possible Fixes.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-7:     Hearing Submission.  John F. Gamble, Robert B. Reger, and Robert E. Glenn.  A Review of the Scientific Basis for MSHA's Proposal for Lowering the Coal Mine Dust Standard.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-8:     Hearing Submission.  Richard Reiss, and Ken Bogen, Exponent, Inc.  Comments on Quantitative Risk Assessment for Coal Dust Rule.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-9:     Hearing Submission.  Robin A. Cantor, Exponent, Inc. Comments on Lowering Miners' Exposure to Respirable Coal Mine Dust: Regulatory Economic Analysis.  Public Hearing, Arlington, VA, February 15, 2011.

PH7-10:    Hearing Submission.  Linda Raisovich-Parsons, UMWA. Testimony on the Proposed Rule for Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors.  Public Hearing, Arlington, VA, February 15, 2011.

GENERAL ACCOUNTABILITY OFFICE (GAO) STUDIES
GAO-1:     January 9, 2012.  Letter from Barbara D. Bovbjerg, GAO, to Secretary of Labor Hilda L. Solis initiating a study to assess the adequacy of data collected by the Department of Labor's Mine Safety and Health Administration (MSHA) to support the proposed rule to lower underground coal miners' exposure to coal mine dust as mandated by Congress in the Consolidated Appropriations Act, 2012.

GAO-2:     August 17, 2012.  GAO Report to Congressional Committees on Mine Safety.  GAO-12-832-R, Mine Safety: Reports and Key Studies Support the Scientific Conclusions Underlying the Proposed Exposure Limit for Respirable Coal Mine Dust

GAO-3:     July 22, 2013.  Letter from Barbara D. Bovbjerg informing Acting Secretary of Labor Seth D. Harris of a new GAO engagement on Coal Mine Dust Exposure.

GAO-4:     December 16, 2013.  Expert Meeting of the National Academy of Sciences to discuss the Technological Feasibility of

51

Reducing Respirable Dust Levels in Underground Coal Mines.  2101 Constitution Avenue NW, Washington, DC 20418.  Agenda.

GAO-4a:    December 16, 2013.  National Academy of Sciences Meeting on Reducing the Level of Dust in Coal Mines: (1) Background and Objectives; and (2) Meeting Topics.

GAO-4b:    December 16, 2013.  National Academy of Sciences Meeting of Experts to Discuss the Technological Feasibility of Reducing Respirable Dust Levels in Underground Coal Mines: Participants List.

GAO-4c:    December 16, 2013.  Questions for National Academies Expert Meeting for Coal Mine Dust Engagement.

GAO-5:    April 9, 2014.  GAO-14-345: Basis for Proposed Exposure Limit on Respirable Coal Mine Dust and Possible Approaches for Lowering Dust Levels.

II.

## REQUEST FOR INFORMATION
## CONTINUOUS PERSONAL DUST MONITORS
## ("CPDM")

### RIN: 1219-AB48
### Request for Information October 14, 2009

## MSHA FEDERAL REGISTER NOTICES

**FR-1:** 30 CFR Parts 70, 71, and 90 Respirable Coal Mine Dust: Continuous

Personal Dust Monitor (CPDM); Request for Information (RFI). Federal Register, 74 FR 52708, October 14, 2009.

## BACKGROUND DOCUMENTS

**BKG-1:** V.C. Antao, E.L. Petsonk, and M.D. Attfield. 2006. "Advanced Cases of Coal Workers' Pneumoconiosis—Two Counties, Virginia," *Morbidity and Mortality Weekly Report*, 55(3):909-913.

**BKG-2:** Jon Kogut, Statistical Methods and Analysis, Review of NIOSH

Report, "Respirable Dust Sampler Equivalency of a Personal Dust Monitor" [BKG 4], by Steven J. Page et al, July 2007, 19 Pages.

**BKG-3:** Philip Lindahl, "Meeting with the Joint BCOA and UMWA Safety Committee Meeting on the Personal Dust Monitor (PDM)", Memorandum for the Plan Verification Rulemaking Record, dated March 14, 2007, 6 Pages.

**BKG-4:** Steven J. Page, Jon C. Volkwein, Robert P. Vinson, Gerald J. Joy,

53

55

Steven E. Mischler, Donald P. Tuchman, and Linda J. McWilliams, "Respirable Dust Sampler Equivalency of a Personal Dust Monitor", Prepublication draft of Background document 6, U.S. Department of Health and Human Services, 19 Pages.

**BKG-5**:    Steve Page, Response to Review Comments Provided by Jon Kogut on Behalf of MSHA Regarding "Respirable Dust Sampler Equivalency of a Personal Dust Monitor" [BKG 4], 15 Pages.

**BKG-6**:    Steven J. Page, Jon C. Volkwein, Robert P. Vinson, Gerald J. Joy,

Steven E. Mischler, Donald P. Tuchman, and Linda J. McWilliams. 2008. "Equivalency of a Personal Dust Monitor to the Current United States Coal Mine Respirable Dust Sampler", *J. Environ Monitoring* 10(1):96-101.

**BKG-7**:    Jon C. Volkwein, Robert P. Vinson, Linda J. McWilliams, Donald P. Tuchman, and Steven E. Mischler. 2004. "Performance of a New Personal Respirable Dust Monitor for Mine Use", *Report of Investigations, RI 9663*, U.S. Department of Health and Human Services, 20 Pages.

**BKG-8**:    Jon C. Volkwein, Robert P. Vinson, Steven J. Page, Linda J. McWilliams,

Gerald J. Joy, Steven E. Mischler, and Donald P. Tuchman. 2006. "Laboratory and Field Performance of a Continuously Measuring Personal Respirable Dust Monitor", *Report of Investigations , RI 9669*, U.S. Department of Health and Human Services,  47 Pages.

## COMMENTS

**COMM-1**:  Don Summers, October 14, 2009

**COMM-2**:  John B. Stemple Jr., Safety Manager, Wolf Run Mining Company,

October 14, 2009

**COMM-3:** Bobby Mitchell, Harper Contracting, October 16, 2009.

**COMM-4:** Dennis O'Dell Administrator Health and Safety, United Mine

Workers of America, December 14, 2009.

**COMM-5:** David M. Young, President, Bituminous Coal Operators' Association,

Inc., December 14, 2009.

**COMM-6:** John Gallick, Vice President Health and Safety, Alpha Natural

Resources Services, LLC, December 14, 2009.

**COMM-7:** Anthony S. Bumbico, Vice President of Safety, Arch Coal, Inc.,

December 14, 2009.

**COMM-8:** Bruce Watzman, Senior Vice President, Regulatory Affairs, National

Mining Association, December 14, 2009.

**COMM-9:** Edward L. Petsonk, MD Professor of Medicine, West Virginia

University School of Medicine, December 14, 2009.

**COMM-10:** Michael G. Parris, Jim Walter Resources, Inc., December 14, 2009.

**COMM-11:** Alan Matta, Product Manager, ThermoFisher Scientific, December 4, 2009.

55

III.

## DETERMINATION OF CONCENTRATION OF RESPIRABLE COAL MINE DUST ("2003 SINGLE SAMPLE")

### RIN-1219-AB18
### (Rule Proposed on March 6, 2003)

## MSHA FEDERAL REGISTER NOTICES

**FR-1:** Proposed rule; notice of reopening of record; request for comments; notice of public hearings; correction; close of record. *Federal Register*, 68 FR 10940, March 6, 2003.

**FR-2:** Proposed rule; notice of public hearings; close of record. *Federal Register*, 68 FR 12641, March 17, 2003.

**FR-3:** Proposed rule; reopening of record; correction. *Federal Register*, 68 FR 15691, April 1, 2003.

**FR-4:** Proposed rule; Extension of comment periods. *Federal Register*, 68 FR 32005, May 29, 2003.

**FR-5:** Proposed rule; Extension of comment period; reopening of the record. *Federal Register*, 68 FR 47886, August 12, 2003.

## ECONOMIC ANALYSIS

**PREA-1:** Preliminary Regulatory Economic Analysis and Preliminary Regulatory Flexibility Analysis, February 2003.

## BACKGROUND DOCUMENTS

56

**BKG-1:**    Ahmad, D., W.K.C. Morgan, N.L. Lapp, R. Reger, and J.J. Renn III.  2002.  Correspondence:  "Meretricious Effects of Coal Dust."  Letter to the Editor regarding 2001 article (L.F. Beeckman, *et al.* "Rapid Declines in FEV₁ and Subsequent Respiratory Symptoms, Illnesses, and Mortality in Coal Miners in the United States."  *Am J Respir Crit Care Med.*, 163:633-639); and Authors' Response.  *Am J Respir Crit Care Med,* 165:552-553.

**BKG-2:**    Althouse, R.B., R.M. Castellan, M.D. Attfield, K.M. Bang, and J.E. Parker.  1998.  "Surveillance of Pneumoconiosis Morbidity in U.S. Underground Coal Miners:  1970-1995."  In:  Advances in the Prevention of Occupational Respiratory Diseases, K. Chiyotani, Y. Hosoda, and Y. Aizawa, Editors.  pp. 174-179.  Amsterdam and New York: Elsevier Sciences B.V.

**BKG-3:**    Attfield, M.D., V. Vallyathan, and F.H.Y. Green.  1994.  "Radiographic Appearances of Small Opacities and their Correlation with Pathology Grading of Macules, Nodules and Dust Burden in the Lungs."  *Ann. Occup. Hyg., Inhaled Particles VII*, 38(Suppl 1):783-789.

**BKG-4:**    Beeckman, L.F., M.L. Wang, E.L. Petsonk, and G.R. Wagner.  2001.  "Rapid Declines in FEV₁ and Subsequent Respiratory Symptoms, Illnesses, and Mortality in Coal Miners in the United States."  *Am J Respir Crit Care Me*d, 163:633-639.

**BKG-5:**    Beeckman-Wagner, L-A. F., M-L. Wang, E.L. Petsonk, and G.R. Wagner.  2002.  "Meretricious effects of coal dust" [authors' response].  *Am J Respir Crit Care Med* 165: 553.

**BKG-6:**    Castranova, V., and V. Vallyathan.  August 2000.  "Silicosis and Coal Workers Pneumoconiosis."  *Environ Health Perspect,* 108(Suppl 4):675-684.

**BKG-7:**    De Vuyst, P., and P. Camus.  2000.  "The Past and Present of Pneumoconiosis."  *Curr Opin Pulm Med 2000,* 6(2):151-156.

**BKG-8:**    Douglas, A.N., A. Robertson, J. S. Chapman, and V. A. Ruckley.  1986.  "Dust exposure, dust recovered from the lung, and

57

associated pathology in a group of British coalminers." *Br J Ind Med,* 43:795-801.

**BKG-9:**    Fernie, J.M., and V.A. Ruckley.  1987.  "Coalworkers pneumoconiosis: correlation between opacity profusion and number and type of dust lesions with special reference to opacity type."  *Br J Ind Med,* 44: 273-277.

**BKG-10:**    Heederik, D. and M. Attfield.  2000.  "Characterization of Dust Exposure for the Study of Chronic Occupational Lung Disease: A Comparison of Different Exposure Assessment Strategies."  *Am J Epidemiol 2000,* 151(10): 982-990.

**BKG-11:**    Jiménez-Ruiz, C.A., F. Masa, M. Miravitlles, R. Gabriel, J.L. Viejo, C. Villasante, and V. Sobradillo.  2001.  "Smoking Characteristics* Differences in Attitudes and Dependence Between Healthy Smokers and Smokers with COPD."  *Chest,* 119:1365-1370.

**BKG-12:**    Kuempel, E.D., E.J. O'Flaherty, L.T. Stayner, R.J. Smith, F.H. Green, and V. Vallyathan.  2001.  "A Biomathematical Model of Particle Clearance and Retention in the Lungs of Coal Miners (I. Model Development)."  *Regulatory Toxicology and Pharmacology*, 34:69-87.

**BKG-13:**    Kuempel, E.D., C.L. Tran, R.J. Smith, and A.J. Bailer.  2001. "A Biomathematical Model of Particle Clearance and Retention in the Lungs of Coal Miners (II. Evaluation of Variability and Uncertainty)." *Regulatory Toxicology and Pharmacology*, 34:88-101.

**BKG-14:**    Lin, L.C, S.C. Yang, and K.W. Lu.  2001.  "Ventilatory Defect in Coal Workers with Simple Pneumoconiosis:  Early Detection of Functional Abnormalities."  *Kaohsiung J Med Sci,* 17:245-251.

**BKG-15:**    Meyer, J.D., D.L. Holt, Y. Chen, N.M. Cherry, and J.C. McDonald.  2001.  "SWORD '99:  Surveillance of Work-Related and Occupational Respiratory Disease in the UK."  *Occup. Med.,* 51(3):204-208.

58

**BKG-16:**  Page, Steven J., and John A. Organiscak.  2000.  "Suggestion of a Cause-and-Effect Relationship among Coal Rank, Airborne Dust, and Incidence of Workers' Pneumoconiosis."  *Am Ind Hyg Assoc J*, 2000 Nov-Dec; 61(6):785-787.

**BKG-17:**  Pon, M.R.L., R. A. Roper, E. L. Petsonk, M. L. Wang, R. M. Castellan, M.D. Attfield, G. R. Wagner.  2003.  "Pneumoconiosis Prevalence Among Working Coal Miners Examined in Federal Chest Radiograph Surveillance Programs - United States, 1996-2002." *MMWR* 52(15):336-340.

**BKG-18:**  Ruckley, V.A., J.M. Fernie, S.J. Campbell, and H.A. Cowie. May 1989.  "Causes of Disability in Coalminers: A clinico-pathological study of emphysema, airways obstruction and massive fibrosis. Chapters 5 through 7."  Report No. TM/89/05.  UDC 622.872:616.24-007.61.  pp. 21-53.

**BKG-19:**  Ruckley, V.A., J.M. Fernie, J.S. Chapman, P. Collings, J.M.G. Davis, A.N. Douglas, D. Lamb, and A. Seaton.  1984. "Comparison of Radiographic Appearances with Associated Pathology and Lung Dust Content in a Group of Coalworkers."  *British Journal of Industrial Medicine*, 41:459-467.

**BKG-20:**  Scarisbrick, Douglas.  2002.  "Silicosis and Coal Worker's Pneumoconiosis."  *The Practitioner*, February 2002; 246:114, 117-119.

**BKG-21:**  Singh, Navdeep, and Gerald S. Davis.  2002.  "Review: Occupational and Environmental Lung Disease."  *Curr Opin Pulm Med* 2001, 8:117-125.

**BKG-22:**  Centers for Disease Control and Prevention.  2000.  "Silicosis Screening in Surface Coal Miners – Pennsylvania, 1996-1997." *Morbidity and Mortality Weekly Report*, July 14, 2000; 49(27):612-615.

**BKG-23:**  U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, Division of Respiratory

Disease Studies.  December 1999.  *Work-Related Lung Disease Surveillance Report 1999*.  DHHS (NIOSH) Number 2000-105.

**BKG-24:**    U.S. Department of Health and Human Services, National Institute for Occupational Safety and Health.  Letter from Gregory R. Wagner, dated July 11, 2002, to Melinda Pon, MSHA, Re:  Information on the Prevalence of Coal workers' Pneumoconiosis from the NIOSH Coal Workers' X-Ray Surveillance Program (CWXSP), 1997-1999.

**BKG-25:**    U.S. Department of Health and Human Services, National Institute for Occupational Safety and Health.  2002.  Letter from Michael Attfield, dated September 30, 2002, to Melinda Pon, MSHA, correcting the CWXSP information provided in the July 11, 2002, letter from Gregory R. Wagner.

**BKG-26:**    U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs.  2001.  "OWCP Annual Report to Congress FY 2000," Submitted to Congress September 28, 2001.

**BKG-27:**    U.S. Department of Labor, Employment Standards Administration, Office of Workers Compensation Programs.  2001.  "Compliance Guide to the Black Lung Benefits Act," May 2001.

**BKG-28:**    U.S. Department of Labor, Mine Safety and Health Administration.  2002.  Chart.  "Mines and Entity Types in Producing Status."  May 14, 2002.

**BKG-29:**    U.S. Department of Labor, Mine Safety and Health Administration.  2000.  Distribution of Applicable Dust Standards by Entity Type.  June 1, 2000.

**BKG-30:**    U.S. Department of Labor, Mine Safety and Health Administration.  2002.  Table.  "Number and Percentage of MMUs by Mine Size of Underground Coal Mines, and Number of Production Shifts."  July 10, 2002.

**BKG-31:**    U.S. Department of Labor, Mine Safety and Health Administration.  March 2002.  "Chapter 1 – Respirable Dust" in *Coal Mine Health Inspection Procedures Handbook*, PH 89-V-1(12).

**BKG-32:**    U.S. Department of Labor, Mine Safety and Health Administration.  2002.  "Number and Percentage of RBDAs by Mine Size of Underground Coal Mines, and Number of Production Shifts." September 4, 2002.

**BKG-33:**    U.S. Department of Labor, Mine Safety and Health Administration.  2002.  Calculations Used in the Single Sample and Plan Verification Quantitative Risk Assessment.  September 12, 2002.

**BKG–34:**    U.S. Department of Labor, Mine Safety and Health Administration, Coal Mine Safety and Health.  2003.  PowerPoint Presentation on Proposed Dust Rules.

**BKG -35:**    Mine Safety and Health Administration.  2003.  "Frequently Asked Questions," From the Public Hearings on Single Sample and Plan Verification Proposals.

**BKG-36:**    Vallyathan, V., M. Goins, L.N. Lapp, D. Pack, S. Leonard, X. Shi, and V. Castranova.  2000.  "Changes in Bronchoalveolar Lavage Indices Associated with Radiographic Classification in Coal Miners." *Am J Respir Crit Care Med,* 162:958-965.

**BKG-37:**    Wang, Xiao-Rong, and David C. Christiani.  2000.  "Respiratory Symptoms and Functional Status in Workers Exposed to Silica, Asbestos, and Coal Mine Dusts."  *J Occup Environ Med.*, November 2000; 42(11):1076-1084.

**BKG-38:**    Yucesoy, B., V. Vallyathan, D.P. Landsittel, D.S. Sharp, J. Matheson, F. Burleson, and M.I. Luster.  2001.  "Polymorphisms of the IL-1 Gene Complex in Coal Miners with Silicosis."  *Am J Ind Med,* 39(3):286-291.

## GENERAL

**GEN-1:**     Memorandum for the Record, Meeting with UMWA, April 3, 2003.

**GEN-2:**     Memorandum for the Single Sample and Plan Verification Rulemaking Records, Meeting with UMWA, April 16, 2003.

**GEN-3:**     Memorandum for the Single Sample and Plan Verification Rulemaking Records, Meeting with UMWA, April 17, 2003.

**GEN–4:**     Memorandum for the Single Sample and Plan Verification Rulemaking Records.  Meeting on PDM Collaborative Research, August 5, 2003.

**GEN–5:**     Memorandum for the Single Sample and Plan Verification Rulemaking Records.  2nd Meeting on PDM Collaborative Research, November 5, 2003.

**GEN–6:**     Memorandum for the Single Sample and Plan Verification Rulemaking Records, 3rd Meeting on PDM Collaborative Research, Rupprecht & Patashnik Co., Inc., December 4, 2003.

**GEN–7**     Memorandum for the Plan Verification Rulemaking Record. Meeting with the Joint BCOA and UMWA Safety Committee on the Personal Dust Monitor.  March 14, 2007.

**GEN–8:**     Memorandum for the Plan Verification Rulemaking Record. Notes of March 22-23, 2007, PDM Partnership Meeting.  May 19, 2006.

**GEN–9:**     Memorandum for the Plan Verification Rulemaking Record. Notes of May 10, 2007, PDM Partnership Meeting.  June 12, 2007.


## COMMENTS

**COMM-1:**  United Mine Workers of America, Joseph Main, April 17, 2003.

**COMM-100:**     National Black Lung Association, John Stewart, received via email June 2, 2003.

**COMM-101:**     UMWA, Clyde D. McKnight Jr., received June 2, 2003.

**COMM-102:**     Valley Mining Inc., Strip and Auger; Allen Mann, received June 2, 2003.

**COMM-103:**     Virginia Black Lung Association, Sparkle Bonds, received June 24, 2003.

**COMM-104:**     Jimmy Bonds, received June 24, 2003.

**COMM-105:**     Clara Hughes, VBLA, received June 25, 2003.

**COMM-106:**     Carl Ball, VBLA, received June 26, 2003.

**COMM-107:**     William St. Clair, VBLA, received June 26, 2003

**COMM-108:**     Allen Hess, received June 26, 2003.

**COMM-109:**     Herbert Endicott, VBLA, June 26, 2003.

**COMM-110:**     Jim Walter Resources, received June 26, 2003.

**COMM-111:**     Ernestine Bailey, received June 26, 2003.

**COMM-112:**     Cynthia Anderson, received June 27, 2003.

**COMM-113:**     Mr. Liggett, received June 27, 2003.

**COMM-114:**     John Cline, received June 27, 2003.

**COMM-115:**     Maxine Gibson, received June 27, 2003.

**COMM-116:**     Donald Taylor, received June 27, 2003.

63

COMM-117:        Cecil Gibson, received June 27, 2003.

COMM-118:        3M, John Runge, received July 2, 2003.

COMM-119:        John Power, received June 27, 2003.

COMM-120:        James Kinney, received June 27, 2003.

COMM-121:        Nancy Campbell, received June 27, 2003.

COMM-122:        Emma Campbell, received June 27, 2003.

COMM-123:        Mary Aliff, received June 27, 2003.

COMM-124:        Edward Lilly, received June 27, 2003.

COMM-125:        Henry Aliff, received June 27, 2003

COMM-126:        Virginia Lilly, received June 27, 2003.

COMM-127:        Kenneth Dangerfield, received June 27, 2003.

COMM-128:        Gary Hairston, received June 27, 2003.

COMM-129:        Bonnie Bower, received June 27, 2003.

COMM-130:        Posey Stump, received June 27, 2003.

COMM-131:        Charles Prather, received June 27, 2003.

COMM-132:        Eve Fingerett, received June 27, 2003.

COMM-133:        Orval King, received June 27, 2003.

COMM-134:        Michael Barn, received June 27, 2003.

COMM-135:        Eunice Dangerfield, received June 27, 2003.

**COMM-136:**     Nancy Massu, received June 27, 2003.

**COMM-137:**     Joe Massie, received June 27, 2003.

**COMM-138:**     Mack Whited, received June 30, 2003.

**COMM-139:**     Leonard Justus, received June 30, 2003.

**COMM-140:**     University of Massachusetts Lowell (Drs. Wegman, Dement, Rice), received July 2, 2003.

**COMM-141:**     Anonymous, received July 2, 2003.

**COMM-142:**     Jack Edwards, received July 2, 2003.

**COMM-143:**     Joseph Sanders, received July 2, 2003.

**COMM-144:**     Joe Pennington, received July 2, 2003.

**COMM-145:**     Jerry Thompson, received July 2, 2003.

**COMM-146:**     John Hall, received July 2, 2003.

**COMM-147:**     Kenneth Bowman, received July 2, 2003.

**COMM-148:**     Louise Crusenberry, received July 2, 2003.

**COMM-149:**     Mike Sanders, received July 2, 2003.

**COMM-150:**     American Society of Safety Engineers, James Kendrick, received July 3, 2003.

**COMM-151:**     Boone Sutherland, received July 3, 2003.

**COMM-152:**     Fred Shapre, received July 3, 2003.

**COMM-153:**     Clinton Corico, received July 3, 2003.

**COMM-154:**     Walter Dean, VBLA, received July 8, 2003.

**COMM-155:**     Ollie Dotson, received July 8, 2003.

**COMM–156:**     Harry Dotson, received July 8, 2003.

**COMM-157:**     Louie Hall, received July 8, 2003.

**COMM-158:**     Jackie Clendenon, received July 8, 2003.

**COMM-159:**     Robert Cassel, Sr. received July 8, 2003.

**COMM-160:**     Sammy Mullins, received July 8, 2003.

**COMM-161:**     Jimmy Scardo, received July 8, 2003.

**COMM-162:**     James Jackson, received July 8, 2003.

**COMM-163:**     Larry Derban, received July 8, 2003.

**COMM-164:**     Walter Dean, received July 8, 2003.

**COMM-165:**     Willie Crusenberry, received July 8, 2003.

**COMM-166:**     Woodrow Tackett, received July 8, 2003.

**COMM-167:**     Everette Meade, received July 8, 2003.

**COMM-168:**     Lena Cassell, received July 14, 2003.

**COMM-169:**     Rep. Shelley Moore Capito, received June 20, 2003.


**PUBLIC HEARINGS**

**<u>Washington, Pennsylvania-Public Hearing, May 6, 2003.</u>**

**PH1-1:**     Hearing Transcript May 5, 2003.

**PH1-2:**    Requests from Joseph Main, UMWA, to speak at all six Single Sample/Plan Verification Public Hearings.  May 1, 2003.

**PH1-3:**    Letter dated April 17, 2003, from the UMWA to Dave Lauriski, Submitted for the docket by Tim Baker, UMWA.

**PH1-4:**    List of Speakers.

**PH1-5:**    List of Attendees.

**PH1-6:**    Photograph of a Personal Dust Monitor, as demonstrated by Jon Volkwein, at the public hearing, May 5, 2003, Washington, PA.

**Charleston, West Virginia-Public Hearing, May 7-8, 2003.**

**PH2-1:**    Hearing Transcript, May 7-8, 2003.

**PH2-2:**    List of Speakers, public hearing, May 7, 2003, Charleston, WV.

**PH2-3:**    List of Attendees, public hearing, May 7, 2003, Charleston, WV.

**PH2-4:**    Submission of testimony from the 2000 public hearing, from Max Kennedy.

**PH2-5:**    Submission of testimony from the 2000 public hearing, from Bob Knisely.

**PH2-6:**    Submission of testimony from the 2000 public hearing, from Rick Glover.

**PH2-7:**    Submission by Tim Baker of Dust, Deception & Death, Why Black Lung Hasn't Been Wiped Out, The Courier-Journal, April 19, 1998.

**PH2-8:**     Letter to Dave D. Lauriski from Joe Main of the UMWA, dated April 17, 2003.

### Evansville, Indiana-Public Hearing, May 13, 2003.

**PH3-1:**     Hearing Transcript, May 13, 2003.

**PH3-2:**     List of Attendees, May 13, 2003.

**PH3-3:**     List of Speakers, May 13, 2003.

**PH3-4:**     Presentation by Lee Ptasnik, Mine & Process Service, Inc., May 13, 2003.

### Lexington, Kentucky-Public Hearing, May 15, 2003.

**PH4-1:**     Hearing Transcript, May 15, 2003.

**PH4-2:**     List of Speakers, May 15, 2003.

**PH4-3:**     List of Attendees, May 15, 2003.

**PH4-4:**     Submission by Joseph Main, UWMA.  *U.S.* v. *Triangle Research Inc.*, Public Information Release, October 21, 1991, United States Attorney, Southern District of West Virginia, May 15, 2003.

**PH4-5:**     Submission by Joseph Main, UMWA.  Summary of Coal Mine Safety and Health Criminal Cases Prosecuted/Dismissed since September 1990, or with Pending. Indictments or Pleas, Excluding Respirable Dust Cases, August 6, 1999.  Public Hearing, May 15, 2003.

### Birmingham, Alabama-Public Hearing, May 20, 2003.

**PH5-1:**     Hearing Transcript, May 20, 2003.

**PH5-2:**     List of Attendees, May 20, 2003.

**PH5-3:**     List of Speakers, May 20, 2003.

68

**PH5-4:**    Hearing Submission, Testimony of Keith Plylar, dated May 19, 2003, submitted by Keith Plylar, May 20, 2003, Public Hearing, Birmingham , Alabama.

**PH5-5:**    Hearing Submission, Letter (with numerous attachments) dated June 8, 1999 from Joseph Main, UMWA to Edward Hugler, Deputy Administrator for Safety, MSHA, re: Technical studies to be conducted at the Jim Walter Resources Number 4 mine, submitted by Tom Wilson at the public hearing, Birmingham, Alabama, May 20, 2003.

**PH5-6:**    Hearing Submission, Memorandum for Joseph Garcia, through Robert Peluso, from Edward Miller, re: Report of Investigations, Conducted at the Jim Walter Resources, Incorporated, No. 4, dated November 30, 1999, submitted by Tom Wilson at the public hearing, Birmingham, Alabama, May 20, 2003.

**PH5-7:**    Hearing Submission, Phase II, Mine Ventilation Pressure-Air Quantity and Face Ventilation Investigations, Investigative Report No. P323-V227, Blue Creek No. 4 Mine - I.D. 01-01247, Jim Walter Resources, December 6-12, 1989 by Gary E. Smith, Gary J. Wirth and Joseph Denk, submitted by Tom Wilson at the public hearing, Birmingham, Alabama, May 20, 2003.

**PH5-8:**    Hearing Submission by Tom Wilson at the public hearing, May 20, 2003, Birmingham, AL.  "Abstract, Health and Safety Issues Related to Extended Longwalls," by Edward Thimons, Robert Jankowski, and Gerald Finfinger, U.S. Bureau of Mines.

**PH5-9:**    Hearing Submission by Tom Wilson at the public hearing, May 20, 2003, Birmingham, AL.  Petition to Marvin Nichols from UMWA members, Re: Request for the Office of Standards provide hard copy material of all future Preliminary Regulatory Economic Analysis for Proposed Rules, preambles of any future proposed rules, as well as future proposed rules.

69

71

**PH5-10:**     Diskettes of the 1996 Dust Advisory Committee public meeting transcripts. Diskette 1: February 21-22, by Tom Wilson 1996 Arlington, Va; April 11-12, 1996 Pittsburgh, PA. Diskette 2: May 29-30, 1996 Charleston, WV; June 20-21, 1996 Salt Lake City, UT. Diskette 3: July 22-25, 1996, Lexington, KY. submitted at the public hearing, Birmingham, Alabama, May 20, 2003.

**PH5-11:**     Hearing Submission by Bradley Berryhill, Continuous Monitoring of Environmental Parameters in Underground Coal Mines, by Robert Peluso, MSHA, undated, submitted at the public hearing, Birmingham, Alabama, May 20, 2003.

**Grand Junction, Colorado-Public Hearing, May 22, 2003.**

**PH6-1:**     Hearing Transcript, May 22, 2003.

**PH6-2:**     List of Attendees, May 22, 2003.

**PH6-3:**     List of Speakers, May 22, 2003.

**PH6-4:**     Hearing Submission, Chronology of Correspondence Between NMA/BCOA and MSHA re: Coal Mine Dust, submitted by NMA/BCOA panel, at the public hearing, May 22, 2003, Grand Junction, CO.

**PH6-5:**     Hearing Submission, General Example-Belt Air to Face and Normal Shearer Controls; Belt Air Taken Away From Face; Additional Dust Controls on Shearer; and Hypothetical Example of the Lowering of the Quartz Standard, submitted by Link Derrick, at the public hearing, May 22, 2003, Grand Junction, CO.

**PH6-6:**     Hearing Submission, Comments from Teresa Thompson and Chris Barbee, coal miners and miner's representative International Union of Operating Engineers, submitted at the public hearing, May 22, 2003, Grand Junction, CO.

70

IV.

## VERIFICATION OF UNDERGROUND COAL MINE OPERATORS' DUST CONTROL PLANS AND COMPLIANCE SAMPLING FOR RESPIRABLE DUST ("2003 PLAN VERIFICATION")

### RIN: 1219-AB14
### Rule Proposed on March 6, 2003

### MSHA FEDERAL REGISTER NOTICES

**FR-1:** 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling; Proposed Rule. *Federal Register*, 68 FR 10784, March 6, 2003.

**FR-2:** 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling; Proposed Rule, notice of public hearings, close of record. *Federal Register*, 68 FR 12641, March 17, 2003.

**FR-3:** 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling; Proposed Rule, correction notice. *Federal Register*, 68 FR 15557, March 31, 2003.

**FR-4:** 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling; Proposed Rule, corrections. *Federal Register*, 68 FR 15691, April 1, 2003.

**FR-5:** 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling; Proposed Rule, extension of comment period. *Federal Register*, 68 FR 32005, May 29, 2003.

**FR-6:** 30 CFR Parts 70, 75, and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling;

71

Proposed Rule, extension of comment period.  *Federal Register*, 68 FR 39881, July 3, 2003.


## ECONOMIC ANALYSIS

**PREA-1:**   Preliminary Regulatory Economic Analysis for Proposed Rule on Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust

**PREA-2:**   Mine Safety and Health Administration.  2002.  Inspector Sampling Frequency and Noncompliance Rate by Entity Type, Mine Type, and Size, MSHA, MIS Data (Inspector subsystem).

**PREA-3:**   Mine Safety and Health Administration.  February 2003.  Preliminary Regulatory Economic Analysis and Preliminary Regulatory Flexibility Analysis.

**PREA-4:**   Mine Safety and Health Administration.  Supporting Data for the Preliminary Regulatory Economic Analysis used to support the proposed rule published on March 6, 2003.


## PAPERWORK REDUCTION ACT

**PRA-1**    Mine Safety and Health Administration.  Paperwork Package for the proposed rule published on March 6, 2003.


## BACKGROUND DOCUMENTS

**BKG-1:**   3M.  1999.  "3M Airstream™ High Efficiency Headgear Systems, User Instructions for:  AS-200LBC, AS-400LBC, AS-600LBC."

**BKG-1A:**   3M.  SECTION 3, "3M™ System Components and Replacement Parts."  New Parts Insert for 3M Airstream High Efficiency Headgear Systems.

72

**BKG-2:**    3M Airstream™.  January 21, 1999.  "3M Airstream™ High Efficiency Helmet, User Instructions For:
- AS-200LBC – Airstream High Efficiency Helmet Powered Air System.
- AS-400LBC – Airstream High Efficiency Helmet Powered Air System, Intrinsically Safe.
- AS-600LBC – Airstream High Efficiency Mining Helmet Powered Air System, Intrinsically Safe."

**BKG-3:**    3M Occupational Health and Environmental Safety Division.  Number.  2001.  "3M Airstream™ Powered Air Purifying Respirator High Efficiency Headgear."  Issue Date 9/01/01.01.  4046 pp. 1-4.

**BKG-4:**    Ahmad, D., W.K.C. Morgan, N.L. Lapp, R. Reger, and J.J. Renn III.  2002.  Correspondence:  "Meretricious Effects of Coal Dust."  Letter to the Editor regarding 2001 article (L.F. Beeckman, *et al.* "Rapid Declines in $FEV_1$ and Subsequent Respiratory Symptoms, Illnesses, and Mortality in Coal Miners in the United States."  *Am J Respir Crit Care Med.*, 163:633-639); and Authors' Response.  *Am J Respir Crit Care Med,* 165:552-553.

**BKG-5:**    Althouse, R.B., R.M. Castellan, M.D. Attfield, K.M. Bang, and J.E. Parker.  1998.  "Surveillance of Pneumoconiosis Morbidity in U.S. Underground Coal Miners:  1970-1995."  In:  *Advances in the Prevention of Occupational Respiratory Diseases,* K. Chiyotani, Y. Hosoda, and Y. Aizawa, Editors.  pp. 174-179.  Elsevier Sciences B.V.

**BKG-6:**    American National Standards Institute.  1992.  *American National Standard for Respiratory Protection.*  ANSI Z88.2-1992.

**BKG-7:**    American National Standards Institute and American Industrial Hygiene Association.  2001.  *American National Standard for Color Coding of Air-Purifying Respirator Canisters, Cartridges, and Filters.*  ANSI/AIHA Z88.7-2001.

**BKG-8:**    Attfield, M.D., and R.M. Castellan.  1992.  "Epidemiological Data on U.S. Coal Miners Pneumoconiosis, 1960 to 1988."  *American Journal of Public Health*, 82(7):964-970.

73

**BKG-9:**    Attfield, M.D., V. Vallyathan, and F.H.Y. Green.  1994. "Radiographic Appearances of Small Opacities and their Correlation with Pathology Grading of Macules, Nodules and Dust Burden in the Lungs." *Ann. Occup. Hyg., Inhaled Particles VII*, 38(Suppl 1):783-789.

**BKG-10:**    Beeckman, L.F., M.L. Wang, E.L. Petsonk, and G.R. Wagner.  2001. "Rapid Declines in FEV$_1$ and Subsequent Respiratory Symptoms, Illnesses, and Mortality in Coal Miners in the United States." *Am J Respir Crit Care Me*d, 163:633-639.

**BKG-11:**    Carta, P., G. Aru, M.T. Barbieri, G. Avantaneo, and D. Casula.  1996. "Dust Exposure, Respiratory Symptoms, and Longitudinal Decline of Lung Function in Young Coal Miners." *Occup. Environ. Med.,* 53:312-319.

**BKG-12:**    Castranova, Vincent, and Val Vallyathan.  2000. "Silicosis and Coal Workers Pneumoconiosis." *Environ Health Perspect*, August 2000; 108(Suppl 4):675-684.

**BKG-13:**    Cecala, A.B., J.V. Volkwein, E.D. Thimons, and C.W. Urban.  1981. "Protection Factors of the Airstream Helmet." *Bureau of Mines Report of Investigation*, RI 8591.

**BKG-14:**    Cochrane, A.L.  1962. "The Attack Rate of Progressive Massive Fibrosis." *Brit. J. Industr. Med.*, 19:52-64.

**BKG-15:**    Cockcroft, A., and N. Andersson.  1987. "Radiological Irregular Opacities and Coal Worker Exposure:  A Case-Referent Study." *British Journal of Industrial Medicine*, 44:484-487.

**BKG-16:**    Cockcroft, A., G. Berry, J.E. Cotes, and J.P. Lyons.  1982. "Shape of Small Opacities and Lung Function in Coalworkers." *Thorax,* 37:765-769.

**BKG-17:**    Cockcroft, A., J. Lyons, N. Andersson, and M. Saunders.  1983. "Prevalence and Relation to Underground Exposure of

74

Radiological Irregular Opacities in South Wales Coal Workers with Pneumoconiosis." *British Journal of Industrial Medicine*, 40:169-173.

**BKG-18:**   Cockcroft, A., R.M.E. Seal, J.C. Wagner, J.P. Lyons, R. Ryder, and N. Andersson. 1982. "Postmortem Study of Emphysema in Coalworkers and Non-Coalworkers." *Lancet,* September 11, 1982; 2:600-603.

**BKG-19:**   Cockcroft, A.E., J.C. Wagner, E.M.E. Seal, J.P. Lyons, and M.J. Campbell. 1982. "Irregular Opacities in Coalworkers' Pneumoconiosis – Correlation with Pulmonary Function and Pathology." In: *Inhaled Particles V. Ann Occup Hyg.,* 26(104):767-787.

**BKG-20:**   Collia, D.V., P.E. Giles, S.L. Edwards, C.S. Freeman (OSHA); and C.E. Colton and J.O. Bidwell (3M). 2000. "The Workplace Performance of a Loose-Fitting Facepiece Powered Air-Purifying Respirator with High Efficiency Filters." Prepared for presentation on May 24, 2000, at the American Industrial Hygiene Conference and Exposition, Orlando, Florida. (Attached data sheet: BE-12 Workplace Protection Factor Study.)

**BKG-21:**   Collins, H.P.R., J.A. Dick, J.G. Bennett, P.O. Pern, M.A. Rickards, D.J. Thomas, J.S. Washington, and M. Jacobsen. 1988. "Irregularly Shaped Small Shadows on Chest Radiographs, Dust Exposure, and Lung Function in Coalworkers' Pneumoconiosis." *British Journal of Industrial Medicine*, 45:43-55.

**BKG-22**:   De Vuyst, P., and P. Camus. 2000. "The Past and Present of Pneumoconioses." *Curr Opin Pulm Med* 2000, 6(2):151-156.

**BKG-23:**   Douglas, A.N., A. Robertson, J.S. Chapman, and V.A. Ruckley. 1986. "Dust exposure, dust recovered from the lung, and associated pathology in a group of British coalminers." *British Journal of Industrial Medicine,* 43:795-801.

**BKG-24:**   Energy West Mining Company. 1997. Petition for Rulemaking to Amend 30 CFR Part 70 Mandatory Health Standards – Underground Coal Mines to Allow Use of Airstream Helmets or Other

NIOSH-Approved Powered Air-Purifying Respirators as a Supplemental Means of Compliance with Respirable Dust Standards, September 10, 1997.

**BKG-24A:** Attachment: "Development of Effective Protection Factors for Racal Airstream Helmets." A Mining Research Contract Report submitted to Energy West Mining Company, Huntington, UT; submitted by R. Bhaskar, W. Jiang, and L. Xu, Department of Mining Engineering, The University of Utah. August 16, 1994.

**BKG-25:** Fernie, J.M., and V.A. Ruckley. 1987. "Coalworkers' Pneumoconiosis: Correlation between Opacity Profusion and Number and Type of Dust Lesions with Special Reference to Opacity Type." *British Journal of Industrial Medicine*, 44:273-277.

**BKG-26:** Haney, R.A., R.S. Ondrey, and K.G. Fields. 1993. "Influence of Airflow and Production on Longwall Dust Control." Chapter 8 in the *Proceedings of the 6th U.S. Mine Ventilation Symposium*, June 21-23, 1993, Salt Lake City, UT, Ragula Bhaskar, Editor. Littleton, CO: Society of Mining, Metallurgy, and Exploration, Inc. (SME). pp. 43-49.

**BKG-27:** Heederik, Dick, and Michael Attfield. 2000. "Characterization of Dust Exposure for the Study of Chronic Occupational Lung Disease: A Comparison of Different Exposure Assessment Strategies." *Am J Epidemiol 2000;* 151(10):982-990.

**BKG-28:** Jiménez-Ruiz, C.A., F. Masa, M. Miravitlles, R. Gabriel, J.L. Viejo, C. Villasante, and V. Sobradillo. 2001. "Smoking Characteristics* Differences in Attitudes and Dependence Between Healthy Smokers and Smokers with COPD." *Chest*, 119:1365-1370.

**BKG-29:** Kogut, Jon (Statistical Methods and Analysis). 2007. "Review of NIOSH Report, 'Respirable Dust Sampler Equivalency of a Personal Dust Monitor,' by Steven J. Page, *et al.*" Performed under Contract DOLB07MR20454 (Amendment #2), July 2007.

**BKG-30:** Kuempel, E.D., E.J. O'Flaherty, L.T. Stayner, R.J. Smith, F.H. Green, and V. Vallyathan. 2001. "A Biomathematical Model of

76

Particle Clearance and Retention in the Lungs of Coal Miners (I. Model Development)." *Regulatory Toxicology and Pharmacology*, 34:69-87.

**BKG-31:**   Kuempel, E.D., C.L. Tran, R.J. Smith, and A.J. Bailer. 2001. "A Biomathematical Model of Particle Clearance and Retention in the Lungs of Coal Miners (II. Evaluation of Variability and Uncertainty)." *Regulatory Toxicology and Pharmacology*, 34:88-101.

**BKG-32:**   Leigh, J., T.R. Driscoll, B.D. Cole, R.W. Beck, B.P. Hull, and J. Yang. 1994. "Quantitative Relation between Emphysema and Lung Mineral Content in Coalworkers." *Occup Environ Med,* 51:400-407.

**BKG-33:**   Leigh, J., K.G. Outhred, H.I. McKenzie, M. Glick, and A.N. Wiles. 1983. "Quantified Pathology of Emphysema, Pneumoconiosis, and Chronic Bronchitis in Coal Workers." *British Journal of Industrial Medicine.* 40:258-263.

**BKG-34:**   Li, Hongfei, M.L. Wang, N. Seixas, A. Ducatman, and E.L. Petsonk. 2002. "Respiratory Protection: Associated Factors and Effectiveness of Respirator Use Among Underground Coal Miners." *Am J Ind Med,* 42:55-62.

**BKG-35:**   Lin, L.C., S.C. Yang, and K.W. Lu. 2001. "Ventilatory Defect in Coal Workers with Simple Pneumoconiosis: Early Detection of Functional Abnormalities." *Kaohsiung J Med Sci*, 17:245-251.

**BKG-36:**   Meyer, J.D., D.L. Holt, Y. Chen, N.M. Cherry, and J.C. McDonald. 2001. "SWORD '99: Surveillance of Work-Related and Occupational Respiratory Disease in the UK." *Occup. Med.*, 51(3):204-208.

**BKG-37**:   Morfeld, P., H.J. Vaultrin, B. Kampmann, and C. Piekarski. 1992. "Modelling the Effect of Different Time Variables on the Risk of Developing Coalworkers' Pneumoconiosis." In: *Proceedings of the 9th International Symposium on Epidemiology in Occupational Health* held September 23-25, 1992, Cincinnati, OH. DHHS (NIOSH) Publication No. 94-112. pp. 509-514.

**BKG-38:**   National Institute for Occupational Safety and Health. September 18, 1995.  Respirator Branch, Test Data Sheet.  Task Number: TN-7780; Ref. No.: CFR 84.1144; Test: Air Flow Test for PAPR; STP No.: 12; Manufacturer: Survivair, Inc.; Item Tested: OV/HEPA.

**BKG-39:**   National Institute for Occupational Safety and Health.  April 17, 2001.  Respirator Branch, Test Data Sheet.  Task Number: TN-11893; Ref. No.: CFR 84.1157; Test: Air Flow Test for PAPR; STP No.: 12; Manufacturer: 3M Company; Item Tested: AS400/AS-101.

**BKG-40:**   National Institute for Occupational Safety and Health. Letter from Gregory R. Wagner, dated July 11, 2002, to Melinda Pon, MSHA, Re:  Information on the Prevalence of Coal workers' Pneumoconiosis from the NIOSH Coal Workers' X-Ray Surveillance Program (CWXSP), 1997-1999.

**BKG-41:**   National Institute for Occupational Safety and Health. 2002.  Letter from Michael Attfield, dated September 30, 2002, to Melinda Pon, MSHA, correcting the CWXSP information provided in the July 11, 2002, letter from Gregory R. Wagner.

**BKG-42:**   National Institute for Occupational Safety and Health (CDC), Rupprecht & Patashnick Co., Inc., Bituminous Coal Operators' Association, Inc., United Mine Workers of America, National Mining Association.  2004.  "PDM TEOM® Personal Dust Monitor – Accurate Continuous Measurement of Respirable Coal Dust."  2004 R&D 100 Joint Entry.

**BKG-43:**   Page, Steve (NIOSH).  2007.  "Response to Review Comments Provided by Jon Kogut on behalf of MSHA Regarding 'Respirable Dust Sampler Equivalency of a Personal Dust Monitor.'"

**BKG-44:**   Page, Steven J., and John A. Organiscak.  2000.  "Suggestion of a Cause-and-Effect Relationship among Coal Rank, Airborne Dust, and Incidence of Workers' Pneumoconiosis."  *Am Ind Hyg Assoc J*, 2000 Nov-Dec; 61(6):785-787.

78

**BKG-45:**  Page, Steven, J., *et al.*  2007.  PEER REVIEW DRAFT.  "Respirable Dust Sampler Equivalency of a Personal Dust Monitor."  U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.

**BKG-46**:  Page, Steven J., J.C. Volkwein, R.P. Vinson, G.J. Joy, S.E. Mischler, D.P. Tuchman, and L.J. McWilliams (Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health).  2008.  "Equivalency of a Personal Dust Monitor to the Current United States Coal Mine Respirable Dust Sampler."  *J. Environ. Monit.*, 10:96-101.

**BKG-47:**  Peed, Daniel.  Facsimile dated July 29, 2002, from Dan Peed, OWCP/DCMWC, to Bill Baughman, MSHA, Subject:  Black Lung Program Statistics to Follow.  Attachments:  Six [DRAFT] Tables Associated with the 2001 *OWCP Annual Report*.

**BKG-48:**  Peed, Daniel.  Message from Dan Peed, OWCP/DCMWC, dated August 2, 2002, to Bill Baughman, MSHA/OSRV, Subject:  Black Lung Program Statistics.  Attachment:  Table B-1, Part C, Black Lung Claim Adjudication at the Initial Level during FY 2001.

**BKG-49:**  Peed, Daniel.  Electronic mail from Dan Peed (OWCP/DCMWC), dated September 11, 2002, to William Baughman (MSHA/OSRV), Subject:  2001 OWCP Report Statistics.

**BKG-50:**  Ruckley, V.A., J.M. Fernie, S.J. Campbell, H.A. Cowie.  May 1989.  "Causes of Disability in Coalminers:  A Clinco-Pathological Study of Emphysema, Airways Obstruction and Massive Fibrosis.  Chapters 5 through 7."  Report No. TM/89/05.  UDC 622.872:616.24-007.61.  pp. 21-53.

**BKG-51:**  Ruckley, V.A., J.M. Fernie, J.S. Chapman, P. Collings, J.M.G. Davis, A.N. Douglas, D. Lamb, and A. Seaton.  1984.  "Comparison of Radiographic Appearances with Associated Pathology

79

and Lung Dust Content in a Group of Coalworkers." *British Journal of Industrial Medicine*, 41:459-467.

**BKG-52:**   Scarisbrick, Douglas.  2002.  "Silicosis and Coal Worker's Pneumoconiosis."  *The Practitioner*, February 2002; 246:114, 117-119.

**BKG-53:**   Singh, Navdeep, and Gerald S. Davis.  2002.  "Review: Occupational and Environmental Lung Disease."  *Curr Opin Pulm Med* 2001, 8:117-125.

**BKG-54:**   Survivair Inc.  1996.  "Mask Mounted, Full Facepiece Powered Air-Purifying Respirator (PAPR) with High-Efficiency Particulate Air (HE) Filter, Operation Manual for MSHA-Approved Models 523000, 524000, 525000, and 526000."  July 1992/April 1996.

**BKG-55**:   U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, Division of Respiratory Disease Studies.  December 1999.  *Work-Related Lung Disease Surveillance Report 1999*.  DHHS (NIOSH) Number 2000-105.

**BKG-56**:   U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.  2000.  "Silicosis Screening in Surface Coal Miners – Pennsylvania, 1996-1997."  *Morbidity and Mortality Weekly Report*, July 14, 2000; 49(27):612-615.

**BKG-57:**   U.S. Department of Health and Human Services, Centers for Disease Control and Prevention.  2003.  "Pneumoconiosis Prevalence among Working Coal Miners Examined in Federal Chest Radiograph Surveillance Programs – United States, 1996-2002."  *Morbidity and Mortality Weekly Report*, April 18, 2003, 52(15):336-340.

**BKG-58:**   U.S. Department of Labor, Bureau of Labor Statistics.  2002.  "Respirator Use and Practices."  *News*, USDL 02-141.

**BKG-59:**   U.S. Department of Labor, Employment Standards Administration, Office of Workers Compensation Programs.  2001.  "Compliance Guide to the Black Lung Benefits Act," May 2001.

**BKG-60:**    U.S. Department of Labor, Employment Standards Administration, Office of Workers' Compensation Programs.  2001.  "OWCP Annual Report to Congress FY 2000," Submitted to Congress September 28, 2001.

**BKG-61:**    U.S. Department of Labor, Employment Standards Administration, Office of Workers Compensation Program, Division of Coal Mine Workers' Compensation.  2002.  "Initial Black Lung Decisions FY 1990-1999."  September 19, 2002.

**BKG-62:**    U.S. Department of Labor, Mine Safety and Health Administration.  *Coal General Inspection Procedures Handbook*, Chapter 5, Release 1 (June 1992), pp. 67-68; and "Appendix D, Evaluation of an Acceptable Respiratory Protection Program," PH 89-V-1(11) (April 2000), pp. d.1-d.5.

**BKG-63:**    U.S. Department of Labor, Mine Safety and Health Administration.  2001.  Designated Occupations Sampling Data, *MSHA Data File,* DO_2001.zip (diskette).

**BKG-64**:    U.S. Department of Labor, Mine Safety and Health Administration.  2001.  Roof-Bolter Designated Area Sampling Data, *MSHA Data File,* RB-DA2001.zip (diskette).

**BKG-65:**    U.S. Department of Labor, Mine Safety and Health Administration.  2001.  Inspector Samples, CY 2001, *MSHA Data File*, Insp2001.zip (diskette).

**BKG-66:**    U.S. Department of Labor, Mine Safety and Health Administration.  March 2002.  "Chapter 1 – Respirable Dust" in *Coal Mine Health Inspection Procedures Handbook*, PH 89-V-1(12).

**BKG-67**:    U.S. Department of Labor, Mine Safety and Health Administration.  2002.  Chart.  "Mines and Entity Types in Producing Status."  May 14, 2002.

81

**BKG-68:**  U.S. Department of Labor, Mine Safety and Health Administration.  2002.  Table.  "Number and Percentage of MMUs by Mine Size of Underground Coal Mines, and Number of Production Shifts."  July 10, 2002.

**BKG-69:**  U.S. Department of Labor, Mine Safety and Health Administration.  2002.  "Number and Percentage of RBDAs by Mine Size of Underground Coal Mines, and Number of Production Shifts." September 4, 2002.

**BKG-70:**  U.S. Department of Labor, Mine Safety and Health Administration.  September 12, 2002.  Quantitative Risk Assessment (Chapter VI in the Preamble to the Proposed Rule) and Calculations Used in the Single Sample and Plan Verification Quantitative Risk Assessment.

**BKG-71:**  U.S. Department of Labor, Mine Safety and Health Administration.  2002.  "Summary of Valid Designated Occupation 'DO' Samples by Calendar Year, 1970-September 30, 2002."  October 25, 2002.

**BKG-72:**  U.S. Department of Labor, Mine Safety and Health Administration.  2002.  "Summary of Valid Continuous Miner 'DO' Samples by Calendar Year, 1970-September 30, 2002."  October 25, 2002.

**BKG-73:**  U.S. Department of Labor, Mine Safety and Health Administration.  2002.  "Summary of Valid Longwall 'DO' Samples by Calendar Year, 1970-September 30, 2002."  October 25, 2002.

**BKG-74**:  U.S. Department of Labor, Mine Safety and Health Administration, Coal Mine Safety and Health.  2003.  PowerPoint Presentation on "Proposed Dust Rules." 2003.

**BKG-75:**  U.S. Department of Labor, Mine Safety and Health Administration.  2003.  "Frequently Asked Questions," From the Public Hearings on Single Sample and Plan Verification Proposals.

82

**BKG-76:**   Vallyathan, V., M. Goins, L.N. Lapp, D. Pack, S. Leonard, X. Shi, and V. Castranova.  2000.  "Changes in Bronchoalveolar Lavage Indices Associated with Radiographic Classification in Coal Miners." *Am J Respir Crit Care Med,* 162:958-965.

**BKG-77:**   Volkwein, Jon C., Robert P. Vinson, Linda J. McWilliams, Donald P. Tuchman, and Steven Mischler.  February 2004. "Performance of a New Personal Respirable Dust Monitor for Mine Use."  U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health.

**BKG-78:**   Wang, Xiao-Rong, and David C. Christiani.  2000. "Respiratory Symptoms and Functional Status in Workers Exposed to Silica, Asbestos, and Coal Mine Dusts."  *J Occup Environ Med.*, November 2000; 42(11):1076-1084.

**BKG-79:**   Yucesoy, B., V. Vallyathan, D.P. Landsittel, D.S. Sharp, J. Matheson, F. Burleson, and M.I. Luster.  2001.  "Polymorphisms of the IL-1 Gene Complex in Coal Miners with Silicosis."  *Am J Ind Med,* 39:286-291.

## MEETINGS

**MEET-1**   Memorandum for the Record, Subject:  MSHA Meeting with UMWA, April 3, 2003.

**MEET-2**   Memorandum for the Single Sample and Plan Verification Rulemaking Records, Subject:  MSHA Meeting with UMWA, April 16, 2003.

**MEET-3**:   Memorandum for the Single Sample and Plan Verification Rulemaking Records, Subject:  MSHA Meeting with UMWA, April 17, 2003.

**MEET-4**:   Memorandum for the Plan Verification and Single Sample Rulemaking Records, Subject:  MSHA Meeting on PDM Collaborative Research, August 5, 2003.

**MEET-5**:   Memorandum for the Plan Verification and Single Sample Rulemaking Records, Subject:  2nd MSHA Meeting on PDM Collaborative Research, November 5, 2003.

**MEET-6**:   Memorandum for the Plan Verification and Single Sample Rulemaking Records, Subject:  3rd MSHA Meeting on PDM Collaborative Research, Rupprecht & Patashnick Co., Inc., December 4, 2003.

**MEET-7**:   Memorandum for the Plan Verification Rulemaking Record, Subject:  March 22-23, 2006, MSHA Meeting with Personal Dust Monitor (PDM) Partnership, May 19, 2006 (with attachments).

**MEET-8**:   Memorandum for the Plan Verification Rulemaking Record, Subject:  MSHA Meeting with the Joint BCOA and UMWA Safety Committee on the Personal Dust Monitor, March 14, 2007.

**MEET-9**:   Memorandum for the Plan Verification Rulemaking Record. Subject:  May 10, 2007, PDM Partnership Meeting, June 12, 2007 (with attachments).


**COMMENTS**

**COMM-1:**  SKC Inc., Deborah F. Dietrich, March 18, 2003.

**COMM-2:**  Centurion Safety Products, May 13, 2003.

**COMM-3:**  United Mine Workers of America, Joseph Main, April 17, 2003.

**COMM-4:**  Bowie Resources Ltd., Ernal Shaw, May 27, 2003.

84

**COMM-5:**  National Black Lung Association, John Stewart, June 2, 2003.

**COMM-6:**  UMWA, Clyde McKnight Jr., June 2, 2003.

**COMM-7:**  Valley Mining Inc., Allen Mann, June 2, 2003.

**COMM-8:**  Rupprecht & Patashnick Co., Erich Rupprecht, June 10, 2003.

**COMM-9:**  Ron Hampleman, June 13, 2003.

**COMM-10:** Lloyd Dunford, June 19, 2003.

**COMM-11:** Calvin Dunford, Virginia Black Lung Association, June 19, 2003.

**COMM-12:** Sparkle Bonds, Virginia Black Lung Association, June 24, 2003.

**COMM-13:** Jimmy Bonds, June 24, 2003.

**COMM-14:** Clara Hughes, Virginia Black Lung Association, June 25, 2003.

**COMM-15:** Carl Ball, Virginia Black Lung Association, June 26, 2003.

**COMM-16:** William St. Clair, Virginia Black Lung Association, June 26, 2003.

**COMM-17:** Allen Hess, June 26, 2003.

**COMM-18:** Herbert Endicott, Virginia Black Lung Association, June 26, 2003.

**COMM-19:** Jim Walter Resources, June 26, 2003.

**COMM-20:** Ernestine Bailey, June 26, 2003.

**COMM-21:**Cynthia Anderson, June 27, 2003.

**COMM-22:**Mr. Liggett, June 27, 2003.

**COMM-23:**    John Cline, June 27, 2003.

**COMM-24:**    Maxine Gibson, June 27, 2003.

**COMM-25:**Donald Taylor, June 27, 2003.

**COMM-26:**Cecil Gibson, June 27, 2003.

**COMM-27:**3M, Michael Runge, July 2, 2003.

**COMM-28:**John Power, June 27, 2003.

**COMM-29:**James Kinney, June 30, 2003.

**COMM-30:**Nancy Campbell, June 30, 2003.

**COMM-31:**Emma Campbell, June 30, 2003.

**COMM-32:**Mary Aliff, June 30, 2003.

**COMM-33:**Edward Lilly, June 30, 2003.

**COMM-34:**Henry Aliff, June 30, 2003.

**COMM-35:**Virginia Lilly, June 30, 2003.

**COMM-36:**Kenneth Dangerfield, June 30, 2003.

**COMM-37:**Gary Hairston, June 30, 2003.

**COMM-38:**Bonnie Bower, June 30, 2003.

**COMM-39:**Posey Stump, June 30, 2003.

86

**COMM-40:** Charles Prather, June 30, 2003.

**COMM-41:** Eve Fingerett, June 30, 2003.

**COMM-42:** Orval King, June 30, 2003.

**COMM-43:** Michael Barn, June 30, 2003.

**COMM-44:** Eunice Dangerfield, June 30, 2003.

**COMM-45:** Nancy Massu, June 30, 2003.

**COMM-46:** Joe Massie, June 30, 2003.

**COMM-47:** Mack Whited, June 30, 2003.

**COMM-48:** Leonard Justus, June 30, 2003.

**COMM-49:** University of Massachusetts Lowell (Drs. Wegman, Dement, and Rice), July 2, 2003.

**COMM-50:** Anonymous, July 2, 2003.

**COMM-51:** Jack Edwards, July 2, 2003.

**COMM-52:** Joseph Sanders, July 2, 2003.

**COMM-53:** Joe Pennington, July 2, 2003.

**COMM-54:** Jerry Thompson, July 2, 2003.

**COMM-55:** John Hall, July 2, 2003.

**COMM-56:** Kenneth Bowman, July 2, 2003.

**COMM-57:** Louise Crusenberry, July 2, 2003.

87

**COMM-58:** Mike Sanders, July 2, 2003.

**COMM-59:** American Society of Safety Engineers, James Kendrick, July 3, 2003.

**COMM-60:** Boone Sutherland, July 3, 2003.

**COMM-61:** Fred Shapre, July 3, 2003.

**COMM-62:** Clinton Corico, July 3, 2003.

**COMM-63:** Walter Dean, Virginia Black Lung Association, July 8, 2003.

**COMM-64:** Ollie Dotson, July 8, 2003.

**COMM-65:** Harry Dotson, July 8, 2003.

**COMM-66:** Louie Hall, July 8, 2003.

**COMM-67:** Jackie Clendenon, July 8, 2003.

**COMM-68:** Robert Cassel, Sr., July 8, 2003.

**COMM-69:** Sammy Mullins, July 8, 2003.

**COMM-70:** Jimmy Scardo, July 8, 2003.

**COMM-71:** James Jackson, July 8, 2003.

**COMM-72:** Larry Derban, July 8, 2003.

**COMM-73:** Walter Dean, July 8, 2003.

**COMM-74:** Willie Crusenberry, July 8, 2003.

**COMM-75:** Woodrow Tackett, July 8, 2003.

**COMM-76:** Everette Meade, July 11, 2003.

**COMM-77:** Lena Cassell, July 14, 2003.

**COMM-78:** Rep. Shelley Moore Capito (WV), June 20, 2003.

## PUBLIC HEARINGS

### Washington, PA, Public Hearing, May 5, 2003.

**PH1-1:**     Request from Joseph Main, UMWA, to speak at all six public hearings, May 1, 2003.

**PH1-2:**     List of Speakers.

**PH1-3:**     List of Attendees.

**PH1-4:**     Pamphlet of a Personal Dust Monitor as demonstrated by Jon Volkwein.

**PH1-5:**     Transcript of Proceedings.

### Charleston, WV, Public Hearing, May 7, 2003.

**PH2-1:**     List of Speakers.

**PH2-2:**     List of Attendees.

**PH2-3:**     Hearing Submission.  Max Kennedy testimony from the 2000 public hearing on Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling.

**PH2-4:**     Hearing Submission.  Bob Knisely testimony from the 2000 public hearing on Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling.

89

**PH2-5:**    Hearing Submission.  Testimony from the 2000 public hearing Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling from Rick Glover.

**PH2-6:**    Hearing Submission from Tim Baker, UMWA.  "Dust, Deception & Death, Why Black Lung Hasn't Been Wiped Out."  *The Courier-Journal*, April 19, 1998.

**PH2-7:**    Hearing Submission.  Letter dated April 17, 2003, from Joseph Main, UMWA, to Dave D. Lauriski, Assistant Secretary for Mine Safety and Health.

**PH2-8:**    Transcript of Proceedings.

**Evansville, IN, Public Hearing, May 13, 2003.**

**PH-3-1:**    List of Speakers.

**PH-3-2:**    List of Attendees.

**PH3-3:**    Presentation by Lee Ptasnik, Mine & Process Service, Inc.

**PH-3-4:**    Transcript of Proceedings.

**Lexington, KY, Public Hearing, May 15, 2003.**

**PH4-1:**    List of Speakers.

**PH4-2:**    List of Attendees.

**PH4-3:**    Hearing Submission from Joseph Main, UWMA.  *U.S. v. Triangle Research Inc.*, Public Information Release, October 21, 1991, United States Attorney, Southern District of West Virginia.

**PH4-4:**    Hearing Submission from Joseph Main, UMWA.  Summary of CMS&H Criminal Cases Prosecuted/Dismissed since September 1990, or with Pending Indictments or Pleas, Excluding Respirable Dust Cases, August 6, 1999.

90

**PH4-5:**    Transcript of Proceedings.


**Birmingham, AL, Public Hearing, May 20, 2003.**

**PH6-1:**    List of Attendees.

**PH6-2:**    List of Speakers.

**PH6-3:**    Hearing Submission from Keith Plylar.  Testimony of Keith Plylar, dated May 19, 2003.

**PH6-4:**    Hearing Submission from Tom Wilson.  Letter from Joseph Main, UMWA, dated June 8, 1999, to Edward Hugler, MSHA, re: Technical studies to be conducted at the Jim Walter Resources No. 4 mine (with attachments).

**PH6-4A:**    Attachment.  Letter dated June 14, 1989, from Edward C. Hugler in response to June 8, 1999 letter from Joseph Main.

**PH6-4B:**    Attachment.  Environmental Dust Survey at the Blue Creek No. 4 Mine, Jim Walter Resources, Inc., Brookwood, AL, by Robert S. Ondrey, MSHA.  PHTC-DD-90-2C.

**PH6-4C:**    Attachment.  Telefax dated May 13, 1991, from Thomas Wilson to Joseph Main, re: section 103(g) request.

**PH6-4D:**    Attachment.  Letter dated January 25, 1989, from Joseph Garcia to W.E. Querry, re:  Ventilation System and Methane and Dust Control Plan, No. 4 Mine.

**PH6-4E:**    Attachment.  Telefax dated May 9, 1991, from Thomas Wilson to Joseph Main, re: respirable dust problems, discussions between MSHA and UMWA.

91

**PH6-4F:**   Attachment.  Memorandum dated March 9, 1990, from Thomas Tomb to Joseph Garcia, re: Respirable Dust Survey conducted at Jim Walter Resources, Blue Creek No. 4 Mine.

**PH6-5:**   Hearing Submission from Tom Wilson.  Memorandum for Joseph Garcia, through Robert Peluso, from Edward Miller, re: Report of Investigations Conducted at the Jim Walter Resources, Inc., No. 4, dated November 30, 1989.

**PH6-6:**   Hearing Submission from Tom Wilson.  Phase II, Mine Ventilation Pressure-Air Quantity and Face Ventilation Investigations: Blue Creek No. 4 Mine - I.D. 01-01247, Jim Walter Resources, December 6-12, 1989, by Gary E. Smith, Gary J. Wirth, and Joseph Denk.  Investigative Report No. P323-V227.

**PH6-7:**   Hearing Submission from Tom Wilson.  Abstract, "Health and Safety Issues Related to Extended Longwalls," by Edward Thimons, Robert Jankowski, and Gerald Finfinger (U.S. Bureau of Mines).

**PH6-8:**   Hearing Submission from Tom Wilson.  Petition to Marvin Nichols from UMWA members, Re:  Request for the Office of Standards to provide hard copy material of all future Preliminary Regulatory Economic Analysis for Proposed Rules, preambles of any future proposed rules, as well as future proposed rules.

**PH6-9:**   Hearing Submission from Tom Wilson.  Diskettes of the 1996 Dust Advisory Committee public meeting transcripts.
- Diskette 1:  February 21-22, 1996, Arlington, VA; April 11-12, 1996, Pittsburgh, PA.
- Diskette 2:  May 29-30, 1996, Charleston, WV; June 20-21, 1996, Salt Lake City, UT.
- Diskette 3:  July 22-25, 1996, Lexington, KY.

**PH6-10:**   Hearing Submission from Bradley Berryhill.  "Continuous Monitoring of Environmental Parameters in Underground Coal Mines," by Robert Peluso, MSHA.

**PH6-11:**    Transcript of Proceedings.

**Grand Junction, CO, Public Hearing, May 22, 2003.**

**PH7-1:**    List of Attendees.

**PH7-2:**    List of Speakers.

**PH7-3:**    Hearing Submission from NMA/BCOA panel. "Chronology of Correspondence between NMA/BCOA and MSHA re: Coal Mine Dust."

**PH7-4:**    Hearing Submission from Link Derrick. "General Example-Belt Air to Face and Normal Shearer Controls; Belt Air Taken Away From Face; Additional Dust Controls on Shearer; and Hypothetical Example of the Lowering of the Quartz Standard.

**PH7-5:**    Hearing Submission. Comments from Teresa Thompson and Chris Barbee, coal miners and miners' representative, International Union of Operating Engineers.

**PH7-6:**    Transcript of Proceedings.

93

V.

## DETERMINATION OF CONCENTRATION OF RESPIRABLE COAL MINE DUST
### ("2000 SINGLE SAMPLE")

RIN: 1219-AB18
Rule Proposed on July 7, 2000

**MSHA FEDERAL REGISTER NOTICES**

**FR-1:** Coal Mine Respirable Dust Standard Noncompliance Determinations.  Notice.  *Federal Register*, 59 FR 8356, February 18, 1994.

U.S. Department of Labor and U.S. Department of Health and Human Services.  Mine Shift Atmospheric Conditions; Respirable Dust Sample.  Notice.  *Federal Register*, 59 FR 8357, February 18, 1994.

**FR-2:** Coal Mine Respirable Dust Standard Noncompliance Determinations; Mine Shift Atmospheric Conditions; Respirable Dust Sample.  Extension of comment periods.  *Federal Register*, 59 FR 16958, April 8, 1994.

**FR-3:** Response to National Institute for Occupational Safety and Health (NIOSH) Criteria Document. *Federal Register*, 61 FR 18308, April 25, 1996

**FR-4:** Response to Recommendations of the Advisory Committee on the Elimination of Pneumoconiosis among Coal Mine Workers. *Federal Register*, 62 FR 3717, January 24, 1997.

**FR-5:** U.S. Department of Labor and U.S. Department of Health and Human Services.  1998. Mine Shift Atmospheric Conditions; Respirable Dust Sample. Final notice of joint finding. *Federal Register*, 63 FR 5664, February 3, 1998.

94

**FR-6:** U.S. Department of Labor, Mine Safety and Health Administration. 1998. Coal Mine Respirable Dust Standard Noncompliance Determinations. *Federal Register*, 63 FR 5687, February 3, 1998.

**FR-7:** U.S. Department of Labor and U.S. Department of Health and Human Services. 2000. Determination of Concentration of Respirable Coal Mine Dust. Proposed Rule; notice of hearings. *Federal Register*, 65 FR 42068, July 7, 2000.

**FR-8:** U.S. Department of Labor and U.S. Department of Health and Human Services. 2000. Determination of Concentration of Respirable Coal Mine Dust. Proposed Rule; notice of public hearings; close of record. *Federal Register*, 65 FR 42185, July 7, 2000.

**FR-9:** Determination of Concentration of Respirable Coal Mine Dust; Proposed rule; correction. *Federal Register*, 65 FR 45743, July 25, 2000.

**FR-10:** Determination of Concentration of Respirable Coal Mine Dust; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust; Proposed rule; extension of comment period; close of record. *Federal Register*, 65 FR 49215, August 11, 2000.


## ECONOMIC ANALYSIS

**PREA-1:** Preliminary Regulatory Economic Analysis (PREA) for the Proposed Rule Concerning Determination of Concentration of Respirable Coal Mine Dust and Proposed Rule for Verification of Dust Control Plans

**PREA-2:** Attfield, M.D., and N.S. Seixas. 1995. "Prevalence of pneumoconiosis and its relationship to dust exposure in a cohort of U.S. bituminous coal miners and ex-miners." *Am. J. Ind. Med.* 27: 137-151.

**PREA-3:**   Attfield, M.D., and K. Morring.  1992.  "The derivation of estimated dust exposures for U.S. coal miners working before 1970." *Am. Ind. Hyg. Assoc. J.* 53:248-255.

**PREA-4:**   Attfield, M.D., and K. Morring.  1992.  "An investigation into the relationship between coal workers' pneumoconiosis and dust exposure in U.S. coal miners."  *Am. Ind. Hyg. Assoc. J.* 53:486-492.

**PREA-5:**   Balaan, M.R., S.L. Weber, and D.E. Banks.  1993.  "Clinical aspects of coal workers' pneumoconiosis and silicosis."  *Occupational Medicine*: State of the Art Rev. 8:19-34.

**PREA-6:**   Denk, J. M. *et al.* 1990.  Summary Project Report, "Longwall Ventilation and Environmental Dust Control Investigation of the Jim Walter Resources No. 4 Mine."  Mine Safety and Health Administration, Investigative Report Nos. P338-V242 and DD-4145.

**PREA-7:**   Hurley, J.F., and W.M. Maclaren.  1987.  "Dust-related risks of radiological changes in coal miners over a 40-year working life," Report on work commissioned by NIOSH.  Edinburgh, Scotland: Institute of Occupational Medicine, Report No. TM/87/09, 1987.

**PREA-8:**   Jacobsen, M., J. Burns, and M.D. Attfield.  1977.  "Smoking and coalworkers' simple pneumoconiosis."  In:  *Inhaled particles IV, Vol. 2.*, W.H. Walton, ed.   Oxford, England: Pergamon Press, pp. 759-770.

**PREA-9:**   Kuempel, E.D., L.T. Stayner, M.D. Attfield, and C.R. Buncher.  1995.  "Exposure-response analysis of mortality among coal miners in the United States."  *Am. J. Ind. Med.*  28:167-184.

**PREA-10:**  U.S. Bureau of the Census, Current Population Reports, Table 18. Resident Population, by Race, 1980 to 1996, and Projections, 1997 to 2050, P25-1095 and P25-1130; and Population Paper Listing PPL-57, March 1997.

**PREA-11:**  U.S. Bureau of the Census.  1997.  "Current Population Reports, Table 119. Expectation of Life and Expected Deaths, by Race, and Age: 1994," March 1997.

**PREA-12:**  U.S. Department of Labor, Mine Safety and Health Administration. "Report of the Statistical Task Team of the Coal Mine Respirable Dust Task Group."  September 1993.

**PREA-13:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA).  Percentage of Coal Miners X-rayed with Evidence of Black Lung.  Source: Centers for Disease Control and Prevention. 1998.

**PREA-14:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA).  Mines and Entity Types in Producing Status. Source: MSIS Data, February 12, 1999.

**PREA-15:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA).  By Mine Size of Underground Coal Mines, MMUs and Percentages, by Number of Production Shifts.  Source: MSIS Data, November 18, 1999.

## BACKGROUND DOCUMENTS

**BKG-1:**    Althouse, R.B., K.M. Bang and R.M. Castellan. 1995. "Tuberculosis co-mortality with silicosis–United States, 1979-1991." *Applied Occupational Environmental Hygiene*.  10(12):1037-1041.

**BKG-2:**    American Conference of Governmental Industrial Hygienists (ACGIH). *TLVs® and BEIs®. Threshold Limit Values for Chemical Substances and Physical Agents, Biological Exposure Indices*. Cincinnati, OH, 1999. pp. 3-14.

**BKG-3:**    American Industrial Hygiene Association (AIHA).  1997. *The Occupational Environment - Its Evaluation and Control*. Salvatore R. DiNardi, Editor. AIHA Press, Fairfax, VA.

**BKG-4:**    American Iron and Steel Institute v. OSHA, (AISI-I) 577 F.2d 825 (3d Circuit) at 832-835, 1978.

97

**BKG-5:**    American Iron and Steel Institute v. OSHA, (AISI-II) 939 F.2d 975, 980, District of Columbia Circuit, 1991.

**BKG-6:**    American Mining Congress (AMC) v. Secretary of Labor, 671 F.2d 1251, 1982.

**BKG-7:**    American Textile Manufacturers' Institute v. Donovan, 452 U.S. 490, 508-509, 1981.

**BKG-8:**    American Thoracic Society.  1991.  "Lung Function Testing: Selection of Reference Values and Interpretative Strategies." *American Review of Respiratory Disease*, 144:1202-1218.

**BKG-9:**    Armitage, P. *Statistical Methods in Medical Research*. Blackwell  Scientific Publications. Oxford, UK. pp. 349, 359, 362, 375-384, 426-433.

**BKG-10:**    Attfield, M.D and F.J. Hearl.  1996.  "Application of data on compliance to epidemiological assessment of exposure-response:  the case of data on exposure of United States coal miners." *Occup. Hyg*. 3:177-184.

**BKG-11:**    Attfield, M.D. and T.K. Hodous.  1992  "Pulmonary function of U.S. coal miners related to dust exposure estimates." *Am. Rev. Resp. Dis*. 145:605-609.

**BKG-12:**    Attfield, M.D., and G. Wagner.  1992  "Respiratory disease in coal miners." In:  *Environmental and Occupational Medicine*.   Second Edition.  W.N. Rom, Editor.  Boston, MA: Little, Brown, and Company, pp. 325-344.

**BKG-13:**    Atuhaire, L.K., M.J. Campbell, A.L. Cochrane, M. Jones, and F. Moore. 1985.  "Mortality of men in Rhondda Fach 1950-1980." *Brit. J. Ind. Med*. 42: 741-745.

**BKG-14:**    Bartley, D.L.  Letter dated  September 7, 1994, from David L. Bartley, Research Physicist, Division of Physical Sciences and

98

Engineering, NIOSH, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, MSHA.

**BKG-15:**    Boden, L.I. and M. Gold.  1984.  "The accuracy of self-reported regulatory data: the case of coal mine dust."  *Am. J. Ind. Med.* 6:427-440.

**BKG-16:**    Bourgkard, E., P. Bernadec, N. Chau, J.P. Bertrand, D. Teculescu, and Q.T. Pham.  1998.  "Can the evolution to pneumoconiosis be suspected in coal miners?"  *Am. J. Respir. Crit. Care Med.* 158: 504-509.

**BKG-17:**    Bowman, J.D., G.M. Breuer, S.A. Shulman, and D.L. Bartley. 1984. "The Precision of Coal Mine Dust Sampling."  U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, National Institute for Occupational Safety and Health, NTIS No. PB-85-220-721.

**BKG-18:**    Carta, P., G. Aru, M.T. Barbieri, G. Avataneo, and D. Casula.  1996.  "Dust exposure, respiratory symptoms, and longitudinal decline of lung function in young coal miners."  *Occup. Environ.  Med.* 53: 312-319.

**BKG-19:**    Cochrane, A.L.  1962.  "The attack rate of progressive massive fibrosis."  *Br. J. Industr. Med.* 19: 52-64.

**BKG-20:**    Cochrane, A.L., T.J.L. Haley, F. Moore, and D. Hole.  1979.  "The mortality of men in the Rhondda Fach, 1950-1970."  *Br. J. Ind. Med.* 36: 15-22,.

**BKG-21:**    Coggon, D. and A.N. Taylor.  1998.   "Coal mining and chronic obstructive pulmonary disease: a review of the evidence."  *Thorax* 53(5): 398-407.

**BKG-22:**    Consolidation Coal Company v. Federal Mine Safety and Health Review Commission, *et al.*, 824 F.2d 1071, (D.C. Cir. 1987).

99

**BKG-23:**    Cotes, J.E. and J. Steel.  1987.  "Pneumoconiosis of coalworkers and related occupations."  In:  Cotes J.E., and J. Steel , Editors.  "Work-related lung disorders."  Oxford, England:  Blackwell Scientific Publications.

**BKG-24:**    Employment Standards Administration.  "Review of Claims Filed Under Black Lung Benefits Amendments of 1981."  Submitted to Congress in 1986.

**BKG-25:**    Employment Standards Administration, Table: Estimated Average of Total Cost of Future Monthly Benefits for Trust Fund and Responsible Operator Claims, p. 9, 1980.

**BKG-26:**    European Standard No. EN 482: "Workplace atmospheres - General requirements for the performance of procedures for the measurement of chemical agents."  *European Committee for Standardization (CEN)*, 1994.

**BKG-27:**    Freedman, A.P. and S.E. Robinson.  1988 "Noninvasive magnetopneumographic studies of lung dust retention and clearance in coal miners".  In:  Respirable dust in the mineral industries:  health effects, characterization and control.  R.L. Frantz,and R.V.  Ramani, Editors.  University Park, PA:  The Pennsylvania State University, pp. 181-186.

**BKG-28:**    Garshick, E., M.B. Schenker, and J.A. Dosman.  1996.  "Occupationally induced airways obstruction."  *Medical Clinics of North America*. 80 (4): 851-879.

**BKG-29:**    Gero, A.J., P.S. Parobeck, K.L. Suppers, B.P. Apel, and J.D. Jolson.  1995.  "The Effect of Altitude, Sample Port Inlet Loading, and Temperature on the Volumetric Flow Rate of the Mine Safety Appliances Co. Escort Elf® Constant Flow Rate Pump."  Pres. at Second International Conference on the Health of Miners, Pittsburgh, PA, November 11-13.

**BKG-30:**   Goodwin, S. and M.D. Attfield.  1998.  "Temporal trends in coal workers' pneumoconiosis prevalence." *J. Occup. Environ. Med.* 40 (12): 1065-1071.

**BKG-31:**   Gray, D.C. and M.I. Tillery.  1981.  "Cyclone vibration effects."  *Am. Ind. Hyg. Assoc. J.* 42(9):685-688.

**BKG-32:**   Grayson, R.L.  Letter dated August 19, 1999, from R.L. Grayson, Associate Director, Office for Mine Safety and Health Research, NIOSH, to Dr. Carol J. Jones, Acting Director, Office of Standards, Regulations and Variances, U.S. Department of Labor, MSHA.

**BKG-33**   U.S. Department of Labor, Mine Safety and Health Administration, Office of Standards, Regulations, and Variances (OSRV).  Reply dated September 9, 1999, from Dr. Carol J. Jones, Acting Director, OSRV, to Grayson, R.L. regarding August 19, 1999, letter to MSHA.

**BKG-34:**   Grayson, R.L.  Letter dated September 27, 1999, from R.L. Grayson, Associate Director, Office for Mine Safety and Health Research, NIOSH, to Dr. Carol J. Jones, Acting Director, Office of Standards, Regulations and Variances, U.S. Department of Labor, MSHA.

**BKG-35:**   Hansen, E.F. , K. Phanareth, L.C. Laursen, A. Kok-Jensen, and A. Dirksen. 1999.  "Reversible and irreversible airflow obstruction as predictor of overall mortality in asthma and chronic obstructive pulmonary disease." *Am. J. Respir. Crit. Care Med.* 159:1267-1271.

**BKG-36:**   Henneberger, P.K. and M.D. Attfield.  1996.  "Coal mine dust exposure and spirometry in experienced miners." *Am. J. Resp. Crit. Care Med.* 153: 1560-1566.

**BKG-37:**   Henneberger, P.K. and M.D. Attfield.  1997.  "Respiratory symptoms and spirometry in experienced coal miners: effects of both distant and recent coal mine dust exposures."  *Am. J. Ind. Med.* 32: 268-274.

**BKG-38:**   Heyder, J., J. Gebhart, G. Rudolf, C.F. Schiller, and W. Stahlhofen. 1986. "Deposition of particles in the human respiratory tract in the size range 0.005-15 μm." *J. Aerosol Sci.* 17: 811-825.

**BKG-39:**   Hodous, T.K. and M.D. Attfield. 1990. "Progressive massive fibrosis developing on a background of minimal simple coal workers' pneumoconiosis." In: *Proceedings of the VIIth International Pneumoconiosis Conference*, August 23-26, 1988, Pittsburgh, PA. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 90-108.

**BKG-40:**   Hurley, J.F., W.P. Alexander, D.J. Hazledine, M. Jacobsen, and W.M. Maclaren. 1987. "Exposure to respirable coal mine dust and incidence of progressive massive fibrosis." *Br. J. Ind. Med.* 44:661-672.

**BKG-41:**   Hurley, J.F., and M. Jacobsen. 1986. "Occupational hygiene implications of new results on progressive massive fibrosis in working coalminers." *Ann. Am. Conf. Gov. Ind. Hyg.* 14:85-89.

**BKG-42:**   Hurley, J.F., and W.M. Maclaren. 1988. "Factors influencing the occurrence of progressive massive fibrosis (PMF) in miners and ex-miners." *Ann. Occup. Hyg.* 32(Suppl 1):575-583.

**BKG-43:**   International Agency for Research on Cancer (IARC) of the World Health Organization. 1997. "IARC Monographs on the evaluation of Carcinogenic Risks to humans: silica, some silicates, coal dust and para-aramid fibrils." Vol. 68. Lyon, France.

**BKG-44:**   International Commission on Radiological Protection. 1994. "Human respiratory tract model for radiological protection." A report of a task group of the International Commission on Radiological Protection. Tarrytown, New York: Elsevier Science, Inc., ICRP Publication No. 66 (Table 6, p. 23).

**BKG-45:**   Industrial Union Dep't., AFL-CIO v. Hodgson, 499 F.2d 467,478 (District of Columbia Circuit), 1974.

102

**BKG-46:**    International Labour Office (ILO).  1980.  "Guidelines for the use of ILO international classification of radiographs of pneumoconiosis."  Rev. ed. *Occupational Safety and Health Series* No. 22. Geneva, Switzerland.

**BKG-47:**    Jacobsen, M.  1976.  *Dust Exposure, Lung Diseases, and Coal Miners' Mortality*.  Doctoral Thesis.  Edinburgh, Scotland: University of Edinburgh.

**BKG-48:**    Jacobsen, M., S. Rae, W.H. Walton, and J.M. Rogan.  1971. "The relation between pneumoconiosis and dust-exposure in British coal mines."  In: *Inhaled Particles III. Volume 2*. W.H. Walton, Editor. Surrey, United Kingdom: Unwin Brothers Limited, The Gresham Press, pp. 903-917.

**BKG-49:**    Kennedy, E.R., T.J. Fischbach, R. Song, P.M. Eller, and S.A. Shulman.  1995.  *Guidelines for Air Sampling and Analytical Method Development and Evaluation*.  U.S. Department of Health and Human Services, Public Health Service, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 95-117.

**BKG-50:**    Kissell, F.N., and R.A. Jankowski.  1993.  "Fixed-Point and Personal Sampling of Respirable Dust for Coal Mine Face Workers." Paper in *Proceedings of the 6th US Mine Ventilation Symposium*. Society of Mining, Metallurgy, and Exploration, Inc. (SME), Littleton, CO, 281-286.

**BKG-51:**    Kogut, J. Letter dated May 12, 1994, from Jon Kogut, MSHA, to David Bartley, Division of Physical Sciences and Engineering, NIOSH.

**BKG-52:**    Kogut, J.  Memorandum dated September 6, 1994, from Jon Kogut, Mathematical Statistician, Denver Safety and Health Technology Center, MSHA, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, MSHA, Subject: Coal Mine Respirable Dust Standard Noncompliance Determination.

**BKG-53:** Kogut, J. Memorandum dated September 6, 1994, from Jon Kogut, Mathematical Statistician, Denver Safety and Health Technology Center, MSHA, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, MSHA, Subject: Multi-day MSHA Sampling of Respirable Coal Mine Dust.

**BKG-54:** Kogut, J., T.F. Tomb, M.B. Gareis, P.S. Parobeck, and A.J. Gero. 1999. "Variability in Weight Gain of Unexposed Filter Capsules within Batches of Filter Capsules Used in MSHA's Respirable Coal Mine Dust Enforcement Program," Internal MSHA Report.

**BKG-55:** Kogut, J., T.F. Tomb, P.S. Parobeck, A.J. Gero, and K.L. Suppers. 1997. "Measurement Precision With the Coal Mine Dust Personal Sampler. " *Applied Occupational Environmental Hygiene*, 12:999-100.

**BKG-56:** Kuempel, E., R.J. Smith, M.D. Attfield, and L. Stayner. 1997. "Risks of occupational respiratory disease among U.S. coal miners." *Appl. Occup. Environ. Hyg.* 12: 823-831.

**BKG-57:** Lewis, S., J. Bennett, K. Richards, and J. Britton. 1996. "A cross sectional study of the independent effect of occupation on lung function in British coal miners." *Occup. Environ. Med.* 53: 125-128.

**BKG-58:** Lewis, T.R., F.H.Y. Green, W.J. Moorman, J.R. Burg, and D.W. Lynch. 1989. "A chronic inhalation toxicity study of diesel engine emissions and coal dust, alone and combined." *J. Amer. Coll. Toxicol.* 8: 345-375.

**BKG-59:** Lippmann, M., and R.E. Albert. 1969. "The Effect of Particle Size on the Regional Deposition of Inhaled Aerosols in the Human Respiratory Tract." *Am Ind Hyg Assoc J*, 30:257-275.

**BKG-60:** Love, R.G., B.G. Miller, S.K. Groat, H.A. Cowie, P.P. Johnston, P.A. Hutchison, and C.R. Soutar. 1997. "Respiratory health effects of opencast coalmining: a cross sectional study of current workers." *Occup. Environ. Med.* 54: 416-423.

104

**BKG-61:**   Love, R.G., B.G. Miller, J. Beattie, H.A. Cowie, S. Groat, S. Hagen, P.A. Hutchison, P.P. Johnston, R. Porteous, and C.A. Soutar. 1992. "A cross-sectional epidemiological study of the respiratory health and exposure to airborne dust and quartz of current workers in opencast coal mines." Edinburgh, Scotland: *Institute of Occupational Medicine*, Report No. TM/92/03.

**BKG-62:**   Maclaren, W.M., J.F. Hurley, H.P.R. Collins, and A.J. Cowie. 1989. "Factors associated with the development of progressive massive fibrosis in British coalminers: a case-control study." *Br. J. Ind. Med.* 46:597-607.

**BKG-63:**   Manahan, S. 1994. "Environmental Chemistry." Sixth Edition.  Chapter 10, pp. 305-326; Chapter 17, pp. 487-526.  Lewis Publishers, Boca Raton, FL.

**BKG-64:**   Marine, W.M., D. Gurr, and M. Jacobsen. 1988. "Clinically important respiratory effects of dust exposure and smoking in British coal miners." *Am. Rev. Resp. Dis.* 137: 106-112.

**BKG-65:**   Mattos, Jay P. Memorandum dated July 15, 1999, from Jay Mattos, Chief, Office of Program Policy Evaluation, MSHA to Dr. Michelle Schaper, Toxicologist, MSHA.

**BKG-66:**   Mauderly, J.L. 1996. "Usefulness of animal models for predicting human responses to long-term inhalation of particles." *Chest* 109 (3): 65S-68S.

**BKG-67:**   McLintock, J.S., S. Rae, and M. Jacobsen. 1971. "The attack rate of progressive massive fibrosis in British coal miners." In: *Inhaled Particles III.*  Vol. II. W. H. Walton.  Editor.  Surrey, U.K. Unwin Brothers Limited, The Gresham Press. pp. 933-950.

**BKG-68:**   Meijers, J.M.M., G.M.H. Swaen, and J.J.M. Slangen.  May 1997. "Mortality of Dutch coal miners in relation to pneumoconiosis, chronic obstructive pulmonary disease, and lung function." *Occup. Environ. Med.* 54: 708-713.

**BKG-69:**    Mercer, T.  1973. "Aerosol Technology in Hazard Evaluation." Introduction, pp. 1-20; Chapter 8, pp. 284-318. Academic Press: New York and London.

**BKG-70:**    Miller, B.G., and M. Jacobsen.  1985.  "Dust exposure, pneumoconiosis, and mortality of coal miners." *Brit. J. Ind. Med.* 42: 723-733.

**BKG-71:**    Moorman, W.J., T.R. Lewis, and W.D. Wagner. 1975. "Maximum expiratory flow-volume studies on monkeys exposed to bituminous coal dust." *J. Appl. Physiol.* 39: 444-448.

**BKG-72:**    Morfeld, P., H.J. Vautrin, A. Kosters, K. Lampert, and C. Pierkarski. December 1997. "Components of coal mine dust exposure and the occurrence of prestages of pneumoconiosis." *Appl. Occup. Environ. Hyg.* 12: 973-979.

**BKG-73:**    Morgan, W.K.C., L. Handelsman, J. Kibelstis, N.L. Lapp, and R. Reger. April 1974. "Ventilatory capacity and lung volumes of U.S. coal miners." *Arch. Environ. Health* 28: 182-189.

**BKG-74:**    Morrow, P.E. 1992. "Contemporary issues in toxicology: dust overloading of the lungs and appraisal." *Toxicol. Appl. Pharmacol.* 113: 1-12.

**BKG-75:**    Morrow, P.E. 1988.  "Possible mechanisms to explain dust overloading of the lungs.*" Fundam. Appl. Toxicology.* 10: 369-384.

**BKG-76:**    National Institute for Occupational Safety and Health (NIOSH). 1977. *Sampling Strategies Manual.*  U.S. Department of Health, Education and Welfare. (DHEW (NIOSH) Publication No. 77-173; Sec. 4.2.1).

**BKG-77:**    National Institute for Occupational Safety and Health (NIOSH). 1977. *NIOSH Accuracy Criterion.*  U.S. Department of Health, Education and Welfare. (DHEW (NIOSH) Publication No. 77-185; pp. 1-5).

**BKG-78:**    National Institute for Occupational Safety and Health (NIOSH). 1995.  *Criteria for a Recommended Standard: Occupational Exposure to Respirable Coal Mine Dust.*  U.S. Department of Health and Human Services. Public Health Service. Center for Disease Control and Prevention. Cincinnati, OH.

**BKG-79:**    Nicas, M., B. Simmons, and R. Spear.  1991. "Environmental Versus Analytical Variability in Exposure Measurements."  *American Industrial Hygiene Association Journal* (62).

**BKG-80:**    Nikula, K.J., K.J. Avila, W.C. Griffith, and J.L. Mauderly. 1997. " Sites of particle retention and lung tissue responses to chronically inhaled diesel exhaust and coal dust in rats and cynomolgus monkeys." *Environ. Health Perspect.* 105 (Suppl. 5): 1231-1234.

**BKG-81:**    Nikula, K.J., K.J. Avila, W.C. Griffith, and J.L. Mauderly. 1997.  "Lung tissue responses and sites of particle retention differ between rats and cynomolgus monkeys exposed chronically to diesel exhaust and coal dust." *Fund. Appl. Toxicol.* 37: 37-53.

**BKG-82:**    Oberdorster, G. 1995.  "Lung particle overload: implications for occupational exposures to particles." *Regul. Toxicol. Pharmacol.* 27 (1): 123-135.

**BKG-83:**    Parkes, R.W. 1982.  "Pneumoconiosis due to coal and carbon." In*: Occupational Lung Disorders, Second Edition.* London, England: Butterworths, pp.175-232.

**BKG-84:**    Parobeck, P. S., J. Kogut, T. Tomb, and L. Raymond. April 1997.  "Investigation of Weighing Variability Between MSHA and Mine Safety Appliances Co. Laboratories MSA." Internal MSHA Report.

**BKG-85:**    Parobeck, P. S., T. Tomb, H. Ku, and J. Cameron. 1981. "Measurement Assurance Program for Weighings of Respirable Coal Mine Dust Samples." *J Qual Tech*, 13(3):157-165,.

**BKG-86:**    Petsonk, E.L., and Attfield, M.D.  1994.  "Coal Workers' Pneumoconiosis and Other Coal-Related Lung Disease."  In: *Textbook of*

107

*Clinical Occupational and Environmental Medicine.*  L. Rosenstock, and M.R. Cullen, Editors. Philadelphia, PA: W.B. Saunders Company.

**BKG-87:**    Rasmussen, D.L., W.A. Laqeur, P. Futterman, H.D. Warren, and C.W. Nelson. "Pulmonary impairment in Southern West Virginia coal miners. " *Am. Rev. Respir. Dis.* 98: 658-667,

**BKG-88:**    Seixas, N.S., L.H. Moulton, T.G. Robins, C.H. Rice, M.D. Attfield, and E.T. Zellers.  1991.  "Estimation of cumulative exposures for the National Study of Coal Workers' Pneumoconiosis." *App. Occup. Environ. Hyg.* 6:1032-1041.

**BKG-89:**    Seixas, N.S., T.G. Robins, M.D. Attfield, and L.H. Moulton. 1993. "Longitudinal and cross sectional analyses of exposure to coal mine dust and pulmonary function in new miners." *Brit. J. Ind. Med.* 50: 929-937.

**BKG-90:**    Seixas, N.S., T.G. Robins, M.D. Attfield, and L.H. Moulton. 1992. "Exposure-response relationships for coal mine dust and obstructive lung disease following enactment of the Federal Coal Mine Health and Safety Act of 1969." *Am. J. Ind. Med.* 21: 715-734.

**BKG-91:**    Senate Report Number 95-181, at 21-22, <u>reprinted</u> in 1977 *United States Code Congressional and Administrative News.* 3421-22, 1977.

**BKG-92:**    Silverman, L., C.E. Billings, and M.W. First.  1971.  "Particle Size Analysis in Industrial Hygiene." Academic Press, NY.

**BKG-93:**    Snipes, M.B.  1996  "Current information on lung overload in nonrodent mammals: contrast with rats." *Inhal. Toxicol.* 8 (suppl.): 91-109.

**BKG-94:**    Soutar, C.A., and J.F. Hurley. 1986.  "Relations between dust exposure and lung function in miners and ex-miners." *Brit. J. Ind. Med.* 43: 307-320.

**BKG-95:**   Soutar, C.A., B.G. Miller, N. Gregg, A.D. Jones, R.T. Cullen, and R.E. Bolton. 1997. "Assessment of human risks from exposure to low toxicity occupational dusts." *Ann. Occup. Hyg.* 41 (2): 123-133.

**BKG-96:**   Starzynski, Z., K. Marek, A. Kujawska, and W. Szymczak. 1996. "Mortality among different occupational groups of workers with pneumoconiosis: results from a register-based cohort study." *Amer. J. Ind. Med.* 30: 718-725.

**BKG-97:**   Tomb, T.F.  Memorandum of August 31, 1981, from Thomas F. Tomb, Chief, Dust Division, Pittsburgh Health Technology Center, MSHA, to William Sutherland, Chief, Division of Health, Coal Mine Safety and Health, MSHA, Evaluation of Criterion Used to Select Respirable Coal Mine Dust Samples for Examination for Over-size Particles.

**BKG-98:**   Tomb, T.F.  Memorandum of February 16, 1996, from Thomas F. Tomb, Chief, Dust Division, Pittsburgh Safety and Health Technology Center, MSHA, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, MSHA, Report on Investigation to Determine the Precision of MSHA's Automated Weighing System.

**BKG-99:**   Tomb, T.F., H.N. Treaftis, R.L Mundell, and P.S. Parobeck. 1973. "Comparison of Respirable Dust Concentrations Measured With MRE and Modified Personal Gravimetric Sampling Equipment." BuMines RI 7772.

**BKG-100:**  Tomb, T.F.  Memorandum of September 1, 1994, from Thomas F. Tomb, Chief, Dust Division, Pittsburgh Safety and Health Technology Center, MSHA, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, MSHA, Determination of the Precision of Setting the Rotameter Ball to a Calibration Mark on Personal Respirable Dust Sampling Pumps.

**BKG-101:**  Treaftis, H.N. and T.F. Tomb. 1974. "Effect of Orientation on Cyclone Penetration Characteristics." *Am. Ind. Hyg. Assoc.* J., 35(10):598-602.

109

**BKG-102:**  United Steelworkers of America v. Secretary of Labor, 647 F.22d 1189, 1265 (D.C. Cir. 1981).

**BKG-103:**  U.S. EPA, "Guidelines and methodology used in the preparation of health effects assessment chapters of the consent decree water criteria documents." *Federal Register* 45(231): 79347-79357, 1980).

**BKG-104:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA). 1998. Data file (CNTRL_98.xls), from Thomas F. Tomb, Chief, Dust Division, Pittsburgh Safety and Health Technology Center, MSHA to Jon Kogut, MSHA, Mathematical Statistician, Contents: Weight gain measurements for control filter capsules with Tyvek® filter support, weighed for a second time in MSHA's laboratory, from May, 1998 to end of 1998, after being sent to the field.

**BKG-105:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA). 2000. Data file (Inspctor.ZIP), from Jon Kogut, MSHA, Mathematical Statistician, Contents: Data file containing MSHA inspectors' respirable coal mine dust exposure measurements for underground coal mines calendar year 1999, 2000 bimonthly exposure measurements used in Quantitative Risk Assessment to estimate reduction in risk for non-designated occupations.

**BKG-106:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA) 1999. Data file (MFCS.xls), from Thomas F. Tomb, Chief, Dust Division, Pittsburgh Safety and Health Technology Center, MSHA to Jon Kogut, MSHA, Mathematical Statistician, Contents: Weight gain measurements of control filter capsules, (300 with Tyvek® filter support and 300 with stainless steel filter support) used in special field study.

**BKG-107:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA). 1999. National  Health Compliance Program (NHSCP) 1999 Data file (NHSCP_99.xls), from Thomas F. Tomb, Chief, Dust Division, Pittsburgh Safety and Health Technology Center, MSHA to Jon Kogut, MSHA, Mathematical Statistician, Contents: Weight gain

measurements for multiple unexposed filter capsules with Tyvek® filter support taken from the same batch and used at the same field location.

**BKG-108:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA). 2000. Data file (Operator.ZIP), from Jon Kogut, MSHA, Mathematical Statistician, Contents: Data file for underground coal mine operators' calendar years 1990-1999, 2000 bimonthly exposure measurements used in Quantitative Risk Assessment to estimate reduction in risk for designated occupations.

**BKG-109:**  U.S. Department of Labor, Mine Safety and Health Administration (MSHA). 1989. "Method P-4: Determination of Invalid Respirable Coal Mine Dust Samples Due to Oversize Particles." August 3, 1989.

**BKG-110:**  Wagner, G.R.  Letter dated May 28, 1997, from Gregory R. Wagner, M.D., Acting Associate Director for Mining, National Institute for Occupational Safety and Health, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, MSHA

**BKG-111:**  Wagner, G.R.  Letter dated October 13, 1995, from Gregory R. Wagner, M.D., National Institute for Occupational Safety and Health, to Ronald J. Schell, Chief, Division of Health, Coal Mine Safety and Health, Mine Safety and Health Administration.

**BKG-112:**  Wang, X., E. Yano, K. Nonaka, M. Wang, and Z. Wang. 1997. "Respiratory impairments due to dust exposure: a comparative study among workers exposed to silica, asbestos, and coalmine dust." *Amer. J. Ind. Med.* 31: 495-502.

**BKG-113:**  Webster, J.B., C.W. Chiaretta, and J. Behling. 1990. "Dust Control in High Productivity Mines." Society for Mining, Metallurgy, and Exploration Inc. Annual Meeting, Preprint, Littleton, CO, pp. 90-82.

**BKG-114:**  Weiss, S.T. M.R. Segal, D. Sparrow, and C. Wager. 1995. "Relation of $FEV_1$ and peripheral blood leukocyte count to total

mortality.  The normative aging study." *Am. J. Epidemiol.* 142(5):493-498.

**BKG-115:** West, J.B. *Respiratory Physiology -- The Essentials, 5th edition.* Williams and Wilkins Publishers, Baltimore, MD, 1990.

**BKG-116:** West, J.B. *Pulmonary Pathophysiology -- The Essentials, 5th edition.* Williams and Wilkins Publishers, Baltimore, MD, 1992.

**BKG-117:** Witschi, H.  1990.  "Lung overload: a challenge for toxicology." *J. Aerosol Med.* 3: S189-S196.

**BKG-118:** Yi, Q. and Z. Zhang. 1996.  "The survival analyses of 2738 patients with simple pneumoconiosis." *Occup. Environ. Med.* 53: 129-135.


## COMMENTS

**COMM-1:**  James Dillion, Hager & Songs, July 5, 2000.

**COMM-2:**  Linda A. Sturnot, Mining Impact Coalition of Wisconsin, Inc., (Via E-Mail), July 11, 2000.

**COMM-3:**  Bill Nash, Jeffrey R. Wirth, Five Star Mining July 28, 2000.

**COMM-4:**  Joseph A. Main, United Mine Workers of America, August 4, 2000.

**COMM-5:**  Greg Mahan, UMWA Local 1969 (Via e-Mail), August 5, 2000.

**COMM-6:**  Sharon Page, Wife of Disabled Miner (Via e-Mail), August 7, 2000.

**COMM-7:**  Gerald Kendrick, Dominion Coal Corporation (Via Fax), August 7, 2000.

**COMM-8:**  Bobby Page, Disabled Miner (Via e-Mail), August 7, 2000.

**COMM-9:**  Martin Harper, University of Alabama, August 24, 2000.

**COMM-10:** M. Shane Harvey, Massey Coal Services, Inc., September 1, 2000.

**COMM-11:** Charles B. Russell, III, Arch Coal, Inc., September 6, 2000.

**COMM-12:** Stephen A. Sanders, Appalachian Research and Defense Fund of Kentucky, Inc.  (Via Fax), September 7, 2000.

**COMM-13:** Janet Madden, Conjun Labs, Inc. (Via Fax), September 7, 2000.

**COMM-14:** Randy Tatton, Energy West Mining Company (Via E-Mail), September 7, 2000.

**COMM-15:** Jim Walter Resources, Inc., Blue Creek Mine (Via Fax), September 7, 2000.

**COMM-16:** David A. Gooch, Coal Operators & Associates, September 7, 2000.

**COMM-17:** Merlin D. Lilly, Coal Miner, September 8, 2000.

**COMM-18:** Albert E. Younger, Coal Miner (Stanaford, WV), September 8, 2000.

**COMM-19:** Edward E. Shieler, Oak Hill, WV (Disabled Miner), September 8, 2000.

**COMM-20:** Darell Petty. Blue Jay, WV, September 8, 2000.

**COMM-21:** John E. Schamatz, Coal Miner, September 8, 2000.

**COMM-22:** Bill Bailey, Coal Miner, Craborchard, WV, September 8, 2000.

113

**COMM-23:** Bill Caylor, Kentucky Coal Association , September 8, 2000.

**COMM-24:** A.S. Bumbico, American Electric Power Mining Operations, Director, HR, September 8, 2000.

**COMM-25:** National Mining Association, September 8, 2000.

**COMM-26:** Michael Peelish, RAG American Coal Holding, September 8, 2000.

**COMM-27:** United Mine Workers of America, Joe Main, September 8, 2000.

**COMM-28:** Edward T. Lilly, Coal Miner, September 11, 2000.

**COMM-29:** Samuel D. Gregory, Coal Miner, September 11, 2000.

**COMM-30:** Lemuel A. Blaylock, Coal Miner, September 11, 2000.

**COMM-31:** Jamie E. Hinckle, Coal Miner, September 11, 2000.

**COMM-32:** Coy W. Holly, Jr., Coal Miner, September 11, 2000.

**COMM-33:** Greg Arrington, Sr., Coal Miner, September 11, 2000.

**COMM-34:** Roger E. Giles, Coal Miner, September 11, 2000.


## PUBLIC MEETING

**MEET-1:**   July 12, 2000 meeting in Bruceton, Pennsylvania between MSHA and UMWA to discuss the July 7, 2000 proposed rule.


## PUBLIC HEARINGS

**Morgantown, West Virginia-public hearing August 7-8, 2000**

114

116

**PH-1:**    Transcript of Public Hearing, August 7 and 8, 2000, Morgantown, West Virginia.

**Prestonsburg, Kentucky-public hearing August 10-11, 2000**
**PH-2:**    Transcript of Public Hearing, August 10-11, 2000, Prestonsburg, Kentucky.

**PH-2A:**    Public Hearing submissions
1.    Darryl Dewberrry, UMWA
2.    Randy Clements, UMWA
3.    Joe Urban, UMWA
4.    Terry Hunter
5.    Joe Main, UMWA

**Salt Lake City, Utah-public hearing August 16-17, 2000**
**PH-3:**    Transcript of Public Hearing, August 16-17, 2000, Salt Lake City, Utah.

**PH-3A:**    Public Hearing submissions
1.    Randy Tatton, Energy West, comment
2.    The Courier Journal, 4/19/98
3.    Randy Tatton, Energy West, testimony
4.    Brad Allen, UMWA, testimony
5.    MSHA, graphic, "Shift Production."

VI.

## VERIFICATION OF UNDERGROUND COAL MINE OPERATORS' DUST CONTROL PLANS AND COMPLIANCE SAMPLING FOR RESPIRABLE DUST ("2000 PLAN VERIFICATION")

### RIN: 1219-AB14
### Rule Proposed July 7, 2000

## MSHA FEDERAL REGISTER NOTICES

**FR-1:** 30 CFR Parts 70, 75 and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust; Proposed Rule. *Federal Register*, 65 FR 42122, July 7, 2000.

**FR-2:** 30 CFR Parts 70, 75 and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust; Proposed Rule; Notice of public hearings; close of record. *Federal Register*, 65 FR 42186, July 7, 2000.

**FR-3:** 30 CFR Parts 70, 75 and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust; Proposed Rule; Correction. *Federal Register*, 65 FR 45742, July 25, 2000.

**FR-4:** 30 CFR Parts 70, 75 and 90; Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust; Proposed rules; Extension of comment period; close of record. *Federal Register*, 65 FR 49215, August 11, 2000.

## ECONOMIC ANALYSIS

**PREA-1:**   Mine Safety and Health Administration.  June 2000. Preliminary Regulatory Economic Analysis (PREA) for the Proposed

116

Rule Concerning Determination of Concentration of Respirable Coal
Mine Dust (RIN-1219-AB18) and Proposed Rule for Verification of Dust
Control Plans (RIN-1219-AB14).

**PREA-2:**   Mine Safety and Health Administration.  1998.  Internal
Chart.  Percentage of Coal Miners X-rayed with Evidence of Black
Lung.  Source:  Centers for Disease Control and Prevention.

**PREA-3:**   Mine Safety and Health Administration.  1999.  Results of
Quartz Sampling Operator Involvement.

**PREA-4:**   Mine Safety and Health Administration.  1999.  Summary of
Valid Designated Occupation Samples by Calendar Year, 1970-1999.

**PREA-5:**   Mine Safety and Health Administration.  1999.  Internal
Chart,  Summary of X-Ray Field Screenings.


## BACKGROUND DOCUMENTS

**BKG-1:**    Althouse, R.B., K.M. Bang, and R.M. Castellan.  1995.
"Tuberculosis co-mortality with silicosis-United States, 1979-1991."
*Applied Occupational Environmental Hygiene*.  10(12):1037-1041.

**BKG-2:**    American Conference of Governmental Industrial Hygienists
(ACGIH).  1999.  *TLVs and BEIs.  Threshold Limit Values for Chemical
Substances and Physical Agents, Biological Exposure Indices*.
Cincinnati, OH.

**BKG-3:**    American Industrial Hygiene Association (AIHA).  1997.
*The Occupational Environment - Its Evaluation and Control*. Salvatore
R. DiNardi, Editor. AIHA Press, Fairfax, VA.

**BKG-4:**    American Thoracic Society.  1991.  "Lung Function Testing:
Selection of Reference Values and Interpretative Strategies."  *Am Rev
Respir Dis.,* 144:1202-1218.

117

**BKG-5:**     American Iron and Steel Institute v. OSHA, 577 F.2d 825 (3d Cir. 1978).

**BKG-6:**     American Iron and Steel Institute v. OSHA, 939 F.2d 975, 980 (D.C. Cir. 1991).

**BKG-7:**     American Textile Manufacturers Institute v. Secretary of Labor, 452 U.S. 490, 508-509 (1981).

**BKG-8:**     Armitage, P. *Statistical Methods in Medical Research*. Blackwell  Scientific Publications. Oxford, UK. pp. 349, 359, 362, 375-384, 426-433.

**BKG-9:**     Attfield, M.D., and K. Morring.  1992.  "The derivation of estimated dust exposures for U.S. coal miners working before 1970." *Am. Ind. Hyg. Assoc. J.*, 53:248-255.

**BKG-10:**    Attfield, M.D., and K. Morring.  1992.  "An investigation into the relationship between coal workers pneumoconiosis and dust exposure in U.S. coal miners."  *Am. Ind. Hyg. Assoc. J.*, 53:486-492.

**BKG-11:**    Attfield, M.D., and G. Wagner.  1992.  "Respiratory disease in coal miners."  In:  *Environmental and Occupational Medicine Disease*, *Second Edition*.  W.N. Rom, Editor.  Boston, MA: Little, Brown, and Company.  pp. 325-344.

**BKG-12:**    Attfield, M.D., and T.K. Hodous.  1992.  "Pulmonary function of U.S. coal miners related to dust exposure estimates."  *Am. Rev. Resp. Dis.,* 145:605-609.

**BKG-13:**    Attfield, M.D., and N.S. Seixas.  1995.  "Prevalence of pneumoconiosis and its relationship to dust exposure in a cohort of U.S. bituminous coal miners and ex-miners."  *Am. J. Ind. Med.,* 27:137-151.

**BKG-14:**    Attfield, M.D., and F.J. Hearl.  1996.  "Application of data on compliance to epidemiological assessment of exposure-response:  the case of data on exposure of United States coal miners."  *Occup. Hyg.,* 3:177-184.

118

**BKG-15:**    Atuhaire, L.K., M.J. Campbell, A.L. Cochrane, M. Jones, and F. Moore.  1985.  Mortality of men in Rhondda Fach, 1950-1980.  *Brit. J. Ind. Med.*, 42:741-745.

**BKG-16:**    Balaan, M.R., S.L. Weber, and D.E. Banks.  1983.  "Clinical aspects of coal workers pneumoconiosis and silicosis."  *Occup. Med.*, 1:19-34.

**BKG-17:**    Bartley, D.  Letter dated November 10, 1999, from David Bartley, Division of Physical Sciences and Engineering, NIOSH, to Thomas Tomb, Pittsburgh Safety and Health Technology Center, MSHA.

**BKG-18:**    Bhaskar, R., W. Jiang, and L. Xu.  1994.  "Development of Effective Protection Factors for Racal Airstream Helmets."  A Mining Research Contract Report submitted to Energy West Mining Company, Huntington, UT; submitted by R. Bhaskar, W. Jiang, and L. Xu, Department of Mining Engineering, The University of Utah.  August 16, 1994.

**BKG-19:**    Boden, L.I., and M. Gold.  1984.  "The accuracy of self-reported regulatory data:  the case of coal mine dust."  *Am. J. Ind. Med.*, 6:427-440.

**BKG-20:**    Bourgkard, E., P. Bernadec, N. Chau, J.P. Bertrand, D. Teculescu, and Q.T. Pham.  1998.  "Can the evolution to pneumoconiosis be suspected in coal miners?"  *Am. J. Respir. Crit. Care Med.*, 158:504-509.

**BKG-21:**    Carta, P., G. Aru, M.T. Barbieri, G. Avantaneo, and D. Casula.  1996.  "Dust exposure, respiratory symptoms, and longitudinal decline of lung function in young coal miners."  *Occup. Environ. Med.*, 53:312-319.

**BKG-22:**    Cecala, A.B., J.C. Volkwein, E.D. Thimons, and C.W. Urban.  1981.  Report of Investigation RI 8591, "Protection Factors of the Airstream Helmet." U.S. Bureau of Mines.

119

**BKG-23:**   Cochrane, A.L.  1962.  "The attack rate of progressive massive fibrosis."  *Brit. J. Industr. Med.*, 19:52-64.

**BKG-24:**   Cochrane, A.L., T.J.L. Haley, F. Moore, and E. Hole.  1979. "The mortality of men in the Rhondda Fach, 1950-1970."  *British Journal of Industrial Medicine,* 36:15-22.

**BKG-25:**   Coggon, D., and A.N. Taylor.  1998.  "Coal mining and chronic obstructive pulmonary disease:  a review of the evidence." *Thorax,* 53(5):398-407.

**BKG-26:**   Cotes, J.E., and J. Steel.  1987.  "Chapter 9 - Pneumoconiosis of coalworkers and related occupations."  In: *Work-Related Lung Disorders.*  J.E. Cotes and J. Steel, Editors.  Oxford, England: Blackwell Scientific Publications, pp. 165-196.

**BKG-27:**   Denk, J. M. *et al.* 1990.  "Project Summary Report, Longwall Ventilation and Environmental Dust Control Investigation of the Jim Walter Resources No. 4 Mine."  *MSHA Investigative Report* Nos. P338-V242 and DD-4145.

**BKG-28:**   Elam, R.A. Letter dated April 9, 1999, from Robert A. Elam, Administrator for Coal Mine Safety and Health, MSHA, to Hervey P. Levin, Counsel.

**BKG-29:**   Elam, R.A.  Memorandum dated August 20, 1999, from Robert A. Elam, Administrator for Coal Mine Safety and Health, MSHA, to MSHA District Managers, Subject:  Extended Cut Survey.

**BKG-30:**   Employment Standards Administration.  *Review of Claims Filed Under Black Lung Benefits Amendments of 1981.*  Submitted to Congress in 1986.

**BKG-31:**   Employment Standards Administration.  Table.  Estimated Average of Total Cost of Future Monthly Benefits for Trust Fund and Responsible Operator Claims, p. 9, 1980.

**BKG-32:**    Fiscor, S.  1998.  "U.S. Longwall Thrive - Population Declines Slightly, But Production Continues to Rise."  *Coal Age.*

**BKG-33:**    Freedman, A.P., and S.E. Robinson.  1988.  "Noninvasive magnetopneumographic studies of lung dust retention and clearance in coal miners".  In:  *Respirable Dust in the Mineral Industries:  Health Effects, Characterization and Control.*  R.L. Frantz and R.V. Ramani, Editors.  University Park, PA: The Pennsylvania State University.  pp. 181-186.

**BKG-34:**    Garshick, E., M.B. Schenker, and J.A. Dosman.  1996.  "Occupationally induced airways obstruction."  *Medical Clinics of North America.*  80 (4):851-879.

**BKG-35:**    Goodwin, S., and M.D. Attfield.  1998.  "Temporal trends in coal workers' pneumoconiosis prevalence."  *J. Occup. Environ. Med.*  40 (12):1065-1071.

**BKG-36:**    Greenough, G.K.  1979.  "Trials of Dust Helmet in Coal Mines."  *Mining Engineer.*  209:559-565.

**BKG-37:**    Haney, R.A., R.S. Ondrey, and K.G. Fields.  1993.  "Influence of Airflow and Production on Longwall Dust Control."  Paper in the *Proceedings of the 6th U.S. Mine Ventilation Symposium.*  Society of Mining, Metallurgy, and Exploration, Inc. (SME), Littleton, CO, pp. 43-49.

**BKG-38:**    Hansen, E.F., K. Phanareth, L.C. Laursen, A. Kok-Jensen, and A. Dirksen.  1999.  "Reversible and irreversible airflow obstruction as predictor of overall mortality in asthma and chronic obstructive pulmonary disease."  *Am. J. Respir. Crit. Care Med.*  159:1267-1271.

**BKG-39:**    Henneberger, P.K., and M.D. Attfield.  1996.  "Coal mine dust exposure and spirometry in experienced miners."  *Am. J. Resp. Crit. Care Med.*  153:1560-1566.

**BKG-40:**    Henneberger, P.K., and M.D. Attfield.  1997.  "Respiratory symptoms and spirometry in experienced coal miners:  effects of both

distant and recent coal mine dust exposures." *Am. J. Ind. Med.* 32:268-274.

BKG-41:    Heyder, J., J. Gebhart, G. Rudolf, C.F. Schiller, and W. Stahlhofen.  1986. "Deposition of particles in the human respiratory tract in the size range 0.005-15 µm." *J. Aerosol Sci.* 17:811-825.

BKG-42:    Hodous, T.K., and M.D. Attfield.  1990.  "Progressive massive fibrosis developing on a background of minimal simple coal workers pneumoconiosis." In:  *Proceedings of the VII*[th] *International Pneumoconiosis Conference, August 23-26, 1988, Pittsburgh, PA.*  U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, National Institute for Occupational Safety and Health, DHHS (NIOSH) Publication No. 90-108, 1990.

BKG-43:    Howie, R.M., *et al.*  1987.  "Development of a Powered Helmet Respirator Suitable for Use in Coalmines."  Institute of Occupational Medicine, Commission of the European Communities Contract 7247/14/041, Final Report on Report No. TM/87/03.

BKG-44:    Hurley, J.F., and M. Jacobsen.  1986.  "Occupational hygiene implications of new results on progressive massive fibrosis in working coalminers." *Ann. Am. Conf. Gov. Ind. Hyg.* 14:85-89.

BKG-45:    Hurley, J.F., and W.M. Maclaren.  1987.  "Dust-related risks of radiological changes in coal miners over a 40-year working life: report on work commissioned by NIOSH."  Edinburgh, Scotland: Institute of Occupational Medicine, Report No. TM/87/09.

BKG-46:    Hurley, J.F., W.P. Alexander, D.J. Hazledine, M. Jacobsen, and W.M. Maclaren.  1987.  "Exposure to respirable coalmine dust and incidence of progressive massive fibrosis." *Br. J. Ind. Med.* 44:661-672.

BKG-47:    Hurley, J.F., and W.M. Maclaren.  1988.  "Factors influencing the occurrence of progressive massive fibrosis (PMF) in miners and ex-miners." *Ann. Occup. Hyg.* 32(Suppl. 1):575-583.

**BKG-48:**   International Commission on Radiological Protection.  1994. "Human respiratory tract model for radiological protection." A report of a task group of the International Commission on Radiological Protection.  Tarrytown, New York: Elsevier Science, Inc., ICRP Publication No. 66 (Table 6, p. 23).

**BKG-49:**   Industrial Union Department, AFL-CIO v. Hodgson, 499 F.2d 467, 478 (D.C. Cir. 1974).

**BKG-50:**   Industrial Union Department, AFL-CIO v. American Petroleum Institute *et al.*, 448 U.S. 607 (1980).

**BKG-51:**   International Agency for Research on Cancer (IARC) of the World Health Organization.  1997.  IARC Monographs on the Evaluation of Carcinogenic Risks to Humans:  Silica, Some Silicates, Coal Dust, and Para-aramid Fibrils.  Vol. 68. Lyon, France.

**BKG-52:**   International Labour Office (ILO).  1980.  "Guidelines for the use of ILO international classification of radiographs of pneumoconiosis."  Rev. ed. Occupational Safety and Health Series No. 22., Geneva, Switzerland.

**BKG-53:**   Jacobsen, M., S. Rae, W.H. Walton, and J.M. Rogan.  1971. "The relation between pneumoconiosis and dust-exposure in British coal mines."  In:  *Inhaled Particles III, Vol. 2.*  W.H. Walton, Editor.  Surrey, United Kingdom: Unwin Brothers Limited, The Gresham Press.  pp. 903-919.

**BKG-54:**   Jacobsen, M.  1976.  "Dust exposure, lung diseases, and coal miner's mortality."  Edinburgh, Scotland:  University of Edinburgh.

**BKG-55:**   Jacobsen, M., J. Burns, and M.D. Attfield.  1977. "Smoking and coalworkers' simple pneumoconiosis."  In:  *Inhaled Particles IV, Vol. 2.*  W.H. Walton, Editor.  Oxford, England: Pergamon Press, pp. 759-771.

**BKG-56:**   Kuempel, E.D., L.T. Stayner, M.D. Attfield, and C.R. Buncher.  1995.  "Exposure-response analysis of mortality among coal miners in the United States." *Am. J. Ind. Med.* 28:167-184.

**BKG-57:**   Kuempel, E., R.J. Smith, M.D. Attfield, and L. Stayner. 1997.  "Risks of occupational respiratory disease among U.S. coal miners." *Appl. Occup. Environ. Hyg.* 12:823-831.

**BKG-58:**   Lewis, T.R., F.H.Y. Green, W.J. Moorman, J.R. Burg, and D.W. Lynch.  1989.  "A chronic inhalation toxicity study of diesel engine emissions and coal dust, alone and combined." *J. Amer. Coll. Toxicol.* 8:345-375.

**BKG-59:**   Lewis, S., J. Bennett, and J. Britton.  1996.  "A cross-sectional study of the independent effect of occupation on lung function in British coal miners." *Occup. Environ. Med.* 53:125-128.

**BKG-60:**   Love, R.G., B.G. Miller, J. Beattie, H.A. Cowie, S. Groat, S. Hagen, P.A. Hutchison, P.P. Johnston, R. Porteous, and C.A. Soutar. 1992.  "A cross-sectional epidemiological study of the respiratory health and exposure to airborne dust and quartz of current workers in opencast coal mines."  Edinburgh, Scotland: Institute of Occupational Medicine, Report No. TM/92/03.

**BKG-61:**   Love, R.G., B.G. Miller, S.K. Groat, H.A. Cowie, P.P. Johnston, P.A. Hutchison, and C.A. . Soutar.1997.  "Respiratory health effects of opencast coalmining:  a cross-sectional study of current workers." *Occup. Environ. Med.* 54:416-423.

**BKG-62:**   Maclaren, W.M., J.F. Hurley, H.P.R. Collins, and A.J. Cowie. 1989.  "Factors associated with the development of progressive massive fibrosis in British coalminers: a case-control study." *Br. J. Ind. Med.* 46:597-607.

**BKG-63:**   Manahan, S.  1994.  Environmental Chemistry (Sixth Edition).  Chapter 10, pp.305-326; Chapter 17, pp. 487-526.  Lewis Publishers, Boca Raton, FL.

**BKG-64:**    Marine, W.M., D. Gurr, and M. Jacobsen.  1988.  "Clinically important respiratory effects of dust exposure and smoking in British coal miners." *Am. Rev. Resp. Dis.* 137:  106-112.

**BKG-65:**    Mattos, Jay P..  Memorandum dated July 15, 1999, from Jay Mattos, Chief, Office of Program Policy Evaluation, MSHA to Dr. Michelle Schaper, Toxicologist, MSHA, Subject:  Data Request.

**BKG-66:**    Mauderly, J.L.  1996.  "Usefulness of animal models for predicting human responses to long-term inhalation of particles".  *Chest* 109 (3):65S-68S.

**BKG-67:**    McLintock, J.S., S. Rae, and M. Jacobsen. 1971.  "The attack rate of progressive massive fibrosis in British coal miners."  In:  Inhaled Particles III. Vol. II.  Walton, W.H., Editor.  Surrey, U.K. Unwin Brothers Limited, The Gresham Press. pp. 933-950.

**BKG-68:**    Meijers, J.M.M., G.M.H. Swaen, and J.J.M. Slangen.  1997.  "Mortality of Dutch coal miners in relation to pneumoconiosis, chronic obstructive pulmonary disease, and lung function." *Occup. Environ. Med.* 54:  708-713.

**BKG-69:**    Mercer, T.  1973.  Aerosol Technology in Hazard Evaluation. Introduction, pp. 1-20; Chapter 8, pp. 284-318.  Academic Press:  New York.

**BKG-70:**    Miller, B.G., and M. Jacobsen.  1985.  "Dust exposure, pneumoconiosis, and mortality of coal miners." *Brit. J. Ind. Med.* 42:723-733.

**BKG-71:**    Mine Safety and Health Administration.  1992.  "Report of the Coal Mine Respirable Dust Task Group:  Review of the Program to Control Respirable Coal Mine Dust in the United States," June 1992.

**BKG-72:**    Mine Safety and Health Administration.  1993.  "Report of the Statistical Task Team of the Coal Mine Respirable Dust Task Group,"  September 1993.

**BKG-73:**   Mine Safety and Health Administration.  1996.  "Report of the Secretary of Labor's Advisory Committee on the Elimination of Pneumoconiosis Among Coal Mine Workers," October 1996.

**BKG-74:**   Mine Safety and Health Administration (MSHA).  2000. Data file (Inspctor.ZIP), from Jon Kogut, MSHA, Mathematical Statistician, Contents:  Data file containing MSHA inspectors respirable coal mine dust exposure measurements for underground coal mines calendar year 1999, 2000 bimonthly exposure measurements used in Quantitative Risk Assessment to estimate reduction in risk for non-designated occupations.

**BKG-75:**   Mine Safety and Health Administration (MSHA).  2000. Data file (Operator.ZIP), from Jon Kogut, MSHA, Mathematical Statistician, Contents:  Data file for underground coal mine operators calendar years 1990-1999, 2000 bimonthly exposure measurements used in Quantitative Risk Assessment to estimate reduction in risk for designated occupations.

**BKG-76:**   Moorman, W.J., T.R. Lewis, and W.D. Wagner.  1975. "Maximum expiratory flow-volume studies on monkeys exposed to bituminous coal dust." *J. Appl. Physiol.*  39:444-448.

**BKG-77:**   Morfeld, P., H.J. Vautrin, A. Kosters, K. Lampert, and C. Pierkarski.  1997. "Components of coal mine dust exposure and the occurrence of prestages of pneumoconiosis." *Appl. Occup. Environ. Hyg.* 12:973-979.

**BKG-78:**   Morgan, W.K.C., L. Handelsman, J. Kibelstis, N.L. Lapp, and R. Reger.  1974.  "Ventilatory capacity and lung volumes of U.S. coal miners." *Arch. Environ. Health.*  28:182-189.

**BKG-79:**   Morrow, P.E.  1988.  "Possible mechanisms to explain dust overloading of the lungs." *Fundam. Appl. Toxicol.*  10:369-384.

**BKG-80:**   Morrow, P.E.  1992.  "Contemporary issues in toxicology: dust overloading of the lungs: update and appraisal." *Toxicol. Appl. Pharmacol.*  113:1-12..

126

**BKG-81:**   Myers, W.R., M.J. Peach III, K. Cutright, and W. Iskander. 1984. "Workplace Protection Factor Measurements on Powered Air-Purifying Respirators at a Secondary Lead Smelter: Results and Discussion." *Am. Ind. Hyg. Assoc.* J. 45(10):681-688.

**BKG-82:**   Myers, W.R., M.J. Peach, III, K.Cutright, and W. Iskander. 1986. "Field Test of Powered Air-Purifying Respirators at a Battery Manufacturing Facility." *J. Int. Soc. Respir. Prot.* 4(1):62-89.

**BKG-83:**   National Institute for Occupational Safety and Health (NIOSH). 1995. "Criteria for a Recommended Standard: Occupational Exposure to Respirable Coal Mine Dust." U.S. Department of Health and Human Services, Public Health Service, Center for Disease Control and Prevention. Publication No. 95-106, Cincinnati, OH, 1995.

**BKG-84:**   National Institute for Occupational Safety and Health. 1987. NIOSH Respirator Decision Logic. U.S. Department of Health and Human Services, DHHS (NIOSH) Publication No. 87-108.

**BKG-85:**   National Institute for Occupational Safety and Health. 1987. "Guide to Industrial Respiratory Protection." U.S. Department of Health and Human Services, DHHS (NIOSH) Publication No. 87-116.

**BKG-86:**   National Research Council. 1980. The Report of the Committee on Measurement and Control of Respirable Dust: Measurement and Control of Respirable Dust in Mines. National Academy of Sciences, NMAB-363.

**BKG-87:**   Nikula, K.J., K.J. Avila, W.C. Griffith, and J.L. Mauderly. 1997. Sites of particle retention and lung tissue responses to chronically inhaled diesel exhaust and coal dust in rats and cynomolgus monkeys. *Environ. Health Perspect.* 105 (Suppl. 5):231-1234.

**BKG-88:**   Nikula, K.J., K.J. Avila, W.C. Griffith, and J.L. Mauderly. 1997. "Lung tissue responses and sites of particle retention differ between rats and cynomolgus monkeys exposed chronically to diesel exhaust and coal dust." *Fund. Appl. Toxicol.* 37:37-53.

**BKG-89:**    Oberdorster, G.  1995.  "Lung particle overload:  implications for occupational exposures to particles."  *Regul. Toxicol. Pharmacol.*  27 (1):123-135.

**BKG-90:**    O'Green, J.E., et al. 1994.  "An Overview of General Operating Experience as it Relates to Longwall Dust Control."  Paper in the Proceedings of Longwall USA, Pittsburgh, PA, pp. 221-233.

**BKG-91:**    Parkes, R.W.  1982.  "Pneumoconiosis due to coal and carbon."  Second Edition.  In:  Occupational Lung Disorders, London, England:  Butterworths, pp.175-232.

**BKG-92:**    Peed, Daniel.  Memorandum dated May 18, 2000 from Dan Peed, Statistician, Employment Standards Administration, DOL, to Rebecca Roper, Senior Scientist, Mine Safety and Health Administration, Subject: Black Lung Program Statistics.

**BKG-93:**    Petsonk, E.L., and Attfield, M.D.  1994.  "Coal Workers' Pneumoconiosis and Other Coal-Related Lung Disease."  In:  Textbook of Clinical Occupational and Environmental Medicine.  Rosenstock, L. and M.R. Cullen, M.R., Editors.  Philadelphia, PA:  W.B. Saunders Company.

**BKG-94:**    Rasmussen, D.L., W.A. Laqeur, P. Futterman, H.D. Warren, and C.W. Nelson.  1968.  "Pulmonary impairment in Southern West Virginia coal miners."  *Am. Rev. Respir. Dis.*  98:658-667.

**BKG-95:**    Secretary of Labor v. Callanan Industries, Inc., 5 FMSHRC 1900 (1983), and Secretary of Labor v. A. H. Smith, 6 FMSHRC 199 (1984).

**BKG-96:**    Seixas, N.S., L.H. Moulton, T.G. Robins, C.H. Rice, M.D. Attfield, and E.T. Zellers.  1991.  "Estimation of cumulative exposures for the National Study of Coal Workers Pneumoconiosis."  *App. Occup. Environ. Hyg.*  6:1032-1041.

128

**BKG-97:**   Seixas, N.S., T.G. Robins, M.D. Attfield, and L.H. Moulton. 1992. "Exposure-response relationships for coal mine dust and obstructive lung disease following enactment of the Federal Coal Mine Health and Safety Act of 1969." *Am. J. Ind. Med.* 21:715-734.

**BKG-98:**   Seixas, N.S., T.G. Robins, M.D. Attfield, and L.H. Moulton. 1993. "Longitudinal and cross-sectional analyses of exposure to coal mine dust and pulmonary function in new miners." *Brit. J. Ind. Med.* 50:929-937.

**BKG-99:**   Sherwood, R.J. 1991. "Recommendations Concerning the Role of Workplace Testing of Respirators as a Condition of Certification." Harvard School of Public Health.

**BKG-100:**  Silverman, L., C.E. Billings, and M.W. First. 1971. "Particle Size Analysis in Industrial Hygiene." Academic Press, NY.

**BKG-101:**  Snipes, M.B. 1996. "Current information on lung overload in nonrodent mammals: contrast with rats." *Inhal. Toxicol.* 8 (suppl.): 91-109.

**BKG-102:**  Soutar, C.A., and J.F. Hurley. 1986. "Relation between dust exposure and lung function in miners and ex-miners." Brit. J. Ind. Med. 43:307-320.

**BKG-103:**  Soutar, C.A., B.G. Miller, N. Gregg, A.D. Jones, R.T. Cullen, and R.E. Bolton. 1997. "Assessment of human risks from exposure to low toxicity occupational dusts." *Ann. Occup. Hyg.* 41 (2):123-133.

**BKG-104:**  Spencer, E.R., P.D. Kovscek, and K.G. Fields. 1996. "Design and Demonstration of a Continuous Dust Control Parameter Monitoring System." Department of Energy RI 9623.

**BKG-105:**  Starzynski, Z., K. Marek, A. Kujawska, and W. Szymczak. 1996. "Mortality among different occupational groups of workers with pneumoconiosis: results from a register-based cohort study." *Am. J. Ind. Med.* 30:718-725.

**BKG-106:**  U.S. Bureau of the Census.  1997.  "No. 18. Resident Population, by Race, 1980 to 1996, and Projections, 1997 to 2050." Source:  U.S. Bureau of the Census, *Current Population Reports*, P25-1095 and P25-1130; and Population Paper Listing PPL-57.

**BKG-107:**  U.S. Bureau of the Census.  1997.  "No. 119. Expectation of Life and Expected Deaths, by Race, and Age:  1994."  Source:  U.S. National Center for Health Statistics, *Vital statistics of the United States*, annual; and unpublished data.

**BKG-108:**  U.S. Bureau of Mines.  Respirable Coal Dust - Longwall.

**BKG-109:**  U.S. Bureau of Mines.  Extended Cut Ventilation.

**BKG-110:**  U.S. Bureau of Mines.  Respirable Coal Dust - Continuous Miners.

**BKG-111:**  U.S. Bureau of Mines.  Respirable Coal Dust - General.

**BKG-112:**  U.S. Bureau of Mines.  Respirable Coal Dust - Scrubbers/Dust Collectors.

**BKG-113:**  U.S. Bureau of Mines.  Respirable Coal Dust - Quartz.

**BKG-114:**  U.S. Bureau of Mines.  Respirable Coal Dust - Ventilation.

**BKG-115:**  U.S. Bureau of Mines.  Respirable Coal Dust Control Technology News.

**BKG-116:**  U.S. Environmental Protection Agency.  1980.  "Guidelines and methodology used in the preparation of health effects assessment chapters of the consent decree water criteria documents."  *Federal Register*, 45(231):49347-49357.

**BKG-117:**  Wang, X., E. Yano, K. Nonaka, M. Wang, and Z. Wang. 1997.  "Respiratory impairments due to dust exposure:   a comparative study among workers exposed to silica, asbestos, and coalmine dust." *Am. J. Ind. Med*. 31:495-502.

130

**BKG-118**:  Webster, J.B., C.W. Chiaretta, and J. Behling.  1990.  "Dust Control in High Productivity Mines."  SME Annual Meeting, Preprint, Society for Mining, Metallurgy, and Exploration, Inc. (SME), Littleton, CO, pp. 90-82.

**BKG-119**:  Weiss, S.T., M.R. Segal, D. Sparrow, and C. Wager.  1995. "Relation of $FEV_1$ and peripheral blood leukocyte count to total mortality.  The normative aging study." *Am. J. Epidemiol.* 142(5):493-498.

**BKG-120**:  West, J.B.  1990.  *Respiratory Physiology -- The Essentials, 5th edition*.  Baltimore, MD: Williams and Wilkins Publishers.

**BKG-121**:  West, J.B.  1992.  P*ulmonary Pathophysiology – The Essentials, 5th edition*.  Baltimore, MD: Williams and Wilkins Publishers.

**BKG-122**:  Witschi, H.  1990.  "Lung overload:  a challenge for toxicology." *J. Aerosol Med.*  3: S189-S196.

**BKG-123**:  Yi, Q. and Z. Zhang.  1996.  "The survival analyses of 2738 patients with simple pneumoconiosis." *Occup. Environ. Med.*  53:129-135.

## MEETINGS

**MEET-1**:   Memorandum for the Plan Verification Rulemaking Record, Summary, Meeting with Mining Industry Representatives re: 1996 Dust Advisory Committee's recommendation to initiate rulemaking on dust control plan verification, June 17, 1998.

**MEET-2**:   Memorandum for the Plan Verification Rulemaking Record, Summary, 2nd Meeting with Mining Industry Representatives re: 1996 Dust Advisory Committee's recommendation to initiate rulemaking on dust control plan verification, October 9, 1998.

**MEET-3:**  Mine Safety and Health Administration and United Mine Workers of America.  Discussion of aspects of the proposed rule addressing Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust, July 12, 2000.

## COMMENTS

**COMM-1:**  Lee V. Ptasnik, Mine and Process Service Inc., July 31, 2000.

**COMM-2:**  Bill Nash, Jeffrey R. Wirth, Five Star Mining, July 31, 2000.

**COMM-3:**  Linda A. Sturnot, Mining Impact Coalition of Wisconsin, Inc., July 11, 2000.

**COMM-4:**  Michael L. Runge, 3M Occupational Health & Environmental Safety Division, August 7, 2000.  With Attachments.

**COMM-4A:**      T.J. Nelson.  August 1996.  "The Assigned Protection Factor According to ANSI."  *Am Ind Hyg Assoc J*, 57:735-740.

**COMM-4B:**      D.W. Stokes, A.R. Johnston, and H.E. Mullins.  1984.  "Respirator Workplace Protection Factor Studies, Powered Air Loose-Fitting Helmet."  3M Occupational Health and Safety Products Division.

**COMM-4C:**      Slide presentation of papers presented at the American Industrial Hygiene Conference, *Protection for All*, May 18-23, 1986, Dallas, TX.

**COMM-5:**  Bobby Page, E-mail dated August 7, 2000.

**COMM-6:**  Rosetta Callahan, August 4, 2000.

**COMM-7:**  Joseph A. Main, United Mine Workers of America, August 4, 2000.

**COMM-8**:  Greg Mahan, United Mine Workers of America Local 1969, August 5, 2000.

**COMM-9**:  Sharon Page, E-mail dated August 7, 2000.

**COMM-10**:Gerald Kendrick, Dominion Coal Corporation, Fax dated August 7, 2000.

**COMM-11**:Letter from N.V.M, received August 21, 2000.

**COMM-12**:Sparkle Bonds, Virginia Black Lung Association, August 24, 2000.

**COMM-13**:Burge L. Speilman, Mountaineer Mine Safety & Training Inc., August 29, 2000.

**COMM-14**:M. Shane Harvey, Massey Coal Services Inc., September 1, 2000.

**COMM-15**:Stephen A. Sanders, Appalachian Research and Defense Fund of Kentucky Inc., September 7, 2000.

**COMM-16**:Charles B. Russell III, Arch Coal Inc., September 7, 2000.

**COMM-17**:Janet Madden, Conjun Laboratories Inc., E-mail dated September 7, 2000.

**COMM-18**:Randy Tatton, Interwest Mining Co., and Kevin Tuttle, Energy West Mining Company, September 8, 2000.

**COMM-19**:Jim Walter Resources Inc., Fax dated September 7, 2000.

**COMM-20**:Merlin D. Lilly, received September 8, 2000.

**COMM-21**:Albert E. Younger, received September 8, 2000.

**COMM-22**:Edward E. Shieler, received September 8, 2000.

**COMM-23:** Darell Petty, received September 8, 2000.

**COMM-24:** John E. Schamatz, received September 8, 2000.

**COMM-25:** Bill Bailey, received September 8, 2000.

**COMM-26:** Coal Operators & Associates Inc., Kentucky Coal Association, and Western Kentucky Coal Association, September 8, 2000.

**COMM-27:** A.S. Bumbico, American Electric Power Mining Operations, September 8, 2000.

**COMM-28:** National Mining Association, September 8, 2000.

**COMM-29:** Michael Peelish, RAG American Coal Holding Inc., E-mail dated September 8, 2000.

**COMM-30:** Randy J. Klausing, E-mail dated September 8, 2000.

**COMM-31:** Joseph A. Main, United Mine Workers of America, September 8, 2000, with separate list of additional documents for the record.

**COMM-31A:** Additional Documents Submitted by the United Mine Workers of America for the Record on the Two Rules Proposed on July 7, 2000, by MSHA, Revising the Coal Mine Dust Sampling Standards. September 8, 2000.

**COMM-32:** Union Rep 3, E-mail dated September 9, 2000.

**COMM-33:** David A. Gooch, Coal Operators & Associates Inc., September 7, 2000.

**COMM-34:** Edward T. Lilly, received September 11, 2000.

**COMM-35:** Samuel D. Gregory, received September 11, 2000.

**COMM-36:** Lemuel A. Blaylock, received September 11, 2000.

**COMM-37:** Jamie E. Hinckle, received September 11, 2000.

**COMM-38:** Coy W. Holly Jr., September 11, 2000.

**COMM-39:** Greg Arrington Sr., received September 11, 2000.

**COMM-40:** Roger E. Giles, received September 11, 2000.


## PUBLIC HEARINGS

**Morgantown, West Virginia, Public Hearing, August 7-8, 2000**

**PH-1:**        Transcript of Proceedings.

**Prestonsburg, Kentucky, Public Hearing, August 10-11, 2000**

**PH-2:**        Transcript of Proceedings.

**Salt Lake City, Utah, Public Hearing, August 16-17, 2000**

**PH-3:**        Transcript of Proceedings.

135

# CERTIFICATE

I, Sheila A. McConnell, Acting Director of MSHA's Office of

Standards, Regulations and Variances, certify that the foregoing is a

true and correct index to the contents of the administrative record of

the captioned proceeding.


SHEILA A. McCONNELL,
Acting Director, Office of Standards,
Regulations, and Variances

Signed and sworn to me on June 13th 2014, in Arlington, Virginia.


Sandra D. Shannon
Notary Public
Comm. No. 107581

My Commission expires:  03/31/2015

CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2014, I electronically filed the foregoing "Certified Index" with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that the service will be accomplished by the CM/ECF system.

/s/ Edward Waldman
Attorney
U.S. Department of Labor
Office of the Solicitor
1100 Wilson Blvd., 22nd Fl.
Arlington, VA 22209
(202) 693-9344
(202) 693-9361 (fax)
waldman.edward@dol.gov

PFR-11942

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

NATIONAL MINING ASSOCIATION, )
ALABAMA COAL ASSOCIATION, )
WALTER ENERGY, INC., and )
WARRIOR INVESTMENT CO., INC., )
                           )
    Petitioners, )
                           )
    v. )              Petition for Review
                           )
MINE SAFETY AND HEALTH )
ADMINISTRATION and THOMAS E. )
PEREZ, SECRETARY, UNITED )
STATES DEPARTMENT OF LABOR, )
                           )
    Respondents. )
_____ )



# PETITION FOR REVIEW

Henry Chajet, Esq.
Avi Meyerstein, Esq.
Collin O'Connor Udell, Esq.
JACKSON LEWIS P.C.
10701 Parkridge Blvd., Suite 300
Reston, VA 20191
Telephone: (703) 483-8300
Fax: (703) 483-8301

*Attorneys for Petitioners*

## I. CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Petitioners certifies that the following listed parties have an interest in the outcome of this case:

1. Alabama Coal Association – Petitioner

2. Avi Meyerstein – Counsel for Petitioners

3. Collin O'Connor Udell – Counsel for Petitioners

4. Heidi W. Strassler – Counsel for Respondent

5. Henry Chajet – Counsel for Petitioners

6. Jackson Lewis P.C. – Counsel for Petitioners

7. M. Patricia Smith – Counsel for Respondent

8. Mine Safety and Health Administration – Respondent

9. National Mining Association – Petitioner

10. Thomas E. Perez – Respondent

11. United States Department of Labor – Respondent

12. Walter Energy, Inc. ( Stock symbol WLT) – Petitioner

13. Warrior Investment Co., Inc. – Petitioner

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3, and 28-1(b), and Fed. R. App. P. 26.1, Petitioners identify the following subsidiaries, conglomerates, affiliates and parent corporations:

Page 1 of 2

141

1.    Atlantic Development & Capital LLC – owned by Jim Walter Resources, Inc.

2.    Atlantic Leaseco LLC – owned by Atlantic Development & Capital LLC

3.    Black Warrior Methane Corp. – owned by Jim Walter Resources, Inc.

4.    Black Warrior Transmission Corp. – owned by Jim Walter Resources, Inc.

5.    Blue Creek Energy, Inc. – owned by Walter Energy, Inc.

6.    Jim Walter Resources, Inc. – owned by Atlantic Development & Capital LLC

7.    Maple Coal Co. LLC– owned by Atlantic Development & Capital LLC

8.    Taft Coal Sales & Associates, Inc. – owned by Walter Minerals, Inc.

9.    Tuscaloosa Resources, Inc. – owned by Walter Minerals, Inc.

10.    Walter Black Warrior Basin, LLC – owned by Walter Exploration & Production LLC

11.    Walter Exploration & Production LLC – owned by Walter Natural Gas, LLC

12.    Walter Minerals, Inc. – owned by Walter Energy, Inc.

13.    Walter Natural Gas, LLC– owned by Walter Energy, Inc.

Page 2 of 2

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| NATIONAL MINING ASSOCIATION, )<br>ALABAMA COAL ASSOCIATION, )<br>WALTER ENERGY, INC., and )<br>WARRIOR INVESTMENT CO., INC., )<br>)<br>Petitioners, )<br>)<br>v. )<br>)<br>MINE SAFETY AND HEALTH )<br>ADMINISTRATION and THOMAS E. )<br>PEREZ, SECRETARY, UNITED )<br>STATES DEPARTMENT OF LABOR, )<br>)<br>Respondents. )<br>—————————————————— ) | Petition for Review |

### PETITION FOR REVIEW

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure and 30 U.S.C. § 811(d) (granting regulatory review jurisdiction to the U. S. Federal Courts of Appeal), Petitioners National Mining Association, Alabama Coal Association, Walter Energy, Inc., and Warrior Investment Co., Inc.[1] hereby petition the United States Court of Appeals for the Eleventh Circuit for review of the United States Secretary of Labor's and Mine Safety and Health Administration's ("MSHA") Final Rule entitled "Lowering Miners' Exposure to Respirable Coal Mine Dust,

---

[1] National Mining Association is a national association with mining company members in the 11th Circuit. The Alabama Coal Association is a state association located in the 11th Circuit. Walter Energy, Inc. and Warrior Investment Co., Inc. are coal mining companies headquartered in the 11th Circuit. All are impacted by the MSHA final rule.

1

Including Continuous Personal Dust Monitors," RIN 1219-AB64, filed with the Federal Register on May 1, 2014 (the "Final Rule"). *See* FR Doc. 2014-09084, available at http://www.federalregister.gov/a/2014-09084. The Final Rule is attached hereto as Exhibit A and is related to *National Mining Association v. Secretary of Labor* 153 F. 3d 1264 (11th Cir. 1998).

Dated: May $\underline{1}$, 2014

Respectfully submitted,

    /s/ Henry Chajet
JACKSON LEWIS P.C.
Henry Chajet
District of Columbia Bar No. 42195
Avi Meyerstein
District of Columbia Bar No. 480765
Collin Udell
Connecticut Bar No. 425810
10701 Parkridge Blvd., Suite 300
Reston, VA 20191
Telephone: (703) 483-8300
Fax: (703) 483-8301
henry.chajet@jacksonlewis.com
avi.meyerstein@jacksonlewis.com
collin.udell@jacksonlewis.com

*Attorneys for Petitioners*

2

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| NATIONAL MINING ASSOCIATION, | ) | |
| ALABAMA COAL ASSOCIATION, | ) | |
| WALTER ENERGY, INC., and | ) | |
| WARRIOR INVESTMENT | ) | |
| COMPANY, | ) | |
| | ) | |
| Petitioners, | ) | Petition for Review |
| | ) | |
| v. | ) | |
| | ) | |
| MINE SAFETY AND HEALTH | ) | |
| ADMINISTRATION and THOMAS E. | ) | |
| PEREZ, SECRETARY, UNITED | ) | |
| STATES DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Respondents. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for Review has been served upon the following individuals via overnight delivery this 1st day of May, 2014:

M. Patricia Smith, Solicitor
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, D.C. 20210

Heidi W. Strassler, Associate Solicitor
U.S. Department of Labor
Division of Mine Safety and Health
1100 Wilson Boulevard, 22nd Floor
Arlington, Virginia 22209-2296

Henry Chajet

145

PFR-12163

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Murray Energy Corp.; American
Energy Corp.; The Ohio Valley Coal
Co.; The American Coal Co.;
OhioAmerican Energy, Inc.;
UtahAmerican Energy, Inc.; West Ridge
Resources, Inc.; KenAmerican
Resources, Inc.; Murray American
Energy, Inc.; The Harrison County Coal
Co.; The Marion County Coal Co.; The
Marshall County Coal Co.; The
Monongalia County Coal Co.; and
The Ohio County Coal Co.,

Case No. *14-3427*

        Petitioners

    v.

Secretary of Labor and
Mine Safety and Health
Administration,

        Respondents.

## PETITION FOR REVIEW

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure and Section

101(d) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 811(d),

Murray Energy Corporation; American Energy Corporation; The Ohio Valley Coal

Company; The American Coal Company; OhioAmerican Energy, Incorporated;

UtahAmerican Energy, Incorporated; West Ridge Resources, Incorporated;

KenAmerican Resources, Incorporated; Murray American Energy, Incorporated;

The Harrison County Coal Company; The Marion County Coal Company; The

Marshall County Coal Company; The Monongalia County Coal Company; and The

Ohio County Coal Company hereby petition the Court for review of the Final Rule of

the Mine Safety and Health Administration entered on May 1, 2014, entitled

*Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous*

*Personal Dust Monitors,* published at 79 Fed. Reg. 24,814 (May 1, 2014).

A copy of the challenged Final Rule is attached.


Respectfully submitted,


Michael O. McKown                          /s/ Daniel W. Wolff
Gary M. Broadbent                          Thomas C. Means
MURRAY ENERGY CORPORATION                  Edward M. Green
46226 National Road                        Daniel W. Wolff
St. Clairsville, Ohio 43950                CROWELL & MORING LLP
Phone: 740-338-3386                        1001 Pennsylvania Avenue, N.W.
mmckown@coalsource.com                     Washington, D.C. 20004
gbroadbent@coalsource.com                  Phone: 202-624-2500
                                           tmeans@crowell.com
                                           egreen@crowell.com
                                           dwolff@crowell.com

                                           *Counsel for Petitioners*


May 1, 2014

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 1, 2014, the foregoing paper was filed with the

Clerk of the Court by e-mail to CA06-ECF-PetitionsForFiling@ca6.uscourts.gov.

There are no non-respondent parties to be served. In accordance with Rule 15 of the

Federal Rules of Appellate Procedure, the Clerk of the Court will serve a copy of the

foregoing paper on respondents, which are located at the following addresses:

M. Patricia Smith, Solicitor
U.S. Department of Labor
Office of the Solicitor of Labor
200 Constitution Avenue, N.W., Room S-2002
Washington, D.C. 20210

Heidi W. Strassler, Associate Solicitor
U.S. Department of Labor
Division of Mine Safety and Health
1100 Wilson Boulevard
22nd Floor West
Arlington, Virginia 22209

 _/s/ Daniel W. Wolff_
Daniel W. Wolff

DCACTIVE-27683861.1

148

I-2-FR-1



# FEDERAL REGISTER

Vol. 79        Thursday,

No. 84        May 1, 2014

Part II

## Department of Labor

Mine Safety and Health Administration

30 CFR Parts 70, 71, 72, et al.
Lowering Miners' Exposure to Respirable Coal Mine Dust, Including
Continuous Personal Dust Monitors; Final Rule

**24814**    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

**DEPARTMENT OF LABOR**

**Mine Safety and Health Administration**

**30 CFR Parts 70, 71, 72, 75, and 90**

**RIN 1219–AB64**

**Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors**

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Final rule.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) is revising the Agency's existing standards on miners' occupational exposure to respirable coal mine dust in order to: Lower the existing exposure limits; provide for full-shift sampling; redefine the term "normal production shift"; and add reexamination and decertification requirements for persons certified to sample for dust, and maintain and calibrate sampling devices. In addition, the rule provides for single shift compliance sampling by MSHA inspectors, establishes sampling requirements for mine operators' use of the Continuous Personal Dust Monitor (CPDM), requires operator corrective action on a single, full-shift operator sample, changes the averaging method to determine compliance on operator samples, and expands requirements for medical surveillance of coal miners.

Chronic exposure to respirable coal mine dust causes lung diseases that can lead to permanent disability and death. The final rule will greatly improve health protections for coal miners by reducing their occupational exposure to respirable coal mine dust and by lowering the risk that they will suffer material impairment of health or functional capacity over their working lives.

**DATES:** *Effective Date:* August 1, 2014. The incorporation by reference of certain publications listed in the rule was approved by the Director of the Federal Register as of October 12, 1999.

**FOR FURTHER INFORMATION CONTACT:** Sheila McConnell, Acting Director, Office of Standards, Regulations, and Variances, MSHA, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia 22209–3939. Ms. McConnell can be reached at *mcconnell.sheila.a@dol.gov* (email), 202–693–9440 (voice), or 202–693–9441 (facsimile).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
 A. Purpose of the Regulatory Action
 B. Legal Authority for Regulatory Action
 C. Summary of Major Provisions
 D. Major Provisions in the Proposed Rule That Are Not in the Final Rule
 E. Projected Costs and Benefits
II. Introduction and Background Information
 A. MSHA's Existing Respirable Dust Standards
 B. 1992 Coal Mine Respirable Dust Task Group Report, 1995 NIOSH Criteria Document, and 1996 Dust Advisory Committee Report
 C. 2000 and 2003 Plan Verification Proposed Rules
 D. 2000 Single Sample Proposed Rule
 E. Continuous Personal Dust Monitors (CPDM)
 F. Regulatory History of This Final Rule
 G. Government Accountability Office Activities
III. Discussion of the Final Rule
 A. Health Effects
 B. Quantitative Risk Assessment (QRA)
 C. Feasibility
IV. Section-by-Section Analysis
V. Executive Order 12866: Regulatory Planning and Review; and Executive Order 13563: Improving Regulation and Regulatory Review
 A. Population at Risk
 B. Benefits
 C. Compliance Costs
 D. Net Benefits
VI. Regulatory Flexibility Act and Small Business Regulatory Enforcement Fairness Act
 A. Definition of a Small Mine
 B. Factual Basis for Certification
VII. Paperwork Reduction Act of 1995
 A. Summary
 B. Procedural Basis
VIII. Other Regulatory Considerations
 A. National Environmental Policy Act (NEPA)
 B. The Unfunded Mandates Reform Act of 1995
 C. The Treasury and General Government Appropriations Act of 1999: Assessment of Federal Regulations and Policies on Families
 D. Executive Order 12630: Government Actions and Interference With Constitutionally Protected Property Rights
 E. Executive Order 12988: Civil Justice Reform
 F. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
 G. Executive Order 13132: Federalism
 H. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
 I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
 J. Executive Order 13272: Proper Consideration of Small Entities in Agency Rulemaking
IX. References
X. Appendix A—Excessive Concentration Values

**Availability of Information**

**Federal Register** Publications: Access rulemaking documents electronically at *http://www.msha.gov/regsinfo.htm* or *http://www.regulations.gov.* Obtain a copy of a rulemaking document from the Office of Standards, Regulations, and Variances, MSHA, by request to 202–693–9440 (voice) or 202–693–9441 (facsimile). (These are not toll-free numbers.)

*Information Collection Supporting Statement:* The Information Collection Supporting Statement is available at *http://www.reginfo.gov/public/do/PRAMain* on MSHA's Web site at *http://www.msha.gov/regs/fedreg/informationcollection/informationcollection.asp* and at *http://www.regulations.gov.* A copy of the Statement is also available from MSHA by request to Sheila McConnell at *mcconnell.sheila.a@dol.gov,* by phone request to 202–693–9440, or by facsimile to 202–693–9441.

*Regulatory Economic Analysis (REA):* MSHA will post the REA on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/rea.htm.* A copy of the REA also can be obtained from MSHA by request to Sheila McConnell at *mcconnell.sheila.a@dol.gov,* by phone request to 202–693–9440, or by facsimile to 202–693–9441.

**I. Executive Summary**

*A. Purpose of the Regulatory Action*

The purpose of this final rule is to reduce occupational lung diseases in coal miners. Chronic exposure to respirable coal mine dust causes lung diseases including coal workers' pneumoconiosis (CWP), emphysema, silicosis, and chronic bronchitis, known collectively as "black lung." These diseases are debilitating and can result in disability and premature death. Based on data from the National Institute for Occupational Safety and Health (NIOSH), new cases continue to occur among coal miners. The prevalence rate of lung disease among our nation's coal miners continues despite the fact that incurable black lung is preventable. Additionally, young miners are showing evidence of advanced and seriously debilitating lung disease from excessive dust exposure.

Over the decade 1995–2004, more than 10,000 miners died from black lung.[1] As of December 2011, according to the Department of Labor's Office of Workers' Compensation Programs, Division of Coal Mine Workers'

[1] *http://www.cdc.gov/niosh/docs/2008-143/pdfs/2008-143a-iii.pdf,* DHHS (NIOSH) Publication No. 2008–143a, Work-Related Lung Disease Surveillance Report 2007, Vol. 1, Table 2–4. Coal workers' pneumoconiosis: Number of deaths by state, U.S. residents age 15 and over, 1995–2004, p. 34, September 2008.

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    **24815**

Compensation, the federal government has paid over $44 billion in Federal Black Lung benefits to beneficiaries (former miners, widows, dependents) since 1970 (U.S. Department of Labor, Division of Coal Mine Workers' Compensation. 2012. Black Lung Program Statistics).

The final rule is changed from the proposal. This final rule will reduce coal miners' occupational exposure to respirable coal mine dust. As a result, it will lower their risk of developing black lung disease and suffering material impairment of health or functional capacity.

*B. Legal Authority for Regulatory Action*

Sections 101(a)(6)(A), 103(h), and 508 of the Federal Mine Safety and Health Act of 1977 (Mine Act), provide the legal authority for this final rule. (30 U.S.C. 811(a)(6)(A), 813(h), and 957).

Section 101 of the Mine Act gives the Secretary of Labor (Secretary) the authority to promulgate mandatory health standards involving toxic materials or harmful physical agents. It requires that the Secretary set standards to assure, based on the best available evidence, that no miner will suffer material impairment of health from exposure to toxic materials or harmful physical agents over his working life. (30 U.S.C. 811(a)(6)(A)). In developing these standards, the Mine Act requires the Secretary to consider the latest available scientific data in the field, the feasibility of the standards, and experience gained under other laws. Id.

Section 103(h) of the Mine Act gives the Secretary the authority to promulgate standards involving recordkeeping. (30 U.S.C. 813(h)). Section 103(h) provides that every mine operator must establish and maintain records and make reports and provide such information as the Secretary may require. Id.

Section 508 of the Mine Act gives the Secretary the authority to issue regulations to carry out any provision of the Act. (30 U.S.C. 957).

*C. Summary of Major Provisions*

1. *Lowers the Existing Concentration Limits for Respirable Coal Mine Dust.* After August 1, 2016, the concentration limits for respirable coal mine dust are lowered from 2.0 milligrams of dust per cubic meter of air (mg/m³) to 1.5 mg/m³ at underground and surface coal mines, and from 1.0 mg/m³ to 0.5 mg/m³ for intake air at underground mines and for part 90 miners (coal miners who have evidence of the development of pneumoconiosis). Lowering the concentration of respirable coal mine dust in the air that miners breathe is the

most effective means of preventing diseases caused by excessive exposure to such dust.

2. *Requires the Use of the Continuous Personal Dust Monitor (CPDM).* On February 1, 2016, mine operators are required to use the continuous personal dust monitor (CPDM) to monitor the exposures of underground coal miners in occupations exposed to the highest respirable coal mine dust concentrations and the exposures of part 90 miners. Use of the CPDM is optional for surface coal mines, non-production areas of underground coal mines, and for underground anthracite mines using the full box, open breast, or slant breast mining methods. The CPDM is a new sampling device that measures continuously, and in real-time, the concentration of respirable coal mine dust and provides sampling results at specific time intervals and at the end of the work shift. It is jointly approved for use in coal mines by MSHA and NIOSH under criteria set forth in Title 30, Code of Federal Regulations (30 CFR) part 74. When the CPDM is used, mine operators, miners, and MSHA will be notified of the results in a more timely manner than when the existing approved Coal Mine Dust Personal Sampler Unit (CMDPSU) is used. This will enable mine operators to take earlier action to identify areas with dust generation sources, reduce the dust levels in those areas, and prevent miners from being overexposed.

3. *Redefines the Term "Normal Production Shift".* The term normal production shift is redefined to require that underground mine operators take respirable dust samples in the mechanized mining unit (MMU) when production is at least 80 percent of the average production over the last 30 production shifts. The MMU is a unit of mining equipment used in the production of material. Under the existing definition, underground mine operators are required to sample when production is at least 50% of the average production reported during the operator's last sampling period (i.e., last set of five valid samples). Under the revised definition, miners will be better protected because samples will be collected during periods that are more representative of normal mining operations and dust levels to which miners are exposed.

4. *Requires Full-Shift Sampling.* The final rule requires the operator to collect respirable dust samples for the full shift that a miner works. If a miner works a 12-hour shift, respirable dust samples must be taken with an approved sampling device for the entire work shift, rather than a maximum of 8 hours

as required under the existing standards. Full-shift sampling provides more representative measurements of miners' respirable dust exposures and increases their health protection.

5. *Changes the Averaging Method to Determine Compliance on Operator Samples.* Under existing standards, corrective action is required only after the average of five operator samples exceeds the respirable coal mine dust standard and a citation is issued. This permits miners to be exposed to levels of respirable coal mine dust that exceed the standard without requiring any corrective action by the operator to reduce concentrations to meet the standard. The final rule requires immediate corrective actions to lower dust concentrations when a single, full-shift operator sample meets or exceeds the excessive concentration value (ECV) for the dust standard. These corrective actions will result in reduced respirable dust concentrations in the mine atmosphere and, therefore, will provide better protection of miners from further high exposures.

6. *Provides for the Use of Single, Full-Shift Samples, by MSHA inspectors, to Determine Compliance.* MSHA inspectors will use single, full-shift samples to determine noncompliance with the respirable dust standards. MSHA has determined that the average concentration of respirable dust to which each miner in the active workings of a coal mine is exposed can be accurately measured over a single shift. MSHA is rescinding the "1972 Joint Finding"[2] by the Secretary of the Interior and the Secretary of Health, Education, and Welfare, on the validity of single-shift sampling. MSHA considers a single, full-shift measurement of respirable coal mine dust to "accurately represent" atmospheric conditions (Section 202(f) of the Mine Act) at the sampling location, if the sampling and analytical method used meet the NIOSH Accuracy Criterion. Limiting the respirable dust concentration in the active workings ensures that the respirable dust concentration inhaled by any miner is limited.

7. *Expands Medical Surveillance Requirements.* The final rule adds spirometry testing, occupational history,

---

[2] In 1972, acting under the Federal Coal Mine Health and Safety Act of 1969 (Coal Act), the Secretaries of the Interior and Health, Education and Welfare made a joint finding (1972 Joint Finding), under § 202(f) of the Coal Act, which concluded that a single shift measurement of respirable dust will not, after applying valid statistical techniques to such measurement, accurately represent the atmospheric conditions to which the miner is continuously exposed (37 FR 3833, February 23, 1972).

and symptom assessment to the periodic chest radiographic (x-ray) examinations required to be offered by mine operators to underground miners under NIOSH's existing standards. The additional medical surveillance requirements will alert miners to any abnormal declines in lung function, which is common evidence of Chronic Obstructive Pulmonary Disease (COPD) and not detected by chest x-ray's. Notification of reduced lung function will enable miners to be proactive in protecting their health. The final rule extends the same medical surveillance requirements afforded underground miners, including chest x-ray examinations, to surface miners since they are also at risk of developing lung diseases and material impairment of health or functional capacity from exposure to respirable coal mine dust. In addition, the final rule extends part 90 miner transfer rights, which are currently provided to underground miners who have x-ray evidence of pneumoconiosis, to surface miners who have evidence of pneumoconiosis. Under 30 CFR part 90, these miners can elect to work in less dusty atmospheres to prevent the progression of disease. The medical surveillance requirements will provide improved health protection for all coal miners.

8. *Strengthens Requirements for Certified Persons.* The final rule revises requirements for certified persons who perform dust sampling and who maintain and calibrate sampling equipment. To strengthen the certification process, the final rule adds a requirement that persons must complete an MSHA course of instruction. This complements the existing requirement that, to be certified, the candidate must pass an MSHA examination to demonstrate competency in the tasks needed for respirable dust sampling procedures and in maintenance and calibration procedures. Completing the MSHA course and passing the MSHA examination will ensure that only trained persons will perform these important functions. Certified persons are required under the final rule to pass the MSHA examination every three years to maintain their certification. The final rule adds procedures allowing MSHA to revoke a person's certification for failing to properly carry out the required sampling or maintenance and calibration procedures.

The final rule was strategically developed to provide a comprehensive, integrated approach to achieve MSHA's goal of reducing miners' exposure to respirable coal mine dust in a protective and feasible manner.

*D. Major Provisions in the Proposed Rule That Are Not in the Final Rule*

1. *Sampling Frequency.* The proposed rule would have required that CPDM sampling be conducted 7 days per week, 52 weeks per year for occupations exposed to the highest respirable coal mine dust concentrations and for part 90 miners.

2. *CPDM Performance Plan.* The proposed rule would have required operators who use CPDMs to develop and submit for approval a CPDM Performance Plan prior to using the sampling devices.

3. *Revisions to the Approved Ventilation Plan.* The proposed rule would have required operators to submit to the District Manager for approval the corrective actions to lower respirable dust concentrations.

4. *Equivalent 8-hour Concentration.* The proposal would have required the respirable coal mine dust sampled to be expressed in terms of an 8-hour equivalent concentration for shifts longer than 8 hours.

5. *Separate Intake Air for each MMU.* The proposed rule would have required a separate intake airway for each MMU.

*E. Projected Costs and Benefits*

• Lowers miners' exposure to respirable coal mine dust, thus reducing and preventing Black Lung.

• Significant reductions in CWP, progressive massive fibrosis (the most severe stage of CWP), emphysema, and deaths from non-malignant respiratory disease.

• Estimated annualized benefits: $36.9 million: (3% discount rate) and $20.0 million (7% discount rate).

• Estimated annualized costs: $24.8 million (3% discount rate) and $28.1 million (7% discount rate).

## II. Introduction and Background Information

This final rule promotes the Secretary of Labor's vision of "Promoting and Protecting Opportunity" [3] and supports the Department of Labor's (DOL's) goal of securing safe and healthy workplaces, particularly for vulnerable workers in high-risk industries such as mining, by reducing workplace deaths and improving the health of coal miners.

This final rule is an important element in MSHA's Comprehensive Initiative to *END BLACK LUNG—ACT NOW!* Launched in December 2009, this initiative will significantly reduce disabling occupational lung disease in coal miners. It includes four

---

[3] Department of Labor 2014–2018 Strategic Plan Outreach, *www.dol.gov/sec/stratplan/2014outreach/.*

---

components: Collaborative outreach, education and training, enhanced enforcement, and rulemaking. This final rule represents one aspect of MSHA's comprehensive and integrated approach to reduce and eliminate continued risks to miners from exposure to respirable coal mine dust. MSHA is committed to working with stakeholders to develop comprehensive outreach materials and to resolve any implementation issues. MSHA also intends to hold stakeholder seminars related to implementation of the final rule in locations accessible to the mining public.

Throughout the preamble, the terms "respirable coal mine dust", "coal mine dust", and "respirable dust" are used interchangeably.

This final rule combines the following rulemaking actions: (1) "Occupational Exposure to Coal Mine Dust (Lowering Exposure);" (2) "Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust" (Plan Verification) (65 FR 42122, July 7, 2000, and 68 FR 10784, March 6, 2003); (3) "Determination of Concentration of Respirable Coal Mine Dust" (Single Sample) (65 FR 42068, July 7, 2000, and 68 FR 10940 March 6, 2003); and (4) "Respirable Coal Mine Dust: Continuous Personal Dust Monitor (CPDM)" (74 FR 52708, October 14, 2009). MSHA is withdrawing Plan Verification and Single Sample as separate rulemaking actions. However, the rulemaking records for the Plan Verification, Single Sample, and the CPDM rulemaking actions are incorporated into the rulemaking record for this final rule.

Several provisions in this final rule will singularly lower miners' exposure to respirable dust and reduce their risk of disease and disease progression. These provisions include lowering the respirable dust standards, using CPDMs for sampling, basing noncompliance determinations on MSHA inspectors' single shift sampling, full-shift sampling to account for occupational exposures greater than 8 hours per shift, changing the definition of normal production shift, changing the operator sampling program to require more sampling, requiring operator corrective action on one operator sample, and changes in the averaging method for operator samples to determine compliance. MSHA's quantitative risk assessment (QRA) in support of the final rule estimates the reduction in health risks when two provisions of the final rule are implemented—the final respirable dust standards and single shift sampling. The QRA shows that these two provisions would reduce the risks of CWP, severe

emphysema, and death from non-malignant respiratory disease (NMRD). The QRA projects, over a 45-year occupational lifetime, improvements in almost every underground job category and at least 6 surface categories. Large aggregated improvements are also projected for longwall tailgate operators and continuous mining machine operators (See the QRA discussion in Section III.B. of this preamble).

While the final 1.5 mg/m³ and 0.5 mg/m³ standards will reduce the risk of impairment, disease, and premature death, MSHA's QRA estimates remaining risk at the final standard. It is important to note that other provisions of this comprehensive and integrated final rule (e.g., use of CPDMs for sampling, changes in the definition of normal production shift, sampling for a full shift, changes in the sampling program, requiring operator corrective action on one operator sample, and changes in the averaging method to determine compliance on operator samples) will reduce these risks. The impacts of these other final provisions were not considered in the QRA. MSHA expects the final provisions, implemented in a comprehensive and integrated manner, will reduce the continued risks that miners face from exposure to respirable coal mine dust and would further protect them from the debilitating effects of occupational respiratory disease.

*A. MSHA's Existing Respirable Dust Standards*

MSHA's existing respirable dust standards, promulgated on April 8, 1980 (45 FR 23990) under Section 101 of the Mine Act, superseded Section 202(b) of the Mine Act. The standards require coal mine operators to continuously maintain the average concentration of respirable dust to which each miner is exposed during each shift at or below 2.0 milligrams per cubic meter of air (2.0 mg/m³) (30 CFR 70.100, underground coal mines; and 71.100, surface coal mines and surface areas of underground coal mines). Miners who have evidence of pneumoconiosis and are employed at underground coal mines or surface work areas of underground coal mines have the option to work in areas where average respirable dust concentrations do not exceed 1.0 mg/m³ of air (30 CFR 90.100, part 90 miners). There is no separate standard for respirable silica; rather, where the respirable coal mine dust contains more than five percent quartz, the respirable coal mine dust standard is computed by dividing the percentage of quartz into the number 10 (30 CFR 70.101 (underground coal mines),

§ 71.101 (surface coal mines and surface areas of underground coal mines), and § 90.101 (part 90 miners)).

Under MSHA's existing standards, mine operators are required to collect bimonthly respirable dust samples and submit them to MSHA for analysis to determine compliance with respirable dust standards (compliance samples). If compliance samples do not meet the requirements of the dust standard, MSHA issues a citation for a violation of the standard and the operator is required to take corrective action to lower the concentration to meet the standard. Further, the operator must collect additional respirable dust samples during the time established for abatement of the hazard or violation (abatement sampling).

Underground coal mine operators collect and submit two types of samples during bimonthly sampling periods: (1) "Designated occupation" (DO) samples taken for the occupations exposed to the greatest concentrations of respirable dust in each mechanized mining unit (§ 70.207); and (2) "designated area" (DA) samples collected at locations appropriate to best measure concentrations of respirable dust associated with dust generation sources in the active workings of the mine (§ 70.208). The operator's approved ventilation and methane and dust control plan, required in existing § 75.370, must show the specific locations in the mine designated for taking the DA samples. In addition, mine operators take respirable dust samples for part 90 miners (§§ 90.207 and 90.208).

For surface work areas of underground mines and for surface mines, mine operators are required to collect bimonthly samples from "designated work positions" (DWPs), which are designated by the District Manager (§ 71.208).

Compliance determinations are based on the average concentration of respirable dust measured by five valid respirable dust samples taken by the operator during five consecutive normal production shifts or five normal production shifts worked on consecutive days (multiple-shift samples). Compliance determinations are also based on the average of multiple measurements taken by the MSHA inspector over a single shift (multiple, single-shift samples) or on the average of multiple measurements obtained for the same occupation on multiple days (multiple-shift samples).

Under the existing program, sampling results are often not known to mine operators, miners, and MSHA for at least a week or more after the samples

are collected. Due to the delay in receiving sampling results, operators are unable to take timely corrective action to lower dust levels when there are overexposures.

*B. 1992 Coal Mine Respirable Dust Task Group Report, 1995 NIOSH Criteria Document, and 1996 Dust Advisory Committee Report*

In May 1991, the Secretary directed MSHA to conduct a review of the coal mine respirable dust control program and to develop recommendations on how the program could be improved. MSHA established an interagency task group (Task Group) which published their findings and recommendations in the June 1992, Review of the Program to Control Respirable Coal Mine Dust in the United States. The Task Group Report can be accessed electronically at *http://www.regulations.gov/#!documentDetail;D=MSHA-2010-0007-0211*.

On November 7, 1995, NIOSH submitted to the Secretary a criteria document recommending reduced standards for respirable coal mine dust and crystalline silica. On April 25, 1996, MSHA published a **Federal Register** notice (61 FR 18308) stating that it had decided to respond to the 1995 NIOSH Criteria Document by developing a proposed rule "derived from the recommendations" in the NIOSH Criteria Document. MSHA further stated that, although it would begin "the background work necessary to develop such a rule," it would defer development of the rule until it received a report from the Secretary of Labor's Advisory Committee on the Elimination of Pneumoconiosis Among Coal Mine Workers (Dust Advisory Committee), which the Secretary had established on January 31, 1995, and to which MSHA had referred the NIOSH criteria document. One of the NIOSH recommendations in the Criteria Document was to use single, full-shift samples to compare miners' exposures with the NIOSH recommended exposure limit. The NIOSH Criteria Document can be accessed electronically at *http://www.cdc.gov/niosh/docs/95-106/*.

On November 14, 1996, the Dust Advisory Committee submitted its report to the Secretary. The Dust Advisory Committee Report can be accessed electronically at *http://www.msha.gov/S&HINFO/BlackLung/1996Dust%20AdvisoryReport.pdf*. The report contained 20 wide-ranging principal recommendations, subdivided into approximately 100 action items, aimed at eliminating coal miners' pneumoconiosis and silicosis. The report recommended that MSHA consider lowering the level of allowable

**24818**     **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

exposure to coal mine dust, with any reduction accompanied by a phase-in period to allow allocation of sufficient resources to the compliance effort. The report also recommended that MSHA should change the compliance sampling program to allow use of single, full-shift samples for determining compliance. On January 24, 1997, MSHA published a **Federal Register** notice (62 FR 3717) responding to the 1996 Dust Advisory Committee Report. In the response, MSHA stated its intent to conduct an in-depth evaluation of the recommendations and respond to them.

### C. 2000 and 2003 Plan Verification Proposed Rules

On July 7, 2000, MSHA published the Plan Verification proposed rule (65 FR 42122, July 7, 2000). The proposal would have required underground mine operators to have a verified mine ventilation plan, with MSHA collecting samples to verify the adequacy of dust control parameters specified in the ventilation plan to maintain respirable dust standards ("verification sampling").

In response to comments urging MSHA to withdraw the proposal, MSHA published a new proposed rule on March 6, 2003, (68 FR 10784), which would have required mine operators to have a "verified" mine ventilation plan and conduct verification sampling on each mechanized mining unit (MMU). Under the proposal, mine operators would have to demonstrate the adequacy of dust control parameters specified in the ventilation plan to maintain the concentration of respirable coal mine dust and quartz at or below dust standards. In addition, the mine operators' existing bimonthly respirable dust sampling program for each MMU and DA would have been eliminated and MSHA would have assumed responsibility for compliance and abatement sampling in underground coal mines.

The 2003 proposal would have also provided for the use of CPDMs once the CPDM was verified as reliable under mining conditions and commercially available.

Public hearings were held in May 2003. The closing date for the comment period for the Plan Verification proposed rule was extended indefinitely to obtain information concerning CPDMs being tested by NIOSH (68 FR 39881, July 3, 2003).

The following provisions from the 2003 Plan Verification proposal have been revised and integrated into this final rule: (1) Use of the CPDM in monitoring respirable dust exposures; (2) recording the amount of material produced by each MMU during each production shift and retaining the record; (3) sampling for respirable dust during the entire time that a miner works to account for shifts longer than 8 hours; (4) requiring that dust control parameters in the mine's ventilation plan be revised when respirable dust overexposures are indicated; and (5) threshold values that would be used to determine violations based on single sample measurements.

### D. 2000 Single Sample Proposed Rule

On July 7, 2000, MSHA and NIOSH jointly published a proposed rule on Determination of Concentration of Respirable Coal Mine Dust (Single Sample) (65 FR 42068). The proposal would have rescinded the 1972 Joint Finding and established that a single, full-shift measurement of respirable coal mine dust may be used to determine the average concentration on a shift if that measurement accurately represents atmospheric conditions to which a miner is exposed during such shift.

MSHA proposed the 2000 Single Sample rule following the 11th Circuit Court of Appeals decision in *National Mining Association (NMA) et al.* v. *Secretary of Labor, et al.*, 153 F.3d 1264 (11th Cir. 1998). In this case, the Court reviewed the 1998 Final Joint Notice of Finding issued by MSHA and NIOSH. The 1998 Final Joint Finding, issued on February 3, 1998, concluded that the 1972 Joint Finding was incorrect and stated that the average respirable dust concentration to which a miner is exposed can be accurately measured over a single shift (63 FR 5664). The Court vacated the 1998 Joint Finding on procedural grounds. It found that MSHA was required by section 101(a)(6)(A) of the Mine Act to engage in rulemaking and demonstrate that a single, full-shift measurement adequately assures that no miner will suffer a material impairment of health, on the basis of the best available evidence; uses the latest available scientific data in the field; is technologically and economically feasible; and is based on experience gained under the Mine Act and other health and safety laws (153 F.3d at 1268–1269).

On March 6, 2003, MSHA and NIOSH reopened the rulemaking record to allow further comment on the Single Sample rulemaking and to solicit comment on new data and information added to the record (68 FR 10940). In May 2003, joint public hearings were held on the 2000 Single Sample proposal and the 2003 Plan Verification proposal. The comment period for the Single Sample proposal was extended indefinitely in order to obtain information on CPDMs being tested by NIOSH (68 FR 47886, August 12, 2003). The Single Sample proposal is integrated into and a part of this final rule, which permits MSHA inspectors to use single, full-shift samples to determine compliance with the respirable dust standard.

### E. Continuous Personal Dust Monitor (CPDM)

On April 6, 2010 (75 FR 17512), MSHA and NIOSH published a final rule, effective June 7, 2010, revising approval requirements under 30 CFR part 74 for the existing coal mine dust personal samplers. It also established new approval requirements for the CPDM.

The CPDM is new technology that provides a direct measurement of respirable dust in the miner's work atmosphere on a real-time basis. In September 2006, NIOSH published the results of a collaborative study designed to verify the performance of the pre-commercial CPDM in laboratory and underground coal mine environments. According to the NIOSH Report of Investigations 9669, "Laboratory and Field Performance of a Continuously Measuring Personal Respirable Dust Monitor," (Volkwein et al., U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (USDHHS, CDC, NIOSH) 2006), the CPDM is accurate, precise, and durable under harsh mining conditions in providing continuous exposure information previously not available to coal miners and coal mine operators.

On October 14, 2009, MSHA published a Request for Information (RFI) on potential applications of CPDM technology to monitor and control miners' exposure to respirable coal mine dust during a work shift (74 FR 52708). The comment period closed on December 14, 2009.

On September 6, 2011, NIOSH approved a commercial CPDM as meeting the CPDM requirements of 30 CFR part 74 (USDHHS, CDC, NIOSH, 2011).

### F. Regulatory History of This Final Rule

On October 19, 2010, MSHA published a proposed rule, Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors (75 FR 64412). The comment period was scheduled to close on February 28, 2011. The QRA in support of the proposal and Preliminary Regulatory Economic Analysis (PREA) were made publicly available at that time.

On October 20, 2010, MSHA held a meeting at MSHA Headquarters in Arlington, Virginia, and via conference call to brief interested stakeholders on the proposed rule.

On November 15, 2010, MSHA published a Notice scheduling six public hearings on the proposed rule in locations accessible to the mining public (75 FR 69617). In response to requests from the public, two of the hearings were rescheduled and an additional hearing was added, for a total of seven, to provide a maximum opportunity for public participation in the rulemaking (75 FR 73995). Hearings were held: December 7, 2010, in Beckley, WV; January 11, 2011, in Evansville, IN; January 13, 2011, in Birmingham, AL; January 25, 2011, in Salt Lake City, UT; February 8, 2011, in Washington, PA; February 10, 2011, in Prestonsburg, KY; and February 15, 2011, in Arlington, VA.

On January 14, 2011, MSHA extended the comment period from February 28, 2011 to May 2, 2011 (76 FR 2617). On May 4, 2011, MSHA again extended the comment period to May 31, 2011 (76 FR 25277). On May 27, 2011, MSHA extended the comment period to June 20, 2011 (76 FR 30878).

On March 8, 2011, MSHA published a **Federal Register** notice (76 FR 12648) requesting comment on information that was included in the preamble to the proposed rule and other issues that were raised during the public hearings. The notice requested comment on 25 specific issues and included two clarifications.

Public comments and supporting documentation submitted were posted on the MSHA Web site and on *www.regulations.gov*, along with transcripts and exhibits from the public hearings.

Several commenters, referring to an MSHA response to a request for documents under the Freedom of Information Act (FOIA), stated that they were denied access to documents that were critical to a thorough evaluation of the proposed rule. The request involved documents specifically related to the QRA in support of the proposed rule, and documents generally related to the rulemaking.

All documents that were critical to a thorough evaluation of the proposed and final rules are in the rulemaking record, and posted on MSHA's Web site and on *www.regulations.gov*, as noted above. These publicly available documents include Agency materials considered in the development of the proposed and final rules, public comments and supporting documentation submitted, along with

transcripts and exhibits from the public hearings. If materials included in the docket are copyrighted, they are listed on *www.regulations.gov* but are not reproduced there. MSHA also posted additional historical information and data on respirable coal mine dust on its Web site at the request of the public. MSHA's complete rulemaking docket, including studies, articles, and reports reviewed by MSHA in the development of the proposed and final rules, is available in hard copy for inspection at its headquarters office. Peer reviewed documents of the QRA for the proposed rule prepared by NIOSH and the Occupational Safety and Health Administration (OSHA) at MSHA's request, as well as the QRA for the proposed rule, have been available on the Black Lung Single Source Page on MSHA's Web site since the October 19, 2010 publication of the proposed rule at *http://www.msha.gov/S&HINFO/BlackLung/Homepage2009.asp.*

*G. Government Accountability Office Activities*

The Consolidated Appropriations Act, 2012, required that the Government Accountability Office (GAO) review and report on the data collection, sampling methods, and analyses MSHA used to support its proposal. In August 2012, GAO issued a report, "*Mine Safety: Reports and Key Studies Support the Scientific Conclusions Underlying the Proposed Exposure Limit for Respirable Coal Mine Dust*", which assessed the strengths and limitations of the data and the analytical methods MSHA used to support its proposal to lower the exposure limit for respirable coal mine dust. GAO concluded that the evidence MSHA used did support its conclusion that lowering the limit as proposed would reduce miners' risk of disease.

In May 2013, GAO was requested to conduct an additional analysis on MSHA's proposed rule. In April 2014, GAO issued a report, "*Basis for Proposed Exposure Limit on Respirable Coal Mine Dust and Possible Approaches for Lowering Dust Levels*". GAO examined (1) the extent to which MSHA used recent CWP trend data as a basis for its proposed exposure limit, and (2) expert views on ways to lower the dust levels in coal mines, including their associated advantages, disadvantages, and cost. In the report, GAO concluded that MSHA appropriately did not use recent trend data on CWP as a basis for its proposal to lower the permissible exposure limit for respirable coal mine dust. According to GAO, these recent data from NIOSH were inappropriate for this purpose because they do not include the types of

detailed information about individual miners needed to estimate the likelihood that miners would develop CWP at different dust exposure levels, such as historical dust exposures. With the help of the National Academies, GAO convened a group of experts knowledgeable about underground coal mining and methods for reducing coal mine dust. GAO did not make any recommendations in this report. MSHA has reviewed both GAO reports and has determined that no further action is necessary.

MSHA has also reviewed the explanatory statement by the Chairman of the House Committee on Appropriations in the 2014 Appropriations Act regarding the coal mine dust rule. Consistent with the explanatory statement, MSHA has taken into consideration all relevant information and conclusions from the GAO study when addressing compliance assistance, training, or post-implementation needs in connection with the final rule. MSHA also considered all available technologies and work practices that would allow mine operators to reduce miners' exposures to respirable coal mine dust in a manner that is not economically prohibitive for the long-term viability of the affected mines, while reducing miners' exposure to respirable (coal) mine dust. (MSHA discusses feasibility in section III.C. of this preamble and in chapter IV of the REA.) MSHA intends to develop outreach materials related to implementation of the final rule and hold stakeholder seminars in locations accessible to the mining public. MSHA also intends to develop compliance assistance materials to ensure that operators have a sufficient number of certified persons to perform sampling and maintenance and calibration of CPDMs.

**III. Discussion of the Final Rule**

*A. Health Effects*

The health effects from occupational exposure to respirable coal mine dust consist of interstitial and obstructive pulmonary diseases. Miners develop Coal Workers' Pneumoconiosis (CWP) or nonmalignant respiratory disease (NMRD). There are no specific treatments to cure CWP or NMRD. These chronic effects may progress even after miners are no longer exposed to respirable coal mine dust resulting in increased disability and death. Other complications may follow, such as pulmonary and cardiac failure, that result in total disability and premature death.

24820    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

The health effects from occupational exposure to respirable coal mine dust were discussed in the preamble to MSHA's proposed rule on Plan Verification published on March 6, 2003 (68 FR 10784). The literature referenced in that document pre-dated 1999. More recent literature, from 1997 to mid-2009 with occasional references to earlier papers, was discussed in the Health Effects section of the preamble to the proposed rule for this final rule (75 FR 64412, 64458).

Reduction of coal mine dust exposure is the only effective way to prevent either CWP or NMRD. Screening and surveillance programs detect trends and clusters of disease occurrences and allow secondary preventive intervention to slow the rate of progression in miners. Data from screening and surveillance programs provide estimates of the prevalence of occupational respiratory disease among working coal miners.

At the existing respirable coal mine dust standard of 2.0 mg/m³, cases of CWP and NMRD continue to occur. In recent years, the prevalence of CWP has increased among experienced miners, and in some cases, CWP has progressed rapidly to the more advanced form—progressive massive fibrosis (PMF). The persistence of disease requires that additional action be taken to reduce coal mine dust exposures. The final rule will reduce occupational pulmonary disease, disability, and premature mortality in coal miners.

Although not a basis or rationale for the final rule, in May 2011, CWP prevalence in a West Virginia mining population was reported in the Governor's Independent Investigation into the April 5, 2010, explosion at the Upper Big Branch (UBB) mine in southern West Virginia (p. 32). This investigation reported the prevalence of CWP as determined by autopsies in the 29 miners who died. Twenty-four of the 29 miners had sufficient lung tissue available to make a determination relating to CWP. Prevalence of CWP in these 24 miners was 71 percent (17 of 24 miners), which compares with the national prevalence rate for CWP among active underground miners of 3.2 percent, and the prevalence rate in West Virginia of 7.6 percent. The ages of the UBB miners with CWP ranged from 25 to 61 years. Of the 7 miners who were not identified as having CWP, 4 had what was characterized as "anthracosis" on their autopsy reports. This term is often used in lieu of the term pneumoconiosis, or may refer to a black pigment deposition without the fibrosis and other characteristics needed to make a firm diagnosis of

pneumoconiosis. Three of the 24 miners had no pneumoconiosis or anthracosis noted.

Of the 17 UBB miners with CWP, 5 had less than 10 years of experience as coal miners, while 9 had more than 30 years of coal mining experience. At least 4 of the 17 worked almost exclusively at UBB. All but 1 of the 17 with CWP began working in the mines after the 2.0 mg/m³ respirable coal mine dust standard became effective in 1973.

There was support for the proposed rule from many commenters who agreed with MSHA's conclusions in the health effects and QRA discussions in the preamble to the proposed rule. Commenters supported the proposed rule which would lower the existing dust standards, require the use of continuous personal dust monitors (CPDMs), base compliance determinations on single, full-shift samples, address extended work shifts, redefine a normal production shift, and extend medical screening and surveillance. These commenters stated that there has been an alarming increase of CWP within the past 10 years and that MSHA's existing standards have not succeeded in eliminating Black Lung.

Other commenters stated that the proposed rule is not needed. Some stated that MSHA should better enforce its existing standards rather than propose new standards. Some stated that black lung rates have been declining since 2000 when MSHA and NIOSH began using enhanced surveillance methods and that the Agency used selective data to support the proposed reduction in the standard. Others stated that MSHA should only address the health concerns in particular areas of the country, which include Virginia, West Virginia, and Kentucky. Several commenters stated that the proposal is not based on the best available evidence but, rather, is based on faulty science and medical data. One commenter suggested that MSHA, NIOSH, industry, and labor conduct a nationwide study using the CPDM to determine what dust concentrations are protective and achievable. The comments are discussed below.

In the health effects section of the proposed rule, MSHA reported results from NIOSH publications and studies that were based on grouped surveillance data. In response to commenters requesting that the underlying demographic information be made available, MSHA points out that these results are part of NIOSH's coal miner surveillance data included in the proposed rule's hazard and risk

assessment analyses. NIOSH posts summary surveillance data on U.S. coal miners on its Web site at *http:// www.cdc.gov/niosh/topics/surveillance/ ords/*. These data are generated based on the requirements of 42 CFR part 37, Specifications for Medical Examinations of Underground Coal Miners. Because of privacy protection laws, such as the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Privacy Act of 1974, and the Freedom of Information Act, MSHA cannot provide underlying personal identifying information.

Some commenters stated that the proposed rule was based on three data sources: The NIOSH 1995 Criteria Document, a literature update by NIOSH entitled "Current Intelligence Bulletin 64, Coal Mine Dust Exposure and Associated Health Outcomes, A Review of Information Published Since 1995" ("NIOSH CIB 64") (USDHHS, CDC, NIOSH (2011a)), and various NIOSH papers on its enhanced surveillance studies. MSHA did not use the NIOSH literature update in the development of the proposed rule because it was published in April 2011 and, therefore, not final when the proposed rule was published on October 19, 2010. However, the NIOSH CIB 64 provides supplementary information that supports the final rule and is referenced later in this section of the preamble. NIOSH submitted CIB 64 to MSHA during the comment period for the proposed rule.

Some commenters stated that MSHA did not produce for independent analysis the underlying data from the NIOSH Criteria Document and X-ray program. One commenter stated that this is a violation of the Office of Management and Budget (OMB) and MSHA guidelines on data quality which prevented stakeholders from being able to comment on the scientific basis of the proposed rule.

The Data Quality Act or Information Quality Act directs OMB to issue guidelines to agencies to ensure and maximize the quality, objectivity, utility, and integrity of information that agencies maintain and disseminate (Section 515 of the Treasury and General Government Appropriations Act for FY 2001 (Pub. L. 106–554)). MSHA has satisfied the requirements of OMB's 2002 data quality Guidelines, for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies (36 FR 8452, February 22, 2002). MSHA has adopted well-established quality assurance techniques to ensure the quality of information disseminated. Information

156

is subject to internal agency quality control and audit, and any appropriate Department of Labor level review before being disseminated to the public. MSHA's Information Quality Guidelines are available on the Agency's Web site at: *http://www.msha.gov/infoquality/mshainfoquality.htm.*

MSHA explained in the preamble to the proposed rule that the proposal was developed in part on the recommendations in the 1995 NIOSH Criteria Document. NIOSH is in possession of the underlying data associated with the Criteria Document and has posted data relevant to the Criteria Document on its Web site at *http://www.cdc.gov/niosh/topics/surveillance/ords/.* In accordance with Section 101(a) of the Mine Act, NIOSH submitted the Criteria Document to the Secretary of Labor for consideration in developing standards to reduce health risks associated with miners' exposure to respirable dust.

In addition, the Health Effects section in the preamble to the proposed rule contains a comprehensive inventory and summarizes key aspects of scientific literature and studies on the health effects from occupational exposure to respirable coal mine dust. Regarding the NIOSH X-ray data, NIOSH posts summary surveillance data on U.S. coal miners on the Web site previously noted at *http://www.cdc.gov/niosh/topics/surveillance/ords/.*

One commenter stated that using data from the NIOSH surveillance program violates the data quality guidelines because NIOSH self-selects the program participants and therefore the data is biased. The commenter also stated that data from the B-reader program is imprecise, inaccurate and biased because the B-reader program gives significant false-positive readings thereby exaggerating the incidence of CWP.

The relatively low participation rates, potential self-selection biases, and a lack of correspondent exposure histories for the individual miners involved limit the use of the NIOSH surveillance data as support for the Quantitative Risk Assessments. Additional discussion is included in Section III.B., Quantitative Risk Assessment, the preamble. NIOSH instituted the B-reader program to ensure competency and consistency in radiographic reading by evaluating the ability of readers to classify a test set of radiographs. A discussion of NIOSH's B-reader program is included in Section III.A., Health Effects, of the preamble.

In developing the proposed rule, MSHA evaluated over 150 peer-reviewed papers as part of the Agency's health effects assessment (75 FR 64460,

October 19, 2010), in addition to the data from MSHA's proposed rule on Plan Verification. The literature review focused on studies of morbidity and mortality among coal miners in many countries, including the United States, South Africa, Europe, Britain, China, Australia, Turkey, and Japan. This research evaluated the relationship between respirable coal mine dust exposure and the respiratory disease it causes. The research reported on the etiology of adverse respiratory diseases, including CWP, PMF, and NMRD, such as chronic obstructive pulmonary disease (COPD) and emphysema. The fact that similar results have been found in decades of research, covering a wide variety of populations at various respirable coal mine dust exposure levels and working conditions, supports the determination that exposure to respirable coal mine dust is a significant causal factor in the development of respiratory diseases in coal miners. The conclusion of MSHA's review of this research and of NIOSH's 2011 literature update is that chronic coal mine dust exposure causes respiratory health effects including CWP, PMF, COPD, and emphysema.

Recognition that long-term respirable coal dust exposure causes irreversible respiratory health effects has been accepted by the medical community for decades. On March 26, 1969, Charles C. Johnson, Jr., Administrator, Consumer Protection and Environmental Health Service, Public Health Service, U.S. Department of Health, Education, and Welfare, testified before the General Subcommittee on Labor, and presented remarks of the Surgeon General addressing the level of medical understanding about the etiology of CWP at that time.[4] Johnson testified that CWP is a chronic chest disease caused by the accumulation of fine coal mine dust particles in the human lung that, in its advanced forms, leads to severe disability and premature death.

Johnson's testimony also pointed out that, by 1969, medical researchers in both Britain and the United States had repeatedly shown that coal miners suffer from more respiratory impairment and respiratory disability than the general population. These respiratory problems were frequently accentuated by chronic bronchitis and emphysema.

Estimates of the severity of disease risk at that time were derived from British research. This research provided the only quantitative exposure-response relationship available in 1969 and

supported lowering the respirable coal mine dust standard from 3.0 mg/m³ to 2.0 mg/m³. Adoption of the 2.0 mg/m³ standard was believed to be protective against the risk of disability and premature mortality that accompanies PMF. However, NIOSH has noted that as more research was completed over the next 25 years, this assumption turned out to be inaccurate (NIOSH CIB 64, 2011a).

In 1995, NIOSH published "Criteria for a Recommended Standard—Occupational Exposure to Respirable Coal Mine Dust", an analysis of research up through the early 1990s that further investigated the etiology of CWP and other adverse health effects associated with respirable coal mine dust exposure. NIOSH recommended that the federal coal mine dust limit be reduced to 1.0 mg/m³. This recommendation was based on risk estimates of CWP derived from two NIOSH studies of U.S. coal miners. Predictions were derived from each study for a working lifetime of 45 years at two exposure levels: 2.0 mg/m³ and 1.0 mg/m³. The recommendation was also based on information that predicted excess lung function decrements following working lifetime exposures to 2.0 mg/m³ and 1.0 mg/m³ respirable coal mine dust. NIOSH also evaluated information from other epidemiologic studies in reaching its 1995 recommendations. NIOSH estimated, and MSHA concurs, that miners exposed to respirable coal mine dust at the existing 2.0 mg/m³ standard are at significant risk of developing adverse health effects, such as CWP and NMRD, including COPD and emphysema.

Some commenters disagreed with NIOSH surveillance and research results as the basis for the proposed rule. These commenters stated that the prevalence of CWP and PMF in U.S. coal miners was overstated, surveillance was incomplete, and the 1.0 mg/m³ standard was not justified. They presented various analyses of the NIOSH studies and submitted for the rulemaking record a NIOSH study that was published after the proposed rule (Suarthana et al., 2011). The Suarthana study is discussed in this Health Effects section of the preamble.

Some commenters suggested that MSHA should collect data from a representative or mandatory surveillance program and study the data in a scientifically sound manner to better understand the incidence of CWP.

MSHA believes that this program already exists in the National Coal Workers Health Surveillance Program (NCWHSP, also known as CWHSP) that is administered by NIOSH. MSHA has

---

[4] 91st Congress House of Representatives Report, 1st Session No. 91–563, Federal Coal Mine Health and Safety Act, October 13, 1969.

used data generated from this program in the development of both the proposed and final rules.

Occupational health surveillance tracks occupational injuries, illnesses, hazards, and exposures to improve worker safety and health and to monitor trends and progress over time. Surveillance includes both population- or group-based activities and individual or case-based activities. Worker screening and monitoring detects early disease in high-risk individuals.

The purpose of federal and state surveillance programs for chronic lung diseases, such as CWP, PMF, and NMRD, is to identify not only cases of disease, but also conditions under which the cases develop in order to improve disease control and prevention. There are three levels of prevention. Primary prevention in the case of dust-related lung disease includes reducing exposure to dust, generally through engineering controls. Secondary prevention focuses on early detection of disease and intervention in order to slow or eliminate progression. Much of the medical surveillance conducted by NIOSH is secondary prevention. Tertiary prevention involves miners seeking further medical care only after they have symptoms, progression to later stages is more likely, and the primary treatment is to manage symptoms of disease since it is too late to prevent disease.

There is a spectrum of respiratory disease development in coal miners exposed to respirable coal mine dust. Pathologic changes occur during the subclinical stage of disease development that are not detectable by either spirometry or chest x-ray (CWP 0/0). For this reason, all miners should have an initial medical examination to establish a baseline health status on which future medical surveillance can be compared to determine disease presence or progression. NIOSH and many of the research papers on which the proposed health effects assessment was based use CWP 1/0+ as the category where disease progression is evident; many of these miners may not have overt symptoms, but the chest x-ray shows signs of fibrotic changes. The use of this CWP category as a sign of the development of minimal illness dates from the 1969 Coal Act, where the Surgeon General recommended that miners be removed from dusty environments as soon as they showed ''minimal effects'' of dust exposure on chest x-ray, i.e., pinpoint, dispersed micro-nodular lesions. Many miners may also report symptoms of developing respiratory disease, such as chronic cough, phlegm production, wheezing, and shortness of breath.

Many comments focused only on detection of clinical disease (tertiary prevention), once disease has advanced well beyond the clinical horizon when symptoms appear (CWP category 2/0+). One commenter submitted an analysis of CWP mortality in a subgroup of miners with advanced disease at the CWP 2/0+ level. While this analysis may help to understand the etiology of advancing disease, it does not identify how the disease process begins or how to prevent disease from developing. Miners with this level of disease present pulmonary symptoms and are likely to suffer from disease progression.

The focus of federal coal workers' health surveillance programs is on prevention of clinical disease, not detection of disease that has progressed well beyond the clinical horizon. The Coal Workers' X-Ray Surveillance Program (CWXSP) was established under the Federal Coal Mine Health and Safety Act of 1969, as amended by Section 203(a) of the Mine Act (30 U.S.C. 843(a)). The CWXSP Program, which is part of the National Coal Workers Health Surveillance Program (NCWHSP), began in 1970. It is administered by NIOSH. The CWXSP provides all underground coal miners with periodic, x-ray examinations, at no cost to the miner, at least every five years (42 CFR part 37).

The National Coal Study (NCS) was a long-term epidemiologic study, limited to workers in a selected group of mines with various seam heights, mining methods, coal types, and geographic locations. Many of the published peer-reviewed epidemiological studies reported in the proposed rule's health effects section grew out of the NCS. Commenters suggested that many of NIOSH's studies were incomplete due to design or other limitations and suggested that a detailed, nationwide epidemiological study be conducted based on mandatory screening before any action to lower the respirable dust standard is initiated.

MSHA does not believe that a nationwide epidemiological study, based on mandatory screening, as suggested by the commenter is needed before regulatory action is taken to reduce the respirable dust standard. Underground coal miners in the United States have been studied since before the 1969 Coal Act by the Public Health Service and State health agencies. Those studies were the basis for the current surveillance programs in this country. Numerous pre-Coal Act studies and studies since that time have characterized the respiratory system's response to various levels of respirable coal mine dust, a known fibrogenic

dust. Significant levels of adverse lung diseases are continuing to develop in coal miners who have been exposed to respirable coal mine dust at the current standard.

Some commenters stated that x-rays are insensitive for detecting CWP and that surveillance programs suffer from inconsistent reading of the x-rays.

Early changes due to CWP are frequently identifiable on a high quality chest x-ray before the miner seeks medical attention due to CWP. NIOSH instituted the B-reader program to ensure competency and consistency in radiographic reading by evaluating the ability of readers to classify a test set of radiographs. This creates and maintains a pool of qualified readers having the skills and ability to provide consistent and accurate ILO classifications. B-readers must retest every 4 years to maintain their B-reader status. A reader who fails the retest must take and pass the original approval examination before the expiration of the 4-year approval period in order to retain B-reader status. The implementation of this program in the mid-1970s, the update of the program to adjust to the ILO guidelines in 1980, and the revised ILO guidelines in 2000 and 2011 ensure B-reader consistency in reading x-rays.

In order to preserve continuity and consistency in the classifications, the images used in reproducing the 2011 ILO version of the standard radiographs are identical to those used for the 1980 set of standard radiographs, aside from one image which demonstrates pleural abnormalities. The ILO did endeavor to improve image quality in the 2000 set by using advanced computer imaging techniques. The NIOSH CWXSP requires that readers submit classifications adhering to the 2011 Revised Edition of the Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconiosis. The sets of standard images used in the 2011 and 1980 classifications are nearly identical, and thus it is the individual reader's choice which of these two sets of standard radiographs to use. However, because the quality of the 2011 standard radiographs has been enhanced by the ILO Guidelines, NIOSH recommends that readers use the 2011 standard radiographs for classifying films for NIOSH programs and studies (*http://www.cdc.gov/niosh/topics/chestradiography/breader-info.html*).

Classifying films can be variable, especially in lower disease categories, with differences of opinion between B-readers and by the same B-reader at different times (Attfield et al., 2007; Naidoo et al., 2004). To account for this

variability, the ILO classification system allows readers to determine profusion severity by indicating the most likely category and also by indicating a neighboring category that might also be valid. For example, a score of 1/2 means the disease state is classified as category 1, but could also be considered category 2. Another means of compensating for variability is to have a panel of readers interpret films by consensus rather than using a single reader. When the ILO system is used for surveillance and screening purposes, it has been demonstrated to be a valid means for identifying trends and disease clusters (Attfield et al., 2007; Naidoo et al., 2004; NIOSH, 2008). The CWXSP uses a profusion score of 1/0+ as indicative of CWP development.

Section 203(a) of the Mine Act specifically requires that operators provide periodic x-ray examinations to underground coal miners, and such other tests as the Secretary of Health and Human Services deems necessary to supplement the x-rays (30 U.S.C. 843(a)). In addition to pneumoconiosis apparent on x-rays, miners are at increased risk for the development of COPD. Chest x-rays alone cannot provide a measure of airflow obstruction and, therefore, often miss important lung disease. Spirometry, a simple breathing test, is an additional component of the health assessment of miners that is particularly useful. NIOSH has recommended periodic medical history and spirometry tests for both surface and underground coal miners since 1995, to facilitate preventive actions, increase miners' participation in programs for early detection of disease, and improve the derivation of representative estimates of the burden, distribution, and determinants of occupational lung disease in relation to coal mining in the United States. Final § 72.100 requires spirometry testing of both underground and surface miners.

A few commenters stated that a recent study by Suarthana et al. (2011) states that dust exposure is a poor predictor of CWP prevalence.

In response, MSHA notes that dose-response relationships between cumulative dust exposure and cases of respiratory diseases have been studied by NIOSH as part of the National Coal Study. The Suarthana study stated that: "Epidemiological modeling of CWP prevalence and incidence undertaken on underground coal miners in the USA and elsewhere has shown that the main predictor of CWP is cumulative exposure to respirable coal mine dust."

As stated previously, NIOSH studies the causes and consequences of coal-related respiratory disease and, in cooperation with MSHA, carries out a program for early detection of coal workers' pneumoconiosis. These activities are administered through the CWXSP.

In the early 2000s, MSHA with assistance from NIOSH piloted the Miners' Choice Program (MCP) to offer all coal miners the opportunity to participate in the CWXSP by having medical staff travel to mines or other areas to conduct medical surveillance of mining populations at no cost to the mine operator. The MCP used a mobile medical examination unit to bring the medical exams, including chest x-rays, to the miners in remote areas to provide early detection of dust-related pulmonary disease. MSHA wanted to determine the state of miner health because participation in the CWXSP decreased from the high of 100% in 1970 to 1974 to a low of 20.6% in 1990 to 1994 (Table III–2). MSHA found that participation rates increased to 25.5% in 1995 to 1999; 34.1% in 2000 to 2004; and 41.7% in 2005 to 2009. MSHA further found that as more miners were screened, the prevalence of CWP detected fluctuated. CWP was detected in 2.0% of the miners who were x-rayed from 1995 to 1999; 3.6% from 2000–2004; and 2.7% from 2005 to 2009 (Table III–1). Although commenters stated that this increase was not real, additional miner participation resulting from the enhanced surveillance identified more cases of CWP that otherwise would have gone undetected.

The Miners' Choice Program was expanded into the Enhanced Coal Workers' Health Surveillance Program (ECWHSP) in March 2006 by NIOSH to continue increasing miner participation by providing additional respiratory health evaluations to coal miners. The ECWHSP uses a mobile medical examination unit to bring the medical exams to the miners in the field to provide early detection of dust-related pulmonary disease and target additional areas for prevention. This program offers lung function testing in addition to chest x-rays as part of the medical examination and asks miners to fill out occupational and health surveys.

The National Coal Workers' Autopsy Study, which is part of the NCWHSP, provides autopsies of deceased coal miners at the request of miners' next-of-kin at no cost to the family. Autopsy results may help support a black lung benefit claim and also help scientists and medical doctors learn more about CWP. Doctors collect standardized lung specimens during autopsies to be used in ongoing scientific research as well as to provide information to the next-of-kin

regarding the presence and extent of CWP in the lungs of the deceased miner. Because one basic reason for the post-mortem examination is research (both epidemiological and clinical), a minimum of essential information is collected regarding the deceased miner, including occupational history and smoking history. The data collected are used by scientists for research purposes in defining the diagnostic criteria for pneumoconiosis and in correlating pathologic changes with exposures and x-ray findings.

NIOSH reports overall prevalence of CWP 1/0+ across all MSHA districts, as well as a national prevalence (Table III–1). These numbers are based on the average number of miners employed per time period (1995–1999, 2000–2004, and 2005–2009) and the number x-rayed per time period. When more information is available from complete medical examination records, NIOSH refines the estimates as in the case with reporting CWP prevalence based on tenure, i.e., the length of time worked in coal mining (Table III–2).

During the 2005 to 2009 period, for example, over 18,500 active underground coal miners were screened as part of the CWXSP. As shown in Table III–1, this is approximately 42% of all active underground miners (NIOSH, 2011—Work-Related Lung Disease Surveillance System, CWXSP. ref. no. 2011T02–17, May 2011). Active miners from all MSHA districts participated in this screening.

Some commenters stated that the NIOSH surveillance programs are not "well-established scientific processes for data collection" and that black lung rates have declined since 2000.

NIOSH surveillance of CWP started in 1970 and continues today using the same case definition of CWP 1/0+ (Tables III–1 and III–2). The number of miners participating in the program has fluctuated through the years. NIOSH's active surveillance programs have reached additional miners, as shown in Table III–2; the percentage participating in the period from 2005 to 2009 was 41.7% as compared to a low of 20.6% in the period from 1990 to 1994. In addition, the number of underground coal miners in the United States has declined from over 150,000 in the 1975–1979 time period to under 45,000 in the 2005–2009 time period. The number of miners examined that provided tenure data on the health questionnaire forms was approximately 85,000 in the 1970–1974 time period to approximately 11,000 in the late 2000s.

Miners who stop working in mining are lost to follow-up. Since their health status is not known, surveillance of only

**24824**    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

active miners may underestimate the prevalence of disease. Cohen et al. (2008) reported that disease progression continues after exposures stop, increasing lung function impairment and pneumoconiosis levels in miners once they leave employment (i.e., ex-miners and retired miners). Coal mine dust clearance from the lungs is slow and incomplete, allowing continued contact between the cytotoxic dust and lung tissues. This progression of disease after retirement from coal mining (i.e., after exposure ceased) was also observed in other countries (Cohen et al., 2008). Ex-miners displayed higher levels of respiratory disease than current miners illustrating the progression of CWP to PMF even after exposure ceased

(Naidoo et al., 2005 and 2006). Miners with advanced disease are forced to retire because they can no longer perform mining tasks (Cohen et al., 2008).

Exposures, as estimated by MSHA inspector samples, have decreased since passage of the 1977 Mine Act from a mean of 0.796 mg/m³ (with 18.7% of samples above the 2.0 mg/m³ standard) in 1979 to 0.468 mg/m³ (with 3.2% of samples above the 2.0 mg/m³ standard) in 2003 at underground coal mines; and from 0.384 mg/m³ (5.0% above the 2.0 mg/m³ standard) in 1979 to 0.148 mg/m³ (0.8% above the 2.0 mg/m³ standard) in 2003 at surface coal mines (NIOSH, 2011—Work-Related Lung Disease Surveillance System, CWXSP. ref. no.

2007T02–14; *http://www2.cdc.gov/drds/ WorldReportData/FigureTableDetails. asp?FigureTableID=529&GroupRef Number=T02-14*). As exposures were reduced, the prevalence of CWP 1/0+ was also reduced, on average. Prevalence information on CWP 1/0+ among miners from the NCWHSP, reported on NIOSH's Web site, was 2.0% in the 1995–1999 time period; 3.6% in the 2000–2004 time period; and 2.7% in the 2005–2009 time period (Table III–1). When tenure is considered, however, the prevalence increased to 2.6%, 4.1%, and 4.1%, respectively (Table III–2). Table III–2 shows that disease progression continues even after exposures were reduced.

Federal Register / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    24825

Table III–1 – CWXSP: Estimated Number of Actively Employed Workers at Underground Mines, Number of Miners Examined, and Number of Miners with CWP, 1995–2009, Including Those With and Without Tenure Information

| MSHA Coal Mining District | 1995–1999 | | | | 2000–2004 | | | | 2005–2009 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Average Number Employed | No. X-Rayed | No. with CWP | % with CWP | Average Number Employed | No. X-Rayed | No. with CWP | % with CWP | Average Number Employed | No. X-Rayed | No. with CWP | % with CWP |
| District 01 (Anthracite coal mining regions in Pennsylvania) | 248 | 26 | – | – | 244 | 63 | 7 | 11.1 | 119 | 58 | 6 | 10.3 |
| District 02 (Bituminous coal mining regions in Pennsylvania) | 3,350 | 1,126 | 18 | 1.6 | 8,261 | 1,777 | 38 | 2.1 | 4,170 | 1,200 | 32 | 2.5 |
| District 03 (Maryland, Ohio, and Northern West Virginia) | 6,278 | 1,698 | 18 | 1.7 | 6,467 | 1,507 | 93 | 6.2 | 5,941 | 1,764 | 38 | 2.2 |
| District 04 (Southern West Virginia) | 9,971 | 891 | 46 | 5.2 | 8,426 | 1,606 | 152 | 9.6 | 8,751 | 1,882 | 198 | 10.0 |
| District 05 (Virginia) | 1,623 | 908 | 60 | 6.6 | 4,101 | 1,389 | 130 | 9.4 | 2,982 | 776 | 70 | 9.0 |
| District 06 (Eastern Kentucky) | 5,321 | 1,630 | 38 | 6.2 | 5,898 | 1,633 | 12 | 1.0 | 1,707 | 453 | 67 | 13.2 |
| District 07 (Central Kentucky, North Carolina, South Carolina, and Tennessee) | 4,627 | 914 | 26 | 1.2 | 4,629 | 371 | 25 | 6.7 | 3,659 | 583 | 50 | 8.6 |
| District 08 (Illinois, Indiana, Iowa, Michigan, Minnesota, Northern Missouri, Wisconsin) | 4,627 | 2,446 | 13 | 1.6 | 4,892 | 3,776 | 37 | 1.9 | 4,540 | 4,891 | 15 | 0.4 |
| District 09 (All States west of the Mississippi River, except for Minnesota, Iowa, and Northern Missouri) | 3,526 | 1,830 | 14 | 1.8 | 4,698 | 3,127 | 34 | 1.1 | 4,338 | 3,858 | 36 | 0.9 |
| District 10 (Western Kentucky) | 2,571 | 688 | 5 | 1.7 | 2,361 | 1,332 | 18 | 1.4 | 2,131 | 2,534 | 26 | 1.1 |
| District 11 (Alabama, Georgia, Florida, Mississippi, Puerto Rico, Virgin Islands) | 4,143 | 2,751 | 22 | 1.8 | 3,253 | 1,034 | 16 | 1.5 | 2,626 | 976 | 17 | 1.7 |
| TOTAL | 50,301 | 12,830 | 258 | 2.0 | 48,971 | 16,700 | 602 | 3.6 | 44,546 | 18,563 | 492 | 2.7 |

"–" indicates fewer than five miners examined or with CWP (to protect identification of miners screened who have been diagnosed with disease because of privacy laws).

**Note:** The average number employed during the period, based upon quarterly reports by coal mine operators to MSHA. Because of hiring and layoffs, the total number of individuals who worked at underground mines in any period may exceed the average employment.

**Source:** CWP data from NIOSH's CWXSP. Coal District codes from MSHA. *http://www2a.cdc.gov/drds/WorldReportData/FigureTableDetails.asp?FigureTableID=2551&GroupRefNumber=T02-17.*

161

24826    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

TABLE III-2—CWXSP: NUMBER AND PERCENTAGE OF EXAMINED UNDERGROUND MINERS WITH CWP (ILO CATEGORY 1/0+) BY TENURE INFORMATION PROVIDED ON MEDICAL QUESTIONNAIRE, 1970-2009

| | | Time Period | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1970–1974 | 1975–1979 | 1980–1984 | 1985–1989 | 1990–1994 | 1995–1999 | 2000–2004 | 2005–2009 |
| | Average No. Employed at Underground Mines. | 104,705 | 150,475 | 131,113 | 91,122 | 69,424 | 50,319 | 39,544 | 44,546 |
| | Number of X-rays | 105,841 | 99,610 | 45,797 | 19,049 | 14,283 | 12,674 | 16,644 | 18,563 |
| | % of Miners X-rayed | 101.1 | 66.2 | 34.9 | 20.9 | 20.6 | 25.2 | 42.1 | 41.7 |
| | % of Miners X-rayed That Reported Tenure Information. | 80.9 | 59.1 | 78.1 | 67.3 | 82.1 | 71.8 | 82.9 | 60.4 |
| | Total No. of Miners Examined | 85,644 | 58,864 | 35,787 | 12,816 | 11,727 | 9,100 | 13,794 | 11,211 |
| Tenure (years in underground mining). | Total No. with CWP | 13,288 | 2,887 | 1,083 | 460 | 424 | 233 | 570 | 455 |
| | Total % with CWP | 15.5 | 4.9 | 3 | 3.6 | 3.6 | 2.6 | 4.1 | 4.1 |
| 0–9 | No. of Miners Examined | 36,303 | 43,296 | 23,190 | 5,063 | 1,638 | 806 | 4,261 | 4,281 |
| | No. with CWP | 803 | 475 | 186 | 44 | 20 | 7 | 47 | 27 |
| | % with CWP | 2.21 | 1.1 | 0.8 | 0.9 | 1.2 | 0.9 | 1.1 | 0.6 |
| 10–14 | No. of Miners Examined | 6,464 | 5,460 | 7,050 | 4,345 | 2,968 | 642 | 562 | 311 |
| | No. with CWP | 586 | 328 | 166 | 111 | 68 | 7 | 10 | ** |
| | % with CWP | 9.1 | 6 | 2.4 | 2.6 | 2.3 | 1.1 | 1.8 | ** |
| 15–19 | No. of Miners Examined | 6,210 | 2,705 | 2,253 | 2,071 | 4,037 | 1,778 | 1,156 | 235 |
| | No. with CWP | 910 | 298 | 139 | 118 | 125 | 34 | 37 | 5 |
| | % with CWP | 14.7 | 11 | 6.2 | 5.7 | 3.1 | 1.9 | 3.2 | 2.1 |
| 20–24 | No. of Miners Examined | 8,769 | 2,044 | 993 | 683 | 2,178 | 3,475 | 3,100 | 958 |
| | No. with CWP | 1877 | 380 | 102 | 63 | 115 | 86 | 152 | 47 |
| | % with CWP | 21.4 | 18.6 | 10.3 | 9.2 | 5.3 | 2.5 | 4.9 | 4.9 |
| 25+ | No. of Miners Examined | 27,898 | 5,359 | 2,301 | 654 | 906 | 2,399 | 4,715 | 5,426 |
| | No. with CWP | 9,112 | 1,406 | 490 | 124 | 96 | 99 | 324 | 376 |
| | % with CWP | 32.7 | 26.2 | 21.3 | 19 | 10.6 | 4.1 | 6.9 | 6.9 |

* Number from Table III-1, 2005-2009 number of miners X-rayed.
** Indicates fewer than 5 miners with CWP
Source: CWP data from NIOSH's Coal Workers' X-ray Surveillance Program (CWXSP), Ref. No. 2007F02-06, 2011T02-12.

Federal Register / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations     **24827**

Some commenters stated that the prevalence of disease was overstated in the proposed rule. Annual prevalence data are reported on NIOSH's Web site and summarized in Table III–3 for 1970 through 2009. Prevalence in 1970, the first year of surveillance, was 2,162 cases (30.5%). The respirable dust standard at the time was 3.0 mg/m³. As shown in Table III–3, the percent of miners show a downward trend until after 1999. In the last decade, the observed prevalence of CWP 1+ in examined miners has varied from a low of 46 cases (2.6%) in 2004 to 167 cases (5.8%) in 2006. The number of miners examined in 2005 was only 706 miners; 37 of them, or 5.2%, were diagnosed with CWP 1/0+. In comparison in 2000, 6,264 miners were examined and 242 (3.9%) were diagnosed with CWP 1/0+.

TABLE III–3—CWXSP: NUMBER AND PERCENTAGE OF EXAMINED UNDERGROUND MINERS (WHO PROVIDED TENURE INFORMATION) WITH COAL WORKERS' PNEUMOCONIOSIS (ILO CATEGORY 1/0+) YEARLY TOTALS, 1970–2009, (USING DATA FROM TABLE III–2)

| Year | Total No. of Miners Examined | Total No. with CWP | Total % with CWP |
|---|---|---|---|
| 1970 | 7,085 | 2,162 | 30.5 |
| 1971 | 30,703 | 5,154 | 16.8 |
| 1972 | 6,916 | 717 | 10.4 |
| 1973 | 8,001 | 961 | 12.0 |
| 1974 | 32,939 | 4,294 | 13.0 |
| 1970–1974 | 85,644 | 13,288 | 15.5 |
| 1975 | 8,779 | 482 | 5.5 |
| 1976 | 7,581 | 174 | 2.3 |
| 1977 | 7,870 | 194 | 2.5 |
| 1978 | 10,235 | 386 | 3.8 |
| 1979 | 24,399 | 1,651 | 6.8 |
| 1975–1979 | 58,864 | 2,887 | 4.9 |
| 1980 | 7,532 | 303 | 4.0 |
| 1981 | 9,201 | 234 | 2.5 |
| 1982 | 4,536 | 80 | 1.8 |
| 1983 | 4,833 | 133 | 2.8 |
| 1984 | 9,685 | 333 | 3.4 |
| 1980–1984 | 35,787 | 1,083 | 3.0 |
| 1985 | 3,056 | 69 | 2.3 |
| 1986 | 848 | 30 | 3.5 |
| 1987 | 2,867 | 92 | 3.2 |
| 1988 | 3,589 | 168 | 4.7 |
| 1989 | 2,456 | 101 | 4.1 |
| 1985–1989 | 12,816 | 460 | 3.6 |
| 1990 | 891 | 61 | 6.8 |
| 1991 | 1,036 | 38 | 3.7 |
| 1992 | 3,578 | 140 | 3.9 |
| 1993 | 3,640 | 95 | 2.6 |
| 1994 | 2,582 | 90 | 3.5 |
| 1990–1994 | 11,727 | 424 | 3.6 |
| 1995 | 1,920 | 57 | 3.0 |
| 1996 | 607 | 27 | 4.4 |
| 1997 | 1,625 | 32 | 2.0 |
| 1998 | 883 | 31 | 3.5 |
| 1999 | 4,065 | 86 | 2.1 |
| 1995–1999 | 9,100 | 233 | 2.6 |
| 2000 | 6,264 | 242 | 3.9 |
| 2001 | 2,618 | 104 | 4.0 |
| 2002 | 1,723 | 109 | 6.3 |
| 2003 | 1,423 | 69 | 4.8 |
| 2004 | 1,766 | 46 | 2.6 |
| 2000–2004 | 13,794 | 570 | 4.1 |
| 2005 | 706 | 37 | 5.2 |
| 2006 | 2,877 | 167 | 5.8 |
| 2007 | 2,923 | 82 | 2.8 |
| 2008 | 3,457 | 111 | 3.2 |
| 2009 | 1,248 | 58 | 4.6 |
| 2005–2009 | 11,211 | 455 | 4.1 |

Source: CWXSP—Coal Workers' X-ray Surveillance Program—Ref. No. 2011T02–12, http://www2a.cdc.gov/drds/WorldReportData.

Some commenters, who stated that current risks of CWP were overstated in the proposed rule, suggested that recently observed cases were due to high coal ranks and/or excessive silica exposures associated with geographically limited areas within the United States. These commenters stated that the increase in prevalence of CWP is distinctly regional and that the proposed 1.0 mg/m³ standard should not apply to regions that do not have an increase. Some of these commenters also said that CWP has been eliminated in the Midwest (i.e., Indiana, Illinois, and Western Kentucky) and pointed out that MSHA District 8 has a high participation rate in the CWXSP and the

lowest CWP rate in the country. A few commenters acknowledged that the prevalence of PMF has increased but, citing Wade et al. (2010), attributed the increase to greater silica exposure from drilling through rock. Some commenters also stated that MSHA should have examined its own silica exposure data before concluding that recently observed cases of CWP were caused by respirable coal mine dust exposures under the existing standard.

As noted in the proposed rule (75 FR 64462–64463), MSHA is aware that some cases of rapidly progressive CWP have been detected in a small percentage of miners diagnosed initially with CWP 1/0+; however, these cases are a small proportion of the larger group of miners across the U.S. who have been diagnosed with CWP 1/0+ that need to be studied to determine the reasons for the rapid progression (see Antao et al. 2005, 2006; Attfield and Petsonk, 2007).

The Wade et al. paper cited by commenters reported on a retrospective chart review of a group of 138 coal miners with PMF who were approved for benefits by the West Virginia State Occupational Pneumoconiosis Board between January 2000 and December 2009. The mean age of this group of miners was 52.6 years (40–77 years) and they had an average tenure of 30 years (7.5 to 47 years). Miners who worked as continuous mining machine operators or roof bolting machine operators had the highest occurrence of PMF (41% and 19%, respectively). The time of progression to PMF was studied in a subgroup of these miners when normal x-rays were available for comparison to x-rays showing advanced disease. In this subgroup of 43 miners, the time between the last normal chest x-ray and one showing advanced disease averaged 12.2 years (5 to 27 years). No data on quartz exposure or respirable coal mine dust was provided by Wade et al.

McCunney et al. (2009) noted in their review of epidemiology literature that coal dust has been described as "able to mask the fibrogenic activity of quartz" and that there are "distinct pathological differences between simple pneumoconiosis of CWP and silicosis." Researchers initially thought that the active agent in respirable coal mine dust that was responsible for CWP development was quartz. However, research reported a poor correlation between radiological evidence of CWP and quartz concentration in the corresponding coal dust; there was no pattern between the quartz content of mixed dust and the probability of developing simple pneumoconiosis at quartz levels averaging 5 percent. Based

on the collective weight-of-evidence of human epidemiology studies, animal investigations and *in vitro* evaluations contained in the preambles to the proposed rule (75 FR 64458, October 19, 2010) for this final rule and to the 2003 proposed rule on Verification of Underground Coal Mine Operators' Dust Control Plans and Compliance Sampling for Respirable Dust (68 FR 10837, March 6, 2003), it is apparent that quartz is not the predominant factor in the development of CWP. In fact, the results of large-scale epidemiological studies in Germany, the United Kingdom, France, and the United States indicate varying levels of risk of CWP, based on the type of coal regardless of silica content.

McCunney et al. (2009) also reported on the results of research conducted by Miller et al. (1995) in British coal miners. These miners participated in the Pneumoconiosis Field Research (PFR) program. As reported in the preamble to the proposed rule (75 FR 64462), that program, in addition to periodic chest x-rays, also collected separate industrial hygiene data that quantified typical concentrations of respirable dust and quartz for a variety of occupations within the mines. These exposure measurements were used to determine individual exposure profiles for participating miners. Miller et al. suggested that the rapid progression in radiological abnormalities, their relationship with quartz exposure estimates, and the strength of their relationship with lung function decrements resembled classical silicosis rather than CWP in a subpopulation exposed to quartz concentrations of about 10% at one specific mine. According to McCunney et al., however, recorded progressions of CWP to PMF in such cases may have resulted from misdiagnosing silicosis as CWP. McCunney et al. also reported similar findings of misdiagnosis in a case/control study of British coal miners that showed an effect of unusually high levels of quartz exposure on rapid CWP-progression.

The preamble to the proposed rule reported that NIOSH researchers determined that cases of rapidly progressive CWP are sentinel health events (75 FR 64468). Antao et al. (2005) identified a total of 886 cases of CWP among 29,521 miners examined from 1996 to 2002 in the CWXSP. CWP progression was evaluated in 783 of these miners; 277 (35.4%) were cases of rapidly progressive CWP, including 41 with PMF. The miners with rapidly progressive CWP were younger than miners without rapid progression, worked in smaller mines, and reported longer mean tenure in jobs involving

work at the face (production area) of the mine. Many of these cases of rapidly progressive CWP developed in miners from eastern Kentucky and western Virginia. Eight cases showed progression of one subcategory over 5 years, 156 cases had progression equivalent to two or three subcategories over a 5-year period, and 72 cases had progression equivalent to more than three subcategories over a 5-year period.

Rounded opacities were the primary shape/size in 73% of the rapidly progressive cases compared to 50% in the non-rapidly progressive cases. Overall, the miners with rapidly progressive CWP were somewhat younger (mean age 48) than the remaining miners evaluated (mean age 51), but were similar in mean work tenure (27 to 28 years). Rapidly progressive cases were more likely to have worked in smaller mines than in larger mines. Rapidly progressive CWP cases reported longer mean tenure in jobs involving work at the face of the mine (19 years), compared to miners without rapid progression (17 years). These particular cases occurred in miners from eastern Kentucky and western Virginia (Antao et al. 2005).

Clusters of newly identified cases of advanced pneumoconiosis were surveyed in 2006 by ECWSHP teams that visited two counties in Virginia (Antao et al., 2006) and in eastern Kentucky and southwestern Virginia (Attfield and Petsonk, 2007). In March and May of 2006, a total of 328 underground coal miners employed in Lee and Wise counties in Virginia were examined. This was 31% of the estimated 1,055 underground miners in those counties. The mean age of examined miners was 47 years, and their mean tenure working in underground coal mines was 23 years. A total of 216 (66%) had worked at the coal face for more than 20 years; and 30 of the 328 miners (9%) had radiographic evidence of pneumoconiosis (i.e., category 1/0 or higher profusion of small opacities). Of these, 11 miners had advanced cases of CWP, including five with large opacities consistent with PMF and six with coalescence of small opacities on a background profusion of category 2. Among the 11 miners with advanced cases, the mean age was 51 years (range: 39–62 years), the mean tenure in underground coal mines was 31 years (range: 17–43 years), and the mean number of years working at the coal face was 29 years (range: 17–33 years). All 11 advanced cases met the radiographic criteria for rapidly progressive CWP. All reported at least one respiratory symptom (i.e., productive cough, wheeze, or shortness

of breath), the most common being shortness of breath (dyspnea). Four of the nine who underwent spirometry testing had abnormal results (Antao et al., 2006).

In a separate ECWSHP survey in 2006, pneumoconiosis rates were determined for 26 sites in seven counties in eastern Kentucky and southwestern Virginia (Attfield and Petsonk, 2007). A total of 975 (20%) of the 4,897 active underground miners in the counties participated; 37 (4%) of those tested had advanced pneumoconiosis. Medical records indicated that all 37 miners with advanced disease had worked underground for at least one interval of 10 years without a chest x-ray; 22 (59%) had worked for at least one interval of 20 years without a chest-ray, and 2 others had worked for more than 30 years without a chest x-ray. Attfield and Petsonk found that miners who worked at the coal face (not typically associated with silica dust exposure) and roof bolting machine operators (typically associated with higher silica dust exposure) with similar tenure underground (about 30 years) developed PMF at high rates. PMF was identified in 64% of the face workers and 42% of the roof bolting machine operators. Attfield and Petsonk examined disease development patterns in this population of miners since silicosis can develop faster than CWP. They found that 1 of 26 roof bolting machines operators (4%) progressed to PMF in less than 10 years, compared with 2 of 11 coal-face workers (18%).). Silica exposure was identified as only one of several factors possibly related to rapid disease progression in this population. The authors listed various potential explanations for the continued occurrence of advanced pneumoconiosis: The respirable dust standard may have been too high; failure to comply with or enforce respirable dust regulations; lack of adjusting disease prevention practices to accommodate changes in mining practices; and missed opportunities for miners to be screened for early disease. The 3 mm rounded opacities may or may not be associated with silica.

Suarthana et al. (2011) cited references by Laney et al. (2009) and Laney and Attfield (2010). These papers attempted to further illustrate what factors may be involved in the rapid progression of CWP to PMF by focusing on the presence of a specific type of x-ray findings frequently associated with silicosis (rounded pneumoconiotic opacities exceeding 3 millimeter (mm)—r-type) (Laney et al., 2009) and mine size (Laney and Attfield 2010) in U.S. coal miners who participated in the CWXSP. Laney examined NIOSH CWXSP data between 1980 to 2008 (2,868 radiographs showing ILO category 1 or greater small opacities out of a total of 90,973 available) found that r-type opacities, frequently associated with silica exposure, occurred in 201 radiographs representing 0.22% of the total number of radiographs examined. The 3 mm rounded opacities may or may not be associated with silica. It is a matter of sensitivity and specificity. It is not a silica-specific finding, but is often or frequently associated with silica exposure. Laney and Attfield examined NIOSH CWXSP data collected between 1970 and 2009 and evaluated the effect of mine size on the development of CWP and PMF. They found that miners working in small mines (fewer than 50 employees) had a significantly higher prevalence of CWP compared to miners who worked in large mines (with 50 or more employees). They reported that miners from small mines were five times more likely to have radiographic evidence of PMF (1% of miners) compared to miners from larger mines (0.2%). The Laney and Attfield (2010) study was the first to directly examine the relationship between miners' respiratory health and mine size in the U.S. They concluded that: there are distinct differences between large and small mines that potentially influence the amount and type of exposures; and the effect of small mine size on development of CWP risk was consistent across all mining states and was not confounded with coal rank or geographical region. They also found the small mine effect on CWP in other states, not just in thin seam mines that are primarily concentrated in Kentucky, Virginia, and West Virginia.

Other epidemiological studies on U.S. coal miners, discussed in the proposed rule (75 FR 64459), conclude that the rank of coal mined influences CWP rates among coal workers, suggesting that coal's carbon content is a factor in CWP risk (Huang et al., 2005, McCunney et al., 2009). According to these studies, coal from districts with lower rates of CWP (while considering similar levels of exposure to coal, both in concentration and duration) show that coal high in bioavailable iron (BAI) is associated with the highest risk of CWP. Results of *in vitro* studies with human and animal cell lines are consistent with the epidemiological data that suggest that risk of CWP is not based on quartz, but most likely due to the concentration of BAI. *In vitro* studies provide further support for the role of iron in the inflammatory process associated with CWP. (Huang et al., 2005; Zhang and Huang 2005; Zhang et al., 2002).

Huang evaluated the quality of coal, including BAI, as determined by the U.S. Geological Survey database of coal quality, across seven regions of the U.S. These data were compared to data from the first National Study of Coal Workers' Pneumoconiosis. The authors found that CWP prevalence was correlated with pyritic sulfur or total iron in the coals but not with coal rank or silica. They concluded that a significant correlation between CWP prevalence and levels of BAI exist, moderated by certain minerals in the coals that can interact and contribute to different levels of BAI and, therefore, different levels of CWP and associated COPD.

Although CWP and silicosis may have some similar clinical patterns, their etiology is different (McCunney et al., 2009; 75 FR 64458, October 19, 2010). Recent studies on U.S. coal miners illustrate this point (Antao et al., 2006; Attfield and Petsonk 2007; Laney et al., 2009, Laney and Attfield 2010, and Wade et al., 2011).

Miller et al. (1997, 2007) and Miller and MacCalman (2009) reported on the results of mortality research conducted in a group of British coal miners. These miners participated in the Pneumoconiosis Field Research (PFR) program. As reported in the preamble to the proposed rule (75 FR 64462), industrial hygiene data was collected as part of that program to quantify typical concentrations of respirable dust and respirable quartz for a variety of occupations within the mines. The data was used to determine individual exposure profiles for participating miners. The mortality of this large cohort of 17,820 coal miners was followed from 1970 through 2006 (Miller et al. 2007). The researchers presented alternative regression analyses to predict risk of mortality in relation to time-dependent estimates of individual exposures to respirable dust and respirable quartz. The researchers concluded that CWP mortality is directly related to exposure to respirable coal mine dust, which is a better single predictor of CWP risk than is respirable quartz exposure. These results are consistent with earlier findings (Hurley et al. (1982); Miller et al. (1997)) that respirable coal mine dust exposure is more closely associated with the development of pneumoconiosis than is quartz. Based on all of the available evidence, MSHA believes that respirable coal mine dust has a fibrogenic effect on the development of CWP in coal miners independent of the quartz or silica content of the coal. High silica content may accelerate the progression of CWP to PMF, the most severe form of CWP, but there is no evidence to suggest that

the presence of silica is a necessary condition for CWP, PMF, severe emphysema, or NMRD mortality.

Exposure to respirable coal mine dust from high rank coal is associated with greater risks of CWP and nonmalignant respiratory disease (NMRD) mortality. However, evidence of high risks in identified hot spots does not imply that risks in other areas are insignificant. Exposure to respirable coal mine dust from lower rank coal still places miners at significant excess risk for CWP and NMRD mortality. MSHA's Quantitative Risk Assessment (QRA) for the final rule shows that significant excess risks of CWP and NMRD mortality under the existing standard are present for miners at low rank coal mines—i.e., outside the geographic "hot spots" identified by some commenters. (See QRA, Tables 13, 14, 15, 17, and 18).

The CWXSP data from 2005–2009 published by Suarthana et al. show that some regions with lower rank coal, i.e., regions not identified as hot spots, also tend to have younger miners with less tenure. For example, in MSHA Districts 8, 9, and 10, tenure underground was less than 5 years for 49.1%, 47.0%, and 49.4% of the miners, respectively. Surveillance of underground coal miners in these regions indicates that CWP is occurring, though at lower rates, primarily due to the age and tenure profile of the miners. In the remaining Districts that mine bituminous coal, the median tenure was over 20 years (Table III–4).

Suarthana did not publish data from MSHA District 1, which mines anthracite, the highest ranked and most fibrogenic coal. District 1 surveillance data from NIOSH (USDHHS, CDC,

NIOSH, Statistics for Underground Miners Working in MSHA District 01 (Anthracite Coal Mining Regions in Pennsylvania, 2011b) shows that during the period of 2004–2008, 67 anthracite miners participated in the ECWHSP. Age information was available for 58 miners. Mean age was 41 (range 18–69 years). Tenure information was available on 55 of these miners. The mean tenure was 17 years (range 0–45 years). Information on tenure at the face (production area) was available for 51 miners; mean years of face work was 17 years (range 1–45 years). The prevalence of CWP 1+ in 58 examined miners was 6 cases (or 10%). Commenters did not include anthracite coal mines in MSHA District 1 in their discussions of regional hot spots or suggest that silica was responsible for CWP at anthracite coal mines. Nevertheless, at exposure levels experienced over a 45-year occupational lifetime under the existing standard, anthracite coal mines present significant excess risks of CWP and NMRD mortality. (See QRA, Tables 13, 14, 15, 17, and 18). In the case of NMRD mortality, risks for anthracite coal miners are estimated to be far greater than for miners in the same occupations at high rank bituminous coal mines (QRA, Tables 17 and 18).

Overall, NIOSH surveillance data indicate that pneumoconiosis at the CWP 1/0+ level is occurring in underground coal miners across each MSHA Coal District in the United States; not just in the "hot spot" areas of southern West Virginia, eastern Kentucky, and western Virginia highlighted by some commenters.

Table III–4 shows that almost 50 percent of CWXSP participants in

Districts 8, 9, and 10 have tenure less than five years; and, yet, miners in those districts continue to develop CWP 1/0+ at 0.6% (16 cases), 1.2% (28 cases), and 2.3% (27 cases) respectively. As shown in Table III–1, miners continue to develop CWP in all MSHA Districts.

The commenters who questioned the validity of the reduction in the existing 2.0 mg/m³ standard focused on the dose-response relationship and asserted that data generated from pre-1970 were out-of-date and should not be used for risk assessment purposes. MSHA's QRAs for the proposed and final rules assessed risk at current exposure levels. Data shown in Tables III–1 and III–2 indicate that CWP is continuing to develop, especially in miners with more underground tenure, as stated in MSHA's QRA. Almost all of these miners have worked only during the period while the existing 2.0 mg/m³ standard has been in effect. While average exposures have been reduced, current exposure conditions place miners at significant risk of incurring material impairment of health or functional capacity over their working lives.

Other commenters suggested that MSHA selectively chose CWP data to include in the health effects assessment. They suggested that CWP prevalence is not increasing. In response, MSHA notes the data show that there was a reduction in prevalence of CWP in the 1990s until continued surveillance indicated that many cases of CWP were missed or newly developed (Attfield et al., 2009). Also, the prevalence of CWP increased with age and tenure. (See Tables III–1, III–2, III–3, and III–4.)

166

Federal Register / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    24831

TABLE III–4—COAL WORKERS' X-RAY SURVEILLANCE PROGRAM (CWXSP)—UNDERGROUND COAL MINING SURVEY SUMMARIES OF OBSERVED PREVALENCE OF CWP—2005–2009 [1,2]

| Parameters | MSHA District | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Median Dust (in mg/m³) | 0.79 (0.54–1.05) | 0.96 (0.46–1.20) | 0.80 (0.31–3.08) | 0.55 (0.18–2.34) | 0.75 (0.36–1.17) | 0.69 (0.28–1.12) | 1.14 (0.73–1.70) | 0.98 (0.30–1.30) | 1.14 (0.76–1.21) | 0.99 (0.52–1.12) |
| Number of Miners | 911 | 1,504 | 1,280 | 689 | 423 | 522 | 2,713 | 2,351 | 1,190 | 825 |
| Age of Miners Examined: | | | | | | | | | | |
| ≤19 | 1 | 10 | 0 | 0 | 0 | 6 | 43 | 73 | 28 | 3 |
| 20–29 | 84 | 148 | 106 | 29 | 29 | 67 | 682 | 686 | 339 | 64 |
| 30–39 | 129 | 207 | 216 | 79 | 70 | 103 | 613 | 529 | 346 | 91 |
| 40–49 | 142 | 218 | 282 | 242 | 174 | 192 | 564 | 524 | 222 | 175 |
| 50–59 | 471 | 785 | 607 | 316 | 132 | 143 | 729 | 464 | 240 | 424 |
| ≥60 | 84 | 136 | 69 | 23 | 18 | 11 | 82 | 75 | 15 | 68 |
| Median Tenure (range) | 25 (0–44) | 22 (0–50) | 25 (0–44) | 27 (0–42) | 24 (0–44) | 20 (0–42) | 5 (0–45) | 5 (0–42) | 5 (0–40) | 24 (0–50) |
| Tenure %: | | | | | | | | | | |
| 0–4 years | 20.1 | 20.6 | 11.0 | 7.8 | 8.5 | 14.0 | 49.1 | 47.0 | 49.4 | 25.5 |
| 5–10 years | 11.5 | 12.9 | 12.1 | 6.5 | 10.9 | 11.5 | 14.1 | 14.6 | 16.2 | 6.6 |
| 11–20 years | 11.5 | 14.0 | 18.9 | 14.7 | 19.4 | 24.7 | 12.9 | 14.8 | 14.1 | 10.6 |
| 21–30 years | 28.2 | 25.3 | 26.7 | 44.0 | 40.9 | 33.3 | 17.6 | 18.0 | 13.4 | 40.1 |
| 41–40 years | 28.3 | 26.5 | 30.6 | 26.6 | 19.6 | 16.3 | 6.2 | 5.4 | 6.9 | 17.0 |
| > 40 years | 0.3 | 0.7 | 0.7 | 0.4 | 0.7 | 0.2 | 0.1 | 0.1 | 0.0 | 0.4 |
| Observed Prevalence of X-ray Findings: | | | | | | | | | | |
| CWP 1/0+ | 22 (2.4%) | 39 (2.6%) | 125 (9.8%) | 62 (9.0%) | 58 (13.7%) | 49 (9.4%) | 16 (0.6%) | 28 (1.2%) | 27 (2.3%) | 20 (2.4%) |
| Age of Cases: | | | | | | | | | | |
| ≤19 | 0 | 0 | 0 | | | 0 | 0 | 0 | 0 | 0 |
| 20–29 | 1 | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 2 | 2 |
| 30–39 | 0 | 0 | 1 | 1 | 1 | 1 | 2 | 5 | 2 | 0 |
| 40–49 | 3 | 8 | 23 | 25 | 28 | 19 | 1 | 8 | 10 | 4 |
| 50–59 | 14 | 23 | 89 | 30 | 29 | 28 | 10 | 13 | 12 | 10 |
| ≥60 | 1 | 7 | 12 | 6 | 1 | 1 | 1 | 1 | 1 | 6 |

[1] Inspector-measured coal mine dust concentration data at mine level 1970–2008.
[2] Observed prevalence is reported. Suarthana et al. estimated predicted CWP prevalence by using the 1992 Attfield and Morring (1992b) model. Attfield and Morring used mean job-specific dust levels used in the 1992 estimates, not mean mine specific dust levels. The paper reported median dust levels.
Source: Suarthana et al., 2011.

167

**24832**     **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

NIOSH reports prevalence in 5-year intervals for miners who voluntarily participate in the CWXSP. The numbers of miners who volunteer for medical surveillance vary over time (Table III–2) and the degree of detailed information provided also varies over time. Participation rates are dependent, in part, on availability of screening resources. NIOSH screens as many miners as possible through both the CWXSP (regular screening program) and the ECWHSP (enhanced screening program). Over time, the percentage of actively employed miners who volunteered for medical surveillance varied from 26% for the 1995–1999 time period to 34% for the 2000–2004 time period to 42% for the 2005–2009 time period, across all MSHA Districts (Table III–1). The requirements in final § 72.100 will increase participation rates. Final § 72.100 requires that each operator provide to each miner, including each surface coal miner, who begins work at a coal mine for the first time, an initial examination consisting of chest x-rays, spirometry, symptom assessment, and occupational history, and the opportunity to have the medical examinations at least every 5 years thereafter. MSHA expects that participation rates will increase due to the inclusion of surface miners in the screening/surveillance program. Other commenters suggested that more studies need to be completed before a revised standard can be developed since MSHA did not demonstrate that cases of CWP can be prevented under the proposed standard.

The QRA to the proposed rule demonstrated that cases of CWP, along with emphysema, silicosis, and chronic bronchitis, known collectively as "black lung," could be prevented under the proposed respirable dust standards. The QRA relied on MSHA inspector and operator sampling data collected during the 5-year period 2004–2008 and predominantly relied on 4 epidemiologic studies from 1995, 2007, 2008, and 2009. These studies relied on coal mine dust samples and data collected from 1968 to 1988. The researchers, who conducted the studies that MSHA relied on for the proposed rule, took steps to mitigate biases in the data used to estimate the health effects of miners' exposure to respirable coal dust. The relationship between exposure to respirable coal mine dust and disease prevalence is essentially unchanged since the studies that MSHA relied on were conducted. In addition, MSHA upwardly adjusted operator samples and excluded abatement samples taken by MSHA to mitigate

biases in the MSHA data. The QRA showed that exposures under the existing respirable coal mine dust standards are associated with cases of CWP, chronic obstructive pulmonary disease (COPD) including severe emphysema, and death due to non-malignant respiratory disease (NMRD). All of these outcomes constitute material impairments to a miner's health or functional capacity.

The QRA also analyzed and quantified the excess risk of miners incurring CWP or COPD, or dying due to NMRD, after 45 years of full-shift occupational exposure at levels currently observed in various exposure categories. Miners having different occupations and working at different locations face significantly different levels of respirable coal mine dust exposure. In every exposure category, including clusters of occupational environments showing the lowest average dust concentrations, current exposure conditions place miners at significant risk of incurring each of the material impairments considered.

Finally, the QRA projected the risk of material impairments after the proposed respirable dust standards were applied to each shift. Several provisions in this final rule will singularly lower coal miners' exposure to respirable dust and reduce their risks of disease and disease progression. These provisions include lowering the respirable dust standard, full-shift sampling to account for occupational exposures greater than 8 hours per shift, changing the definition of normal production shift, use of CPDMs for sampling, basing noncompliance determinations on MSHA inspectors' single shift sampling, revising the sampling program, requiring operator corrective action on a single full-shift operator sample, and changing the averaging method to determine compliance on operator samples. MSHA's QRA estimates the reduction in health risks when two provisions of the final rule are implemented—the final respirable dust standard and single shift sampling. The QRA shows that these two final provisions would reduce the risks of CWP, severe emphysema, and death from non-malignant respiratory disease (NMRD). For instance, the QRA for the final rule projects, over a 45-year occupational lifetime, significant improvements in almost every underground job category and at least 6 surface categories. Large aggregated improvements are also projected for longwall tailgate operators and continuous mining machine operators.

While the final 1.5 mg/m³ standard will reduce the risk of impairment,

disease, and premature death, estimates from MSHA's revised QRA reveals remaining risk at the final standard. However, MSHA believes that other provisions of the final rule will diminish these risks. The impacts of these other final provisions were not considered in the QRA. Cumulatively, MSHA expects that the final provisions will reduce the continued risks that miners face from exposure to respirable coal mine dust and would further protect them from the debilitating effects of occupational respiratory disease.

It has been over 40 years since the 1969 Coal Act was enacted. Exposures to respirable coal mine dust have been reduced with resultant reduction in disease prevalence. Table III–2 shows that: In the time period from 2005 to 2009 miners with over 25 years of tenure in underground coal mining have a CWP 1/0+ prevalence of 6.9%; and miners with only 0–9 years of tenure have CWP 1/0+ prevalence of 0.6% for that same time period. These miners are younger and have less cumulative exposure to respirable coal mine dust. The average prevalence of CWP 1/0+ for the period 2005 to 2009 was 4.1%.

The overall prevalence of CWP 1/0+ in all miners was 2.7% (See Table III–1) for the 2005–2009 time period. However, NIOSH data show that CWP 1/0+ is still occurring at significant levels in the active mining population. With continued surveillance over time, the number of CWP 1/0+ cases detected annually fluctuates; however, significant risk of material impairment of coal miners' health still remains, as noted in the QRA for this final rule.

Smoking in miners was mentioned by some commenters as a causative factor for observed lung disease in miners.

Exposure to coal mine dust is an independent factor in the development of CWP. Smoking is a risk factor for the development of lung disease, including cancer, COPD, and emphysema. Smoking and exposure to respirable dust have an additive effect on the development of COPD in miners. However, as shown in the Health Effects section of the preamble to the proposed rule, significant levels of NMRD, such as COPD and emphysema, occur in nonsmoking miners caused by their exposure to respirable coal mine dust.

In the first round of the CWHSP, 54.4% of underground coal miners were smokers, 25.5% were former smokers, and 20.1% were never smokers (Beeckman, et al., 2001; Beeckman, et al., 2002). Estimates of the current prevalence of smoking in coal miners (by MSHA District) are shown in Table III–5. This data set was reported as part

of the ECWHSP data on NIOSH's Web site. Smoking status among surveyed coal miners is currently estimated to be 22% smokers, 27% former smokers, and 51% never smoked. Again, since respirable coal dust exposure and smoking have an additive effect on the occurrence of COPD in smoking miners, MSHA believes the reduction in respirable dust levels in mining due to implementation of the final rule, coupled with the reduction in smoking in the mining population, also would have a beneficial effect on reducing the occurrence of NMRD in this population over time. (See Section IV, Health Effects, in the preamble to the proposed rule (75 FR 64458), Green et al., 1998a, and Kuempel et al., 2009b.)

TABLE III–5—SMOKING PREVALENCE AMONG COAL MINERS PARTICIPATING IN THE ECWHSP, 2006–2010

| MSHA district | Number of miners | Smoking status | | |
|---|---|---|---|---|
| | | Never (%) | Former (%) | Current (%) |
| 1 | 58 | 22 (38) | 8 (14) | 28 (48) |
| 2 | 664 | 356 (54) | 200 (30) | 108 (18) |
| 3 | 1,019 | 531 (52) | 264 (26) | 224 (22) |
| 4 | 1,059 | 573 (54) | 250 (24) | 236 (22) |
| 5 | 629 | 314 (50) | 170 (27) | 145 (23) |
| 6 | 374 | 182 (49) | 79 (21) | 113 (30) |
| 7 | 443 | 205 (46) | 109 (25) | 128 (29) |
| 8 | 667 | 312 (47) | 205 (31) | 150 (22) |
| 9 | 879 | 462 (53) | 262 (30) | 155 (18) |
| 10 | 135 | 78 (58) | 39 (29) | 18 (13) |
| 11 | 565 | 299 (53) | 158 (28) | 108 (19) |
| Total | 6,492 | 3,334 (51) | 1,744 (27) | 1,413 (22) |

Source: USDHHS, CDC, NIOSH, CWHSP, Statistics for Underground Miners, Districts 1 to 11, 02/13/2011.

MSHA's existing standard permits overexposures above the respirable coal mine dust standard due to averaging samples. Some commenters expressed concern that the proposed single sample provision would increase the number of citations that a mine operator receives, but would not affect a miner's long-term exposure and the subsequent development of chronic health effects.

The single sample provision in this final rule is changed from the proposal and only applies to MSHA inspector samples. MSHA does not anticipate that this final provision will, over the long term, increase the number of operator citations. A single sample that exceeds the standard would not cause or significantly contribute to disease. However, cumulative overexposures—masked when used as part of an average based on multiple samples—could cause or significantly contribute to development or progression of diseases, with each overexposure being an important factor contributing to disease. Compared to the current method of dust sampling, single full-shift samples will reduce a miner's cumulative exposure to respirable coal mine dust and the risk of developing occupational respiratory disease. For these reasons, single full-shift samples above the standard must be controlled so that miners' cumulative exposure is not increased beyond the level that will induce disease.

Final § 72.800 provides that the Secretary will use a single, full-shift measurement of respirable coal mine dust to determine the average concentration on a shift since that measurement accurately represents atmospheric conditions to which a miner is exposed during such shift. Additional discussion on single full-shift sampling is located elsewhere in this preamble under § 72.800.

Some commenters questioned the relationship between respirable coal mine dust exposure and development of NMRD, such as COPD and chronic bronchitis. Epidemiological studies that were discussed in the Health Effects section of the preamble to the proposed rule (75 FR 64460) found that coal miners from the United States, Great Britain, Australia, France, Asia, and South Africa developed decreased lung function that was proportional to the miners' cumulative respirable coal mine dust exposure. Exposure to higher respirable coal mine dust levels over a working lifetime resulted in more miners experiencing a significant loss of lung function. These studies illustrate a strong dose-dependent relationship between respirable coal mine dust exposure and subsequent development of obstructive lung diseases, such as lung function impairment, chronic bronchitis, and emphysema (75 FR 64465). The decline in lung function is not linear; studies indicate that there may be some recovery following a year or two of exposure. But, the recovery can be temporary and is affected by continued exposure. As the number of years working in mining grows, the adverse effect on lung function does as well.

Chronic exposure to respirable coal mine dust causes chronic bronchitis, as was found in 35% of a mining population in the United States. This disease is different from that caused by tobacco smoke. Coal mine dust-related bronchitis is associated with deposits of fibrous tissue, mineral pigment, and inflammatory cells in the walls of membranous and respiratory bronchioles and alveolar ducts. This condition is referred to as mineral dust airways disease. Emphysema is caused both by smoking and coal mine dust exposure. Severity of disease has been related to dust content of the lungs and cumulative lifetime coal mine dust exposure. Kuempel et al. (1997b) showed that significant decrements in lung function occur by the age of 65 years in long-term nonsmoking miners exposed to an average respirable coal mine dust concentration of 0.5 mg/m³.

One commenter stated that for proper evaluation of the health effects studies, more information is needed; such as miner jobs, number of job changes, time spent on specific jobs, number and size of mines, and employment in different mines.

Many of the studies reported in the proposed rule had this type of detail in the data collected from certain mining populations, although only summary data were reported in the published papers. This type of detail was available in the industrial hygiene (IH) surveys conducted by British researchers as part of the Pneumoconiosis Field Research (PFR) program established in the early

**24834**    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

1950s and explained in the proposed rule (75 FR 64462). Concurrent with the health surveys, a separate IH assessment was conducted as part of the PFR program that quantified typical concentrations of respirable dust and quartz for a variety of occupations within the mines. These exposure measurements were linked to data from payroll systems on the times worked by each miner in the same occupations. This IH assessment produced individual and period-specific estimates of exposure to respirable dust and quartz (MacCalman and Miller, 2009; Attfield and Kuempel, 2003; Scarisbrick and Quinlan, 2002).

In addition, the U.S. National Coal Study (NCS) is a long-term epidemiologic study, limited to miners in a selected group of mines with various seam heights, mining methods, coal types, and geographic locations. Many of the published peer-reviewed epidemiological studies reported in the proposed rule's health effects section are based on data from the NCS. In those studies, estimates of cumulative dust exposures were given. Examples of these studies include Henneberger and Attfield (1997) and Kuempel et al. (1997b). These papers were reviewed in the development of the proposed rule (75 FR 64460).

Similarly, some commenters identified seam height or mine size as potential factors that were not modeled in the regression analyses but could potentially contribute to the observed frequency of adverse health effects. To date, there are some epidemiological studies that have directly explored the association of coal seam height or mine size and CWP, PMF, non-malignant respiratory diseases, emphysema, or $FEV_1$ declines. However, no epidemiological coal miner studies have modeled respirable coal mine dust and non-malignant respiratory diseases while examining the confounding effect of coal seam height. The available studies are described below.

Peters et al. (2001) studied the influence of coal seam height on lost-time injury and fatality rates at small underground bituminous coal mines. Nonetheless, Peters did not examine the association of coal seam height and NMRDs or $FEV_1$ declines among coal miners.

Suarthana et al. (2011) stated that low seam height likely contributed to excess CWP cases. It was also noted that thin seam mining poses difficulties because the rock surrounding the coal seam often has to be cut to permit equipment to be employed effectively (also see Pollock et al., 2010). Suarthana et al. (2011) noted that the average coal seam

height was lower in central Appalachia than in other regions (median seam height 60 (range 26–138) inches versus 79 (range 31–168 inches; p<0.001). Data on seam height were obtained from the MSHA Standardized Information System (MSIS) for the time period of 2005–2009. Suarthana concluded that the observed prevalence of CWP substantially exceeded predicted levels in central Appalachia. Therefore, coal seam height was reported as a likely factor contributing to the observed elevated CWP rates. However, Suarthana stated that further study is needed to characterize the factors responsible for elevated CWP rates. Overall, no direct association between CWP and coal seam height was observed.

Cowie et al. (2006) found $FEV_1$ deficits in 1,267 (18%) British coal miners. Cumulative respirable dust exposure ranged up to 726 gh/m³ (gram hours per cubic meter) with a mean of 136 gh/m³; on average an exposure to cumulative respirable dust of 100 gh/m³ was associated with a reduction in $FEV_1$ of 0.0631. In addition, an increase of 50 gh/m³ was associated with an increase of about 2% in the proportion of men with small deficits in $FEV_1$ (−0.367 deficit); 1.5% to 2% for medium deficits (−0.627) depending on age; and a similar pattern was observed for large deficits (−0.993), but with smaller increases. Cowie stated that these results may be due to differences in seam height, mechanical breathing efficiencies, or the workload associated with limb size or body mass. Yet, the association of $FEV_1$ deficits among coal workers and seam height was not explored.

In terms of $FEV_1$ declines, Wang et al. (1999) investigated the association between occupational exposure to dust and clinically important $FEV_1$ declines in a group of 310 underground coal miners (cases) and their matched mining referents with stable lung function. This study defined a seam height <50 inches as a low seam mine, and compared the total years worked in low seam mines between two groups 1) cases (310 underground coal miners) and 2) matched partners (referents); cases and referents averaged 7.2 and 5.4 total years worked (p=0.21), respectively. However, the authors did not investigate the association between clinically important $FEV_1$ declines and mine seam height and mine size. Overall, logistic regression models conducted in this analysis did not explore the relationship between clinically important declines in $FEV_1$ and seam height.

Laney et al. (2010) acknowledged that their study is the first to directly examine miner respiratory health and mine size. Laney also highlighted that the prevalence of CWP and PMF increased between the 1900s and the 2000s for mines of all sizes. The prevalence of CWP is 6.5% in the 1970s, 2.5% in the 1980s, 2.1% in the 1990s and 3.2% in the 2000s. The prevalence of PMF was higher in larger mines (50+ miners) in the 1970s and 1980s; whereas, the prevalence was higher in smaller mines (<50 miners) in the 1990s and 2000s.

Laney and Attfield (2010) examined NIOSH CWXSP data collected between 1970 and 2009 and evaluated the effect of mine size on the development of CWP and PMF. They found that miners working in small mines (fewer than 50 employees) had a significantly higher prevalence of CWP compared to miners who worked in large mines (with 50 or more employees). They reported that miners from small mines were five times more likely to have radiographic evidence of PMF (1% of miners) compared to miners from larger mines (0.2%).

Suarthana et al. (2011) found that mine size (e.g., number of employees in a mine) may be associated with higher CWP prevalence levels. The researchers used the Attfield and Morring (1992b) exposure response model versus the original Attfield and Morring (1992a) model that used mean job-specific dust levels. The researchers stated that they did not have the dust level information specific to all jobs; instead, the researchers estimated dust exposure using the mean mine-specific dust level based on MSHA compliance data. The median measured dust concentration and range are reported at the mine level. However, the QRA for the proposed rule estimated CWP risk based on mean job-specific dust levels. The authors excluded underground coal miners from MSHA district 1 due to the small number of participants (n=55) and difference in coal type (anthracite) compared to the other districts in the analysis (bituminous). In addition, the authors state that further study is needed to characterize the factors responsible for elevated CWP rates; the results point to a need for greater vigilance in controlling coal mine dust, especially that which arises from rock cutting.

One commenter said that MSHA failed to consider in the proposed rule other factors that NIOSH discussed in its 2011 Current Intelligence Bulletin 64, such as free radicals, particle occlusion, and bioavailable iron.

MSHA did not use the 2011 NIOSH literature update in the development of the proposed rule because it was not final when the rule was published on October 19, 2010. However, the Health Effects section in the preamble to the proposed rule included a section called Hazard Identification (75 FR 64458) that discussed these factors and how they affect the toxicity of coal particles.

One commenter stated that MSHA analyzed only part of the NIOSH data. This commenter, however, did not provide detail about what data were missing.

The preamble to the proposed rule stated that it summarized the health effects from occupational exposure to respirable coal mine dust. This summary included a literature review on this same subject published in its proposed rule on Plan Verification, which was published on March 6, 2003 (68 FR 10784). The literature referenced in that document pre-dated 1999. The October 19, 2010, proposed rule updated the health effects information that was published in 2003 and discussed the more recent literature dating from 1997 to mid-2009 (75 FR 64458). MSHA reviewed extensive literature not only published by NIOSH but also published by researchers in other countries, such as France, Britain, Taiwan, Netherlands, Germany, China, and South Africa.

One commenter stated that during the 2009 spot inspections, MSHA personnel routinely observed improper sampling procedures for dust collection, improper handling of sampling devices, and improper maintenance and calibration of approved sampling devices. This commenter stated that improper procedures must be corrected before lowering the respirable dust standards.

In response, MSHA points out that the QRA to the proposed rule was based on both MSHA inspector samples and operator samples during 2008 and 2009. MSHA's enforcement experience is that most mine operators attempt to be in compliance with the existing respirable dust standard during MSHA inspector sampling. However, even if proper sampling procedures, proper handling of sampling devices, and proper maintenance and calibration of approved sampling devices had been used, this Health Effects section and the QRA to the proposed rule establish that at the existing standard of 2.0 mg/m³, cases of CWP and COPD continue to occur.

A commenter stated that MSHA does not really know how much dust that miners are exposed to and therefore needs to conduct a study using the CPDM to determine the exposure before reducing the exposure level.

Dose-response relationships have been determined by using the approved sampling device (gravimetric or CMDPSU) over the last 35 years. NIOSH and MSHA will continue to study the effects of respirable coal mine dust; however, the relationship between exposure and effect is well established. The final rule will lower miner exposure to respirable coal mine dust thus resulting in less respiratory disease in the miner population.

*B. Quantitative Risk Assessment (QRA)*

Below is a summary of the quantitative risk assessment (QRA) in support of the final rule. The QRA for the final rule revises the QRA in support of the proposed rule. The QRA for the proposed rule (US Department of Labor, Quantitative Risk Assessment in Support of Proposed Respirable Coal Mine Dust Rule, September 2010) addressed the proposed respirable coal mine dust standard of 1.0 mg/m³, and 0.5 mg/m³ for intake air and for part 90 miners. The QRA for the final rule addresses the final 1.5 mg/m³ respirable coal mine dust standard as well as the 0.5 mg/m³ standard for intake air and part 90 miners. In response to public comments, it also includes an uncertainty analysis.

The QRA for the proposed rule was peer reviewed by independent scientific experts at NIOSH and OSHA. The full text of that QRA and the peer reviewers' reports can be accessed electronically at *http://www.msha.gov/regs/QRA/ CoalDust2010.pdf* and *www.regulations.gov*. MSHA posted all comments on the QRA for the proposed rule at *http://www.msha.gov/REGS/ Comments/2010-25249/ CoalMineDust.asp* and on *www.regulations.gov*. The full text of the QRA for the final rule can be accessed electronically at *http://www.msha.gov/ regsqra.asp* and *www.regulations.gov*.

The QRA for the final rule, like the QRA for the proposal, addresses three questions: ''(1) whether potential health effects associated with current exposure conditions constitute material impairments to a miner's health or functional capacity; (2) whether current exposure conditions place miners at a significant risk of incurring any of these material impairments; and (3) whether the final rule will substantially reduce those risks.''

After summarizing respirable coal mine dust measurements for miners in various occupational categories, Part 1 of the QRA for the final rule shows that exposures at existing levels are associated with CWP, COPD including severe emphysema, and death due to NMRD. All of these outcomes constitute material impairments to a miner's health or functional capacity.

Part 2 of the QRA for the final rule analyzes and quantifies the excess risk of miners incurring CWP or COPD, or dying due to NMRD, after 45 years of full-shift occupational exposure at levels currently observed in various exposure categories. Miners having different occupations and working at different locations face significantly different levels of respirable coal mine dust exposure. In every exposure category, including clusters of occupational environments showing the lowest average dust concentrations, current exposure conditions place miners at a significant risk of incurring each of the material impairments considered.

Part 3 of the QRA for the final rule projects the risk of material impairments after the final respirable coal mine dust standards are applied to each shift. It estimates the reduction in health risks when two provisions of the final rule are implemented—the final respirable dust standard and single full-shift sampling. The QRA shows that these two provisions would reduce the risks of CWP, severe emphysema, and death from NMRD. Additionally, MSHA believes that other provisions of the final rule (e.g., full-shift sampling, changing the definition of normal production shift, use of CPDMs for sampling, revising the sampling program, and requiring operator corrective action based on a single full-shift operator sample will further diminish these risks.

The final rule is projected to have a greater impact on reducing risk for underground miners than for surface miners. Although the final rule will benefit coal mine workers who are exposed to average respirable dust concentrations both above and below the final 1.5 mg/m³ and 0.5 mg/m³ standards, it is projected to have its greatest impact on workers who currently experience frequent exposures to dust concentrations above the final standards. Underground work locations exceed the final respirable dust standards on many more shifts than surface locations and also tend to experience higher average dust concentrations.

The final rule is expected to reduce the risks of CWP, severe emphysema, and NMRD mortality attributable to respirable coal mine dust exposures. Table 28 of the QRA for the final rule contains the projected reduction in these risks for each occupational category. For progressive massive

fibrosis (PMF), the most severe stage of CWP considered, reductions of up to 56 excess cases per thousand are projected for underground workers at age 73, depending on occupation. For severe emphysema at age 73, the projected improvements for underground workers range up to a reduction of 34 cases per thousand depending on occupation. Again for underground workers, the reduction in excess cases of death due to NMRD by age 85 is projected to range up to 6 per thousand, depending on occupation. For surface workers, reductions exceeding 1 case per thousand exposed miners are projected for PMF and severe emphysema in several occupational categories. Excess risks per thousand part 90 miners are projected to decline by 19 cases of PMF at age 73, 14 or 22 cases of severe emphysema at age 73 (depending on race), and 4 cases of NMRD mortality by age 85.

Part 4 of the QRA for the final rule contains an analysis of uncertainties in the projected reductions in risk. This includes both a quantitative analysis of sensitivity to the assumptions and methods used and a qualitative discussion of the maximum range of credible estimates for projected reductions in respirable coal mine dust exposures. MSHA's best estimates were found to lie near the middle of the range produced by alternative assumptions.

In all of its calculations, the QRA assumes that miners are occupationally exposed to respirable coal mine dust for a total of 86,400 hours over a 45-year occupational lifetime (e.g., either 48 weeks per year at 40 hours per week, 32 weeks per year at 60 hours per week, or any other work pattern that amounts to an average of 1,920 exposure hours per year). Current health risks are greater than those shown in the QRA for miners working more than 1,920 hours per year.

In addition, the final rule also tightens the requirement for normal coal production necessary for a valid dust sample, requires the use of CPDMs, revises the dust sampling program, and requires operator corrective action on a single, full-shift operator sample. These provisions are expected to further reduce respirable dust exposures, thereby resulting in improvements greater than those shown in the QRA. For a discussion of the benefits of the final rule, see Section V of the REA.

Public comments on the QRA for the proposed rule addressed five issues: (1) Hazard identification, (2) exposure-response models and possible threshold effects, (3) reliance on mean and cumulative exposures, (4) method of projecting exposures and risk reductions under successful implementation of

final rule, and (5) uncertainty in the QRA's results.

1. Hazard Identification

Some commenters stated that the QRA for the proposed rule did not contain a hazard identification section, consisting of toxicological, epidemiological, or clinical evidence addressing whether the existing standard of 2.0 mg/m³ causes incremental harm to miners' health.

MSHA provided a comprehensive evaluation of the critical scientific evidence supporting a causal connection between respirable coal mine dust exposures at the current level and adverse health effects in Section IV, Health Effects, of the preamble to the proposed rule, and in Section 1(d) of the QRA for the proposal which pertained to health effects and material impairment under current exposure conditions.

MSHA agrees with the commenters that the hazard identification step should reflect current biological understanding of the inflammatory mode of action for lung diseases induced by inhalation of coal mine dust. Section IV.B.4 of the preamble to the proposed rule discussed a variety of biological mechanisms including inflammation.

A few commenters stated that the QRA relied on spurious associations among historical trends to establish a causal relationship between respirable coal mine dust exposures and adverse health effects. Associations among historical trends played no role in the QRAs for the proposed or final rules. None of the three published regression analyses on which the QRAs rely regress one time trend against another. Instead, they quantify the relationship between varying levels of accumulated respirable coal mine dust exposure and the relative frequency of CWP (CWP1+, CWP2+, and PMF), severe emphysema, and premature death due to NMRD.[5] The subjects, i.e., data points, of these regression analyses are not rates of disease corresponding to aggregated exposure levels in particular years. Rather, the data points of the regression models are individual miners who were more or less simultaneously exposed to different levels of respirable coal mine dust. Thus, those miners who were exposed to low cumulative exposures serve as an internal control group compared to miners who were exposed to higher cumulative exposures.

Since the pertinent studies included miners whose lifetime cumulative

exposures fell well below the existing standards, these studies provide MSHA with a basis for determining whether exposure levels under the existing respirable coal dust standards cause incremental harm to miners' health. This topic was addressed in sections 1(d) and 2 of the QRA for the proposal. The conclusion, subject to assumptions described in Section 2(f) of the QRA, is that current exposure conditions which, as shown in Tables 6 and 12 of the QRA for the proposal, are generally below the existing 2.0 mg/m³ and 1.0 mg/m³ standards, place miners at a significant risk of incurring each of the material impairments considered. MSHA reaches the same conclusion in the QRA for the final rule.

A few commenters stated that MSHA improperly relied on estimates of current disease prevalence from the NCWHSP, which was initiated in 1970 and is administered by NIOSH. These commenters stated that the NCWHSP surveillance data is biased due to issues related to the accuracy and precision in the diagnosis of CWP and PMF, low miner participation rates, limited exposure data, and other design and analysis limitations, e.g., participant self-selection.

MSHA did not rely on the NCWHSP surveillance data in its QRAs for either the proposed or final rules. The relatively low participation rates, potential self-selection biases, and a lack of correspondent exposure histories for the individual miners involved limit the use of the surveillance data as support for the QRAs. The QRAs primarily relied on three epidemiologic studies: Attfield and Seixas (1995); Kuempel et al. (2009a); and Attfield and Kuempel (2008). These three studies are consistent with the commenters' statement that estimates of current disease prevalence should characterize historical exposures of individual miners and incorporate cumulative exposure metrics in the analyses to check for a pattern of increasing disease risk with increased dust exposure level.

However, NCWHSP surveillance data are useful in establishing that significant health hazards persist under existing respirable coal dust exposure conditions. Although the utility of these data for quantitative risk assessment is limited, they do show there is an unacceptably high incidence of respirable coal mine dust-related disease among miners whose exposure came entirely after adoption of the existing respirable coal dust standards. (See Section III.A., Health Effects, in this preamble.)

Sections 1(d) and 2 of the QRAs for the proposed and final rules use the

---

[5] See Appendices I, J, and K of the QRAs for the proposed and final rules.

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    **24837**

National Study of Coal Workers' Pneumoconiosis (otherwise known as NCS) data to address the question of whether a lifetime of occupational respirable coal mine dust exposure at the existing standard presents a significantly increased risk of adverse health effects (also see Goodwin and Attfield (1998) and Brower and Attfield (1998)). Unlike the surveillance data, the NCS data contain information on both the health and the respirable coal mine dust exposure of individual miners.

Dust exposure estimates are calculated by summing the products of time worked in each job within an individual miner's work history with dust concentration data from the exposure matrix derived by Seixas et al. (1991). Brower and Attfield (1998) found that the self-reported occupational history information on standardized questionnaires in the NCS collected from U.S. underground coal miners is reliable and that the amount of bias introduced by recalling past employment history is minimal. The NCS is further described in Section III.A of this preamble.

Some commenters discussed possible radiological misclassification in the NCS data.[6] However, these commenters did not dispute the appropriateness of using this type of study to establish a dose-response relationship that can be used effectively in a quantitative risk assessment.

Some commenters challenged the QRA's findings of significant health risks from exposure at the existing 2.0 mg/m³ standard over an occupational lifetime. MSHA addresses issues raised by these commenters in the following subsections: (a) CWP, including PMF; (b) severe emphysema; and (c) mortality due to NMRD.

a. CWP, including PMF

Some commenters acknowledged that the exposure-response analyses of respirable coal mine dust and CWP2+ show strong associations for high rank coal, with increased prevalence below the existing standard. However, these commenters maintained that there are no apparent increases in CWP2+ for low rank coals at exposures below the existing 2.0 mg/m³ standard. According to the commenters, the prevalence of CWP2+ and PMF predicted by the exposure-response models for miners experiencing an occupational lifetime of exposure to respirable coal dust at 2.0 mg/m³ from low or medium rank coal is less than the "background" rate, or prevalence, of positive radiographic findings among workers with no occupational exposure to respirable coal mine dust.

The commenters assumed, in reaching their conclusion, that the background prevalence, which had been shown to be approximately five percent for CWP1+ among 60-year-old non-exposed workers, was also five percent for CWP2+ and PMF. MSHA stated during one of the public hearings on the proposed rule that it is not appropriate to compare predictions of CWP2+ prevalence to the background prevalence for CWP1+.

The 1995 Attfield/Seixas study provides a formula, shown in Appendix I of the QRAs for the proposed and final rules, that enables estimation of the background prevalences for CWP1+, CWP2+, and PMF. Based on this formula, Table III–6 below shows the estimated background prevalences specific to CWP1+, CWP2+, and PMF, along with the corresponding prevalences predicted for miners exposed to respirable coal mine dust concentrations averaging 2.0 mg/m³ for an occupational lifetime of 45 years. The predicted prevalences of CWP1+, CWP2+, and PMF for miners exposed to respirable coal mine dust from low/medium rank coal are all far greater than the corresponding background prevalence. For miners exposed to high rank coal, the difference is even greater.

All of the estimated excess risks shown in both QRAs for exposed miners are denoted as "excess" risks precisely because the background prevalence has been subtracted from the predicted prevalence among exposed miners. Therefore, the calculation of excess risk always equals zero when exposure equals zero (i.e., no known occupational exposure); and, for exposed miners, excess risk is the increase in predicted prevalence from background. For example, at age 73, the center graph in Figure 10 of the QRAs for the proposed and final rules shows an excess risk of 156 cases of CWP2+ per thousand miners exposed for 45 years to respirable coal mine dust from low/medium rank coal at an average concentration of 2.0 mg/m³. The same result is obtained from Table III–6 below by subtracting the background prevalence of 6.2 percent (62 cases per thousand) from the prevalence of 21.8 percent (218 cases per thousand) shown for exposed miners (i.e., 21.8%−6.2%=15.6%: 156 cases per thousand miners, compare with Figure 10 in both QRAs).

TABLE III–6—EXPECTED PREVALENCE (PERCENTAGE) OF RADIOGRAPHIC FINDINGS INDICATING CWP AND PMF, BASED ON ATTFIELD/SEIXAS LOGISTIC REGRESSION MODEL

| Age | Background (zero exposure) | | | 45-year exposure at 2.0 mg/m³ top entry is for low/medium rank coal bottom entry is for high rank coal | | |
|---|---|---|---|---|---|---|
| | CWP 1+ | CWP 2+ | PMF | CWP 1+ | CWP 2+ | PMF |
| 60 | 5.3 | 1.1 | 0.7 | 17.8 | 4.7 | 2.2 |
| | | | | 32.7 | 14.7 | 9.3 |
| 65 | 7.6 | 2.2 | 1.3 | 24.1 | 8.7 | 4.2 |
| | | | | 41.7 | 25.2 | 16.9 |
| 73 | 13.3 | 6.2 | 3.9 | 37.1 | 21.8 | 11.6 |
| | | | | 57.0 | 49.6 | 37.8 |

Moreover, systematic error or bias due to systematic misinterpretation of radiographic data would be equally present in the results for both exposed and unexposed miners. Therefore, the effect, if it exists, of such misinterpretations should be canceled when background prevalence is subtracted from predicted prevalence to form the estimates of excess risk provided in the QRAs for the proposed and final rules. Some commenters

---

[6] Uncertainty due to radiological misclassification is addressed separately in Section 2, Exposure-Response Models and Possible Threshold Effects, (b) Bias due to Errors in Diagnosis and (c) Bias due to Errors in Exposure Estimates. See Wagner et al., 1992.

**24838**     **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

emphasized potential biases of this type but failed to mention that comparing the frequency of positive radiographic findings for exposed miners with the appropriate background rates serves to control for such biases.

b. Severe Emphysema

Some commenters stated that the weight of the epidemiological evidence fails to support any clinically significant deficits in forced expiratory volume ($FEV_1$) or any increased occurrence of chronic obstructive pulmonary disease (COPD) at cumulative respirable coal mine dust exposures equivalent to an occupational lifetime at the existing standard. [See the proposed rule discussion on emphysema; Green et al., 1998a; Kuempel et al., 2009a and 1997b]. However, the only metric used to support this assertion was the average loss in $FEV_1$ attributable to respirable coal mine dust exposure, across the entire population of exposed miners. Section 1(d)(ii) of the QRAs for the proposed and final rules points out that averaging $FEV_1$ loss across a population can mask the effects of exposure on susceptible sub-populations. Averaging fails to reveal the risk of $FEV_1$ reductions that exceed the average by a clinically significant amount.[7] Dust

exposure at a given level may affect susceptible individuals to a far greater extent than what is suggested by the average effect. This type of masking is avoided when, as in NIOSH's 1995 Criteria Document, findings are expressed in terms of the prevalence of clinically significant outcomes.

For example, the average reduction in $FEV_1$ predicted by the Soutar/Hurley (1986) estimate is less than 140 ml after 45 years of occupational exposure to respirable coal mine dust at 2.0 mg/m³. However, this average reveals little or nothing about the effects on individual miners. If the exposure effects were clinically significant in as little as one percent of all cases (10 cases per thousand), then this would constitute a significant increase in risk associated with exposure. An average reduction in $FEV_1$ of 140 ml or less does not preclude the possibility that the reduction exceeds 300 ml or even 1,000 ml in a substantial portion of the exposed population. Instead of solely focusing on the average loss in pulmonary function associated with respirable coal mine dust exposure, MSHA also considers the rate at which clinically significant lung function deficits have occurred. Table III–7 (reproduced from Table 7–3 of the NIOSH Criteria Document) provides estimates of the excess risk, i.e., the number of miners

expected to develop a clinically significant deficit in $FEV_1$ per thousand exposed miners after an occupational lifetime of exposure to various concentrations of respirable coal mine dust.[8] Although the commenters correctly counted the Attfield and Hodous (1992) study that showed no clinically significant average reduction in $FEV_1$, Table III–7 shows that the average reduction is not the only outcome of interest. As shown in Table III–7, the Attfield and Hodous (1992) study also shows clinically significant reductions in $FEV_1$ in a substantial number of cases per thousand exposed miners. Specifically, for miners at age 65 occupationally exposed to a mean respirable coal mine dust concentration of 2.0 mg/m³ over a 45-year working lifetime, the estimated excess risk of $FEV_1 < 65\%$ of the predicted normal value is 9 per 1,000 for never smokers in the western region and 12 per 1,000 for the eastern region.[9]

---

[7] The term ''clinical significance'' is defined as a difference in effect size considered by experts to be important in clinical or policy decisions, regardless of the level of statistical significance (Last, John M.,

ed. 2001. *A Dictionary of Epidemiology*, Fourth Edition. New York: Oxford University Press, Inc.

[8] The values shown in Table III–7 represent excess risks because they are adjusted to discount background rates of clinically significant deficits in $FEV_1$ for unexposed workers at age 65.

[9] Table III–7 is based on two studies: Attfield and Hodous (1992) and Seixas et al. (1993). The commenters indicated that the first study is a sound study methodologically—except for the exposure estimates that are biased to increase the exposure-response slope of the study group of pre-1970 miners exposed to high and unregulated respirable coal mine dust levels. MSHA discusses the comments on bias in the exposure estimates in Section III.B.2.c of this preamble.

Table III-7. — Excess (exposure-attributable) prevalence of clinically significant decreased lung function* among U.S. coal miners at age 65 following exposure to respirable coal mine dust over a 45-year working lifetime.

| Study and region | Lung function decrement | Smoking status | Cases/1,000 at various mean dust concentrations | | |
|---|---|---|---|---|---|
| | | | 0.5 mg/m$^3$ | 1.0 mg/m$^3$ | 2.0 mg/m$^3$ |
| Attfield and Hodous [1992]:[†] | | | | | |
| East | <80% FEV$_1$ | Never smoked | 10 | 21 | 44 |
| | | Smoker | 12 | 24 | 51 |
| West | <80% FEV$_1$ | Never smoked | 9 | 19 | 40 |
| | | Smoker | 11 | 23 | 48 |
| East | <65% FEV$_1$ | Never smoked | 2 | 5 | 12 |
| | | Smoker | 4 | 8 | 19 |
| West | <65% FEV$_1$ | Never smoked | 2 | 4 | 9 |
| | | Smoker | 3 | 7 | 15 |
| Seixas et al. [1993][‡] | <80% FEV$_1$ | Never smoked | 60 | 134 | 315 |
| | | Smoker | 68 | 149 | 338 |
| | <65% FEV$_1$ | Never smoked | 18 | 45 | 139 |
| | | Smoker | 27 | 67 | 188 |

[*]Decreased lung function is defined as FEV$_1$ <80% of predicted normal values. Clinically important deficits are FEV$_1$ <80% (which equals approximately the LLN, or the 5th percentile) and FEV$_1$ <65% (which has been associated with exertional dyspnea).

[†]Attfield and Hodous [1992] define the following coal ranks and regions:
  East: anthracite (eastern Pennsylvania), and bituminous (central Pennsylvania, northern Appalachia [Ohio, northern West Virginia, western Pennsylvania], southern Appalachia [southern West Virginia, eastern Kentucky, western Virginia], Midwest [Illinois, western Kentucky], South [Alabama]).
  West: Colorado and Utah.

[‡]Coal rank was not provided in Seixas et al. [1993]. However, miners were included from bituminous coal ranks and regions across the United States, as described in Attfield and Seixas [1995]:
  1. High-rank bituminous (89%-90% carbon): central Pennsylvania and southeastern West Virginia
  2. Medium/low-rank bituminous (80%-87% carbon): medium-rank—western Pennsylvania, northern and southwestern West Virginia, eastern Ohio, eastern Kentucky, western Virginia, and Alabama; low-rank—western Kentucky, Illinois, Utah, and Colorado.

Source: Reproduced from Table 7–3 of the NIOSH Criteria Document.

**24840** **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

Similarly, the QRAs for the proposed and final rules focus on excess risk, rather than mean response, to show that respirable coal mine dust exposures for an occupational lifetime at the existing standard can significantly increase the risk of $FEV_1$ reductions associated with severe emphysema. Based on the exposure-response model described in Kuempel et al. (2009a), Figure 14 in both QRAs shows that among never-smoking white coal miners, the excess risk at 2.0 mg/m³ ranges from approximately 12 percent (117 cases per 1,000) at age 65 to approximately 16 percent (162 cases per 1,000) at age 80. These percentages represent the estimated probability that a miner exposed to an average respirable coal mine dust concentration of 2.0 mg/m³ over a 45-year occupational lifetime will develop severe emphysema attributable to that exposure.

The QRAs for the proposed and final rules use the pulmonary response model described in Kuempel et al. (2009a) as the basis not only for the estimates discussed previously, but also for the calculation of all current and projected excess risks of severe emphysema attributable to respirable coal mine dust exposures.[10]

Some commenters criticized the Kuempel et al. (2009a) study and the related study, Kuempel et al. (2009b) which relied on the same study population of 722 autopsied miners and non-miners. These commenters stated that the Kuempel et al. studies had little to no relevance to the existing or proposed dust standards because the exposures of the autopsied miners studied were pre-1970 and likely to have been much higher than current exposures. The commenters did not provide evidence to support their criticism of the Kuempel et al. (2009a and 2009b) studies.

Table 1 of the Kuempel et al. 2009b study and section 1(d)(ii) of the QRAs for the proposed and final rules show that the study group in question consisted of 616 deceased coal miners and 106 deceased non-miners (who presumably had no respirable coal mine dust exposure but functioned as internal controls in the statistical analysis).[11]

Among the coal miners, the mean cumulative respirable coal mine dust exposure was 103 mg-yr/m³, with a standard deviation (σ) of 40.6 mg-yr/m³.

Since miners in the study had an average tenure of 34.3 years, they were exposed to an average respirable coal mine dust concentration of 3.0 mg/m³ (i.e., 103 mg-yr/m³/34.3 yr) over their occupational lifetimes, with σ = 1.184. Assuming an approximately lognormal distribution,[12] this would suggest that approximately 58% of these miners experienced average respirable coal mine dust concentrations less than 3.0 mg/m³ and 19% of them averaged less than 2.0 mg/m³.

The QRAs for the proposed and final rules are designed to evaluate risks expected for exposures accumulated over a 45-year occupational lifetime. Therefore, it is also relevant to examine the distribution of respirable coal mine dust concentrations that would, after a 45-year occupational lifetime, give rise to the same exposure totals as those experienced by miners in the Kuempel et al. 2009b study. This result in an average respirable coal mine dust concentration of 2.3 mg/m³, with σ = 0.902 mg/m³. In this case, again assuming an approximately lognormal exposure distribution,[13] approximately 82% of the miners would experience average respirable coal mine dust concentrations less than 3.0 mg/m³, 43% would average less than 2.0 mg/m³, and 18% would average less than 1.5 mg/m³.

Consequently, considering either the 34.3-year average tenure of miners in the study group (Kuempel et al., 2009b), or the 45-year occupational lifetime MSHA uses to evaluate occupational risks, it appears that the Kuempel et al., 2009a, 2009b reports are relevant to exposure conditions under the existing respirable coal mine dust standard.[14] Table 8 of the QRAs for the proposed and final rules show that MSHA's enforcement of the existing respirable dust standard has not eliminated work locations exhibiting average respirable coal mine dust concentrations greater

than 1.5 mg/m³ or even 2.0 mg/m³. At the very least, these studies are highly relevant to risks at such work locations.

The commenters, in referring to the Kuempel et al. (2009a and 2009b) study population, identified self-reporting of smoking histories as a potential source of bias and rejected a suggestion by the studies' authors that the timing of self-reported data collection on smoking added to the studies' strengths. According to the studies' authors, data collection had occurred in the 1960s and 1970s, when smoking was not a contentious issue and Federal compensation programs for smoking-related illnesses had not yet been introduced. The commenters, however, contended that the authors' mention of possible smoking exposure misclassification "tends to negate" their claim that non-contentious smoking histories constituted a strength of the study. The commenters further argued that the studies' finding that dust exposure had a greater effect than smoking was unconvincing and that both of these factors were questionable for the study cohort because smoking histories were self-reported and "when compensation matters are involved, smoking histories are likely to be unreliable." Commenters further stated that occupational dust exposure can have an effect on the development of emphysema and COPD, but the general literature still considers "ordinary" levels of occupational pollution to be minor compared to cigarette smoking and aging.

First, in response to commenters, as suggested by the studies' authors, MSHA points out that the reliability of the miners' smoking histories is unlikely to have been compromised by compensation programs in that the programs did not exist at the time of the studies. Kuempel et al. (2009a and 2009b) mention misclassification of smoking history only in a list of "potential limitations" and make no suggestion that this has anything to do with compensation incentives. Second, as demonstrated in the preceding discussion, respirable coal mine dust exposures for the autopsied miners were not "far in excess of today's standard", 2.0 mg/m³, as the commenters state. Third, respirable coal mine dust exposure estimates were not biased to overestimate high exposures and underestimate low exposures. (See discussion in the subsequent preamble section on bias due to errors in exposure estimates, Section III.B.2.c.). Finally, the commenters interpreted the finding that each mg-year/m³ of respirable coal mine dust exposure is, on average, similar in effect to each "pack-year" of cigarette

---

[10] See QRA for the proposed rule, Tables 16, 24, and Appendix J.

[11] The commenters stated that the study population in Kuempel et al., 2009a "is comprised of 116 individuals with spirometry drawn from the same 722 autopsied miners and non-miners just discussed [in connection with Kuempel et al., 2009b]." In response to commenters, although 116 subjects with $FEV_1$ data were used to define cutoff points for clinically significant emphysema severity, the logistic regression models relating respirable coal mine dust exposure to the probability of meeting these cutoff points used all

342 members of the study population with complete data. (See Kuempel et al., 2009a, Tables 1 and 2).

[12] If X is Lognormally distributed with mean = 3.0 and standard deviation = 1.184, then $Log_e(X)$ is Normally distributed with mean = 1.026 and standard deviation = 0.380.

[13] If X is Lognormally distributed with mean = 2.3 and standard deviation = 0.902, then $Log_e(X)$ is Normally distributed with mean = 0.756 and standard deviation = 0.380.

[14] Since these studies used the same methods for estimating pre-1970 exposures as the NCWHSP studies, the comments on possible biases in these exposure estimates also apply here. Comments on bias in the exposure estimates are addressed in the Section III.B.2.c.

smoking as somehow undermining the studies' credibility.[15] The commenters did not provide any references to support their view that the general literature still considers adverse health effects of ordinary levels of occupational pollution to be minor relative to those from cigarette smoking; nor did they provide evidence that this generalization applies specifically to respirable coal mine dust and emphysema.[16]

With respect to the data used in Kuempel et al. (2009a) to relate clinically significant cutoff points of emphysema severity to respirable coal mine dust exposures, the commenters stated, without any supporting evidence, that miners were coached to distort pulmonary measurements.

In addition, commenters stated that there was a significant trend between the emphysema index and $FEV_1$, but much of the variability was unexplained. The $FEV_1$ data (available for a small subset of the autopsied subjects) were used in this study only to establish appropriate cutoff points for clinically significant values of the emphysema severity index; the unexplained variability seen while establishing these cutpoints has no

direct bearing on the logistic regressions that relate respirable coal mine dust exposures to the probability of exhibiting clinically significant emphysema severity.

The average cumulative dust exposure was reported to be 87 mg-year/m³ among the autopsied miners used in the logistic regressions.[17][18] This is notably less than the 103.0 mg/m³ average reported for miners in the study population as a whole. Assuming the same coefficient of variation in exposures as reported for all miners in the study population (approximately 39%), it follows that autopsied miners included in the logistic regressions experienced exposures equivalent to a respirable coal mine dust concentration of 1.93 mg/m³ averaged over a 45-year occupational lifetime, with σ = 0.762 mg/m³.[19] Once again assuming an approximately lognormal exposure distribution,[20] this means that approximately 62% of these miners would have experienced average respirable coal mine dust concentrations less than 2.0 mg/m³ and 32% of them would have averaged less than 1.5 mg/m³. This calculation contradicts the commenters' claim that the study is applicable only to the pre-1970 era, when "miners were exposed to respirable dust far in excess of today's standard."

The commenters generally disagreed with MSHA's reliance on the Kuempel et al. (2009a) findings by focusing on the possibility of errors in the $FEV_1$ measurements and cumulative exposure estimates. Despite MSHA's heavy reliance on these studies in the QRA, the commenters did not include them in their evaluation of the weight of evidence. However, potential biases due to exposure and/or $FEV_1$ misclassification cannot explain all of the results.

Table 4 of Kuempel et al. (2009b) shows that a strong correlation ($R^2$ = 0.44) was observed between the amount of coal dust found in the lungs of deceased miners and the degree of emphysema severity determined at autopsy. This result, which depends on neither exposure estimates nor $FEV_1$ measurements, is statistically significant at a confidence level greater than 99.99 percent (p < .0001), after accounting for cigarette smoking, age at death, and race. The average emphysema severity index observed among never-smoking miners (302, or 30.2 percent of the lung affected, Kuempel et al., Table 2 (2009b)) exceeded the cutoff point (285) corresponding to a 20-percent reduction in $FEV_1$ from the predicted normal value. Therefore, this study provides strong evidence that respirable coal mine dust exposures under current conditions can cause clinically significant pulmonary effects. This evidence is confirmed and strengthened by evidence presented in Miller et al. (2007) and Attfield and Kuempel (2008) that the risk of mortality due to COPD increases significantly with increasing respirable coal mine dust exposure.

### c. Mortality Due to NMRD

Some commenters acknowledged a strong exposure-response relationship between respirable coal mine dust exposure and mortality from nonmalignant respiratory diseases (NMRD) but claimed that the associations appear to be confined to high rank coal dust. According to these commenters, respirable coal mine dust exposure "is strongly associated with significant excess NMRD mortality among anthracite coal miners," but this association "is not found among miners of lower rank coals (bituminous and sub-bituminous)." More specifically, the commenters stated that "there appears to be no increased mortality risk of CWP associated with coal mined in eastern Appalachia, western Appalachia, and the Midwest."[21] To support this

---

[15] With regard to the probability of developing clinically relevant emphysema (i.e., emphysema associated with $FEV_1$ less than either 80% or 65% of predicted normal values), "the contribution of cumulative dust exposure was greater than that of cigarette smoking at the cohort mean values, *although not significantly so . . .* [emphasis added]." In the cohort used for the logistic regression analysis supporting this part of the analysis, mean cumulative respirable coal mine dust exposure was 87 mg-year/m³ among miners and mean cigarette smoking was 42 pack-years. (Kuempel et al., 2009a).

[16] The relative magnitude of estimated coefficients of the emphysema severity index regression model for smoking history and respirable coal mine dust exposure should not be interpreted as representing the relative potencies of cigarette smoke and respirable coal mine dust as toxic agents. See Appendix J, Table 66 of the QRAs for the proposed and final rules. The estimated smoking history coefficient is 0.0099 (packs/day $X$ years) and the estimated respirable coal mine dust coefficient is 0.010 (mg/m³ $X$ years). The magnitude of each coefficient depends on the choice of units used to represent exposure to the respective agent. For example, if the unit used to represent respirable coal mine dust exposure had been μg-year/m³ instead of mg-year/m³, then the estimated coefficient for respirable coal mine dust would have been approximately 1/1,000 of that for smoking. Furthermore, a "pack-year" does not represent the same duration of exposure as an occupational mg-year/m³. A pack-year represents an annual consumption of one pack of cigarettes per day for a year. Each pack normally contains 20 cigarettes. If it took an average of five minutes to consume each cigarette, then a pack-year would represent 36,500 minutes of exposure to cigarette smoke. In contrast, assuming a 1,920 occupational exposure hours per year, each mg-year/m³ represents 115,200 minutes of exposure to respirable coal mine dust (i.e., 1,920 hrs of exposure per yr $X$ (60 minutes/ 1 hr) = 115,200 minutes of exposure per yr).

[17] With regard to the probability of developing clinically relevant emphysema (i.e., emphysema associated with $FEV_1$ less than either 80% or 65% of predicted normal values), "the contribution of cumulative dust exposure was greater than that of cigarette smoking at the cohort mean values, *although not significantly so. . . .*" In the cohort used for the logistic regression analysis supporting this part of the analysis, mean cumulative respirable coal mine dust exposure was 87 mg-year/m³ among miners and the mean cigarette smoking was 42 pack-years (Kuempel et al. (2009a).

[18] Neither the standard deviation of cumulative exposure nor information on tenure in mining was reported for this subset of the study population.

[19] The coefficient of variation is the ratio of the standard deviation to the mean. The coefficient of variation is independent of the unit in which the measurement is taken, i.e., dimensionless. The coefficient of variation for the coal mine population in the logistic regression model is assumed to be the same as that for the entire study population in the Kuempel et al. (2009a) study.

[20] The log-normal distribution is a continuous probability distribution of a random variable whose logarithm is normally distributed. The distribution of respirable coal mine dust is not normally distributed; therefore, respirable coal mine dust was assigned a random continuous probability distribution termed the lognormal distribution represented by $Log_e$ (respirable coal mine dust). The transformation was conducted to run parametric statistics models (i.e., model respirable coal mine dust with an analysis of variance (ANOVA), analysis of covariance (ANCOVA), and regression models). If X is Lognormally distributed with mean = 1.9 and standard deviation = 0.762, then $Log_e(X)$ is Normally distributed with mean = 0.585 and standard deviation = 0.380.

[21] The same commenters also claimed that "Numbers were too small for a mortality analysis
Continued

**24842**    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

conclusion, the commenters cited the results in Tables IX and X of Attfield and Kuempel (2008). These commenters also noted that the conclusion is based on only one mortality study, Attfield and Kuempel (2008), and proposed that NIOSH should test this observation by analyzing exposure-response trends by coal rank.

The study cohort in Attfield and Kuempel (2008) included a total of 8,899 miners from five coal mining regions across the U.S. There were 498 miners from the Anthracite region, 1,353 from the East Appalachia region, 4,886 from the West Appalachia region, 1,210 from the Midwest region, and 952 from the West region. Contrary to the commenters' interpretation, Tables IX and X of Attfield and Kuempel (2008) show a statistically significant increase in NMRD mortality associated with increasing respirable coal mine dust exposure in each of these five coal mining regions. The commenters' mischaracterization of the findings presented in Attfield and Kuempel (2008) appear to have resulted from two misinterpretations.

First, the relative risks shown in Table IX of Attfield and Kuempel (2008) for four of the five coal mining regions examined are expressed relative to the risks found for the fifth region (i.e., the West). Therefore, the fact that, except for Anthracite, the relative risks do not differ significantly from 1.0 means that only in the Anthracite region is the observed effect different from the effect observed in the West.[22] Although the effects observed in East Appalachia, West Appalachia, and the Mid-west do not differ significantly from those observed in the West, this does not imply that any of the observed effects are insignificant. Specifically, the "four-fold increased risk of anthracite," shown in Table IX (op. cit.) as having a relative risk of 4.41, means that (all other factors being equal), the risk of NMRD mortality in the Anthracite region is probably four to five times what it is in the West (95% CI: 3.08–

5.92). Since the analysis used to construct Table IX does not show any statistically significant difference between the West and any other region, except Anthracite, it shows *only* that NMRD risk in the Anthracite region is probably four to five times what it is in the other regions as a group. This says nothing about what the risk actually is in any of the regions, let alone the risk attributable to cumulative dust exposure.

Similarly, the regional coefficients shown for NMRD in Table X of Attfield and Kuempel (2008) pertain to NMRD mortality risks relative to the West region—this region is based on a statistical analysis that treats cumulative dust exposure as a continuous variable. It is this analysis that is used to evaluate current and projected risks in the QRAs for the proposed and final rules.[23] For example, all other factors being equal, the relative risk (RR) in the "Mid-west" region is best estimated to be:

$$RR = e^{-0.2870} = 0.75$$

There is considerable uncertainty in this particular estimate, so all that can be said with high confidence is that NMRD mortality risk in the Mid-west probably lies somewhere between 51 percent below and 12 percent above that in the West (95% CI: 0.49–1.12). However, just as NMRD mortality risk in the West depends on age, smoking history, and cumulative respirable coal mine dust exposure, so does NMRD mortality risk in the Mid-west. According to the analysis used to construct Table X, NMRD mortality risk is far greater in the Anthracite region than in any of the other four regions,[24] but that does not mean there is no risk in the other regions or that the other regions exhibit no relationship between NMRD mortality and cumulative respirable coal mine dust exposure.

Second, contrary to the commenters' interpretation, both Tables IX and X of Attfield and Kuempel (2008) show statistically significant increases in NMRD mortality with increasing respirable coal mine dust exposure for the region associated with lowest rank coal: The West. The estimated exposure-response relationship is modified in the other regions—amplified, relative to the

West, in the East Appalachia and Anthracite regions and attenuated, relative to the West, in the West Appalachia and Mid-west regions. The following explication is based on Table X, since that is what is used in the QRAs for the proposed and final rules, but the same principles apply to interpreting Table IX.

Since the West region comprises the baseline in the relative risk model, no regional coefficient is applied for respirable coal mine dust exposures in the West. Therefore, using Table X, the relative risk of NMRD mortality, after a 45-year occupational lifetime of exposure to (low-rank) western respirable coal mine dust at a concentration averaging 2.0 mg/m³, is estimated to be:

$$RR = e^{-0.00709\,(45\,\times\,2.0)} = 1.89$$

This means that the risk of NMRD mortality is estimated to be 89 percent greater for a miner who has been exposed to 90 mg-year/m³ of respirable coal mine dust than for an unexposed miner of the same age, region, and smoking history. At a 45-year occupational lifetime average respirable coal mine dust concentration of 1.5 mg/m³, the estimated relative risk is:

$$RR = e^{0.00709(45\times1.5)} = 1.61$$

Therefore, for respirable coal mine dust exposures in the West-region (where the coal is low-rank), increasing the lifetime average from 1.5 mg/m³ to 2.0 mg/m³ increases the estimated relative risk by 28 percentage points (i.e., (1.89−1.61)*100). According to Attfield and Kuempel (2008), the coefficient giving rise to this increase (0.00709) is statistically significant at a confidence level exceeding 99 percent. Therefore, contrary to the commenters' assertions, the Attfield-Kuempel analysis shows an increased risk of NMRD mortality associated with increasing respirable coal mine dust exposures in the region with lowest rank coal. Multiplying these relative risks by 0.75 (the regional factor for Mid-west coal) attenuates but does not eliminate, the estimated exposure-response relationship.

For exposures to the higher rank respirable coal mine dust in East Appalachia, the corresponding relative risks are:

$$RR = e^{0.2187 + 0.00709(45\times2.0)} = 2.36$$

at 2.0 mg/m³ and

$$RR = e^{0.2187 + 0.00709(45\times1.5)} = 2.01$$

at 1.5 mg/m³.

Therefore, increasing the cumulative exposure from 67.5 mg-year/m³ to 90 mg-year/m³ increases the estimated relative risk by an estimated 35 percentage points (i.e., (2.36−

---

[22] For regions other than Anthracite, the 95% CI in Table IX encompasses the number one ("1.0") and is therefore not statistically significant—i.e., the study authors are not 95% confident that the effects in East Appalachia, West Appalachia, and the Mid-west region are different from that in the comparison region (the West).

of Western coal, which is the lowest ranked coal and presumably the lowest risk if the coal rank hypothesis is correct." This is incorrect. The study cohort described in Attfield and Kuempel (2008) included 952 miners from the West region, and the study found significant risk of NMRD mortality for miners exposed to respirable coal mine dust in that region. As will be explained below, NMRD mortality in the West region was used as a baseline for the relative risk of NMRD mortality in the other four regions.

[23] Appendix K of the QRAs for the proposed and final rules shows that for each regional coefficient (α), $RR = e^\alpha$, where $RR = e$ is the base of the natural logarithms. For the West region, $\alpha = 0$, so the baseline relative risk is $RR = e^0 = 1$.

[24] Regional coefficients of the proportional hazards model are reported by Attfield and Kuempel (2008) in Table X as Anthracite (1.4844), East Appalachia (0.2187), West Appalachia (−0.3477), and Mid-west (−0.2870), relative to the West region. Therefore, applying the formula in Footnote 23, the relative risks are respectively estimated to be 4.41, 1.24, 0.71, and 0.75.

2.01)\*100).[25] This shows that the estimated exposure-response relationship is steeper (positive slope) in East Appalachia than in the West, as reflected by the positive regional coefficient. For the Anthracite region, where coal has the highest rank, the estimated coefficient is substantially larger (Table X: 1.4844), so the slope of the estimated exposure-response relationship is far steeper than in East Appalachia or any of the other regions. Therefore, the commenters' interpretation that the Attfield-Kuempel 2008 study suggests that there is no increased risk associated with the lower-than-anthracite ranks of coal is not correct.[26]

In the QRA for the proposed rule, all work locations are classified as ''Low/Medium Rank,'' ''High Rank Bituminous,'' or ''Anthracite'' by a procedure described in Footnote 40 of that QRA. Appendix K of the QRA states that work locations included in the Anthracite and High Rank Bituminous categories are assigned coal rank coefficients of 1.4844 and 0.2187 (Table X), respectively. All other work locations are assigned a coefficient of zero. The resulting relative risk estimates for NMRD mortality under current exposure conditions are shown, by occupation, in Table 68 of the QRAs for the proposed and final rules. The fact that the underlying Attfield-Kuempel exposure-response model shows relative risk as increasing with increasing exposure levels—even for low/medium rank coal—can be seen by comparing relative risks in the QRAs' Table 68 to the corresponding exposure levels in the QRAs' Table 12.

As shown above and in Appendix K of the QRAs for the proposed and final rules, the Attfield-Kuempel exposure-response analysis does exactly what some of the commenters said is needed: Using geographic location as a proxy, it stratifies the analysis of NMRD mortality risk by coal rank. Though it may be prone to misinterpretation, that analysis identifies statistically significant and substantial NMRD mortality hazards not only for anthracite, but also for regions identified with high rank bituminous and lower rank coal.

[25] The mg-year/m³, 45-yr occupational lifetime average, is calculated from the mg/m³ dust concentration. Where 67.5 mg-year/m³ = 1.5 mg/m³ × 45 yr occupational lifetime average and 90 mg-year/m³ = 2.0 mg/m³ × 45 yr occupational lifetime average.

[26] The commenters also stated that the exposure estimates used by Attfield and Kuempel [2008] are biased in such a way as to ''increase the exposure response slope.'' This comment is discussed in Section III.B.2.c.

## 2. Exposure-Response Models and Possible Threshold Effects

For each of the three adverse health conditions covered by the QRAs for the proposed and final rules (CWP, severe emphysema, and NMRD mortality), a previously published exposure-response model was used to quantify the excess risk associated with specified respirable coal mine dust exposures averaged over a 45-year occupational lifetime. Appendices I, J, and K in both QRAs describe the three models and explain, mathematically, how the models were applied to calculate risks. Some commenters objected to the use of these models for a variety of reasons. These objections will be addressed in the following subsections: (a) Attribution of Risk, (b) Bias due to Errors in Diagnosis, (c) Bias due to Errors in Exposure Estimates, (d) Threshold Effects, and (e) Model Consistency and Coherence.

### a. Attribution of Risk

A commenter stated that regression equations do not necessarily express causal relationships and objected to the characterization in the QRA for the proposed rule of its underlying formulas as exposure-response relationships.

Although the misuse or misinterpretation of regression analysis can lead to groundless imputations of causal relations, regression analysis can properly be used to quantify a causal relationship that is known or believed to exist. As shown in the Health Effects section of the preambles to the proposed rule and in this final rule, there is ample toxicological and epidemiologic evidence to support a causal relationship between respirable coal mine dust exposures and the adverse health outcomes that have been identified. MSHA believes regression analysis was properly used and interpreted in the published studies on which the QRAs for the proposed and final rules rely. MSHA also believes that the resulting regression models express useful estimates of causal exposure-response relationships. In addition, while some commenters questioned the strength or shape of the exposure-response relationships, one commenter challenged the premise of a causal connection between respirable coal mine dust exposure and adverse health effects. The commenter provided a simple hypothetical regression analysis example. The example illustrates both (1) the danger of misidentifying a causal relationship by misinterpreting a regression result and (2) why MSHA believes the regression models used to quantify excess risk in the QRAs for the proposed and final rules express

exposure-response relationships rather than spurious, non-causal associations.

In the commenter's example, the underlying basis of causal relationships is represented by two equations:

$$Risk = Age - Exposure$$

and

$$Exposure = 0.5 \times Age$$

The first equation specifies that in the hypothetical universe of this example, aging causes risk to increase, while exposure is protective and causes risk to decrease. The second equation expresses a causal relationship between age and exposure: Each year of aging causes an increase of 0.5 exposure units.[27] Combining these two equations, risk can be expressed as either,

$$Risk = Age - (0.5 \times Age) = 0.5 \times Age$$

or, as the commenter chose to do for the sake of example,

$$Risk = (2 \times Exposure) - Exposure = Exposure$$

Now, if a researcher were to compile data on risk and exposure in this hypothetical universe, and then perform a regression analysis on these data (ignoring age), the result would be, as indicated by the commenter, a spurious (i.e., non-causal but mathematically correct) relationship of the form

$$Risk = 1 \times Exposure$$

where ''1'' is derived from the analysis as the estimated regression coefficient. Because of this, and the fact that the QRA relies on regression models, the commenter concluded that MSHA's projected changes in risk are meaningless.

The commenter, however, did not present a full analysis in the example. If the researcher suspected that Age (but not exposure) was causally connected to Risk, then this would presumably motivate the researcher to compile data on Age and perform the regression analysis on that variable. The result would properly express the causal exposure-response relationship:

$$Risk = 0.5 \times Age$$

In this case, the regression analysis would yield ''0.5'' as the estimated coefficient of Age, thereby correctly determining the slope of the causal exposure-response relationship. A researcher might also perform an exploratory, multiple regression analysis using all of the available data, including both Age and Exposure as candidate predictor variables. In this event, calculation of the regression coefficients would be computationally intractable if the data contained

[27] Aging might be said to *cause* exposure if exposure accumulates unavoidably as time passes. Exposure to cosmic radiation is a possible example.

absolutely no measurement errors.[28] If, more realistically, the data did contain measurement errors, then the regression analysis would yield a relationship with estimated coefficients of the following form:

Risk = $a_1 \times$ Age + $a_2 \times$ Exposure

where the regression estimates, $a_1$ and $a_2$, would generally be close to +1 and −1, respectively, but could differ from these values by amounts dependent on the error structure. So, rather than showing that regression invariably produces spurious relationships, the commenter's example illustrates the importance of taking all relevant variables into account. When properly executed on the relevant data, regression analysis provides a valid means of estimating the parameters of causal exposure-response relationships.

MSHA believes that the exposure-response models on which the QRAs for the proposed and final rules rely were derived from regression analyses properly executed on the relevant data. The causal connections with respirable coal mine dust exposure are supported by evidence from independent studies,[29] and the effects of age and other correlates (such as coal rank and smoking history when available) were simultaneously estimated. All three studies (Kuempel et al., 2009a, 2009b; Attfield and Kuempel, 2008) found both age and cumulative respirable coal mine dust exposure to be statistically significant factors in predicting the probability of adverse health effects. Other factors (such as smoking history, coal rank, and race) were incorporated into the exposure-response models when they were found to be statistically significant.

The commenter disagreed with MSHA about the utility of the specific regression models on which the QRA for the proposed rule relied, and the relative importance of possibly relevant factors that were not included—either because the factors were not deemed relevant by the studies' authors or because the necessary data were unavailable. The commenter proposed that socioeconomic and demographic factors that may affect exposure or risk (such as age, seniority, education, income, and access to medical care) be included in the models and used in the calculation of partial attributable risks. The commenter suggested that neglecting such variables could lead to

spuriously high estimates of health risks due to exposure.

As indicated above, age was accounted for in all of the models used in the QRAs for the proposed and final rule). Some socioeconomic factors may have been represented, to an unknown extent, by coal mining region in the CWP and NMRD mortality studies and by race in the emphysema study. Risks in the CWP and emphysema studies were attributed to exposure based on internal comparisons with miners in the same cohort experiencing relatively little or no exposure. Variation in respirable coal mine dust exposure among miners within mining regions is unlikely to be related to socioeconomic differences. Therefore, socioeconomic differences among miners within regions are unlikely to have the risk attributed to exposure (i.e., the difference between risk expected with and without the exposure, after adjustment for age and coal mining region or race). MSHA recognizes that the regression models may have been improved by explicit consideration of various socioeconomic factors. However, no such studies have been published, and the commenter provided no evidence that including such variables would have a significant impact on the estimated effects of respirable coal mine dust exposure.

Similarly, other commenters identified a number of factors that were not modeled in the regression analyses but could potentially contribute to the observed frequency of adverse health effects. These included silica content of the respirable coal mine dust, coal rank, mine size, and seam height.

Coal rank was not considered in the emphysema study, but it was represented by a surrogate mdash;coal mining region—in the CWP and NMRD mortality studies. Mine size may, to some degree, be correlated with socioeconomic characteristics, but the only evidence of its relevance pertains to its correlation with exposure levels: As shown in their comment, exposures tend to be greater at smaller mines. Therefore, accurate exposure estimates should include the contribution of mine size to health risks.[30] Similarly, seam height may be related to socioeconomic characteristics, but the only known effect it has on respiratory health arises through its impact on silica content of the respirable coal mine dust: As pointed out in their comment, thin seams require mining a higher proportion of stone than thick seams. This leaves silica content of respirable

coal mine dust as a potentially important variable that was not included in the regression models used in the QRA.

MSHA agrees that including silica exposures as a covariate would have improved the credibility of these models. There are no alternative studies on U.S. exposures that do so. However, Miller et al. (2007), using data from British coal mines, conducted two separate analyses on mortality due to CWP and mortality due to COPD, both of which simultaneously examined silica exposures and respirable coal mine dust exposures as candidate predictor variables. Both of these analyses showed a stronger association with respirable coal mine dust than with quartz, and including both variables in the models, resulted in approximately the same regression coefficient for respirable coal mine dust exposure as when silica exposure was excluded.[31] Furthermore, the models containing both silica and respirable coal mine dust exposures resulted in estimated regression coefficients for silica exposure that were not statistically significant. In contrast, the estimated coefficients for respirable coal mine dust exposure were statistically significant at a high confidence level (>99.9 percent) regardless of whether silica exposure was included. These analyses were used in the QRAs for the proposed and final rules to confirm the significance of respirable coal mine dust exposures below the existing standard. (See Figures 12 and 15 in both QRAs.)

Although the possible confounding effects of tobacco smoking were addressed in all of the studies used in the QRAs for the proposed and final rules, one commenter objected to the use of "smoking patterns that held decades ago" in formulating exposure-response relations applicable to current or projected conditions. This commenter stated that because of curvature in the joint exposure-response relationship for severe emphysema (described in Appendix J of the QRA), part of the risk of severe emphysema attributed to respirable dust exposure

---

[28] This is because it would not be possible to invert the so-called X'X matrix, given the unvarying interdependence of *Age* and *Exposure*.

[29] See the Health Effects Section of the preamble to the proposed rule.

[30] Potential biases in the exposure estimates are addressed in Section III.B.2.c below.

[31] Though remaining *approximately* the same, the estimated regression coefficients for respirable coal mine dust exposure actually *increased* slightly when silica exposure was included in the model. For CWP mortality, the regression coefficient for respirable coal mine dust exposure was 0.0058 when quartz exposure was excluded and 0.0060 when quartz exposure was included (Miller et al. (2007), Table 5.9). For COPD mortality, the coefficient for respirable coal mine dust exposure was 0.0016 when quartz exposure was excluded and 0.0019 when quartz exposure was included. (Miller et al. (2007), Table 5.18). Exposure units for both respirable coal mine dust and silica were g-hr/m³. Predicted effects are on the natural logarithm of relative risk.

depended on smoking patterns that no longer exist.

MSHA addressed this issue in both QRAs by basing its estimates of excess risks of severe emphysema attributed to respirable coal mine dust exposure only on the results obtained for never-smokers.[32] This was done partly to avoid the amplification effect of smoking noted by the commenter. Likewise, the estimated excess risks of CWP and NMRD mortality attributed to respirable coal mine dust exposure are independent of smoking effects.

The commenter also used the relatively large regional background effect estimated by one of the models to suggest that a causal interpretation of the QRA's regression models is not justified. One of the exposure-response models used in the QRAs for the proposed and final rules, namely the Attfield-Kuempel NMRD mortality model, does assign a "background" relative risk of 4.4 to miners in the Anthracite region (Attfield and Kuempel (2008), Table IX).

As stated in the QRA for the proposed rule, Appendix K (p. 135), "This suggests that the regional effects [as estimated using the model] are primarily due to geographic factors other than coal rank." However, it does not undercut a causal interpretation of the model's result for respirable coal mine dust exposure. Study demographics affirm that only 5.6 percent of the study group resided in the Anthracite region (Table III–7). Furthermore, a causal interpretation is supported by the results for NMRD mortality vs. respirable coal mine dust exposures found by Miller et al. (2007, Table 5.10), in which the regional and/or coal rank issue did not arise. Attfield and Kuempel (2008) recognized that in their analysis, "variations in lifestyle, health care, and non-coalmine exposures across geographical regions are . . . confounded with coal rank. . . ." Nevertheless they concluded that "the findings confirm and enlarge upon previous results showing that exposure to coal mine dust leads to increased mortality, even in the absence of smoking." After consideration of the commenters' views, MSHA continues to agree with these conclusions from Miller et al. (2007) and Attfield and Kuempel (2008).

b. Bias due to Errors in Diagnosis

Other commenters stated that inaccuracies in diagnosing CWP and PMF by means of chest X-rays during

the fourth Round of the NCWHSP invalidate the exposure-response relationships used in the QRA for the proposed rule. These commenters also stated that the adjusted summary prevalence for the percentage of combined opacities in the original readings for Round 4 using ILO 1980 was 2.3% for category 1+ and 0.3% for category 2+ and that the re-readings using ILO 1980 were 22.5% and 0.91% for categories 1+ and 2+, respectively. From this, they inferred that the results from re-reading the NCWHSP x-rays were no more reliable or valid than the original readings and therefore do not represent prevalence of disease.

Accuracy of the Round 4 X-ray readings pertains only to the exposure-response relationships used for CWP and not for severe emphysema or NMRD mortality. Furthermore, imprecision in the readings would not bias the logistic regression results for CWP used in the QRAs for the proposed and final rules, since the readers were unaware of respirable coal mine dust exposures for the miners whose X-rays they were reading. Therefore, errors in the readings due to imprecision would have been uncorrelated with exposure and so should not have appreciably affected the regression estimates. In addition, imprecision of the readings was reduced by using the median category assigned by three specially selected B-readers. Potential bias was mitigated by specifically selecting the three readers to be "representative of B-readers in general (i.e., avoiding extremes of interpretation)" (Attfield and Seixas, 1995). The commenters present no evidence of any bias in these readings.

MSHA believes that disagreement between results from the original readings of Round 4 x-rays and the re-readings does not imply that the re-readings were "no more reliable or valid than the original readings. . . ." The team of three B-readers who performed the re-readings were selected because they were highly experienced (having read at least 500 films during Round 4) and, based on a preliminary reading trial, were the least likely to give extreme interpretations among readers meeting the other selection criteria. More importantly, the opacity prevalences shown by the commenters are for "combined opacities," a category that includes both rounded and irregular opacities. Unlike small rounded opacities, small irregular opacities are not generally associated with simple CWP; and for small rounded opacities, much closer agreement was reported between the original readings and the re-readings. For CWP1+, prevalence was 1.3% in the

original Round 4 readings and 2.1% in the re-readings of the same Round 4 X-ray films (Goodwin and Attfield, 1998).

Furthermore, Attfield and Seixas (1995) reported good agreement in the prevalences of CWP1+ found by the three readers used in their analysis of the Round 4 data: 7%, 7%, and 9%. They also reported that "this similarity persisted when the data were tabulated by deciles of estimated dust exposure. . . ."

As reported in Attfield et al. (1997), a randomly selected subset of 2,380 x-rays from Round 1 of the NCWHSP were re-read by three readers who were selected to be representative of reader participants in the surveillance program. The median determinations of these re-readings were used to re-estimate exposure-response relationships for comparison with the corresponding results reported in Attfield and Morring (1992a). Although the intercepts (i.e., the predictions of background risk at no respirable coal mine dust exposure) were significantly different, "the logistic [regression] coefficients from the two studies for cumulative exposure were almost identical (0.008 for the original study and 0.010 for the re-readings)" (Attfield et al., 1997, p. 343). Consequently, estimates of excess risk attributable to respirable coal mine dust exposure (obtained by subtracting the intercept from the risk predicted at a specified exposure level according to the same analysis) would be similar regardless of whether the original readings or the re-readings were used.[33]

c. Bias Due to Errors in Exposure Estimates

Biases in respirable coal mine dust exposure estimates could enter into the analyses in the QRAs for the proposed and final rules in a variety of ways. Bias may enter either into the exposure estimates used in the epidemiologic studies on which both QRAs rely or into the QRAs' estimates of current exposures. Since the QRAs' projections of exposures under the proposed and final rules are formed by modifying the estimates of current exposures, biases in current exposure estimates would also affect the projections.

The estimates of current exposures in the QRAs for the proposed and final rules are formulated primarily from MSHA inspector samples, but they are supplemented by operator samples for

---

[32] See the QRA for the proposed rule, pp. 53, 74, 131–132, captions to Tables 15, 24, and footnote to Table 28.

[33] Because of the upward curvature in the logistic regression model, estimated excess risk would be slightly higher using the analysis yielding a higher intercept than if the two analyses yielded identical regression coefficients for respirable coal mine dust exposure.

**24846**     **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

work locations where fewer than two (i.e., only one or zero) valid inspector sample is available for the base year, 2008. The current exposures estimates are also adjusted upwards for certain work locations where there is some evidence that relatively high respirable coal mine dust levels have been temporarily reduced in the presence of an MSHA inspector.[34] The procedure used to form the adjusted, supplemented (AS) estimates, and the rationale behind it, are described in the QRA for the proposed rule on pages 24–25 and in Appendix F. The effect of these adjustments on exposure estimates is discussed on page 26 of the QRA for the proposed rule and summarized in Figures 8 and 9 of the QRAs for the proposed and final rules, which compare the AS estimates against the generally lower unadjusted estimates drawn entirely from inspector samples. As explained in the QRA for the proposed rule Footnotes 26 and 28, and supported by the statistical analysis in Appendix E(c) of the QRAs for the proposed and final rules, MSHA believes that the adjustments do not introduce bias into the AS exposure estimates, but rather compensate for pre-existing downward biases in both the inspector and operator sampling data.

Some commenters disagreed with MSHA's AS estimates stating that the QRA's adjustment process systematically overestimates exposures, even when the original exposure estimates are unbiased.'' According to this commenter, the AS procedure ignores or denies ''the obvious possibility that the operator samples may sometimes be too high''.

It is not MSHA's objective in using the AS estimation procedure to derive unbiased estimates for individual work locations. Instead, the objective is to

improve the accuracy of the estimated mean for a group of related work locations (e.g., all continuous mining machine operators or all continuous mining machine operators at high rank bituminous coal mines). MSHA agrees that the adjustments may result in overestimates of exposure at individual work locations, but it is only the mean exposure, estimated across an entire group, that is included in the risk calculations in the QRAs for the proposed and final rules.

Based on evidence cited in the QRAs, MSHA believes that mean exposure levels, across groups of work locations, are underestimated by both the inspector and the operator sampling data. The commenter did not address this evidence and suggested instead that the adjustments were made ''unjustifiably . . . to correct for possible occasional underestimation of true exposures . . . but without performing any symmetrical adjustments to correct for equally possible occasional overestimation of true exposures.'' MSHA does not agree that respirable coal mine dust samples, whether they are collected by inspectors or by operators, are equally likely to overestimate or underestimate mean exposure levels. Instead, MSHA believes that the unadjusted means are biased downward precisely because respirable coal mine dust concentrations on sampled shifts are more likely to be below the mean than to exceed it. This was a principal motivating factor behind development of the continuous personal dust monitor.

Moreover, MSHA made corrections for occasional overestimation of exposures. For example, the QRAs for the proposed and final rules exclude repeated inspector samples at work locations exhibiting high Day-1 measurements and adopt a weighting procedure designed to avoid biasing the estimates toward work locations targeted for more frequent dust inspections because of their relatively high respirable coal mine dust measurements. These adjustments resulted in reducing estimates of respirable coal mine dust concentrations more than the AS procedure increased them.

In addition to evidence of underestimation cited in the QRAs, Boden (1986) noted that mine- and job-specific distributions of respirable coal mine dust concentrations compiled from operator compliance samples in 1970 to 1977 contained greater than expected numbers of low measurements compared to fitted lognormal distributions. Attfield and Morring (1992a) reported the same general

tendency. These findings are further support of the QRAs' use of the AS estimation procedure.

MSHA agrees with the commenter that there may be work locations where inspector samples are perfectly representative, statistically, of normal conditions. However, MSHA believes that making a relatively small upward adjustment for roughly half of any such work locations hardly compensates for other work locations at which inspector samples and operator samples are both biased downward. Figures 8 and 9 in the QRAs for the proposed and final rules show that the impact of these adjustments on estimated means is not excessive compared to the downward biases that have been reported. As stated in Footnote 28 of the QRA for the proposed rule,

MSHA recognizes that the AS estimates may be biased relative to mean exposure levels . . . on those shifts sampled by MSHA inspectors . . .. However, the objective is to obtain the best possible estimate of mean exposure across all shifts within groups of related work locations, and not just those shifts that are sampled by an MSHA inspector. Accordingly, MSHA believes that its use of operator data in the AS estimation procedure as applied to specific work locations serves to reduce rather than increase the potential for overall bias.

Systematically increasing exposure estimates is not the same thing as systematically over-estimating exposures. These increases may well be insufficient to fully compensate for the downward bias in respirable coal mine dust samples as a representation of respirable coal mine dust concentrations.

Commenters stated that another limitation of the AS estimation procedure was that there was no symmetrical counter-adjustment in the estimated effects of exposure used in the QRA's exposure-response models. The commenter stated that when exposure estimates are adjusted upward, then potency estimates should be symmetrically counter-adjusted downward to avoid biasing risk estimates upward.

The commenters assumed that a downward bias in exposure measurements was not accounted for in estimating the exposure-response relationships. As described in Seixas et al. (1991), respirable coal mine dust concentration measurements obtained at the mining face were, for the NCWHSP, adjusted upward by 13 percent to compensate for a downward bias judged to exist in the operator sampling data used.[35] These adjusted exposure values

---

[34] Some commenters mistakenly stated that MSHA did not adjust the AS estimates when the inspector samples are higher. However, whenever only one valid MSHA sample was available for a work location, operator samples were used in addition to the MSHA sample, regardless of whether the MSHA measurement was higher or lower than the operator average. As to other aspects of the AS estimates, these commenters recognized that MSHA's ''approach was motivated by the concern that dust levels are temporarily lowered when MSHA inspectors are present . . .'' but stated that ''when the operator data are higher than the inspector data, MSHA has no real evidence that this is because of extra control efforts during the inspector sampling.'' MSHA's objective in using the AS estimates is to estimate conditions on all shifts, not just shifts that were sampled by MSHA or operators or both. Since evidence of bias exists in both the inspector and the operator samples (see the QRAs for the proposed and final rules, pp. 24–25 and Appendix E), the AS estimation procedure was deliberately designed to compensate for bias in samples from both sources.

[35] Other adjustments described in Seixas et al. (1991) were designed to compensate for specific

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations **24847**

were then applied to both the pre- and post-1970 exposures used in the development of cumulative exposure estimates for all of the exposure-response relationships on which the QRA for the proposed rule relies.

In response, MSHA notes that since respirable coal mine dust concentrations measured at the face are generally far higher than those measured at other work locations, they dominate in determining regression estimates of the exposure effects. Hence, the 13-percent upward adjustment in exposures resulted in a corresponding reduction of estimated potency, just as the commenter suggested. This 13-percent adjustment correlates well with the overall impact of applying the AS estimation procedure (see Figures 8 and 9 in the QRAs for the proposed and final rules).

After cautioning that errors in estimated exposures could (theoretically) bias the QRA's estimates of risks attributable to the exposures, the commenters suggested that "an unknown fraction (up to 100%) of the risk attributed to differences in exposures may in reality be due to unmodeled errors in exposure estimates and covariates . . . ."

MSHA recognizes that any unknown fraction may be as high as 100 percent or as low as zero percent. However, the commenters did not submit any calculations showing how large or widespread the measurement errors would need to be to account for a significant portion of the differences in prevalence of adverse health effects observed for study subjects having categorically different estimated exposures. Nor did the commenters provide any evidence that any errors in the estimated exposures used to establish the exposure-response models in the QRA for the proposed rule were of a type that would increase, rather than occlude, the estimated effects of respirable coal mine dust exposure.

Other commenters stated that there was a specific systematic error in

---

biases introduced, at the time of the NCWHSP, by MSHA's analytical and data processing procedures for determining respirable coal mine dust concentrations from gravimetric samples. These biases have long since been eliminated, as documented in the **Federal Register** notice MSHA published jointly with DHHS on July 7, 2000 (65 FR 42068). Therefore, corresponding adjustments are not necessary for the 2004–2008 data used in the QRAs.

[36] Errors due to imprecision of the sampling device (cyclone, pump, and weight gain determination) are *not* of a type that would increase estimated effects of respirable coal mine dust exposure. Since they are independent of the underlying exposures, having more errors of this type merely raises the threshold on how steep the response must be to be detectable.

---

estimates of pre-1970 exposures that tend to exaggerate the effects of respirable coal mine dust exposure in the Kuempel pulmonary emphysema model for severe emphysema, the Attfield-Kuempel NMRD mortality model, and (to a lesser extent) the Attfield-Seixas CWP model.

In response to commenters' concern, MSHA notes that the epidemiologic studies that produced these models relied on estimates of pre-1970 exposure levels for specific jobs. These estimates were formed by combining exposure measurements collected in 1968–1969 by the U.S. Bureau of Mines (BOM) with measurements collected by mine operators in 1970–1972. The U.S. BOM dataset contained data for certain jobs at the mining face but little or no data for most other underground jobs and no data at all for any surface jobs. Therefore, in order to compile lifetime cumulative exposures for each miner included in the epidemiologic studies, job-specific mean respirable coal mine dust concentrations observed in the 1970–1972 operator data were multiplied by a factor of 2.3. This factor "was obtained averaging ratios of job-specific BOM dust means to 1970–1972 MSHA concentrations for every occupation where there were sufficient U.S. BOM dust means (n > 10 samples)" (Attfield and Morring, 1992a). All exposures for miners after 1972 were estimated using the job-specific means calculated each year from the operator data.

According to these commenters, the estimates of each miner's pre-1970 exposures are biased relative to the U.S. BOM data and elevate the slope of the exposure-response curve and reduce thresholds of effect, thereby spuriously overestimating risk. Since they were based on an average ratio rather than job-specific ratios, pre-1970 exposures were generally underestimated in high-exposure jobs and overestimated in low-exposure jobs. According to the commenters, this resulted in underestimating total cumulative exposure for the most highly exposed miners and overestimating total cumulative exposure for the least exposed miners, thereby giving rise to a "spuriously steeper slope" in the estimated exposure-response relationships derived from these data.

The use of the mean ratio to estimate job-specific occupational exposure averages prior to 1970 was justified by Attfield and Morring (1992a) by four factors. First, a large part of the job-to-job variation in the ratio of pre-1970 BOM exposure data to 1970–1971 mine operator exposure data is probably of random origin, especially for jobs with

relatively few BOM samples. Based on standard errors for the ratios' numerators, 95% confidence intervals included the value 2.3 (i.e., the mean ratio used in the back-extrapolation) for 13 of the 25 ratios for the jobs shown in Table I of Attfield and Morring (1992a).

Second, for some of the remaining jobs, the mean of 2.3 was believed to be more valid than the actual, observed, job-specific ratios. For example, BOM data show pre-1970 dust levels were less than or equal to levels shown by the 1970 and 1971 data for the supply man and utility man jobs. In the opinion of Attfield and Morring, this did not seem reasonable.

Third, the necessity of pooling individual MSHA jobs into the broader Lainhart categories for matching with the work histories resulted in reduced variation of dust levels across Lainhart job groups compared to individual MSHA jobs. This brought the job-specific ratios based on Lainhart categories (which Attfield and Morring considered to be of more practical relevance than the individual MSHA jobs cited by the commenters) closer to the mean of 2.3 used in the exposure derivation.

The last of the four factors proposed by Attfield and Morring concerns the results of attempting to derive exposure estimates based on variable ratios. The actual BOM job means were used directly to estimate the exposures, with MSHA data being used only to fill in the gaps. The resulting exposure estimates had a mean and standard deviation of 100 and 79 g-hr/m³, respectively, and were highly correlated with those developed by using the common ratio (Pearson correlation = 0.95). Use of these data in exposure-response analyses did not realize any advantages. In another attempt, a set of pre-1970 dust exposure estimates was generated by using variable ratios derived from a nonlinear regression model. The resulting exposure estimates did not correlate better with medical indexes in analyses of exposure-response.

MSHA agrees with Attfield and Morring that the first three factors support their use of the common average ratio. However, their fourth factor may support the position taken by commenters that use of this constant ratio artificially inflates the slope of the exposure-response regression line. This would be the case if the criterion for "realizing any advantages" and correlating "better" is simply that the estimated slope is steeper (and therefore more evident) than the slope obtained using the constant ratio. It is not clear from Attfield and Morring (1992a) what the criterion actually is.

**24848**    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

MSHA believes that both the commenters and Attfield and Morring (1992a) overlooked an important factor mitigating any bias introduced into cumulative exposure estimates by use of the common ratio: Namely, that miners generally did not continue to work in a single occupation for their entire lifetimes. In another context, Attfield and Morring (1992a) state: ". . . few miners spent all of their working life in the dustiest jobs, hence heavy exposures received while performing those jobs were usually diluted by the exposures caused by work in less dusty jobs" (op cit, p. 252). Likewise, some of a miner's occupations would have a below-average ratio while others would have an above-average ratio. Therefore, job-related exposure biases introduced into the exposure history of an individual miner would tend to compensate for one another; and estimates of overall cumulative exposure would be expected to approach the correct value as the number of individual jobs held increased. For this reason, along with those provided by Attfield and Morring, MSHA believes that bias due to use of a common ratio for back-extrapolation had only a minor impact, if any, on the estimated exposure-response relationships.

Some commenters also stated that the Attfield and Kuempel (2008) NMRD mortality study had another bias, related to incomplete work history data, that could potentially bias exposure-response associations by under-estimating exposure and over-estimating risk.

After acknowledging that "up to 23 years of exposure may have been omitted from a miner's exposure," Attfield and Kuempel (2008) addressed potential impact of exposure misclassification on their results. According to Attfield and Kuempel, any such impact was mitigated by several factors. First, dust exposure levels in U.S. mines were mandated to be much lower after 1969; data indicates that levels had dropped by 1975 to less than one-third to one-quarter of pre-1969 levels, with most of the drop happening in the period 1970–1972 [Attfield and Morring, 1992b]. A miner's post-1970 exposure would generally have contributed a relatively small percentage of total exposure. Second, the workforce had an average age of 44.5 at the start of follow-up, meaning that many in the study cohort would be likely to retire early in the follow-up period, again limiting the potential for misclassification. Third, although younger miners have the most potential for misclassification in their exposures since their tenure during follow-up may

have been as long, or longer than, their pre-follow-up tenure, very few NMRD deaths occurred in younger miners. Only 6% of the total NMRD deaths occurred in miners younger than 45 years of age at start of follow-up, while 19% occurred in miners younger than age 50. The impact of exposure misclassification during follow-up was assessed by restricting the analysis to miners aged 50 years or older at start of follow-up. Use of the proportional hazards model on NMRD on this subgroup gave rise to a relative risk of 1.006 per mg-year/m³ (p<0.0001), which is similar, but slightly smaller than that for all workers (relative risk=1.007). According to Attfield and Kuempel, these findings do not absolve the results from the effects of exposure misclassification, but the findings do indicate that any effect is limited and "much less than might be suggested by first appearances."

Although Attfield and Kuempel characterize the issue as one of "exposure misclassification," this is somewhat misleading, since the missing exposures are systematically set to the lowest possible value (zero) rather than to various values randomly drawn from the distribution of exposure levels. Consequently, the effect is not "possible attenuation of the exposure-response relationship," as Attfield and Kuempel suggest, but, to the contrary, an inflation of the relative risk associated with each unit of exposure, as suggested by these commenters. The three mitigating factors cited by Attfield and Kuempel reduce the effect of this bias, but they do not completely eliminate it.

Only part of the impact of excluding exposures experienced after 1970 is revealed by restricting analysis to workers aged 50 or greater at the start of follow-up, as described by Attfield and Kuempel above. Although these workers were older than the average age of the cohort, it can reasonably be presumed that many of them still accumulated significant exposures after 1970. Therefore, the restricted analysis does not show the full impact of the bias. Nevertheless, even the partial impact is greater than Attfield and Kuempel suggest by comparing the relative risks estimated for a single mg-yr/m³ of exposure. Over a 45-year occupational lifetime, exposure to low rank (West region) respirable coal mine dust at an average concentration of 2.0 mg/m³ produces an estimated relative risk = $e^{90 \times 0.00709} = 1.89$ based on the full analysis and relative risk = $e^{90 \times \text{Log}_e \ (1.006)}$

= 1.71 based on the partial analysis.[37] This discrepancy of over 10 percent demonstrates a substantial overestimate of the risk attributable to respirable coal mine dust exposure. Eliminating the bias entirely would almost certainly reduce the estimated relative risk even further.[38]

MSHA agrees that setting all exposures experienced after 1970 to zero has inflated the Attfield-Kuempel estimates of NMRD mortality risk attributable to respirable coal mine dust exposure. However, based on the discussion above, MSHA sees no evidence that this bias is entirely or even mostly responsible for the observed relationship between respirable coal mine dust exposure and NMRD mortality risk. Still, the bias may help explain why the Attfield-Kuempel relative risk estimates are so much greater than corresponding estimates based on the research reported by Miller et al. (2007), as shown in Figure 15 for COPD mortality in the QRAs for the proposed and final rules. Accordingly, MSHA is reducing the coefficient of respirable coal mine dust exposure used to estimate NMRD mortality relative risk (hazard ratios) by one-third. This brings the coefficient down to a value of 0.0048, which is halfway between the original Attfield-Kuempel estimate of 0.00709 and the Miller estimate of 0.0025.[39]

### d. Threshold Effect

One commenter suggested that the majority of cases of respirable coal mine dust-related disease observed in miners is due to high multiples of average exposures (perhaps 5 to 10 times). The commenter stated that miners in this upper end of the exposure distribution contribute disproportionately, and perhaps exclusively, to the number of observed cases. Since current average respirable coal mine dust concentrations exceed 0.5 mg/m³ for nearly all underground face occupations (see Figure 7 in the QRAs for the proposed and final rules), the commenter considered concentrations of 2.5 mg/m³ or less (i.e., anything less than a five-fold multiple of the average) to be generally benign. However, the

---

[37] The average respirable coal mine dust concentration of 90 mg-yr/m³ is calculated by multiplying 2.0 mg/m³ by 45 yr occupational life.

[38] All of the discussion and calculations in this paragraph pertain to estimated NMRD mortality risks.

[39] The Attfield-Kuempel estimate is shown in Table X of Attfield and Kuempel (2008) and Appendix K of the QRA for the proposed rule. The Miller estimate was derived by multiplying 0.0013 (i.e., the coefficient of respirable coal mine dust exposure shown in Model NMRD/05 of Miller et al. (2007) by 1,920 hr/yr and dividing by 1,000 mg/m³.

commenter cited no toxicological or epidemiological evidence to support this hypothesis with respect to respirable coal mine dust exposures.

The commenter suggests that only respirable coal mine dust concentrations above a threshold level can cause adverse respiratory health effects, and that exposure-response relationships for respiratory diseases must model a threshold effect. The commenter was correct in noting the QRA's exclusive reliance on threshold-free risk models. However, the commenter cited no alternative, empirically-derived threshold models applicable to risks specifically due to respirable coal mine dust exposures, and provided no evidence to support the premise that respirable coal mine dust is toxic only when exposures exceed a threshold

level.[40] Although the QRA did not discuss the evidence for or against thresholds, the applicability of threshold models to respirable coal mine dust exposures has been investigated in the published literature.

The possibility of an exposure threshold for CWP response was investigated and rejected in Attfield et al. (1997). In the explanation from the Attfield article below, TLV represents a possible threshold limit value.

Determination of the existence of a threshold effect, through use of the transformation

$$CE = (CE - TLV) \cdot H(CE - TLV),$$

Where CE is cumulative exposures and $H(CE - TLV) = 0$ if $CE < TLV$, and 1 otherwise, was examined using the $\chi^2$ value for the coefficient for transformed exposure variable.

Figure 1 shows a plot of this statistic for three outcomes: category 1+, category 2+ and PMF for a range of TLV from 0.0 to 2.0 $mg \cdot m^{-3}$. It is clear from this figure that there was little convincing indication of a threshold. For category 1+ and PMF, $\chi^2$ peaked close to 0 $mg \cdot m^{-3}$, while for category 2+ the peak was near to 1.0 $mg \cdot m^{-3}$ but the curve was virtually flat, suggesting great uncertainty in the location of any threshold. Use of the log-likelihood value in place of $\chi^2$ suggested even less evidence for a threshold. In other analyses . . ., rather than a threshold, there was evidence of a non-zero baseline of response at zero dust exposure.

Figure III–1 is reproduced from Figure 1 of Attfield et al. (1997) and shows why the authors concluded that the evidence failed to support a threshold effect (no threshold effect existed at or above 1.0 mg/m³).



**Figure III–1—Examination of threshold.** Plot of $\chi2$ statistics against candidate threshold limit values for category 1 +, category 2+ and PMF, reproduced from Figure 1 of Attfield et al. (1997). PMF was mislabeled as "PFM" in the original Figure

Bailer et al. (1997) examined several alternative models, including threshold models, for describing exposure-response relationships between respirable coal mine dust and $FEV_1$ deficits among miners who participated in Round 1 of the NCWHSP. For $FEV_1$ less than 80% of the predicted normal value, a threshold was suggested at a cumulative exposure of 22.0 mg-yr/m³.[41] This corresponds to exposure at an average respirable coal mine dust concentration of 0.5 mg/m³ over a 45-year occupational lifetime.[42]

Based on its review of the available evidence included in the QRAs for the proposed and final rules and the Health Effects section of the preamble to the proposed rule, MSHA has determined that the best available epidemiological evidence fails to support a threshold model for either CWP or clinically significant pulmonary effects due to respirable coal mine dust exposures. The evidence indicates that if an exposure threshold does exist, it is likely to occur at respirable coal mine dust concentrations below not only the existing standard, but also the final

standard, assuming a 45-year lifetime of occupational exposure. Due to the nonlinear nature of the models, much of the reason for stratifying the exposures by occupation and work location was to account for higher exposures in certain job categories.

Regardless, the mean respirable coal dust concentration for each coal mining occupation in the QRAs for the proposed and final rules is documented in accordance to the MSHA's job coding based on single distinct occupation. Attfield and Morring (1992a) determined that the average tenure

---

[40] The research cited by the commenter does not apply specifically to respirable coal mine dust exposures.

[41] The 95-percent confidence interval reported for this estimate was 0 to 55 mg-yr/m³, so the evidence for a threshold was not statistically significant at a 95-percent confidence level.

[42] The average respirable coal mine dust concentration of 0.5 mg/m³ is calculated by multiplying 22 mg-yr/m³ by 45 yr occupational life.

worked for the Lainhart job coding scheme was different for each occupation group. Therefore, the occupational category decomposition for respirable coal dust is needed in the QRA, as was done in both QRAs.

e. Model Consistency and Coherence

One commenter also stated that the Attfield-Kuempel exposure-response model for NMRD mortality used in the QRA for the proposed rule exhibited inconsistencies and that it did not pass basic consistency checks for yielding valid risk predictions. As an example, this commenter cited the Attfield-Kuempel model for NMRD mortality risk, which, even with cumulative exposure set to zero, produces relative risk estimates of 4.4 and 1.2 for miners regionally associated with anthracite and high rank bituminous coal, respectively. The commenter did not describe or enumerate the "basic consistency checks" considered necessary for validating risk predictions or identify any other examples of purported inconsistencies in any exposure-response models used in the QRA.

As discussed in Section III.B.2.c. of this preamble, the commenters did not recognize that the model does not attribute a relative risk of 4.4 to coal in the absence of any exposure. Instead, as explained in the QRA for the proposed rule, Appendix K, the model estimates a relative risk of 4.4 "for miners regionally associated with anthracite . . ." and "[t]his suggests that the regional effects are primarily due to geographic factors other than coal rank . . . ." (QRA, Appendix K, p. 135). The relative risk estimate of 4.4 represents background risk in the Anthracite region, which is not associated by the model with coal. The same background risk is present in both the estimate of risk under current exposure conditions and the reduced risk projected to remain under the final rule. Therefore, background risk associated with the Anthracite region is canceled out when projected risk is subtracted from existing risk to estimate the final rule's impact.

MSHA does not regard the relative risk estimated for exposure in the Anthracite region as an inconsistency. As emphasized above, the Attfield-Kuempel model yields a background relative risk or intercept of 4.4 for occupationally unexposed miners in the Anthracite region. The effect of anthracite exposure is modeled by the slope of the exposure-response curve, rather than its intercept. The model predicts (a) that the background rate of NMRD mortality in the anthracite region is 4.4 times what it is in the West region;

and (b) that the slope of the exposure-response relationship is also greater (by a factor of 4.4) for anthracite exposures than for exposures to western coal.[43]

Furthermore, MSHA believes that it is appropriate to attribute improvements in predicted risk (obtained by subtraction within coal mining regions) with reductions in the exposures expected under the final rule. The commenter listed several factors, unrelated to respirable coal mine dust exposure, that could account for the predicted improvements, including model specification errors, unmodeled interactions among variables, omitted covariates and confounders, etc. However, these possibilities do not arise from inconsistencies in the particular exposure-response models used in the QRA. Such factors may contribute to the uncertainty of any epidemiological analysis. The fact that the commenter "could" account for the predicted improvements does not contradict MSHA's view that the predicted improvements are rationally attributable to reductions in respirable coal mine dust exposure.

Despite their shortcomings, the exposure-response models used in the QRA comprise the best available means of quantifying risks attributable to respirable coal mine dust exposures. Therefore they satisfy both the requirements of § 101(a)(6)(A) of the Mine Act requiring the Secretary to set health standards "on the basis of the best available evidence" and the Office of Management and Budget's (OMB) 2002 data quality guidelines, Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies (36 FR 8452, February 22, 2002). None of the commenters cited alternative quantitative models that they thought MSHA should use instead.

2. Reliance on Mean and Cumulative Exposures

Some commenters, in accounting for possible threshold effects, objected to the reliance in the QRA for the proposed rule on mean respirable coal mine dust

concentrations at work locations and lifetime cumulative respirable coal mine dust exposures. In addition, the commenters disagreed with the QRA's application of exposure-response models to mean exposures within groups of occupationally, geographically, and environmentally related work locations.[44] The commenters explained that there are two related problems with the QRA's exposure metric: (1) Its use of cumulative exposures (ignoring peaks, and the fact that a higher concentration for a shorter time may cause diseases even though the same cumulative exposure spread over more years would not); and (2) its focus on mean exposures, ignoring the variance of exposure and the occurrence of exceptionally high (far above the mean) cumulative exposures.

The commenters' concern about relying on average exposures depends partly on the premise of threshold effects noted in Section III.B.2.d. of this preamble. If this premise were true, then attributing risks to average respirable coal mine dust concentrations and cumulative exposures could both mask threshold effects and assign risks to a broader population than warranted. The existing epidemiological data, however, do not appear to support the premise of significant threshold effects. Furthermore, as mentioned in the QRA, no exposure-response models have been published that would enable MSHA to account for peak respirable coal mine dust exposures when quantifying health risks.

The commenters are also concerned that masking can occur when different exposures are averaged together. MSHA agrees, and the QRA for the proposed rule states this in the justification for stratifying its analysis:

Applying an exposure-response model to an occupational average exposure level fails to account for risks in more specific environments where the exposure is above the occupational average. (QRA, p. 41.)

. . . Therefore . . . exposure response models for CWP, severe emphysema, and NMRD mortality are applied to dust concentration averages for clusters of work locations whose dust conditions pose similar risks. (QRA, p. 42.)

Work locations with respirable coal mine dust conditions posing similar risks are identified in the QRA not only by occupation, but also by the recurrence of exposure measurements exceeding 1.0 mg/m³ and 2.0 mg/m³

---

[43] At a specified mean respirable coal mine dust exposure concentration, μ mg/m³, experienced over a 45-year occupational lifetime in the Anthracite region, the slope (i.e., rate of change) of the Attfield-Kuempel exposure-response model for relative risk of NMRD mortality is:

$$45\beta \times \exp(\alpha + 45\beta\mu) = \exp(\alpha) \times 45\beta \times \exp(45\beta\mu)$$

where β = 0.00709, α = 1.4844 for the Anthracite region, and α = 0 for the West region. Therefore, for any specified value of μ, the slope for anthracite exposures is exp (1.4844) = 4.4 times the slope for West region exposures. Note that for reasons explained in Section III.B.2.c, MSHA is reducing the Attfield-Kuempel estimate of β by a factor of one-third, from 0.00709 down to 0.0048.

[44] In the present context, "environmentally related" refers to work locations in the same overexposure recurrency class as defined in the QRA. "Geographically related" refers to work locations assigned to the same coal rank category.

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations     **24851**

(''recurrency class'') and by the rank of coal at the work location. Accordingly, the QRA's analysis is stratified into 306 cells, shown in the Tables 12 and 20 in the QRA. Although this complicates presentation of the QRA's results, it was done precisely to avoid distorting risk estimates by averaging essentially different exposures. The QRA provides separate analyses for strata ranging between work locations showing average exposure to low rank respirable coal mine dust at 0.11 mg/m³ and work locations showing average exposure to high rank respirable coal mine dust at 2.94 mg/m³. (See Table 12 in the QRAs for the proposed and final rules.)

These same commenters stressed the importance of quantifying not just the mean exposure concentration before and after a rule is implemented, but how the frequency distribution of exposures will change. To illustrate, a hypothetical example was provided to show that a rule that decreases mean exposure can increase risk. A key feature of this example was that the rule reduces the mean exposure concentration, through rigorous dust control measures that result in lower exposures for most workers, but in higher exposures for workers in locations where implementation or compliance fail.

The commenters presented no discussion of where, how, or why the proposed rule would cause exposures for any miners to increase, and MSHA sees no reason why failures of implementation or compliance would do so. Furthermore, the projections in the QRA for the proposed rule of respirable coal mine dust concentrations under the proposed and final rules do exactly what the commenter advocates as being important: The frequency distribution of exposures, before and after implementation of the rule, is projected before estimating any risks. The QRA does this by projecting the expected impact of the rule onto each of the individual respirable coal mine dust measurements used to characterize the exposure distribution for each work location (See the QRA for the proposed rule, Appendix H(c), p.128). Mean projected exposure concentrations are calculated, for each work location and then for the whole cluster of similar work locations comprising each stratum of the analysis, only after the frequency distribution of respirable coal mine dust concentrations on a shift has been projected.

MSHA did not rely on mean exposures, and as further justification for stratifying its analysis, the QRA for the proposed rule points out that when exposure-response relationships are curved upwards (as in the QRA), ''evaluating risk at the average exposure level will always underestimate average risk.''

The commenters also stated that MSHA's QRA did not quantify relatively high (disease-relevant) exposures, nor model how they would change if the proposed rule is finalized.

As indicated above, the QRA for the proposed rule separately evaluates current and projected risks in 306 different exposure strata, including five in which average exposure exceeds the existing standard (QRA, Table 12). In addition, the QRA for the proposal quantifies the prevalence of individual excursions (QRA, Tables 6 and 9 and Figures 5 and 6) and explicitly projects the impact of reducing these excursions to the final standard (QRA, p. 64 and Footnote 55). MSHA agrees that further research on the effects of excursions would be beneficial, but there have been no studies providing exposure-response models sensitive to measures of exposure excursion frequency and intensity. MSHA believes that by modeling the elimination of all shift exposures above the final standard in its projections of risk under the final rule, the QRA for the final rule has accounted for excursions to the greatest extent possible.

### 3. Projected Exposures and Risk Reductions

MSHA believes that it is not only important to quantify the mean exposure concentration before and after a final rule is implemented, but also how the frequency distribution of exposures will change. This is why the QRAs for the proposed and final rules address each work location separately in their projections of exposures, estimating the job-specific effect on relatively low exposures separately from the effect on exposures that currently exceed the standard. Some commenters used a very different method of predicting how exposures would have changed under the proposed rule. According to their method, respirable coal mine dust concentrations under the proposed rule would follow the same distributional form as current exposures, but with the mean shifted lower by an amount sufficient enough to force nearly all of the high concentrations down below the proposed standard. To reduce dust concentrations sufficiently while maintaining the same distributional form, a substantially greater reduction in the mean is required than what the QRA for the proposed rule projects.

The QRA for the proposed and final rules formulate projections by reducing current exposures by various amounts, depending where they are relative to the applicable standard, and then calculating the resulting mean for each stratum in the analysis. Since the QRA assumes (conservatively) that respirable coal mine dust concentrations on relatively dusty shifts will be reduced only as far as necessary to achieve compliance, the distribution of projected concentrations generally bears little resemblance to the current distribution of concentrations. It is anticipated that the continuous personal dust monitor will eventually enable mine operators to maximize production while keeping dust concentrations at or below the permissible standard on every shift. The projected change in exposure distributions is schematically illustrated by Figure III–2.

24852    Federal Register / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations



**Figure III–2—Schematic diagram of change in distribution of respirable coal mine dust concentrations (RCMD) at an individual work Location as projected by QRA for the proposed rule. Vertical line represents the final respirable coal mine dust concentration standard**

In contrast, other commenters' method constructs its projections by computing the mean of a theoretical distribution in which individual respirable coal mine dust concentrations would rarely exceed the final standard. This calculation is based on the premise that in achieving compliance with the final standard on every shift, the distribution of concentrations would compress but retain the same general shape as before. Their method assumes that the shape of the respirable coal mine dust distribution (i.e., the relative variance) remains unchanged. The type of change predicted by the commenters is shown in Figure III–3.

The underlying difference between these two approaches is that the commenters state that MSHA's analysis in the QRA for the proposal of the required respirable coal mine dust reductions needed to meet the proposed respirable coal mine dust standard is not adequate because it substantially underestimates the necessary reductions. Under the final rule, operators will only need to make reductions on shifts on which the 1.5 mg/m³ standard is exceeded. Additional reductions may occur and were included in the QRA's projections to the extent suggested by empirical evidence (Table 19 and Appendix H(b) of the QRAs for the proposed and final rules), but neither the proposed and final rules require these reductions. The theoretical model used by the commenters would require larger reductions to satisfy the theoretical constraint of a constant relative variance.

 

**Figure III–3—Schematic diagram of projected change in distribution of respirable coal mine dust (RCMD) concentrations according to the commenters approach. Vertical line represents final respirable coal mine dust concentration standard**

These commenters expressed concern about the difficulty of reproducing MSHA's analysis of the inspector sampling data cited in the QRA for the proposed rule (U.S. Department of Labor, MSHA (2010). Quantitative Risk Assessment, Dust Data Files, InspSamp.txt). Before discussing the evidence the commenters present in support of their theoretical model, it is helpful to clarify a source of some confusion. The commenters are correct when they state that a total of 146,917 valid, Day-1 inspector samples [45] were used by MSHA in the QRA, as shown in Tables 1 and 3 of the QRA for the proposal. These commenters noted that this subset of 146,917 was obtained from the total of 181,767 non-voided samples by excluding (a) 14,016 samples collected within 21 days after "Day 1" of an MSHA dust inspection, (b) 10,927 Day-1 samples not associated with an occupation, and (c) 9,906 Day-1 intake air samples. One additional sample (d) was excluded "because the dust concentration measurement appears to have resulted from a coding error." These subtotals (a, b, c, and d) are all shown in Appendix B of the QRAs for the proposed and final rules and fully account for the 34,850 valid samples excluded from the analysis

[45] A "Day-1" inspector sample is an MSHA inspector sample that was collected more than 21 days after the initial day of a prior MSHA inspection in the same production area of a specified mine.

Samples are deemed to have been obtained in the "same production area" of a specified mine when the samples are coded with the same mine ID and the same 2nd and 3rd digits of MSHA's 4-digit entity code. For example, entity codes 0010 and 9011 represent the same production area within a specified mine.

$(181{,}767 - 34{,}850 = 146{,}917)$. The apparent source of confusion was that the summary formula provided at the bottom of page 93 in the QRA for the proposed rule did not include the 9,906 excluded intake air samples.[46] This has been corrected in Appendix B of the QRA for the final rule.

These commenters also were concerned with the QRA's stated reasons for excluding the 2004–2007 inspector samples from its estimates of current and projected exposure levels. After noting the temporal changes in samples per work location shown by Table 5 in the QRA for the proposed rule, and substantial right-skewing of the respirable coal mine dust concentration data, they stated that a downward trend in the average [respirable coal mine dust] level per work location is expected due to increasing sampling error associated with decreasing sample size for the right-skewed data, absent any real change in respirable coal mine dust distributions over that period.[47] Furthermore, these commenters expressed concern with MSHA's finding of a downward trend in inspectors' measurements since their assessment of a temporal trend by job category in the MSHA inspector Day-1 sample data shows no meaningful temporal trend in any category or for the aggregated data. According to the commenters, some trends reached nominal statistical significance, but they explained virtually zero percent of the variance of the natural-log-transformed respirable coal mine dust data.

For both underground and surface measurements, MSHA's analyses (summarized in Appendix D(c), Tables 39 and 41, in both QRAs for the proposed and final rules) show a statistically significant downward time-trend in respirable coal mine dust concentrations obtained from inspector samples, at confidence levels exceeding 99.9 percent. Unlike the non-peer reviewed analysis submitted by these commenters, MSHA's peer-reviewed analyses account for specific times, specific work locations within mines, and applicable standards. Although, in MSHA's analysis, the percentage of variance explained by the time-trend (represented by "sampling date" in the ANCOVA tables) is small compared to that explained by occupational differences, it is larger than the amount explained by mine-to-mine differences or differences between production areas within the same mine, and even the applicable standard. It may be that in the commenters' analysis, temporal effects were partially masked by aggregating across work locations and ignoring differences and/or changes in the applicable standard in effect at specific work locations. As mentioned on page 102 of the QRA for the proposed rule, the ANCOVA method used adjusts for variability in the number of samples obtained in each year at each location. Furthermore, lack of statistical symmetry in the data (and associated heterogeneity of sampling errors) is addressed by application of the maximum-likelihood Box-Cox transformation[48] (Box and Cox, (1964)). The commenters' objections to MSHA's analyses are not supported by the available data.

These commenters performed an analysis of the Log-transformed inspector data and reported that when each Mine ID and work location-specific set of untransformed data was normalized (divided) by its corresponding applicable dust standard, the resulting log-transformed data sets aggregated by job category were, in each, either approximately normally distributed (for 9 of 33 job categories), or otherwise approximately distributed as a mixture of two normal distributions for the remaining job categories.

From this analysis, the commenters concluded that mixed lognormal distributions provided a more accurate and simpler basis for performing statistical analysis with the coal mine dust data set. However, they presented no evidence that the logarithmic transformations they used were "more accurate" than the Box-Cox transformations used by MSHA in the QRA for the proposed rule (which include the logarithmic transformation as a special case). It is simpler to analyze the data (and explain results) when all mines and work locations within mines are combined into an undifferentiated pool. However, the finding in the QRA for the proposed rule[49] that ". . . work locations exhibit a wide variety of distributional forms . . . that cannot adequately be approximated by a lognormal model" did not refer to the combined data. These commenters presented no evidence suggesting that it was more accurate to combine data from all work locations associated with the same occupation than to differentiate among work locations at different mines or mine areas. Tables 39 and 41 of the QRA for the proposal show that these differences are statistically significant, so not including them would not yield more accurate results.

Approximate log-normality across work locations was never questioned or disputed in the QRA for the proposed rule. For purposes of estimating the impact of the final rule on expected risk, the important questions are whether the distributions should be assumed lognormal within work locations and, far more important, whether they would retain, within work locations, the same coefficient of variation and distributional form under the final rule regardless of their distribution. MSHA expects the final rule to have its greatest impact on work locations currently exhibiting the highest dust concentrations, with relatively little impact on work locations already in compliance with the final standard on every shift.

According to the commenters, full compliance with the rule as proposed would have required a 92% reduction in the mean respirable coal mine dust concentration for longwall tailgate operators, from 1.39 mg/m³ (their estimate of the current mean) to 0.11 mg/m³ (their estimate of the mean level required to meet the proposed 1.0 mg/

---

[46] These commenters also requested clarification of the 4-digit entity code provided in the sampling data files. Leading zeros and blanks should be treated as equivalent when interpreting the first two characters. As stated in Footnote 12 on pages 5 and 14 respectively of the QRAs for the proposed and final rules, samples collected at the same work location within a mine or processing facility are identified by sharing the same 2nd and 3rd characters of the entity code, along with the same mine ID and job classification code.

[47] These commenters also questioned MSHA's use of a study predating the 2004–2008 data, and of miners' anecdotal evidence, to justify the assumption of downward bias in MSHA's respirable coal mine dust measurements. MSHA acknowledges that it is inherently difficult, if not impossible, to fully quantify bias due to selective reductions of dust levels in the presence of an MSHA inspector. However, MSHA finds the anecdotal evidence for such bias, confirmed over many years of miners' testimony at public hearings, to be persuasive. The 1993 study represented an attempt to quantify some part of this bias, and no similar study of later sampling data is available. It was cited in the QRA for the proposed rule, along with the anecdotal evidence, only to support MSHA's assessment that such bias exists. Neither it, nor the anecdotal evidence, was used in any attempt to quantify the extent of the bias (U.S. Dept. of Labor, MSHA, 1993, Report of the Statistical Task Team of the Coal Mine Respirable Dust Task Group).

[48] This enables valid analysis of data exhibiting a much wider array of error structures than what these commenters assume, and permits the logarithmic transformation (appropriate when standard deviation is proportional to the mean concentration measurement) as a special case. In the analysis of surface data (QRA for the proposal, Table 41), the transformation (Box-Cox $\lambda=0$) is identical to the logarithmic transformation favored by these commenters. In the analysis of underground data (QRA, Table 39), the transformation (Box-Cox $\lambda=0.1$) is close to logarithmic but reflective of data that is slightly less skewed than the Lognormal assumption would predict.

[49] Appendix G(b), p. 125.

m³ standard with a 99% compliance rate). This calculation relies on the following unfounded assumptions that MSHA responds to below.

(i) That variability in dust concentrations for a specified occupation, pooled across all mines and mine sections, is similar to the variability at the individual work locations where exposure occurs and the final standard would actually be implemented.

The values of $\sigma_1$ and $\sigma_2$ shown in the commenter's calculations represent the pooled variability in respirable coal mine dust concentrations across all work locations for each occupation. Thus, the measure of variability these commenters use in their analysis combines (1) the average variability observed within work locations and (2) the variability in the mean levels observed between work locations of the same occupational type. This inflates the estimates of variability within work locations—where the mandated reductions would actually have to occur. Furthermore, individual work locations may have widely differing degrees of variability in respirable coal mine dust concentrations. Therefore, pooled estimates of variability within work locations (even if properly calculated so as to eliminate the effects of variability between work locations) could merely be averages of significantly divergent exposure patterns at individual work locations. The calculations that the commenters present in their comments apply only to work locations where variability in respirable coal mine dust concentrations is approximately equal to variability observed across the entire population of work locations associated with longwall tailgate operators.

(ii) That within occupational categories, the shift-to-shift dust concentration at each work location is lognormally distributed.

Although the assumption of universally lognormal exposure distributions is widespread and perhaps entrenched in the occupational hygiene literature, it is not always supported by coal mine dust concentration measurements at individual work locations. (See Appendix G(b), QRA for the proposed rule.) Multimodal, or even unimodal right-skewed distributions, are not necessarily well-approximated by a lognormal model. Although these commenters correctly suggest that multimodal distributions can often be adequately represented as mixtures of lognormal distributions, they present no evidence that such distributions provide good, predictive models for the distribution of respirable coal mine dust concentrations within work locations. The fact that pooled exposures are

lognormally distributed does not imply that exposures at individual work locations are lognormally distributed.

(iii) That the distributional form (i.e., shape) of each occupational exposure distribution, as represented by the lognormal parameters shown in their comments, would not change after successful implementation of the final rule.

As illustrated by Figure III–3, it is this assumption of shape-retention that is primarily responsible for the extreme reductions in mean exposure that these commenters conclude are necessary for compliance with the proposed rule. The commenters did not present empirical evidence directly supporting this assumption, but they did offer the following justification after MSHA questioned the assumption at a public hearing: (1) Empirical evidence for each job category was shown to be consistent with contributing log-normal components; (2) evidence was based on an analysis of dust concentration measurements that had already been "normalized" as a result of dividing them by compliance level specific to each job location and job category; and (3) the underlying pre-normalized data aggregated across each job category also exhibit mixed log-normal distributions. According to the commenters, this demonstrates that compliance resulted in job-specific multiplicative shifts of the type assumed in their subsequent analysis. They also argued that if more complex types of shifts had arisen due to compliance, such as those projected in the QRA, then the pre-normalized data would not be expected to exhibit the degree of consistency with mixed log-normal distributions that is summarized in the comments.

Although all three of the commenters' premises summarized above are true, they do not support the commenters' conclusion that the effect of applying job-type-specific control measures to comply with new regulations will be to induce a leftward (downward) multiplicative shift in the mixed log-normal distribution that the commenters estimated to be consistent with empirical data for that job category. Furthermore, the commenters' three premises apply only to the distributions of respirable coal mine dust concentration measurements aggregated across all work locations of a given occupational type. Their analysis models a static distribution for each occupational aggregate and does not address the response to compliance with more stringent standards. Despite the "normalization" procedure described, the commenters' analysis provides no information on how

individual work locations have responded to reductions in their exposure limits. For most work locations, the applicable standard did not even change appreciably during the data period. The fact that these aggregated distributions are consistent with mixed lognormal assumptions demonstrates nothing about how individual work locations will respond to the reduced standard.

4. Uncertainty Analysis

As indicated above, a difference in assumptions as to how respirable dust exposures would have changed under the proposed rule led some commenters to project exposures for longwall tailgate operators that are quantifiably different from those projected by MSHA. Although MSHA believes that Figure III–2 provides a much better picture than Figure III–3 of how dust concentrations in individual work locations will change under either the proposed or final rule, MSHA fully acknowledges that its predictions of future exposure distributions are not certain. This uncertainty was expressed in the QRA for the proposal by a statement of the major assumptions involved in MSHA's projections (QRA, p. 80). However, MSHA has no empirical data basis for quantifying the degree of uncertainty attached to these assumptions. This illustrates a more general point: Although it may be possible to quantify and compare the results of competing models, it may not be possible (in the absence of appropriate experimental data) to provide a valid quantitative assessment of uncertainty in regard to competing assumptions.

Several commenters stated that the QRA for the proposal lacked sufficient discussion of the uncertainty surrounding its estimates of current and projected exposures and health risks, and of the reductions in risk expected to result from implementation of the proposed rule.

Although the QRA for the proposed rule contained qualitative discussions of its major assumptions and their implications with respect to both current and projected risks (pp. 58–59 and p. 80, respectively), it did not present much quantitative information on statistical uncertainties related to the estimates it used. In part, this was because such quantification often overlooks far greater and more important uncertainties in the underlying assumptions. Nevertheless, in response to comments, the QRA for the final rule provides additional information on uncertainty of the estimates wherever possible. In

190

addition, the QRA for the final rule contains a comprehensive uncertainty analysis for MSHA's estimates of current and projected exposures (QRA for the final rule, Section 4).

MSHA agrees with some commenters that a purely quantitative approach has the potential to underestimate uncertainty due to its lack of incorporation of model uncertainty. Therefore, although MSHA believes that the QRAs for the proposed and final rules have employed the best available models for estimating existing and future health risks, MSHA's presentation of quantitative uncertainty measures should be tempered by the realization that such measures depend heavily on acceptance of the underlying assumptions of the models used in the both QRAs.

One commenter stated that the two mortality studies cited in the QRA for the proposal (Miller et al., 2007; and Attfield and Kuempel, 2008, Figure 15) yield what appear to be quite different estimates of relative risk for COPD mortality attributable to respirable coal mine dust exposure. However, the commenter did not mention the main point of the QRA's discussion of the difference between these estimates on page 40: "... even the lower estimate shows a significant increase in COPD mortality attributable to the dust exposure." More importantly, the difference in relative risk reported from the two studies (Miller et al., 2007; Attfield and Kuempel, 2008) is not statistically significant. Table III–8 contains 90-percent confidence intervals

for the relative risks at mean concentrations of 1.0, 1.5, and 2.0 mg/m³. The lack of any statistically significant difference is shown by the extensive overlap between corresponding intervals. Therefore, contrary to the commenter's suggestion, the difference in estimated relative risks may well reflect normal sampling variability rather than a fundamental disagreement between models.

In addition, Table III–8 presents 90-percent confidence intervals for relative risks of COPD mortality based on MSHA's revision of the Attfield-Kuempel estimate, which is intended to mitigate bias due to underestimation of exposure, as explained in the last paragraph of Section III.B.2.c.[50]

TABLE III–8—90-PERCENT CONFIDENCE INTERVALS FOR RELATIVE RISK (RR) OF COPD MORTALITY ATTRIBUTABLE TO RESPIRABLE COAL MINE DUST EXPOSURE AVERAGED OVER 45-YEAR OCCUPATIONAL LIFETIME, ACCORDING TO THREE DIFFERENT EXPOSURE-RESPONSE MODELS

| Mean respirable coal mine dust conc. mg/m³ | Miller et al. (2007) model COPD/17 | Attfield/ Kuempel (2008) | Attfield/ Kuempel revised by MSHA |
|---|---|---|---|
| 1.0 | 1.10–1.20 | 1.12–1.61 | 1.13–1.36 |
| 1.5 | 1.16–1.31 | 1.18–2.03 | 1.20–1.58 |
| 2.0 | 1.22–1.43 | 1.25–2.58 | 1.28–1.84 |

The commenter also suggested that mortality data obtained after implementation of the Mine Act contradict predictions from the exposure-response models on which the QRA relies. Citing Bang et al. (1999) and Mazurek et al. (2009), the commenter stated that mean respirable coal mine dust concentrations have been reduced in the past, yet health risks have increased in some age categories. According to the commenter, this conflicts with the predictions of the QRA's risk modeling, and shows that the model predictions are not certain, and may be incorrect. For reasons explained below, MSHA believes the commenter misinterpreted the results of both studies. Bang et al. (1999) computed annual age-specific mortality rates for three age groups (15–44, 45–64, and 65 or older), and for the aggregate, among decedents for whom CWP,

asbestosis, or silicosis was identified as either an underlying or contributing cause of death. The overall age-adjusted CWP-related mortality rate declined steadily over the 1985–1996 study period, "from 8.32 per million in 1985 to 3.20 per million in 1996." CWP-related mortality rates also declined significantly within the 45–64 and ≥ 65 age groups, but not in the 15–44 age group. The authors concluded that "the reduction of CWP mortality could be related to enforcement of and compliance with dust-control measures adopted in 1969." With respect to the lack of a statistically significant downward trend in the 15–44 age group, the authors noted not only that "this observation may have resulted in part from lack of power due to smaller annual numbers of deaths at younger ages;" but also that—

The continued occurrence of pneumoconiosis deaths in young adults may reflect recent overexposures. High levels of exposure are associated with much shorter latency and more rapid disease progression, resulting in early death [Bang et al., 1999].

Mazurek et al. (2009) examined annual CWP mortality rates and years of potential life lost (YPLL),[51] based on 28,912 decedents from 1968 through 2006 for whom CWP was identified as the underlying cause of death. The overall finding was that:

... CWP deaths among U.S. residents aged ≥25 years declined 73%, from an average of 1,106.2 per year during 1968–1972 to 300.0 per year during 2002–2006. . . . Age-adjusted death rates among residents aged 25–64 declined 96%, from 1.78 per million in 1968 to 0.07 in 2006; age-adjusted death rates among residents aged ≥65 years declined 84%, from 6.24 per million in 1968 to 1.02 in 2006 . . . [Mazurek et al., 2009].

---

[50] As in the case of NMRD mortality risk discussed earlier, the revised estimate of the coefficient of cumulative respirable coal mine dust exposure for estimating COPD Relative Risk lies halfway between the Attfield-Kuempel estimate of 0.00648 and the Miller COPD/17 estimate of 1.92 × 0.0016 = 0.00307 (i.e., (0.00648 + 0.00307)/2 = 0.00478). Therefore, relative risk (RR) in the revised model is given by: $RR = \exp (0.00478 \times 45 \times \mu)$, where μ is the mean respirable coal mine dust concentration experienced over a 45-year occupational lifetime. Standard errors for the

revised coefficient were obtained by applying the standard propagation of errors formula for the average of two independent random variables (i.e., the 1.92-adjusted Miller and Attfield-Kuempel estimates of the coefficient).

[51] The term "years of potential life lost (also known as "potential years of life lost") is a measure of the relative impact of various diseases and lethal forces on society (see Last, John M., ed. 2001. *A Dictionary of Epidemiology*, Fourth Edition. New York: Oxford University Press, Inc.).

YPLL is computed by estimating the years that people would have lived if they had not died prematurely due to disease or other causes. YPLL is an important measure of premature mortality. YPLL is equal to the numerical difference between a predetermined endpoint age (i.e., 75, 85, etc.) and the age at death for a death or deaths that occurred prior to that endpoint age. In addition, the YPLL Rate is equal to the (Number of YPLLs divided by the population under endpoint age) × 100,000.

**24856** **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

Annual CWP-attributable YPLL before age 65 years was also reported to have declined, "from a high of nearly 1,800 in 1970 to a low of 66 in 2001." However, YPLL before age 65 years was found to have been increasing between 2002 and 2006. Unlike the commenter, the authors did not associate the observed increase in YPLL from 2002 and 2006 with any suggested decrease in exposures over that time period. Instead, the authors noted that the

. . . annual CWP-attributable YPLL before age 65 years also have decreased, from a high of nearly 1,800 in 1970 to a low of 66 in 2001. However, the findings in this report indicate that YPLL before age 65 years have been increasing since 2002. This is consistent with the observed increase in the percentage of underground coal miners identified with CWP, in particular among younger workers.

The report did not examine historical changes in the age-composition of the mining population or analyze the effects that the changes would have on historical changes in YPLL. However, contrary to the commenter's implicit assumption of a progressive decline in exposures in the latter years of the study period, Mazurek et al. did pose the following possible explanations for the observed increase in YPLL:

One cause of the increased YPLL in recent years might be greater exposure of workers to coal dust . . . Increased coal production per shift can make dust suppression more difficult. . . . Larger, more powerful machines generate larger quantities of dust in shorter periods, potentially exposing workers to higher concentrations of dust. . . In addition, the total number of hours worked in underground coal mines increased 25.6%, from an annual average of 1,671 per miner during 1978–1982 to 2,099 per miner during 2003–2007. Increased hours of work can result in increased inhaled dust, which might exceed the lungs' ability to remove dust. . . Finally, another cause of increased CWP-attributable YPLL could be missed opportunities by miners for early disease screening, which could exacerbate disease progression. [Mazurek et al., 2009].

None of these potential explanations invokes any decrease in mean cumulative exposure to explain the relatively recent increase in YPLL. Neither the results reported in Mazurek et al. (2009) nor the possible explanatory factors it discusses conflict in any way with "the predictions of the QRA's risk modeling" or show "that the model predictions . . . may be incorrect."

Some measure of the uncertainty implicit in the estimates of exposure under current conditions in the QRA for the proposed and final rules is given by QRA Figures 7, 8, and 9, along with the discussion of underlying assumptions in the Section 2 of the QRA for the final rule. In conjunction with new projections of exposures and residual excess risks under a 1.5 mg/m³ respirable coal mine dust concentration final standard, Section 4b of the QRA for the final rule discusses uncertainty in the exposures expected under the final standard and enforcement policies. In the remainder of this section, MSHA addresses uncertainty in the exposure-response models used in the QRAs for the proposed and final rules. Confidence bands graphically representing this source of uncertainty are provided in Section 4c of the QRA for the final rule.

a. CWP, Including PMF

Table 65 (in Appendix I) in the QRA for the final rule (Table 53 in the QRA for the proposed rule) provides the standard errors of all estimated coefficients used in the exposure-response models for CWP1+, CWP2+ and PMF. Nevertheless, some commenters objected to the absence of confidence bands in the graphic displays of these models (Figures 10 and 11 of both QRAs). In response to these commenters, 90-percent confidence intervals for the estimated excess risks attributable to respirable coal mine dust are shown for 73-year-old miners at three different exposure levels in Tables III–9 and III–10. Table III–9 pertains to geographic regions associated with low/medium rank coal and Table III–10 pertains to geographic regions with high rank coal. Assuming, as MSHA does, that the Attfield-Seixas models are reasonably accurate, there is a chance of approximately 1 in 20 that 45 years of occupational exposure at the specified level would result in fewer adverse outcomes, per thousand, than the left interval endpoint. Similarly, the chance is approximately another one in twenty that exposure at the specified level would result in adverse outcomes at a rate exceeding the upper confidence limit. For example, according to the Attfield-Seixas model, the likelihood is approximately 95 percent that 45 years of occupational exposure to high rank respirable coal mine dust at an average concentration of 1.5 mg/m³ would result in more than 53 excess cases of PMF per 1,000 miners at age 73 years.

TABLE III–9—MAXIMUM LIKELIHOOD ESTIMATES AND 90-PERCENT CONFIDENCE INTERVALS FOR EXCESS RISK OF CWP ATTRIBUTABLE TO RESPIRABLE COAL MINE DUST EXPOSURE, BASED ON ATTFIELD-SEIXAS MODEL FOR 73-YEAR-OLD MINERS AFTER 45-YEARS OF OCCUPATIONAL EXPOSURE AT LOW TO MEDIUM RANK COAL MINES

| Mean respirable coal mine dust conc. mg/m³ | Excess cases per thousand exposed miners | | | | | |
| | CWP 1+ | | CWP 2+ | | PMF | |
| 1.0 | 98.3 | 73.0–125.6 | 57.5 | 29.7–92.3 | 20.0 | 5.7–63.3 |
| 1.5 | 163.5 | 119.4–211.7 | 100.8 | 48.9–170.7 | 50.2 | 8.8–121.2 |
| 2.0 | 238.2 | 172.2–309.5 | 156.0 | 71.6–273.0 | 77.0 | 12.1–203.0 |

TABLE III–10—MAXIMUM LIKELIHOOD ESTIMATES AND 90-PERCENT CONFIDENCE INTERVALS FOR EXCESS RISK OF CWP ATTRIBUTABLE TO RESPIRABLE COAL MINE DUST EXPOSURE, BASED ON ATTFIELD-SEIXAS MODEL FOR 73-YEAR-OLD MINERS AFTER 45-YEARS OF OCCUPATIONAL EXPOSURE AT HIGH RANK COAL MINES

| Mean respirable coal mine dust conc. mg/m³ | Excess cases per thousand exposed miners | | | | | |
| | CWP 1+ | | CWP 2+ | | PMF | |
| 1.0 | 177.7 | 118.2–244.4 | 141.0 | 69.8–237.6 | 96.8 | 30.6–208.9 |
| 1.5 | 303.1 | 198.6–413.7 | 271.4 | 125.0–459.1 | 196.9 | 53.2–444.9 |
| 2.0 | 437.3 | 290.3–572.9 | 433.6 | 196.5–672.7 | 338.6 | 82.2–688.2 |

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations **24857**

**b. Severe Emphysema**

Standard errors for all estimated coefficients in the Kuempel pulmonary impairment model are shown in Table 66 of Appendix J in the QRA for the final rule (Table 54 in the QRA for the proposed rule). Table III–11 below provides 90-percent confidence intervals for estimated excess risks of severe emphysema attributed by the model to respirable coal mine dust exposures at 45-year occupational lifetime average concentrations of 1.0, 1.5, and 2.0 mg/m³. As in Tables 16, 24, and 28 of both QRAs, these risks apply to never-smoking miners at age 73. According to this model, the likelihood is approximately 95 percent, for example, that white miners exposed to respirable coal mine dust at an average concentration of 1.5 mg/m³ will, at age 73 years, experience severe emphysema at a rate exceeding 49 cases per thousand exposed miners. Similarly, the likelihood is approximately 95 percent that this rate will be less than 156 cases per thousand.

TABLE III–11—MAXIMUM LIKELIHOOD ESTIMATES AND 90-PERCENT CONFIDENCE INTERVALS FOR EXCESS RISK OF SEVERE EMPHYSEMA ATTRIBUTABLE TO RESPIRABLE COAL MINE DUST EXPOSURE, BASED ON KUEMPEL PULMONARY IMPAIRMENT MODEL FOR 73-YEAR-OLD NEVER-SMOKING MINERS AFTER 45-YEARS OF OCCUPATIONAL EXPOSURE

| Mean respirable coal mine dust conc. mg/m³ | Excess cases of severe emphysema per thousand exposed miners | | | |
|---|---|---|---|---|
| | Racially "white" miners | | Racially "non-white" miners | |
| 1.0 | 61.0 | 31.6–94.3 | 94.3 | 50.3–141.0 |
| 1.5 | 98.7 | 49.6–156.3 | 147.0 | 77.5–220.7 |
| 2.0 | 141.2 | 69.0–227.4 | 202.1 | 105.8–301.7 |

**c. Mortality Due to NMRD**

Attfield and Kuempel (2008) did not provide standard errors or other measures of uncertainty for the model of NMRD mortality risk presented in their Table X (reproduced in Appendix K of the QRAs as Table 67 for the final rule and Table 55 for the proposed rule). However, in a communication from Dr. Attfield (U.S. Department of Labor, MSHA, Memorandum for the Record: Email from Michael Attfield, 2011), MSHA has obtained standard errors for the estimated coefficients pertaining to cumulative respirable coal mine dust exposure and geographical coal mining region. These are presented in Table III–12 below.

TABLE III–12—STANDARD ERRORS OF ESTIMATED COEFFICIENTS RELATED TO RESPIRABLE COAL MINE DUST EXPOSURE IN ATTFIELD-KUEMPEL NMRD MORTALITY MODEL

| Variable | Standard error of estimated coefficient |
|---|---|
| Anthracite | 0.16557 |
| East Appalachia | 0.18853 |
| West Appalachia | 0.16335 |
| Midwest | 0.21121 |
| Cumulative respirable coal mine dust Exposure (mg-yr/m³) | 0.00128 |

Miller et al. (2007) presented estimates and standard errors for the coefficients specified in 18 candidate models of NMRD mortality risk associated with respirable coal mine dust exposures in the United Kingdom (Miller et al., 2007, Table 5.12). In the model that best fits the data (NMRD/17), the estimated coefficient of cumulative exposure and its standard error were 0.0014 and 0.0001997, respectively, for respirable coal mine dust exposures expressed in units of mg-hr/m³. For exposures expressed in units of mg-yr/m³, the corresponding values are 0.0027 and 0.000383, assuming, as in the QRA, an average work-year of 1,920 hours.

Because of bias in the Attfield-Kuempel estimates due to underestimation of respirable coal mine dust exposure for the study cohort, as explained in the last paragraph of Section III.B.2.c. above, MSHA is using a model of NMRD mortality risk in which the Attfield-Kuempel coefficient of respirable coal mine dust exposure has been reduced by averaging it with the coefficient estimated from the NMRD/17 model. The modified coefficient is (0.00709 + 0.0027)/2 = 0.0049, with a standard error of

$$\sqrt{\frac{(0.00128)^2 + (0.000383)^2}{4}} = 0.000668$$

Table III–13 contains maximum likelihood estimates and 90-percent confidence intervals for the relative risk of NMRD mortality attributable to respirable coal mine dust exposure according to the Attfield-Kuempel model, the Miller NMRD/17 model, and MSHA's modified version of the Attfield-Kuempel model. All the risks shown in Table III–13 are relative to unexposed workers with identical smoking histories in the same coal mining region. A relative risk of 1.0 would indicate no expected effect of exposure, and values deviating from 1.0 describe predicted multiplicative effects.[52] For example, according to the modified Attfield-Kuempel model (refer to Table III–13, last column, below), 45 years of occupational exposure at an average respirable coal mine dust concentration of 1.5 mg/m³ increases the risk of NMRD mortality by an

---

[52] Relative Risk Interpretation: The relative risk is the risk of the exposed group compared to risk of a control group (unexposed workers with identical smoking histories in the same coal mining region). If the relative risk is equal to one, then the risk of developing disease for the exposed group is the same as the risk for the comparison group. This would indicate no association between exposure and the risk of disease. If the relative risk is greater than one, there is a strong positive association (risk of disease increases with increased exposure); whereas if the relative risk is less than one, there is a strong negative association (risk of disease decreases with increased exposure). If the confidence interval (CI) for relative risk contains the number one, this implies lack of statistically significant evidence for an association.

**24858**     **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

amount probably between 29 and 50 percent—with a 5-percent chance that the increase is less than 29 percent and a 5-percent chance that the increase is greater than 50 percent.

Table III–14 translates the relative risks shown in Table III–13 into excess risks (expected cases per thousand exposed miners) attributable to respirable coal mine dust exposure. As explained in Appendix K of the QRA for the final rule, this translation was based

on a competing risk life-table analysis.[53] As before, these excess risks should be interpreted relative to unexposed workers with identical smoking histories in the same coal mining region. For miners exposed for 45 years to respirable coal mine dust at an average concentration of 1.5 mg/m³, the modified Attfield-Kuempel model (see Table III–14, last column) predicts between 6.4 and 11.0 excess cases of NMRD mortality by age 73, per

thousand exposed miners. By definition of the 90-percent confidence interval, there is (again according to the modified Attfield-Kuempel model) approximately a 5-percent chance that the excess NMRD mortality rate would be below 6.4 cases per thousand, and another 5-percent chance that it would be above 11.0 cases per thousand, for miners exposed at this level.[54]

TABLE III–13—MAXIMUM LIKELIHOOD ESTIMATES AND 90-PERCENT CONFIDENCE INTERVALS FOR RELATIVE RISK (RR) OF NMRD MORTALITY ATTRIBUTABLE TO RESPIRABLE COAL MINE DUST EXPOSURE AVERAGED OVER 45-YEAR OCCUPATIONAL LIFETIME, ACCORDING TO THREE ALTERNATIVE EXPOSURE-RESPONSE MODELS

| Mean respirable coal mine dust conc. mg/m³ | Relative risk of NMRD mortality | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Attfield/Kuempel (2008) | | Miller et al. (2007) NMRD/17 | | Attfield/Kuempel modified by MSHA | |
| 1.0 ............................ | 1.38 | 1.25–1.51 | 1.13 | 1.10–1.16 | 1.25 | 1.19–1.31 |
| 1.5 ............................ | 1.61 | 1.40–1.86 | 1.20 | 1.15–1.25 | 1.39 | 1.29–1.50 |
| 2.0 ............................ | 1.89 | 1.57–2.29 | 1.27 | 1.20–1.35 | 1.55 | 1.41–1.71 |

TABLE III–14—MAXIMUM LIKELIHOOD ESTIMATES AND 90-PERCENT CONFIDENCE INTERVALS FOR EXCESS RISK OF NMRD MORTALITY ATTRIBUTABLE TO RESPIRABLE COAL MINE DUST EXPOSURE AVERAGED OVER 45-YEAR OCCUPATIONAL LIFETIME, ACCORDING TO THREE ALTERNATIVE EXPOSURE-RESPONSE MODELS

| Mean respirable coal mine dust conc. mg/m³ | Excess cases of NMRD mortality by age 73 years, per thousand exposed miners | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Attfield/Kuempel (2008) | | Miller et al. (2007) NMRD/17 | | Attfield/Kuempel modified by MSHA | |
| 1.0 ............................ | 8.5 | 5.5–11.6 | 2.9 | 2.2–3.5 | 5.5 | 4.2–7.2 |
| 1.5 ............................ | 13.3 | 8.8–19.2 | 4.4 | 3.4–5.5 | 8.9 | 6.4–11.0 |
| 2.0 ............................ | 19.4 | 13.0–28.3 | 5.9 | 4.4–7.9 | 12.0 | 9.4–15.9 |

*C. Feasibility*

1. Pertinent Legal Requirements

Section 101(a)(6)(A) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. 811(a)(6)(A), requires the Secretary of Labor, in setting health standards, to consider the feasibility of the standards. Section 101(a)(6)(A) of the Mine Act states that the Secretary, in promulgating mandatory standards dealing with toxic materials or harmful physical agents under the Mine Act, shall set standards to assure, based on the best available evidence, that no miner suffer material impairment of health from exposure to toxic materials or harmful physical agents over his working life. (30 U.S.C. 811(a)(6)(A)). In developing these standards, the Mine Act requires the

Secretary to consider the latest available scientific data, the feasibility of the standards, and experience gained under other laws. Id.

Thus, the Mine Act requires that the Secretary, in promulgating a standard, based on the best available evidence, attain the highest degree of health and safety protection for the miner with feasibility a consideration.

In relation to feasibility, the legislative history of the Mine Act contemplates technology-forcing standards and standards that may include some financial impact. The legislative history states that:

* * * While feasibility of the standard may be taken into consideration with respect to engineering controls, this factor should have a substantially less significant role. Thus, the Secretary may appropriately consider the state of the engineering art in

industry at the time the standard is promulgated. However, as the circuit courts of appeals have recognized, occupational safety and health statutes should be viewed as "technology forcing", and a proposed health standard should not be rejected as infeasible "when the necessary technology looms on today's horizon." *AFL–CIO* v. *Brennan*, 530 F.2d 109 (3d Cir. 1975); *Society of Plastics Industry* v. *OSHA*, 509 F.2d 1301 (2d Cir. 1975), cert. denied, 427 U.S. 992 (1975). * * *

Similarly, information on the economic impact of a health standard which is provided to the Secretary of Labor at a hearing or during the public comment period, may be given weight by the Secretary. In adopting the language of section 102(a)(5)(A), the Committee wishes to emphasize that it rejects the view that cost benefit ratios alone may be the basis for depriving miners of the health protection which the law was intended to insure. The committee concurs with the judicial

---

[53] To obtain the values in Table III–14, relative risks calculated in the QRA for 162 different clusters of work locations were paired with the corresponding life-table determination of excess risk of NMRD mortality. These 162 pairs were then arranged in order of increasing relative risk, thereby forming a look-up table. Each relative risk in Table III–13 was then assigned an excess risk

corresponding to that in the matched pair of the look-up table. Intermediate values were calculated using linear interpolation. The 162 matched pairs of relative and excess risks are shown in the corresponding cells of Tables 17 and 68 of the QRA for the final rule.

[54] The 90% confidence interval indicates the range within which there is approximately a 90%

probability that the excess NMRD mortality rate lies. In the example, there is a 10% chance that the true excess NMRD mortality rate lies outside of the range of 6.4–11.0. Therefore, there is approximately a 5% chance that the true rate would be below 6.4 cases per thousand and another 5% chance that it would exceed 11.0 cases per thousand.

constitution that standards may be economically feasible even though from the standpoint of employers, they are "financially burdensome and affect profit margins adversely" (I.U.D. v Hodgson, 499 F.2d 647 (D.C. Cir. 1974)). Where substantial financial outlays are needed in order to allow industry to reach the permissible limits necessary to protect miners, other regulatory strategies are available to accommodate economic feasibility and health considerations. These strategies could include delaying implementation of certain provisions or requirements of standards in order to allow sufficient time for engineering controls to be put in place or a delay in the effective date of the standard. S. Rep. No. 95–181, at 21–22 (1977), reprinted in 1977 U.S.C.C.A.N. 3421–22.

Courts have interpreted the term "feasible" as meaning "capable of being done, executed, or effected," both technologically and economically. See *Kennecott Greens Creek Mining Co.* v. *MSHA and Secretary of Labor*, 476 F.3d 946, 957 (D.C. Cir. 2007) (citing *American Textile Mfrs. Inst.* v. *Secretary of Labor (OSHA Cotton Dust)*, 452 U.S. 490, 508–09 (1981)). In order for an agency's rules to be deemed feasible, the agency must establish "a reasonable possibility that the typical firm will be able to develop and install engineering and work practice controls that can meet the [permissible exposure limit] in most of its operations." *Kennecott Greens Creek*, 476 F.3d at 957 (quoting *American Iron & Steel Inst.* v. *OSHA*, 939 F.2d 975, 980 (D.C. Cir. 1991)).

In promulgating standards, hard and precise predictions from agencies regarding feasibility are not required. The "arbitrary and capricious test" is usually applied to judicial review of rules issued in accordance with the Administrative Procedure Act. See *American Mining Congress* v. *Secretary of Labor*, 671 F.2d 1251, 1254–55 (10th Cir. 1982) (applying the arbitrary and capricious standard of review to MSHA rulemaking challenges). The legislative history of the Mine Act further indicates that Congress explicitly intended that the "arbitrary and capricious test" be applied to judicial review of mandatory MSHA standards. "This test would require the reviewing court to scrutinize the Secretary's action to determine whether it was rational in light of the evidence before him and reasonably related to the law's purposes." S. Rep. No. 95–181, 95th Cong., 1st Sess. 21 (1977). In achieving the Congressional intent of feasibility under the Mine Act, MSHA may also consider reasonable time periods of implementation. *Id.* at 21.

Feasibility determinations involve complex judgments about science and technology. Therefore, in analyzing feasibility, an agency is not required to provide detailed solutions to every problem. Rather, it is sufficient that the agency provides "plausible reasons for its belief that the industry will be able to solve those problems in the time remaining." *Kennecott Greens Creek*, 476 F.3d at 957 (quoting *National Petrochemical & Refiners Ass'n* v. *EPA*, 287 F.3d 1130, 1136 (D.C. Cir. 2002)). MSHA's feasibility determinations in this rulemaking are buttressed by its statistical findings that many mines are already in compliance with the requirements of the final rule. *See Kennecott Greens Creek*, 476 F.3d at 959; *American Iron & Steel Institute* v. *OSHA (AISI–II)*, 939 F.2d 975, 980 (D.C. Cir. 1991). The fact that "a few isolated operations within an industry will not be able to comply with the standard does not undermine a showing that the standard is generally feasible." 476 F.3d at 957 (quoting AISI–II, 939 F.2d at 980).

Finally, MSHA has authority to promulgate technology-forcing rules. When a statute is technology-forcing, the agency "can impose a standard which only the most technologically advanced plants in an industry have been able to achieve-even if only in some of their operations some of the time." *Kennecott Greens Creek*, 476 F.3d at 957 (citing *United Steelworkers of America* v. *Secretary of Labor*, 647 F.2d 1189, 1264 (D.C. Cir. 1980) and quoting *AISI* v. *OSHA*, 577 F.2d 825, 832–35 (3d Cir. 1978)).

Economic feasibility presents different issues from that of technological feasibility. In the OSHA Cotton Dust case, the Supreme Court stated that a standard would not be considered economically feasible if an entire industry's competitive structure was threatened. According to the Court, the appropriate inquiry into a standard's economic feasibility is whether the standard is capable of being achieved. 452 U.S. at 508–509. To establish economic feasibility, MSHA is not required to produce hard and precise estimates of cost. Rather, MSHA must provide a reasonable assessment of the likely range of costs of its standard, and the likely effects of those costs on the industry. See *United Steelworkers of America* v. *Secretary of Labor*, 647 F.2d at 1264. The courts have further observed that granting companies reasonable time to comply with new exposure limits may enhance economic feasibility. *Id.* at 1264.

MSHA evaluated the technological and economic feasibility of meeting the requirements of the final rule. The technological feasibility of the final rule includes two determinations. MSHA determined that it is feasible to use the continuous personal dust monitor (CPDM) as a compliance device to sample coal miners' exposures to respirable coal mine dust. MSHA also determined that it is feasible for operators to achieve the 1.5 mg/m³ standard (0.5 mg/m³ for intake air and part 90 miners) using existing and available engineering controls and work practices. The final rule provides a reasonable amount of time of 18 months after the effective date of the final rule to implement the requirements concerning the use of CPDMs. It also provides a reasonable amount of time of 24 months after the effective date of the final rule to implement the standards. In addition, MSHA determined that the final rule is economically feasible.

2. Technological Feasibility of Using the CPDM as a Compliance Device To Sample Coal Miners' Exposures

This preamble discusses the development of the CPDM over the last 20 years. Development began in the 1990s following a 1992 report issued by MSHA's Coal Mine Respirable Dust Task Group (Task Group) and the 1996 Dust Advisory Committee Report in which both recommended the development of continuous personal dust monitor technology for use in underground coal mines. Prototypes were developed prior to the proposed Plan Verification rulemaking in the mid-2000s. The pre-commercial CPDM is the specific prototype that NIOSH and MSHA, along with input from the mining industry, decided to complete and test in 2006. The commercial CPDM was made available after MSHA's intrinsic safety approval of the pre-commercial CPDM in September 2008 and subsequent NIOSH approval in September 2011 following promulgation of revisions to 30 CFR part 74. Discussion on the development and testing of this technology is summarized below along with comments on the proposed rule.

a. Background Information on the Coal Mine Dust Personal Sampler Unit (CMDPSU) and Continuous Personal Dust Monitors (CPDM)

Since the 1970s, mine operators and MSHA inspectors have used the approved coal mine dust personal sampler unit (CMDPSU) to determine the concentration of respirable dust in coal mine atmospheres. The CMDPSU, which consists of a battery-powered pump unit, a cyclone (a type of particle-size selector) and filter assembly, is either worn or carried by the miner and, under MSHA's existing standards, remains operational during the entire shift or for 8 hours, whichever time is

24860    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

less. The CMDPSU samples the mine atmosphere by drawing dust-laden mine air, at a flow rate of 2 liters per minute (L/min) through a 10-mm nylon cyclone that removes non-respirable dust particles from the airstream, allowing respirable dust particles to be deposited on the filter surface. The collection filter is enclosed in an aluminum capsule which is sealed in a protective plastic enclosure, called a cassette, to prevent contamination. After completion of sampling, the filter cassette is capped and sent to MSHA for processing, where it is disassembled to remove the filter capsule for weighing under controlled conditions to determine the amount of dust that was collected on the filter. The measured weight gain is used to determine the average concentration of respirable coal mine dust in the work environment of the affected miners.

Because samples are typically transmitted through the mail to MSHA for processing, results of sampling are often not known to mine operators, miners, and MSHA for at least a week or more. Consequently, if results indicate the presence of excessive dust concentrations, any corrective action taken to lower dust levels would only impact miners' exposure a week or more after sampling has been completed. The ability to continuously monitor and give mine operators and miners real-time feedback on dust concentrations in the work environment has been an MSHA goal for nearly three decades.

MSHA's commitment to advanced sampling technology, specifically technology that measures coal mine dust concentration continuously, is noted in the preamble to 30 CFR part 70 dust rules that became effective in April 1980 (45 FR 23990). In response to comments during that rulemaking regarding the machine-mounting of sampling devices that would give a continuous readout of dust concentrations, the Agency agreed that every effort should be made to advance sampling technology. In addition, MSHA stated that the Agency had embarked on an intensive program to develop a reliable machine-mounted continuous dust monitor. At that time, prototypes of such monitors had been developed and were being tested in several mines. Additionally, MSHA noted that the U.S. Bureau of Mines, now NIOSH, was pursuing research in this area. While found to be useful as an engineering tool to monitor the effectiveness of dust controls, those monitors, which were based on light-scattering technology, proved to be unsuitable for enforcement purposes at that time.

The health benefits of continuous monitoring were recognized by MSHA's Coal Mine Respirable Dust Task Group, established in 1991, and the Dust Advisory Committee. In 1992, the Task Group issued a report that concluded that continuous monitoring of the mine environment and dust control parameters offered the best long-term solution for preventing occupational lung disease among coal miners. It specifically recommended development of monitoring technology capable of providing both short-term as well as full-shift concentration measurements. Similarly, the Dust Advisory Committee unanimously recommended in its report issued in 1996 that continuous personal dust monitoring (CPDM) technology, once verified as reliable, be broadly used by MSHA for assessing operator compliance efforts in controlling miners' dust exposures and for compliance purposes.

In response to the recommendations by the Task Group and Dust Advisory Committee, NIOSH undertook an aggressive research and development program in the 1990s to produce a prototype technology for a new type of personal dust monitor that would provide a direct measurement of respirable coal mine dust levels in the mine atmosphere on a real-time basis, unlike the existing sampling system used since 1970. The new technology would eliminate the delay in obtaining an offsite laboratory analysis which, on average, requires a week or more before the results are known to the mine operator and MSHA. Such technology, which is referred to generically as a "continuous personal dust monitor" (CPDM), would enable a mine operator to be more proactive in taking corrective measures to avoid miners' exposure to excessive respirable coal mine dust levels and in optimizing mining procedures and dust control parameters to continuously maintain respirable coal mine dust concentrations at or below the dust standard.

NIOSH's efforts to advance the technology for directly measuring and displaying the amount of respirable coal mine dust contained in mine air in real-time resulted in the development of a prototype CPDM in 2003. The prototype CPDM represented the first significant advance in respirable coal mine dust sampling technology in more than 30 years. This prototype dust monitor consisted of a respirable dust sampler, a gravimetric analysis device, and an on-board computer that was incorporated into the miner's cap light battery case as a single package located on the belt. The cap light battery case contained all the components, including

two separate batteries, to enable the dust monitor and cap lamp to operate independently. The CPDM was configured to have dimensions and weight similar to those of the current lead-acid type miner's cap lamp battery. Air from a miner's work environment entered the sampling device through an inlet located adjacent to the lens of the cap light on the miner's hard hat and flowed via a flexible tube that ran parallel to the lamp cord to the belt-mounted device. The air stream was first coursed through a size selector, a Higgins-Dewell (HD) cyclone, at a flow rate of 2.2 L/min to separate the non-respirable dust, so that only airborne particles that could penetrate to the lung were analyzed by the device. From there, the air stream flowed through: (1) A heater that removed excess moisture; (2) a 14-mm diameter glass fiber filter; (3) a flow rate sensor; and (4) a computer-controlled pump.

The prototype CPDM employed a unique inertial mass sensor system called the Tapered Element Oscillating Microbalance (TEOM® system). The TEOM system consists of a hollow tapered tube called the tapered element, which is clamped at its base and free to oscillate at its narrow or free end on which an exchangeable filter cartridge is mounted. Electronics positioned around the TEOM system cause the tapered element to oscillate (or resonate) at its natural frequency. When dust particles are deposited on the collection filter, the mass of the collection filter increases, causing the natural oscillating frequency of the tapered element to decrease. Because of the direct relationship between mass and frequency change, the amount of respirable coal mine dust deposited on the filter can be determined by measuring the frequency change. The concentration of respirable coal mine dust in the mine atmosphere was then determined by a computer incorporated in the CPDM prototype. The computer divided the mass of dust collected by the volume of mine air that passed through the monitor during the sampled period. The result was reported on the monitor's digital display. The data were retained for downloading onto any personal computer using accompanying software. To accommodate monitoring over a full shift, the prototype monitor was designed to operate continuously for up to 12 hours. The display on the device continuously showed: (1) The average concentration from the beginning of the shift; (2) the percent of the respirable dust standard that had been reached; and (3) the respirable dust concentration calculated at distinct 30-minute

intervals. Through the display, both the miner wearing the device and the mine operator were aware of the concentration of respirable coal mine dust at any time during the shift. This information could be used to validate whether dust control parameters were working as intended to ensure that miners were not being exposed to excessive dust concentrations.

While the performance of the prototype CPDM to accurately and precisely measure respirable coal mine dust in the mine environment and its durability under in-mine conditions had not been extensively evaluated when MSHA published its proposed Plan Verification rule (68 FR 10784, March 6, 2003), preliminary indications from the limited testing performed by NIOSH suggested that the prototype CPDM had the potential to provide timely information on dust levels. Although MSHA had confidence in this technology, a final determination of the applicability and suitability of CPDMs under conditions of use being proposed was not expected until after completion of the scheduled laboratory and in-mine testing and evaluation at the end of 2003. MSHA recognized that to be accepted by the mining community, the new CPDM must reliably monitor respirable dust concentrations in the mine environment with sufficient accuracy to permit exposures to dust concentrations to be effectively controlled on each shift. As part of the comprehensive dust control program in the proposed Plan Verification rule, MSHA proposed a new standard to permit, but not require, the use of such monitors to encourage the use of CPDM technology.

Public hearings on the proposed Plan Verification rule, together with MSHA's proposed Single Sample rule (68 FR 10940, March 6, 2003), were held in Pennsylvania, West Virginia, Indiana, Kentucky, Alabama, and Colorado in May 2003. Commenters expressed concern that the proposed sampling program did not incorporate the new CPDM technology. After reviewing the favorable performance of the prototype CPDM in initial in-mine tests, MSHA announced in July 2003 and August 2003, respectively, that it would suspend all work to finalize the proposed dust rules published in March 2003, and the proposed single sample rule published in July 2000, to pursue accelerated research on the new CPDM technology being tested by NIOSH. NIOSH research verifying the CPDM technology, as reliable under in-mine conditions, was being conducted. The comment period was extended indefinitely to assemble the best

information available on CPDM technology and its application in coal mines. On successful completion of in-mine performance verification testing of the new technology, MSHA would move forward with a final rule to incorporate new requirements for monitoring exposures that reduce miners' risk of black lung disease.

After enlisting the collaboration of various stakeholders representing industry and organized labor in the final testing of the pre-commercial CPDM, MSHA and NIOSH purchased 25 units for the collaborative study, which was initially conducted in 10 underground mines. This was followed by extended testing at 4 additional mines. Additional test data were also collected by MSHA at the request of NIOSH at 180 randomly-selected mechanized mining units across 10 MSHA coal districts for the purpose of evaluating the equivalency of the CPDM compared to using the then approved CMDPSU.

In September 2006, NIOSH published the results of the collaborative research effort designed to verify the performance of the pre-commercial CPDM in laboratory and underground coal mine environments. According to the NIOSH Report of Investigations 9669, ''Laboratory and Field Performance of a Continuously Measuring Personal Respirable Dust Monitor,'' (Volkwein et al., NIOSH, 2006), the testing of the pre-commercial CPDM under a broad range of test conditions verified it to be accurate and precise in providing end-of-shift dust concentration information. It also stated that the device was acceptable to miners from an ergonomic standpoint, and when worn by miners during normal work, the device demonstrated durable performance with about a 90% availability rate, which is similar to existing sampling devices. This study demonstrated that the pre-commercial CPDM technology was suitable for use in coal mines to monitor and prevent overexposures to respirable coal mine dust.

In September 2008, the commercial model of the CPDM successfully passed MSHA's intrinsic safety tests permitting the device to be purchased for use in coal mines as an engineering tool.

Based on the results of the collaborative study, MSHA published a Request for Information (RFI) on October 14, 2009 (74 FR 52708) on the feasibility of using the commercial CPDM technology to more effectively monitor and control miners' exposure to respirable coal mine dust during a working shift. Most commenters generally agreed that requiring the use

of a CPDM would enhance the protection of miners' health.

On April 6, 2010 (75 FR 17512), MSHA and NIOSH published a final rule that revised the approval requirements for the CMDPSU and established new performance-based requirements for the CPDM to permit the Secretaries of HHS and Labor to approve dust monitoring devices for use in coal mines based on new designs and technology capable of continuously monitoring and reporting concentrations of respirable coal mine dust during and at the end of a work shift.

On September 6, 2011, NIOSH approved a commercial CPDM as meeting the CPDM requirements of 30 CFR part 74. Sampling devices, such as the CPDM, can be used for compliance purposes only if they meet the specific performance criteria defined in 30 CFR part 74 and have been approved by the Secretaries of Labor and HHS for use as a compliance sampling device. The performance criteria in 30 CFR part 74 establish the requirements for bias, precision, and reliability that must be met for direct-reading devices such as the CPDM. The results of published NIOSH studies demonstrate that the CPDM meets these performance criteria.

The use of an approved CPDM, which affords real-time respirable coal mine dust exposure measurements, will significantly improve health protection for current and future coal miners by reducing their cumulative coal mine dust exposure and reducing their risk of developing and dying from occupational lung diseases. The approved CPDM is demonstrated to be accurate, precise, reliable, and durable under in-mine use conditions, and is commercially available.

The CPDM is capable of being used in a shift mode, in which the device is programmed by certified persons to operate for specific shift lengths (e.g., 8, 10, 12 hours) to monitor a Designated Occupation (DO) or another sampling entity's exposure, or in an engineering mode for short-term evaluations. If the device is operated in an engineering mode, the person would operate it for short periods of time within the shift to record respirable dust levels during specific mining activities or at specific dust-generation sources in the mine. The display has various screens that show the: (1) Time of day; (2) elapsed time since beginning of the shift; (3) total amount of respirable dust accumulated on the filter since the start of sampling, which is stored in an internal memory for analysis; (4) dust concentrations; and (5) a bar graph of the respirable dust concentration during the entire sampling period. On the bar

**24862** **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

graph, each bar represents the average concentration value for each previous 30-minute interval, with a new bar added to the graph every 30 minutes. Also displayed and stored are sampling status conditions that have occurred during sampling. The terminology "sampling status conditions" is explained elsewhere in the preamble related to § 70.210. This, along with other information, is stored in the CPDM and can be accessed and downloaded with a personal computer at the end of the shift for analysis, recordkeeping, and posting.

The final rule, like the proposal, requires mine operators to use an approved CPDM for each shift to sample designated occupations (DOs) and other designated occupations (ODOs) in each MMU and each part 90 miner. In addition, it permits them to use the approved CPDM or CMDPSU to sample designated areas (DAs) and designated work positions (DWPs). However, the proposal would have required all underground coal mine operators to use approved CPDMs 12 months after the effective date of the final rule to sample DOs on each production shift and part 90 miners on each shift, seven calendar days per week (Sunday through Saturday), 52 weeks per year. The final rule differs from the proposed requirements in that mine operators are required to use the CPDM on consecutive production shifts to collect 15 valid representative samples from each DO and ODO and 5 valid representative samples from each part 90 miner every calendar quarter. In addition, the final rule permits operators of underground anthracite mines to continue to use the approved CMDPSU after the 18-month period. Specific details regarding the change in the period from the proposed 12 months to 18 months after the effective date of the final rule, the option to use CMDPSUs in underground anthracite mines instead of CPDMs, and the reduction in the CPDM sampling frequency, are discussed elsewhere in this preamble under final §§ 70.201, 70.208, 90.201, and 90.207.

b. Technological Feasibility Determination on the Use of the CPDM

MSHA concluded in the Preliminary Regulatory Economic Analysis to the proposed rule (PREA) that requiring the use of the CPDM to sample miner exposures to respirable coal mine dust was technologically feasible. NIOSH, through an informal partnership with MSHA, industry, and organized labor, conducted extensive testing of the CPDM in a variety of underground coal mines.[55] The in-mine testing verified the new sampling device to be accurate and reliable, ergonomically acceptable to miners, and sufficiently durable to withstand the rigors of the underground environment. This testing demonstrated that the CPDM is suitable for use in coal mines to monitor and prevent overexposure to respirable coal mine dust (Volkwein et al., 2004, NIOSH RI 9663; Volkwein et al., 2006, NIOSH RI 9669).

In the PREA, MSHA stated that the CPDM is a new technology and that there are only a few hundred of these devices currently in use. However, MSHA determined that the proposed 12–18 month phase-in period would allow sufficient time to manufacture the necessary quantity of CPDMs. It would also provide sufficient time for operators to conduct training on the use and care of the device.

Many commenters expressed support for using the CPDM as an engineering tool to identify dust sources and reduce dust exposure during a miner's work shift. Some of the commenters were opposed to using it for compliance purposes. Some commenters suggested that MSHA conduct a data-gathering study along with NIOSH and other interested parties using both the gravimetric and CPDM before requiring use of the CPDM. Other commenters suggested that MSHA delay requiring the use of the CPDM until further field testing in coal mines is conducted to address technical concerns about the readiness of the CPDM, its measurement accuracy, and its reliability for long-term use in coal mines. These commenters also suggested that ergonomic improvements be incorporated into the CPDM design to make it more worker-friendly since they believe its weight would cause serious harm to the musculoskeletal system of the miner.

Specifically, some commenters cited results of coal mine operator field testing involving side-by-side sampling in underground mines using the approved CMDPSU and the commercial CPDM. These commenters stated that the sampling results varied greatly and demonstrated that additional development of, and improvement on, the CPDM is needed to provide accurate results in underground mine environments. These commenters also claimed that their independent testing of the CPDM found the devices to be unreliable in typical underground

conditions. When tested under the same environmental conditions, the commenters stated that multiple CPDMs reported a wide range of airborne dust concentrations, particularly when operating in elevated temperatures and humidity levels. For example, one commenter stated that only 554 of the 955 (58%) concentrations measured with the CPDM were within 25% of the concentrations measured with the CMDPSU. This commenter concluded that, since the NIOSH definition of accuracy is that the sampling device be accurate to within 25% of the actual concentration 95% of the time, the CPDM does not meet the NIOSH accuracy definition.

NIOSH reviewed the commenters' data regarding the sampling performance of the CPDM. In its comments on the proposed rule, NIOSH stated that it questioned the commenters' interpretation of the data for three reasons.

The analytical methodology used by the commenters was inappropriate for the conditions to which it was applied; several of the commenters inappropriately referred to their data by using a scientific term that could be interpreted in different ways; and none of the commenters' data included statistically representative samples that fully reflect the conditions observed nationwide in underground coal mines.

Regarding the comments that the CPDM did not meet the NIOSH Accuracy Criterion (Kennedy et al., 1995), NIOSH commented that this criterion is designed primarily this criterion is designed primarily for evaluating the accuracy of a sampling and analytical method under controlled laboratory conditions. Although the NIOSH Accuracy Criterion does not require field testing, it recognizes that field testing "does provide further test of the method." However, in order to provide a valid basis for assessing accuracy and avoid confusing real differences in dust concentrations with measurement errors when testing is done in the field, precautions have to be taken to ensure that all samplers are exposed to the same concentrations. If not carried out correctly, field testing yields invalid comparisons and erroneous accuracy conclusions as it did in the commenters' limited field study.

In addition, NIOSH stated that the commenters did not properly define the term "accuracy" in their analysis. "Accuracy" is defined by referencing two statistically independent and fundamental parameters known as "precision" and "bias." Precision refers to consistency or repeatability of results, while bias refers to a systematic error

---

[55] Section 501(a)(1) of the Mine Act, 30 U.S.C. 951(a)(1), provides that NIOSH shall conduct studies and research to improve working conditions and prevent occupational diseases in the coal mining industry.

that is present in every measurement. Since the NIOSH Accuracy Criterion requires that measurements consistently fall within a specified percentage of the concentration, the criterion covers both precision and uncorrectable bias. NIOSH's experimental design was developed such that the precision and bias of the CPDM could be estimated by regression analysis of data obtained in field environments. Regression analysis is a statistical methodology that uses the relationship between two or more quantitative variables so that one variable can be predicted from the other, or others. The CPDM performance was then compared to the defined and accepted reference standard within the mining industry, which is the gravimetric CMDPSU.

In its comment, NIOSH stated that when evaluating the performance of the CPDM, it collected and analyzed samples that were statistically representative of the nation's underground coal mining industry. The sample set was selected using the Survey Select procedures from the SAS statistical analysis software package. The samples were collected by MSHA inspectors at approximately 20 percent of active mechanized mining units. Statistically representative samples are critical for correctly estimating the bias of the CPDM relative to the gravimetric method of the CMDPSU. Bias may not be properly estimated from studies conducted in a limited number of mines or regions, regardless of the number of samples obtained. The methodology used by NIOSH to collect data was reviewed and approved by various members of the mining community.

In addition, NIOSH noted that none of the commenters' data sets were statistically representative of the entire underground coal mining industry. The largest data set MSHA received came from a commenter who collected 955 samples from 6 of its mines by having miners wear a CPDM and a CMDPSU (gravimetric sampler) concurrently. Unlike the commenter's data, NIOSH data were collected from over 100 mines. Therefore, the NIOSH data set is more representative of the underground mining environment and is more appropriate for evaluating the accuracy and precision of the CPDM and its use as a compliance instrument.

In terms of bias, NIOSH reviewed the results presented by the commenter and concluded that the results support those published by NIOSH. They show that the average concentration measured by the CMDPSU, 0.83 mg/m³, was virtually identical to the CPDM average value of 0.82 mg/m³. NIOSH further concluded, from reviewing both the

commenter's and NIOSH's data sets, that there was no statistically significant difference between the data sets, and that the bias between the CPDM and the approved CMDPSU is zero. In so concluding, NIOSH noted that, to be strictly correct, dust concentration data are lognormally distributed and, therefore, a simple arithmetic average cannot be calculated from these data. The appropriate method is to average the logarithms of the numbers, followed by un-transformation of the logarithmic averages. This method yields average concentrations that are typically lower than simple arithmetic averages. However, the relative difference between the averages will remain the same in either case.

Regarding the comment that the CPDM variability was too large for it to be used as a compliance instrument, NIOSH commented that there will be no imprecision or variability in the regression if there is total control of all parameters in any given test. In addition, imprecision in a regression is a direct estimate of the degree to which there are unknown and uncontrolled parameters at work during the test. The variability reported by the commenter was primarily due to large sample variability, which was due to uncontrolled variables known to exist in field samples, even when two identical samplers were placed side-by-side. Because the commenter's experimental design did not control for the variability resulting from the samplers themselves, it was not an appropriate estimate of the CPDM's precision. Instead, the data introduced by the commenter included uncontrolled variability potentially caused by significant dust gradients known to exist, sampler inlet location differences, and the nature of mine ventilation. Ventilation currents found in mines can produce widely varying results or seemingly poor precision between two identical side-by-side instruments, even though their inlets may be separated by only a few inches. To correctly estimate the precision of the CPDM, an experimental design must minimize the uncontrolled variables in the sampling. Here, the commenter's data and analysis were based on a flawed experimental design and analysis.

In addition, spatial variability, or the differences in concentration related to location, while sometimes substantial, does not contribute to measurement error. As stated in § 72.800 of this preamble regarding a single, full-shift measurement of respirable coal mine dust, the measurement objective is to accurately measure average atmospheric conditions, or concentration of

respirable dust, at a sampling location over a single shift. The average respirable coal mine dust concentration on a specific shift is being measured at the sampling location.

NIOSH has conducted the necessary scientific studies with approved methods and the results were published in a peer-reviewed document. Through years of work, NIOSH has demonstrated that the CPDM is an accurate instrument that meets the NIOSH Accuracy Criterion and, therefore, can be used as a compliance instrument. (Volkwein et al., NIOSH RI 9669, 2006). The recent NIOSH approval of the commercial CPDM, under 30 CFR part 74, further demonstrates that the CPDM is an accurate compliance sampling device for determining the concentration of respirable dust in coal mine atmospheres.

Some commenters expressed concerns regarding the reliability of the CPDM for long-term compliance use in mines based on their experience using the device. These commenters cited on-site voiding characterized in comments as reported instantaneous errors of samples as a persistent problem. They also stated that 35 to 80 percent of the units in use were returned for service and that the repair time was lengthy. One commenter stated that of the 40 CPDMs purchased, 14 units, or 35 percent, were returned to the manufacturer for repair over a 10-month period, while 5 of the units were returned for repair multiple times, suggesting the devices were less than mine-ready. According to this commenter, 20 percent of the 1,000 samples collected indicated that an error had occurred during sampling and over 6 percent indicated multiple errors. In addition, the analysis encountered numerous diagnostic failures with the CPDM units. Another commenter reported similar equipment and diagnostic issues, as well as failures when exposed to certain radio frequencies. According to this commenter, the failures were not reported by the CPDM and, as a result, may have produced false concentration measurements.

According to NIOSH's comment, these commenters relied on the analysis of data collected by the CPDM at multiple mines without an appropriate experimental protocol to control for data quality. Given that these commenters did not control critical variables like the level of operator training, sampling methodology, and sample size and distribution across mines, the data generated do not provide an appropriate estimate of the CPDM's reliability. In addition, these commenters misunderstood the CPDM error

**24864**    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

messages received during their testing, believing that the messages indicated failure of the CPDM. The CPDM, as currently programmed, monitors its performance during sampling and registers any status conditions (errors) logged during the sample run. These messages are not indicative of a failure of the CPDM, rather they provide the user with valuable constructive feedback in real-time concerning sample validity. The frequency and type of these error messages are logged during sample collection. They will be used by MSHA to determine whether samples are valid or should be voided.

In its comment, NIOSH has identified several parameters currently being used as validation criteria. These are based on the existing list of sample validation criteria for the CMDPSU developed over time. Based on MSHA's previous experience, defining the final validation criteria requires routine use of the approved CPDM as a compliance instrument. Given the limited data set, including error messages, from only five mines cited by the commenters as evidence of CPDM failure, both NIOSH and MSHA consider the cited failure rate of 41 errors per 1,000 hours to be invalid. The NIOSH published data remains the most appropriate data set to assess the failure rate of the CPDM.

In addition to proper interpretation of the error messages, NIOSH commented that it used an experimental design in their study that controlled critical variables needed to ensure the quality of data collected. Two factors related to reliability were evaluated, critical repairs and remedial repairs. Critical repairs were considered those that required factory service while remedial repairs were those capable of being performed in the field. Using this experimental design, the critical repair rate of the pre-commercial devices was calculated to be 1.24 repairs per 1,000 hours, with a total rate of 4.75 repairs per 1,000 hours. These repair rates are an order of magnitude less than the failure rates suggested by some commenters due to their inappropriate analysis of the CPDM's error messages as described above. Furthermore, repair rates are expected to improve in general due to the quality control systems required for certification by 30 CFR part 74.

As of June 2011, the CPDM's manufacturer had reported improvements in repair rates. According to this manufacturer, 77 different units, representing 28.8 percent of the total units shipped, were returned a total of 115 times for repair in the previous two years. Repair rates decreased, quarter over quarter, after the first six to eight

months of shipments due to process improvements. Also, repair turnaround times, which averaged 26 days per repair the first year following the product launch in May 2009, averaged 15.1 days between July 2010 and June 2011. The average turnaround time in 2011 was 4.7 days. Reliability of the CPDM has improved based on these data, the increasing population of CPDMs in the field, and the reduction in the number of units being returned for servicing, and the actions taken by the manufacturer to address reported field performance.

Some commenters expressed concerns about the CPDM operating reliably, when used in underground mining environments that have elevated temperatures and humidity levels, under certain laboratory conditions, and when exposed to certain radio frequency signals or electromagnetic interference (EMI). These commenters provided supplemental information and analysis of laboratory testing indicating that the CPDM does not respond reliably under all controlled conditions like those that can be encountered in an underground coal mine.

As discussed earlier, the CPDM was initially tested in 10 mines and then further tested in 4 other mines that included a variety of coal types, equipment types, and mining methods, operating conditions, geographic locations, and seam heights. Consequently, the CPDM was subjected to the typical temperature and humidity conditions normally encountered at an underground coal mine. Additionally, sampling packages that included one CPDM and two CMDPSUs were exposed to the full range of environmental conditions encountered at over 100 mines, a good representation of the entire underground mining sector. To be approved under 30 CFR part 74, the CPDM must operate reliably and accurately at any ambient temperature and varying temperatures ranging from −30 °C to + 40 °C; at any atmospheric pressure from 700 to 1,000 millibars; at any ambient humidity from 10% to 100% RH; while exposed to water mists generated for dust suppression; and while monitoring atmospheres including such water mists which is common at longwall mining operations. The differences resulting from temperature and humidity testing reported by a commenter are below the minimum detection limit of the commercial CPDM, which is 0.2 mg/m³. Therefore, the commenter's conclusions, which are based on these test results, are inaccurate. In addition, the CPDM has a user-selected temperature operating range to optimize

performance. The commenter's test procedures did not specify the selected operating range and did not indicate that this range was modified for different temperature ranges.

In addition, the commenter's laboratory testing involved a settling dust test under controlled conditions, which included the application of an outdated U.S. Department of Defense, Military Standard MIL–STD–810F, Method 510.4, Procedure III (January 1, 2000). This laboratory testing was not designed to evaluate the accuracy and precision of airborne dust sampling instruments. Therefore, the accuracy and precision conclusions are inaccurate. The conclusions are also inaccurate because the testing involved talc as a surrogate for respirable coal mine dust. Talc has a size distribution ranging from 0.8 to 1.3 μm and is not representative of respirable coal mine dust, which has a size distribution of 10 μm or less. Furthermore, because the dust chamber did not establish a uniform distribution of respirable dust within the chamber, the reported differences between the CPDMs and between the CPDMs and the CMDPSU would be expected. Since only one CMDPSU was used during testing, an estimate of sampler variability could not be obtained. Lastly, only 7 tests were completed and each test was of limited duration. As a result, the dust settling chamber results submitted by the commenter are flawed and not representative of the actual underground coal mining environment.

Some commenters stated that pre-programming of temperature range selection is difficult in areas such as Alabama which has unseasonable weather. These commenters also stated that high temperature or high humidity causes higher CPDM readings and that the 2006 NIOSH study did not discuss the effect of high temperatures or high humidity.

Certified persons pre-program the CPDMs with environmental conditions that the units are expected to be exposed to on the sampled shift. Temperature and humidity in underground coal mines are fairly uniform and stable and there is little variability experienced on a daily basis. Even when there are seasonal changes, the operators know the temperature and humidity ranges that apply to their mines; the values used to program the CPDMs need to be reasonable but not exact.

Regarding concern expressed about the reliability of the CPDM when exposed to certain radio frequency (RF) signals or electromagnetic interference (EMI), the commercial CPDM meets the

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations **24865**

electromagnetic interference requirements of 30 CFR part 74. In addition, MSHA and NIOSH intend to modify 30 CFR part 74 to incorporate approval requirements on electro-static discharge and radiated RF susceptibility. The CPDM manufacturer has redesigned and incorporated changes to the commercial CPDM to ensure that it passes electro-static discharge and radiated RF tests before the CPDM is required to be used for compliance sampling. Testing by an independent lab will provide verification. These changes should eliminate the commenter's concerns.

Some commenters stated that CPDM calibration is too complex and difficult and operators will need to have two units ready for each person to be sampled in case a unit does not properly calibrate.

CPDMs are calibrated by certified persons approximately one to two times per year depending on the number of hours the unit has operated. In the event that a unit were to fail the pre-operational check during the pre-shift warm-up period, the operator would either use another CPDM for sampling, or notify the District Manager orally and in writing that sampling will not occur because a CPDM is not available.

Some commenters stated that the CPDM is not designed to perform in the wet, foggy, and misty atmosphere on the longwall face. They also stated that wetting of the dust inlet due to rain or roof sweats, water head bolters, shearers and jacksetters, and shoveling under the belt will prevent accurate measurement of respirable dust.

The CPDM is designed to perform in such mining environments and uses the cyclone and heating element to prevent moisture affecting the CPDM's determination of respirable dust concentration. This was one of the parameters considered when NIOSH tested the CPDM in underground mine environments, such as at the longwall face, for part 74 approval. The CPDM was found to produce accurate results in accordance with NIOSH's Accuracy Criterion.

One commenter stated that the CPDM collects different dust particle size than the CMDPSU making it inconsistent with prior definitions of hazardous respirable dust that supports the underlying risk and benefit research.

The CPDM and CMDPSU collect essentially the same dust particle size distribution, with the CPDM almost matching the CMDPSU. This is illustrated by the low 1.05 constant factor used by the manufacturer for programming the CPDM to automatically provide an MRE-equivalent concentration, compared with the 1.38 constant factor used for the CMDPSU. Both samplers are designed with the same type of cut points with each sampler using a different cyclone. Each sampler also runs at a different flowrate, which makes the cyclones behave similarly, resulting in the CPDM and CMDPSU capturing almost identical dust particle sizes. This was also a consideration when NIOSH tested the CPDM for part 74 approval.

Some commenters stated that there is no blank cassette analysis to protect against the known deficiencies in the filter system that cause false weight gains.

For a CPDM, there is no need to pre-weigh a filter or to perform a blank cassette analysis to check the filter. During the unit's 30-minute warm-up period, the device zeroes the filter to set a baseline at the beginning of the shift. Anything on the filter or any deficiency in the filter is eliminated as a potential false weight gain. The CPDM then registers any net change in weight of the filter during the shift to correlate the change to a respirable dust concentration measurement.

Some commenters stated that repeated, current lab quality control procedures, audits and checks to help reduce error are not employed for the CPDM. One commenter stated, for example, that lab examinations to determine sample discoloration or evidence of rock dust or other contaminants are eliminated, increasing the probability of inaccurate exposure assessments. Other commenters stated that MSHA currently employs procedures in the sample analytical lab to prevent contamination-induced false results, such as "oversized," nonrespirable particles or sample contamination from other sources. These commenters expressed concern that such protections will no longer be available if the CPDMs are adopted as a compliance mechanism. The commenters stated that CPDMs use an electronic vibration measurement to determine sample weight and the collection filters are not examined by any laboratory for reasons that void large numbers of current samples.

There are no such laboratory examination procedures because the CPDM filters will not be sent to laboratories. The CPDM recognizes when contamination is entering the system (e.g., when water enters the unit, or the unit is overloaded when dropped into a dust powder) and then triggers sampling status condition codes (referred to as error codes in the proposed rule). MSHA's experience is that a relatively small number of samples are voided for contamination or oversize particles. The most common reason that samples are voided is for excess samples that are sent by the operator. For example, of the 41,701 operator CMDPSU samples submitted to MSHA in 2009, approximately 15.6% were voided. Of those voided samples, approximately 5.48% were voided for submission of excess samples, 0.11% for oversize particles, and 0.50% for contaminated samples (U.S. Department of Labor, MSHA, 2012a).

Some commenters stated that, based on limited experimentation, a new but suspect conversion factor (1.05 CPDM vs. 1.38 CMPDSU) is used to relate CPDM results to the British MRE sampler on which U.S. health-based dust risks, benefits, and limits were based.

As noted in the preamble to the proposed rule, NIOSH researchers (Page et al., 2008) determined that measurements of respirable dust concentrations using the CPDM and CMDPSU are comparable. The MRE was used as the basis for the existing coal mine respirable dust standards and had been designed specifically to match the United Kingdom British Medical Research Council (BMRC) criterion. The CMDPSU is used with a 1.38 multiplier to convert readings to the BMRC criterion.

In order to compare CPDM measurements with those of the CMDPSU, NIOSH conducted field research. Researchers used a stratified random sampling design that incorporated a proportionate allocation strategy to select a sample of MMUs representative of all U.S. underground coal mines. A sample of 180 MMUs was chosen, representing approximately 20% of the MMUs in production at the time the sample was selected (September 2004). Dust concentrations were monitored concurrently by both CMDPSUs and CPDMs for a full shift. A total of 129 valid CPDM/CMDPSU dust sample sets were obtained. A weighted linear regression analysis of this database shows that, in comparison with the CMDPSU, the CPDM requires a mass equivalency conversion multiplier of 1.05 [95% Confidence Interval (1.03 to 1.08)] to produce a concentration that is an MRE-equivalent concentration similar to the CMDPSU. This research shows that the two types of sampling units are very comparable due to this linear relationship.

One commenter stated that the CPDM does not distinguish between coal dust, rock dust, or any other dust that may be in the air.

**24866** **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

No approved sampling device distinguishes between types of respirable dust measured at coal mines. The respirable dust standards in Parts 70, 71, and 90 are environmental standards that apply to respirable coal mine dust in the mine atmosphere. Any respirable dust in the mine atmosphere is considered respirable coal mine dust to which miners are exposed and, when measured, is counted for determining compliance with the respirable dust standards.

Some commenters stated that requiring miners to frequently read the CPDM monitor is a safety concern because it distracts miners while doing their job. One commenter noted that use of the CPDM interfered with shuttle car operator's running of the shuttle car.

MSHA recognizes that anything new has the potential to attract attention. However, it is the certified person, not the miner, who is required under final § 70.205(c) to monitor the dust concentration being reported by the device at mid-shift or more frequently as specified in the operator's approved mine ventilation plan. Under final § 70.201(h), miners will be provided training on the various types of information displayed on the CPDM screen. At that time, operators can stress that miners should only make such observations when it is safe to do so.

Some commenters pointed to studies that show that carrying a load can result in both physiological and biomechanical changes, discomfort, higher rates of musculoskeletal disorders (MSDs) and increased risk of falls. For example, a NIOSH study, Information Circular (IC) 9501-Miners' Views about Personal Dust Monitors (Peters et al., 2008), provided limited insight into ergonomic issues associated with wearing a CPDM. Commenters noted that the NIOSH study followed a previous model, which found that perceived negative features or barriers could affect an individual's actions regarding the use of the CPDM to assess and reduce his or her dust exposures. Commenters stated that, for the NIOSH report, 30 miners were interviewed and that some miners reported issues with sitting in equipment due to the limited space in operator compartments and with the CPDM getting bumped when working in confined areas. In addition, some miners said when the CPDM was attached to the belt with no clips, it sometimes falls off the belt, and when pouches were provided to hold the CPDM, sometimes there was not enough room on the belt for the pouch because of the other pouches already on the belt. Commenters noted that 11 miners who had worn the CPDM responded to a

questionnaire and that 82 percent had problems that included discomfort, weight issues, difficulty wearing it on the miner's belt, being in the way when interfacing with equipment, and many errors occurring.

The 2008 NIOSH study (Peters et al., 2008) cited by commenters was based on a pre-commercial model of the CPDM. Since that time, the manufacturer has improved the unit's design, incorporating a better means of attaching the unit to the miner's belt and providing a shorter cap lamp cord. These improvements allow better positioning of the CPDM on the miner. NIOSH evaluated the commercial CPDM model and, in September 2011, determined that it met the CPDM approval requirements of 30 CFR part 74, which include that the CPDM be designed and constructed so that miners can wear and operate the CPDM without impeding their ability to perform their work safely and effectively.

In addition, many commenters expressed concern about the weight of the CPDM and the size and stiffness of the sampling hose and light cord assembly. Some commenters stated that requiring miners to wear the CPDM, many of whom have become accustomed to wearing the smaller and lighter cap light compared to the lead acid battery, will suffer serious musculoskeletal disorders, which have been on a decline.

MSHA notes that under the final rule, miners will wear the CPDM less since the frequency of required sampling is significantly reduced from the proposal, which would have required 24/7 sampling of the DO and the part 90 miner. This is discussed elsewhere in the preamble under final §§ 70.201, 70.208, and 90.207.

Also, NIOSH commented that when the configuration of the CPDM was conceived in 1999 at the urging of the mining community, miners typically wore both a self-contained self-rescuer (SCSR) on their mining belt and a battery to power their cap lamp. Integrating the CPDM with the cap lamp battery reflected the available technology at that time. The current CPDM integrates the dust sampler and cap lamp battery, with a total weight that is within 8 ounces of the traditional lead acid cap lamp battery alone, a power source that is still in use.

According to an MSHA survey of 418 coal mines in October 2010, which was completed after publication of the proposed rule, 47 percent of the cap lamps in use were being powered by lead-acid batteries. In its comment, NIOSH noted that traditional lead acid cap lamp batteries weigh over 5 pounds.

The total relative increase in the weight of the miner's belt is low given that only 8 ounces is added by combining the CPDM with the cap lamp battery. Not only is the marginal weight change of the miner's ensemble an important factor regarding biomechanical loading, but the resultant weight distribution characteristics (especially height and anterior-posterior of center of mass) are important with respect to balance issues. Studies, by Lin et al. (1996) and Dempsey et al. (1996), show that user preferences and biomechanics of different loading configurations are complex but, the least problematic configuration was the placement of two symmetric loads below hip level with two shoulder straps and a waist belt. Although this configuration used criss-crossed straps, it was otherwise similar to a typical miner's belt configuration. A miner's belt may be more effective at reducing shoulder loads because it transfers the load to the hips, which reduces the risk of injury to the shoulders and back.

Commenters suggested that, because recent advances in cap lamp technology have reduced the size and weight of the battery, the CPDM should not be used as a compliance instrument until it accommodates this new technology. Other commenters suggested separating the dust sampler from the cap lamp. Ultimately, the existing design of the CPDM may be modified to accommodate the change in cap lamp technology. The CPDM manufacturer has reported plans to improve the ergonomic design of the unit. Changes include a shorter cap lamp cord to minimize tangling, especially in low coal; removal of the cap lamp due to recent approvals of wireless cap lamps; and possible reduction in weight.

Some commenters stated that the CPDM should not be required until it can measure silica exposures.

Neither the CMDPSU nor the CPDM is able to measure quartz in respirable coal mine dust samples. MSHA will continue to collect respirable dust samples to analyze for quartz to establish applicable respirable dust standards and limit miners' quartz exposure. Also, as discussed elsewhere in the preamble related to § 70.101, the final rule does not change the existing respirable dust standard when quartz is present.

Some commenters expressed concern that there is only one CPDM manufacturer and, therefore, requiring use of the CPDM results in guaranteed sales regardless of price, performance, or quality of service, and there will be little incentive for the manufacturer to address issues limited to a small

segment of customers. Based on its experience with the CPDM manufacturer, MSHA does not anticipate the concerns expressed by the commenters. The Agency anticipates a continuation of the same high level of cooperation that the manufacturer of the CPDM has shown to date.

Some commenters stated that there should be a 24-month interim period before a new standard becomes effective. The commenters suggested that during this period the gravimetric sampler should be used while a joint labor, industry, MSHA, and NIOSH committee consider problems that may arise as the CPDM and new standards are integrated into underground mining. As the mining industry knows, MSHA and NIOSH jointly approved the CPDM for use in underground coal mines, and determined that the device was accurate, precise, reliable, and durable under in-mine conditions. MSHA intends on taking the lead in conducting a retrospective study beginning February 1, 2017. MSHA also intends to evaluate the data collected using CPDMs to determine whether (1) the 1.5 mg/m³ respirable dust standard should be lowered to protect miners' health; (2) the frequency of CPDM sampling should be increased; (3) engineering controls and work practices used by mine operators achieve and maintain the required respirable coal mine dust levels; and (4) samples taken on shifts longer than 8 hours should be converted to an 8-hour equivalent concentration to protect miners who work longer shifts. Using the results of this study, MSHA intends to identify best practices that can be shared with the mining community. Under the Department's Plan for Retrospective Analysis of Existing Rules, MSHA intends to consult with industry, labor, NIOSH, and other stakeholders to determine how these best practices can be replicated throughout mines to achieve similar results.

This retrospective study will be conducted in accordance with the Department of Labor's Plan for Retrospective Analysis of Existing Rules which complies with Executive Order (E.O.) 13563 ''Improving Regulation and Regulatory Review'' (76 FR 3821). E.O. 13563 requires agencies to—

develop and submit to the Office of Information and Regulatory Affairs a preliminary plan, consistent with law and its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified, streamlined, expanded, or repealed so as to make the agency's regulatory program more effective or less burdensome in achieving the regulatory objectives. [76 FR 3822]

The Department of Labor's Plan for Retrospective Regulatory Review—

is designed to create a framework for the schedule and method for reviewing its significant rules and determining whether they are obsolete, unnecessary, unjustified, excessively burdensome, counterproductive or duplicative of other Federal regulations.

Sections 70.201 and 90.201 of the final rule provide that operators must use CPDMs 18 months after the effective date of the rule. In the event of any logistical or feasibility issues involving the availability of the CPDM, MSHA will publish a notice in the **Federal Register** to continue to use an approved CMDPSU to conduct sampling. In addition, assuming no technological issues arise concerning the use and manufacture of CPDMs, and depending on manufacturer projections, if CPDMs are not available in sufficient quantities, MSHA will accept, as good faith evidence of compliance with the final rule, a valid, bona fide, written purchase order with a firm delivery date for the CPDMs.

3. Technological Feasibility of Achieving the Required Dust Standards

MSHA concluded, in the PREA, that compliance with the respirable dust standards in the proposed rule was feasible on each shift because the sampling data indicated that mine operators are keeping miners' average exposures at or below the levels required under the existing standards, and dust exposures at most operations average less than the proposed standards of 1.0 mg/m³ for underground and surface coal mines, and 0.5 mg/m³ for part 90 miners and intake air. MSHA acknowledged, however, that some of the proposed requirements regarding the use of single full-shift samples to determine noncompliance on each shift and changes to the definition of normal production shift would result in higher exposure measurements when compared to the existing sampling program. MSHA concluded that existing engineering controls including ventilation, water sprays and environmentally controlled cabs along with changes in work practices can be used to further reduce dust levels. Engineering controls are the primary means used to control respirable coal mine dust exposures. Work practices may be used to further reduce dust levels. In addition, MSHA acknowledged that in rare instances, some operators, after taking these actions, may encounter implementation issues as they attempt to comply with the proposed requirements and need to take additional measures to comply with the proposed standards. To allow mine operators adequate time to comply with the proposed respirable dust standards, MSHA included a two-year phase-in period for the 1.0 mg/m³ proposed standard for underground and surface coal mines, and a six-month phase-in period for the 0.5 mg/m³ proposed standard for part 90 miners and intake air.

Many commenters expressed concern with complying with the proposed 1.0 mg/m³ standard for underground and surface coal mines on each shift. They stated that they have incorporated all available engineering and administrative dust controls and that they cannot lower respirable dust levels any lower than the existing 2.0 mg/m³ standard. In addition, several commenters stated that MSHA incorrectly assessed the feasibility of the proposed 1.0 mg/m³ standard for underground coal mines. These commenters stated that the vast majority of operators cannot meet the proposed 1.0 mg/m³ standard on a single shift sampling basis at any single mine over any substantial period of time. They stated that operators may be able to meet the proposed standard some of the time, but will not be able to meet the proposed standard all of the time, as would have been required by the proposed rule. Other commenters stated their calculations showed that, as opposed to less than 200 citations per year for violations of the current 2.0 mg/m³ standard, a 1.0 mg/m³ standard based on a single, full-shift measurement could result in more than 230,000 citations annually. In addition, some commenters stated that each violation would require abatement, a penalty, and mine plan amendments, and would likely result in mine interruptions until plan approvals can be obtained and abatement accomplished. These commenters stated that by averaging results from the current dust sampling system and not using the latest 2010 database of single shift sample results to determine compliance impacts under the proposed rule, MSHA improperly masked the feasibility of the proposal. Lastly, some commenters stated that MSHA did not support its conclusion that existing engineering controls and changes in work practices can be used to further reduce dust levels. These commenters, however, did not provide any definitive data to support their statements.

During the development of the final rule, MSHA evaluated the rulemaking record, including public comments, and the potential impacts of alternatives to

the proposed rule. As a result of this evaluation, the final rule addresses the commenters' concerns in several ways. First, the final rule includes a respirable dust standard of 1.5 mg/m³ for underground and surface coal mines. MSHA's rationale for the 1.5 mg/m³ standard is discussed elsewhere in this preamble under §§ 70.100 and 71.100. MSHA's analysis of the technological feasibility of the 1.5 mg/m³ standard for underground and surface coal mines and the 0.5 mg/m³ standard for part 90 miners and intake air on each shift is discussed below.

Second, the final rule requires sampling of designated occupations (DOs) on 15 consecutive shifts each quarter. The proposal would have required sampling of DOs on each and every shift.

Third, the final rule provides that noncompliance with the respirable dust standard is demonstrated during the sampling period when either two or more samples out of five operator samples or three or more samples out of fifteen operator samples meet or exceed the applicable excessive concentration value (ECV), or the average for all operator samples meets or exceeds the applicable ECV.[56] A detailed discussion on the ECVs is in Appendix A of this preamble. MSHA constructed the ECVs to ensure that a citation is issued when the respirable dust standard is exceeded. The ECVs ensure that MSHA is 95 percent confident that the applicable respirable dust standard has been exceeded. Each ECV accounts for the margin of error between the true dust concentration measurement and the observed dust concentration measurement when using the CMDPSU or the CPDM.

Under the proposal, noncompliance determinations would have been made on an operator's single full-shift sample that met or exceeded the ECV or a weekly accumulated exposure that exceeded the weekly permissible accumulated exposure.

Finally, MSHA has revised the methodology used to assess the technological feasibility of meeting the respirable coal mine dust standards. To evaluate the impact of the final rule, MSHA retained the adjustment factor used in the PREA for normal production. MSHA did not retain the adjustment factor to estimate an equivalent 8-hour concentration for work shifts longer than 8 hours. Like the proposal, MSHA's feasibility analysis is

based on sampling data from samples collected in 2008 and 2009. Rather than using both operator and inspector samples as was done for the proposal, this final analysis is based solely on MSHA inspector samples. MSHA has more confidence in MSHA inspector samples for the reasons discussed in Section 1(a) of the QRA for the final rule.

As in the PREA, these data reflect measurements under the existing sampling program. The definition in the final rule for a normal production shift will result in higher exposure measurements when compared to the existing sampling program. Therefore, as in the PREA, each individual sample is adjusted to account for normal production as defined by the final rule.

Even without an adjustment for work shifts longer than eight hours, the final rule results in more representative measurement of dust concentrations to which miners are being exposed on a daily basis in the active workings. Under final §§ 70.201(c), 71.201(b), and 90.201(b), sampling is conducted over the entire work shift. Since the work shift for many miners normally extends beyond eight hours, the reported sampling results for the 2008 and 2009 period likely understate miners' everyday coal mine respirable dust exposures. MSHA anticipates an increase initially in the observed dust concentrations under the final rule.

To evaluate the impact of the proposed rule for feasibility purposes, MSHA applied two adjustment factors to the 2008–2009 data. The first factor adjusted the 2008–2009 sample data to estimate an equivalent 8-hour concentration for work shifts longer than eight hours. The second factor adjusted the sample data for normal production. After consideration of the comments and relevant data, MSHA is not including in the final rule the provision that adjusts respirable coal mine dust measurements for shifts longer than 8 hours. The rationale for not including this provision is discussed elsewhere in the preamble discussion of the equivalent concentration definition under § 70.2.

To evaluate the impact of the final rule for feasibility purposes, MSHA retained the adjustment factor for normal production that was applied to the 2008–2009 data. In deriving the normal production adjustment factor for underground mines, MSHA applied a conservative method using production data for the previous 30 production shifts collected from mine operators during the Agency's enforcement activities in October 2009. First, the average shift length was calculated for

underground operations. Using 2009 shift length information for each mine stored in the MSHA Standardized Information System (MSIS) database, MSHA determined that the average shift length for longwall MMUs was 10 hours and the average for non-longwall MMUs was 9 hours. The 30-shift average production was calculated for each of the 193 MMUs that were inspected. These production values were then averaged across all non-longwall and longwall MMUs, yielding estimated overall 30-shift averages of 921 tons and 7,355 tons, respectively. These averages were then divided by the average shift length for the MMU type established earlier to estimate average production rate in tons per hour. For example, to estimate the overall longwall MMU production rate, 7,355 tons, which represents the full-shift production, was divided by 10 hours, yielding an estimated production rate of 736 tons/hour. The same calculation was performed for non-longwall MMUs resulting in a production rate of 102 tons/hour (921 tons ÷ 9 hrs).

Next, the production reported for each MSHA inspector and operator sample collected during CY 2009 was averaged across all non-longwall and longwall MMUs. This yielded overall 8-hour averages of 672 tons and 5,537 tons, respectively, for MSHA inspector samples, and 703 tons and 5,398 tons, respectively, for operator compliance samples. These averages were then divided by 8 hours, yielding estimates of the average production rate across the respective MMU types. For example, the production rate for operator samples was estimated at 88 tons/hour (703 tons/ 8 hr) for non-longwall MMUs and 675 tons/hour (5,398 tons/8 hr) for longwall MMUs.

These estimates of average production rates were used to derive the industry-wide production factors by dividing the estimated overall 30-shift average production rate by the overall CY 2009 average production rate. In the case of non-longwall MMUs, each operator DO concentration was multiplied by 1.16 (102/88 tons/hr). And, each longwall MMU sample was multiplied by 1.09 (736/675 tons/hr).

Although some commenters stated that MSHA's feasibility assessment of the proposed rule was based solely on historical averages, that assessment was based on the mean (or average) concentrations, the average deviation of sample concentrations from standards, and the percentage of observations above the standard. For the final rule, MSHA presents these summary statistics for more detailed occupations than were presented for the proposal

---

[56] In the final rule, compliance determinations are also based on single full-shift MSHA inspector samples. MSHA inspectors sample a small fraction of a mine's production shifts to ensure that dust levels are at or below the standard.

and also presents the median. MSHA also calculated the average deviations in a slightly different manner than was done for the proposal. Rather than computing the deviation from the existing standards as was done for the proposal, the deviation in this analysis is the deviation from the final standard or the existing standard, whichever is lower.

The means and medians of the detailed occupations and locations are measures of central tendency and help to answer the question of whether typical dust levels in each operation/location currently meet the standards. If both the mean and median of the inspector samples collected in various mines over the two-year period are less than the final standard, then MSHA concludes that typical dust levels for that occupation/location currently meet the standard. The percentage of observations currently above the final standards for each occupation/location indicates the probability that an MSHA inspector will find a violation for a single full-shift sample exceeding the standard in the final rule.[57] The average deviation of the sample concentrations from the existing standard or final standard provides an indication of the degree to which mine operators are currently meeting the standards in the final rule. In addition, the average deviation takes into account the reduced standards below 1.5 mg/m³. A negative average deviation indicates how much exposures average below the 1.5 mg/m³ standard and any reduced standard below 1.5 mg/m³ that was in effect at the time the samples were taken.

Summary data for various types of coal mining are presented in the following sections. After each presentation, MSHA also discusses the currently available dust control technology which can be used to reduce exposures that exceed the final standard. As was noted in the PREA, these technologies are also discussed in several NIOSH publications available at: *http://www.cdc.gov/niosh/mining/topics/RespirableDust.html.* In response to comments, the discussions of these

control technologies are more extensive in this assessment than those presented in the assessment of the proposed rule.

MSHA reviewed MMU data where an inspector collected a respirable dust sample that, after adjustments to represent the normal production on that shift, would have exceeded a concentration of 1.5 mg/m³. Specifically, MSHA looked at all longwall and approximately 20% of non-longwall MSHA MMU dust surveys collected during the fourth quarter of calendar year 2009 where the adjusted concentrations would have exceeded 1.5 mg/m³. MSHA reviewed measurements of the engineering controls in use on the day each sample was collected to assess whether using additional engineering controls would have likely reduced the dust concentration to levels at or below 1.5 mg/m³. Every survey indicated that additional control measures are available that would be likely to reduce the respirable dust concentration to 1.5 mg/m³ or less. MSHA determined that many MMUs could: Increase air quantity, air velocity, the number of water sprays, and the water pressure; balance the quantity of air delivered to the face with the scrubber air quantity; and/or change from blowing face ventilation to exhausting face ventilation. Changing one or more dust controls is an option at all MMUs that MSHA reviewed. On nearly all MMUs that used blowing face ventilation and a scrubber, the air quantity provided was less than the scrubber air quantity, causing an imbalanced system and the potential for respirable dust overexposures. Many MMUs using exhausting face ventilation had air quantities that would produce Mean Entry Air Velocities (MEAV) of less than 100 feet per minute (fpm), which indicates that the air provided could be increased to provide greater protection of miners' health. The number of water sprays, while important, is not the only spray variable affecting dust control; the location, flow rate, spray pattern, and droplet size are variables that impact dust levels where miners work. The dust control data that MSHA reviewed

is contained in two spreadsheets titled "MSHA Longwall Surveys with Adjusted Concentrations of 1.5 mg/m³ Dust Controls, Oct–Dec 2009" and "MSHA Random Non-Longwall Surveys with Adjusted Concentrations of 1.5 mg/m³ Dust Controls, Oct–Dec 2009" (U.S. Department of Labor, MSHA, 2012b and 2012c). Detailed discussions of these dust control technologies follow.

Some commenters expressed concern with the phase-in periods in proposed §§ 70.100, 71.100, and 90.100 regarding dust standards. In proposed § 70.101 regarding the respirable dust standard when quartz is present, and § 75.350 regarding the respirable dust standard in the belt air course. The final rule is changed from the proposal. It includes a 24-month implementation date in each of these sections to provide an appropriate amount of time for mine operators to comply with the standards in the final rule. Comments on the proposed phase-in periods and MSHA's rationale for the 24-month period in the final rule are discussed elsewhere in this preamble under final §§ 70.100, 70.101, 71.100, 75.350, and 90.100.

### a. Surface Coal Mines and Facilities

Table IV–1 presents a summary of the 2008–2009 sampling data for surface coal mines and facilities by selected occupations. Of the more than 4,500 samples taken by MSHA inspectors at surface coal operations and facilities during 2008 and 2009 approximately 5% exceeded the standard and the average deviation was 0.69 mg/m³ below the standard. The mean and median of the samples were 0.47 mg/m³ and 0.26 mg/m³, respectively. MSHA believes that these data overstate the exposures at surface coal operations and facilities because, rather than conducting random sampling, MSHA inspectors tend to sample operations where they believe respirable coal mine dust levels are high. Based on these data, MSHA concludes that most operations at surface mines and facilities can meet the 1.5 mg/m³ standard without significant changes on each shift.

TABLE IV–1—SUMMARY OF 2008–2009 SAMPLING DATA FOR SURFACE COAL MINES AND FACILITIES, BY SELECTED OCCUPATIONS

| Occupation | Number of samples | Mean mg/m³ | Median mg/m³ | Pct. > standard * | Avg. deviation mg/m³ |
|---|---|---|---|---|---|
| Bulldozer Operator | 1,118 | 0.28 | 0.16 | 1 | -0.50 |
| Cleaning Plant Operator | 175 | 0.75 | 0.59 | 13 | -0.75 |
| Cleanup Man | 108 | 0.55 | 0.44 | 2 | -0.95 |
| Crusher Attendant | 104 | 0.62 | 0.35 | 12 | -0.71 |

[57] For this analysis, MSHA used the standard even though a sample would have to meet or exceed the ECV for there to be a violation under the final rule.

TABLE IV–1—SUMMARY OF 2008–2009 SAMPLING DATA FOR SURFACE COAL MINES AND FACILITIES, BY SELECTED OCCUPATIONS—Continued

| Occupation | Number of samples | Mean mg/m³ | Median mg/m³ | Pct. > standard * | Avg. deviation mg/m³ |
|---|---|---|---|---|---|
| Fine Coal Plant Operator | 177 | 0.84 | 0.71 | 14 | -0.66 |
| Highlift Operator/Front End Loader | 160 | 0.28 | 0.12 | 1 | -1.08 |
| Highwall Driller | 797 | 0.43 | 0.24 | 4 | -0.44 |
| Laborer/Blacksmith | 179 | 0.52 | 0.34 | 8 | -0.90 |
| Mechanic | 194 | 0.49 | 0.37 | 4 | -1.00 |
| Other ** | 799 | 0.47 | 0.28 | 5 | -0.83 |
| Refuse Truck Driver/Backfill Truck Driver | 162 | 0.30 | 0.24 | 0 | -1.13 |
| Utility Man | 386 | 0.71 | 0.44 | 12 | -0.76 |
| Welder (NonShop) | 188 | 0.69 | 0.24 | 10 | -0.81 |
| Total | 4,547 | 0.47 | 0.26 | 5 | -0.69 |

\* 1.5 mg/m³ or a reduced standard below 1.5 mg/m³.
\*\* Occupations with fewer than 100 samples.
Source: Tabulation of MSHA MSIS Data.

The highest mean and median exposures and the greatest percentage of samples exceeding the standard were for the cleaning plant and fine coal plant operators. As MSHA stated in the PREA, workers in surface facilities can be protected by enclosing the dust-generating processes, placing the operator in an environmentally controlled booth, using dust collectors to limit the amount of dust that becomes airborne, ensuring that the equipment is being maintained and functioning properly, and following good work practices.

As MSHA noted in the PREA, engineering controls and work practices are also available to reduce the dust concentrations at other surface work locations. According to NIOSH's Best Practices for Dust Control in Coal Mining (Best Practices), most of the dust generated at surface mines is produced by mobile earth-moving equipment such as drills, bulldozers, trucks, and front-end loaders, excavating silica-bearing rock and minerals. There exist four practical areas of engineering controls to mitigate surface mine worker exposure to all airborne dusts, including silica. Those are drill dust collection systems including wet suppression, enclosed cab filtration systems, controlling dust on

unpaved haulage roads, and controlling dust at the primary hopper dump. (Colinet et al., 2010 NIOSH Information Circular 9517, Best Practices for Dust Control in Coal Mining, ("NIOSH IC 9517"), pp. 65–72.)

MSHA concludes that it is technologically feasible for surface coal mines and facilities to comply with the 1.5 mg/m³ standard in the final rule on each shift.

In addition, a review of the 2008–2009 operator-submitted respirable coal mine dust samples used for the proposed rule shows 97 surface mines operating on reduced standards of 0.5 mg/m³ or less. Many mines submitted respirable dust samples that routinely indicate the mine is able to operate and still control dust at or below the 0.5 mg/m³ level. For operator-submitted respirable dust samples for 2008 and 2009, 65% of all valid samples were at or below 0.5 mg/m³. The engineering controls and work practices available to reduce quartz exposure at surface mines are the same as those described above for reducing dust levels at surface coal mines and facilities.

b. Intake Air at Underground Coal Mines

Table IV–2 presents a summary of the 2008–2009 inspector intake air samples

at underground coal mines. Of the more than 8,200 samples taken by MSHA inspectors in underground coal mine operations during 2008 and 2009, less than 6% exceeded 0.5 mg/m³ and the average deviation was 0.33 mg/m³ below the 0.5 mg/m³ standard. The mean and median of the samples were 0.17 mg/m³ and 0.11 mg/m³, respectively. Based on these data, MSHA concludes that most intake air can meet the 0.5 mg/m³ standard without significant changes on each shift.

According to NIOSH's Best Practices, maintaining this concentration is not usually difficult, but it requires attention from mine operators to address activities that can raise intake air dust levels. Typically, high levels of intake air dust are sporadic and brief in nature due to activities in the intake air entries that may take place over the course of a working shift. These sporadic activities include delivery of supplies and/or personnel, parking equipment in the intake, rock dusting, scoop activity, and construction activity. (NIOSH IC 9517, 2010, p. 61.)

TABLE IV–2—SUMMARY OF 2008–2009 INSPECTOR INTAKE AIR SAMPLES AT UNDERGROUND COAL MINES

| Location | Number of samples | Mean mg/m³ | Median mg/m³ | Pct. > 0.5 mg/m³ | Avg. deviation mg/m³ |
|---|---|---|---|---|---|
| Not Belt Air | 7,655 | 0.15 | 0.10 | 3.5 | −0.35 |
| Belt Air | 613 | 0.43 | 0.35 | 28.1 | −0.07 |
| Total | 8,268 | 0.17 | 0.11 | 5.3 | −0.33 |

Source: Tabulation of MSHA MSIS Data.

The highest mean and median exposures and the greatest percentage of

intake air samples exceeding 0.5 mg/m³ were taken in belt entries. The average

deviation for the belt air samples was less than 0.1 mg/m³ below the 0.5 mg/

m³ standard. One commenter specifically supported respirable dust control and reduction in dust levels for intake air because intake air goes straight to the face.

According to NIOSH's Best Practices, when belt air is used for face ventilation, dust generated in the belt area should be controlled. Dust controls at the belt head helped maintain low dust levels in the belt entry. Automated water sprays were used to suppress dust at the section-to-main belt transfer point. A belt scraper equipped with water sprays controlled dust by cleaning the outside surface of the belt after the coal had been transferred to the main belt. (NIOSH IC 9517, 2010, p. 61.)

In addition, because the potential for dust from the belt entry to contaminate the face area has increased in recent years due to the increased quantity of coal being transported by the belt, NIOSH states that the following practices can help control respirable dust levels in the belt entry: Belt maintenance, wetting the coal product during transport, belt cleaning by scraping and washing, use of a rotary brush that cleans the conveying side of the belt, and wetting dry belts. (NIOSH IC 9517, 2010, pp. 18–19.)

MSHA concludes that it is technologically feasible for mine operators to meet the 0.5 mg/m³ standard for intake air on each shift. As noted in the PREA, many of the high dust concentrations for intake air represented samples taken while belt entries were being used as intake air courses. Dust concentrations in the belt entry, when used as an intake air course, can be consistently maintained at or below the final standard by employing currently available engineering controls such as water sprays at transfer points to adequately wet the conveyor belt and transported coal, combined with regular belt maintenance and cleaning of the belt entry. Moreover, no mine is required to use belt entries as intake air courses and relatively few do (less than 40 mines in 2009). If maintaining the belt entries is burdensome, an operator has the option of using another entry for intake air.

c. Part 90 miners

Table IV–3 presents a summary of the 2008–2009 sampling data for part 90 miners. Of the 500 samples taken by MSHA inspectors for part 90 miners during 2008 and 2009, approximately 23% exceeded 0.5 mg/m³ and the

average deviation was 0.13 mg/m³ below the applicable standard. The mean and median of the samples were 0.37 mg/m³ and 0.24 mg/m³, respectively. These data indicate that current dust levels for the part 90 miners meet the final 0.5 mg/m³ standard. In addition, dust levels for part 90 miners will likely decline under the final rule after operators implement controls to reduce the dust levels in the intake airways and active workings. Further, there are currently fewer than 70 part 90 miners out of an underground coal work force of approximately 50,000 miners. A mine operator may further reduce the dust levels of a part 90 miner by limiting the time that the part 90 miner spends in high dust areas, such as at the face for underground miners; on the surface, for example, an operator can move a part 90 miner to a less dusty job or place the miner in an environmental cab. Finally, part 90 miners can avoid areas of the mine that are under a reduced dust standard due to the presence of quartz. Therefore, MSHA concludes that it is technologically feasible for mine operators to meet the final 0.5 mg/m³ standard for part 90 miners on each shift.

TABLE IV–3—SUMMARY OF 2008–2009 SAMPLING DATA FOR PART 90 MINERS

| Number of samples | Mean mg/m³ | Median mg/m³ | Pct. > 0.5 mg/m³ | Avg. deviation mg/m³ |
|---|---|---|---|---|
| 502 ................................................................................................ | 0.37 | 0.24 | 23 | −0.13 |

Source: Tabulation of MSHA MSIS Data.

d. Non-Longwall Underground Mining Operations

Table IV–4 presents a summary of the adjusted 2008–2009 sampling data for non-longwall operations in underground coal mines by selected

occupations. Of the nearly 38,000 samples taken by MSHA inspectors at non-longwall operations in underground coal mines during 2008 and 2009, after adjustment, approximately 9% exceeded the

standard and the average deviation was 0.68 mg/m³ below the standard. The mean and median of the samples were 0.75 mg/m³ and 0.59 mg/m³, respectively, approximately half of the 1.5 mg/m³ standard.

TABLE IV–4—SUMMARY OF ADJUSTED 2008–2009 SAMPLING DATA FOR NON-LONGWALL OPERATIONS IN UNDERGROUND COAL MINES, BY SELECTED OCCUPATIONS

| Occupation | Number of Samples | Mean mg/m³ | Median mg/m³ | Pct. > Standard* | Avg. deviation mg/m³ |
|---|---|---|---|---|---|
| Coal Drill Operator ............................................ | 194 | 0.75 | 0.61 | 8 | −0.73 |
| Continuous Mining Machine Helper ................... | 656 | 0.79 | 0.64 | 8 | −0.63 |
| Continuous Mining Machine Operator ............... | 7,595 | 0.99 | 0.81 | 17 | −0.44 |
| Cutting Machine Operator .................................. | 185 | 1.14 | 0.91 | 25 | −0.35 |
| Electrician ........................................................... | 949 | 0.40 | 0.31 | 2 | −0.98 |
| Laborer ............................................................... | 257 | 0.40 | 0.30 | 5 | −1.03 |
| Loading Machine Operator ................................. | 284 | 0.36 | 0.30 | 0 | −1.12 |
| Mechanic ............................................................ | 406 | 0.56 | 0.45 | 4 | −0.86 |
| Mobile Bridge Operator ...................................... | 1,283 | 0.80 | 0.67 | 9 | −0.69 |
| Other ** ............................................................... | 407 | 0.59 | 0.41 | 6 | −0.82 |
| Roof Bolting Machine Operator .......................... | 8,651 | 0.74 | 0.60 | 8 | −0.70 |
| Scoop Car Operator ........................................... | 3,574 | 0.69 | 0.53 | 8 | −0.74 |
| Section Foreman ................................................. | 385 | 0.64 | 0.50 | 7 | −0.78 |
| Shuttle Car Operator .......................................... | 11,867 | 0.68 | 0.54 | 7 | −0.74 |
| Tractor Operator/Motorman ................................ | 275 | 0.53 | 0.41 | 3 | −0.91 |

24872    **Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

TABLE IV–4—SUMMARY OF ADJUSTED 2008–2009 SAMPLING DATA FOR NON-LONGWALL OPERATIONS IN UNDERGROUND COAL MINES, BY SELECTED OCCUPATIONS—Continued

| Occupation | Number of Samples | Mean mg/m³ | Median mg/m³ | Pct. > Standard * | Avg. deviation mg/m³ |
|---|---|---|---|---|---|
| Utility Man | 775 | 0.63 | 0.51 | 5 | −0.79 |
| Total | 37,743 | 0.75 | 0.59 | 9 | −0.68 |

\* 1.5 mg/m³ or a reduced standard below 1.5 mg/m³.
\*\* Occupations with fewer than 100 samples.
Source: Tabulation of MSHA MSIS Data.

The highest mean, median exposures, the greatest percentage of samples exceeding the applicable standard, and the smallest average deviation below the applicable standard were for the cutting machine and continuous mining machine operators. These data are consistent with NIOSH's findings that the greatest source of respirable dust at continuous mining operations is the continuous mining machine. NIOSH's Best Practices states that, at most continuous mining operations, the DO is the continuous mining machine operator and that dust generated by the continuous mining machine has the potential to expose the continuous mining machine operator and anyone working downwind of the active mining. (NIOSH IC 9517, 2010, p. 41.)

In the PREA, MSHA stated that dust levels at non-longwall operations could be controlled using currently available engineering controls, implementing well-designed face ventilation systems and controls, and following good maintenance and work practices. This is consistent with NIOSH's Best Practices, which states that ventilating air to a continuous mining section, whether blowing or exhausting, is the primary means of protecting workers from overexposure to respirable dust. In addition, proper application of water spray systems, ventilation, and mechanical equipment (scrubbers) provides the best overall means of respirable dust control. Also, the maintenance of scrubbers, water sprays, cutting bits and/or drill bits is basic to any effective dust control strategy and must be routinely practiced. Furthermore, suppression of dust is the most effective means of dust control. Suppression is achieved by the direct application of water to wet the coal before and as it is broken to prevent dust from becoming airborne.

Once dust is airborne, NIOSH states that other methods of control must be applied to dilute it, direct it away from workers, or remove it from the work environment. For example, redirection of dust is achieved by water sprays that move dust-laden air in a direction away

from the operator and into the return entry or behind the return ventilation curtain. In addition, capture of dust is achieved either by water sprays that impact with the dust in the air to remove it or by mechanical means such as fan-powered dust collectors. Ventilating air dilutes and directs dust away from workers. Either blowing or exhausting ventilation is used on continuous mining sections. A cut sequence should be adopted so that cut-throughs are made from intake to returns when practical to prevent return air from blowing back over the operator. Handheld remote control of the continuous mining machine has made it possible for operators to stay outby the continuous mining machine while operating the machine; however, operator positioning is crucial depending on the ventilation system being used. The velocity and quantity of face ventilating air are important factors for controlling respirable dust exposure of the continuous mining machine operator. A good ventilation plan consists of sufficient mean entry air velocity to confine dust near the face and/or direct it toward the return entry with a high enough quantity of air for diluting generated respirable dust. (NIOSH IC 9517, 2010, pp. 41, 48, 54.)

Roof bolting machines are another source of dust at non-longwall underground coal mine operations. Most roof bolting machines are equipped with MSHA-approved dry dust collection systems to remove dust during drilling. However, roof bolting machine operators can be overexposed to dust from drilling, cleaning the dust collector, not maintaining the dust collector, or working downwind of the continuous mining machine. According to NIOSH, the largest source of operator dust exposure can occur from working downwind of the continuous mining machine. NIOSH states that if the dry dust collector is properly maintained and if the roof bolting machine is not working downwind of the continuous mining machine, very little dust should be measured in the roof bolting machine operator's work environment.

According to NIOSH, there are three major roof bolting respirable dust problem areas: (1) Filter leaking or plugging, (2) accumulation of dust in the collection system, and (3) low airflow at the bit due to hose, fitting, and relief valve leaks. NIOSH's best practices can help reduce dust exposure to the roof bolting machine operator by maintaining the dust collector system, cleaning the dust box, using dust collector bags, routing miner-generated dust to the return, and not working downwind of the continuous mining machine. (NIOSH IC 9517, 2010, p. 57).

Some commenters stated that MSHA's technological feasibility assessment of the proposed rule did not take into consideration that mine operators had optimized the dust controls in their operations to achieve compliance with the current 2.0 mg/m³ standard. These commenters further stated that there is no new technology that will allow mine operators to generally comply with the proposed 1.0 mg/m³ standard.

Under its existing dust standards, MSHA has found numerous instances involving mine operators using dust control technologies that were not in proper working order. For example, ventilation at the face is sometimes insufficient because of lost air due to inadequate or missing line curtains and stoppings. In addition, water sprays are sometimes inadequate because of insufficient pressure or improper or clogged nozzles. MSHA has also found scrubbers not properly maintained with clean filters or miners not being positioned in fresh air.

MSHA has also found numerous instances involving mine operators using dust control technologies together with improper work practices. The following information from NIOSH's Best Practices shows how work practices (e.g., miner and equipment positioning, and maintenance) can reduce a miner's exposure to respirable coal mine dust.

The velocity and quantity of face ventilating air are important factors for controlling respirable dust exposure of the continuous mining machine

operator. When blowing ventilation is used, the continuous mining machine operator should be positioned in the clean discharge air at the end of the blowing curtain or tubing with intake air sweeping from behind. The continuous mining machine operator should not proceed past the end of the line curtain. If the continuous mining machine operator must be on the return side of the curtain, some of the intake air should be bled over the line brattice to provide fresh air to the continuous mining machine operator. In addition, scrubber discharge must be on the opposite side of the line brattice to allow scrubber exhaust to discharge directly into return air. The air quantity provided at the end of the line curtain should be limited to 1,000 cfm over the scrubber capacity. Air quantities exceeding 1,000 cfm over the scrubber capacity can overpower the scrubber and push dust-laden air past the scrubber inlets. (NIOSH IC 9517, 2010, pp. 54–55.) MSHA has found miners working in the return air with scrubber exhaust not discharging directly into the return air and air quantities exceeding 1,000 cfm over the scrubber capacity.

When exhausting ventilation is used, intake air is delivered to the face in the working entry. The clean air sweeps the face, and the dust-laden air is then drawn behind the return curtain or through the exhaust tubing to the return entries. This type of system will keep mobile equipment in fresh air. It affords the continuous mining machine operator more freedom of movement than a blowing ventilation system. In addition, it allows more visibility around the loading area so that shuttle car operators can easily determine where the continuous mining machine operator is located when entering the face area.

Another advantage of exhausting ventilation is that shuttle car operators are always positioned in fresh air. The end of the ventilation curtain or tubing must be kept within 10 feet of the face when not using a scrubber to ensure that air reaches and effectively sweeps the face. The continuous mining machine operator should not proceed inby the end of the line curtain since this will expose the operator to dust-laden return air. If continuous mining machine operator dust levels are too high, the first thing to check is whether the operator is standing parallel to or outby the end of the line curtain. Scrubber exhaust must be on the same side of the entry as the line curtain to allow

scrubber exhaust to discharge directly into return air. (NIOSH IC 9517, 2010, pp. 55–56.) MSHA has found instances of the exhaust curtain or tubing farther than 10 feet from the face when not using a scrubber, continuous mining machine operators standing parallel to or outby the end of the line curtain, and scrubber exhaust being recirculated rather than being discharged into the return air.

Bit type and bit wear can adversely affect respirable dust concentrations. Routine inspection of bits and replacement of dull, broken, or missing bits improve cutting efficiency and help minimize dust generation. (NIOSH IC 9517, 2010, p. 52.)

High-pressure sprays are recommended for redirecting of dust. However, care must be taken when determining location and direction because high pressure can cause turbulence, leading to rollback of dust laden air. Operators should examine, clean, or replace sprays if necessary before each cut. (NIOSH IC 9517, 2010, p. 47.) MSHA has found instances where water sprays different from those specified in the approved mine ventilation plan were being used and where some of the sprays were not operating properly.

Scrubbers lose as much as one-third of their airflow after just one cut. The most common cause of efficiency loss is filter panel clogging. Pitot tubes should be used to obtain air velocity readings as a measure of scrubber performance. When the dust is excessive, cleaning of the filter panel, the demister, and the scrubber ductwork, is required more often. Also, the spray nozzles in the ductwork should be checked to ensure they are completely wetting the entire filter panel and not just the center. In some mines, filters should be cleaned with water at least after each place change. In addition, inlets and ductwork may require more frequent cleaning. (NIOSH IC 9517, 2010, pp. 49–51.) MSHA has found instances where scrubbers were operating with clogged filters. MSHA has also found that some operators use less efficient filters. A less efficient filter traps fewer dust particles, but is used by some mine operators because it requires less frequent maintenance than an efficient filter which traps more dust.

In addition to dust created by the roof bolting machine itself, roof bolting machine operators can be exposed to continuous mining machine-created dust when bolting is required

downwind of the continuous mining machine. According to NIOSH, regardless of the type of ventilation being used, the cutting sequence must be designed to limit the amount of time the roof bolting machine operator works downwind of the continuous mining machine. Properly sequenced cuts with double-split ventilation can eliminate the need to work downwind of dust concentrations created by the continuous mining machine. (NIOSH IC 9517, 2010, pp. 59–60.)

Because MSHA has found numerous instances involving mine operators using dust control technologies that were not in proper working order and improper work practices, both of which have contributed to miners' exposure to respirable coal mine dust in excess of the existing permissible levels, it is reasonable to conclude that mine operators have not optimized all existing dust controls. MSHA concludes that it is technologically feasible for mine operators to meet the 1.5 mg/m³ standard for non-longwall underground coal mining operations using existing engineering controls along with proper work practices on each shift.

### e. Underground Coal Mining Longwall Operations

Longwall coal mining operations generally have the highest respirable coal mine dust levels. In the PREA, MSHA stated that, in rare instances, some operators may encounter implementation issues as they attempt to comply with the proposed dust standards. Under the final rule, implementation issues are greatly reduced for longwall operators.

Table IV–5 presents a summary of the adjusted 2008–2009 sampling data for longwall operations in underground coal mines by selected occupations. Of the more than 2,000 samples taken by MSHA inspectors during 2008 and 2009, after adjustment, approximately 21% exceeded the standard and the average deviation was 0.39 mg/m³ below the standard. The mean and median of the samples were 1.09 mg/m³ and 0.98 mg/m³, respectively. These data indicate that, after adjustment, typical dust levels at longwall operations are below the 1.5 mg/m³ standard. The longwall operator on the tailgate side is the only occupation/location where more than 30 percent of the adjusted samples exceeded the standard.

TABLE IV–5—SUMMARY OF ADJUSTED 2008–2009 SAMPLING DATA FOR LONGWALL OPERATIONS IN UNDERGROUND COAL MINES, BY SELECTED OCCUPATIONS

| Occupation | Number of samples | Mean mg/m³ | Median mg/m³ | Pct. > standard * | Avg. deviation mg/m³ |
|---|---|---|---|---|---|
| Headgate Operator ........................................... | 352 | 0.74 | 0.60 | 8 | −0.74 |
| Jack Setter (Longwall) ....................................... | 726 | 1.16 | 1.04 | 22 | −0.32 |
| Longwall Operator (Headgate Side) ................... | 337 | 1.20 | 1.11 | 24 | −0.27 |
| Longwall Operator (Tailgate Side) ..................... | 371 | 1.39 | 1.22 | 35 | −0.09 |
| Other ** ............................................................. | 253 | 0.76 | 0.58 | 11 | −0.71 |
| Total ........................................................... | 2,039 | 1.09 | 0.98 | 21 | −0.39 |

* 1.5 mg/m³ or a reduced standard below 1.5 mg/m³.
** Occupations with fewer than 100 samples.
Source: Tabulation of MSHA MSIS Data.

As MSHA stated in the PREA, existing technologies are available to reduce dust levels in longwall operations. Ventilation is the most effective control. The amount of ventilation reaching the face can be increased by better maintenance and positioning of the line curtains and stoppings, increasing the amount of air delivered to the longwall face, and reducing the restrictions in the intake entries. Under some circumstances, mine operators may have to develop additional airways. In addition, efficient and better positioned water spray nozzles as well as increased water pressure and volume can be used. Work practices, such as proper positioning of the miner as well as the cleaning and maintenance of the dust controls further reduce dust levels. The use of CPDMs will enable operators to ascertain the effects of these practices and how to combine their use most effectively.

NIOSH noted many areas where improvements could be made to reduce current dust levels in longwall operations. These areas include: (1) Reducing dust in the intake air entries by decreasing air velocities in the intake entries; (2) controlling dust generated by the shearer by ensuring sufficient wetting of the coal; (3) maintaining the cutting drum bits by promptly replacing damaged, worn, or missing bits; (4) controlling dust generated by the stageloader/crusher by fully enclosing the stageloader/crusher, wetting the coal in the stageloader and crusher area, and using scrubber technology to create negative pressure; (5) using a high-pressure water-powered scrubber; and (6) installing and maintaining gob curtains. (NIOSH IC 9517, 2010, pp. 17–26.)

Some commenters stated that, like non-longwall operations, dust controls for longwall operations have been optimized and there were no additional controls available to further reduce coal mine dust levels. In response to these comments, MSHA notes that the Agency

has found that improvements have been made in respirable dust control at longwall operations since the 1990s. According to NIOSH, approximately 25% of the active longwall faces in the United States were surveyed to quantify dust generation from major sources and determine the relative effectiveness of the different control technologies. NIOSH found that the average face velocities increased by 28% (0.71 m/sec or 140 ft/min) when compared to air velocities reported in a mid-1990s longwall study. NIOSH also found that water to the shearer increased in an effort to control dust liberated from the face. Headgate splitter arm directional spray systems were observed on 90% of the surveyed longwalls. The exact type, number and location of these sprays varied significantly between mines, but all were operating on the principle of splitting the ventilating air as it reaches the headgate side of the shearer and holding the dust-laden air near the face. (Rider et al., 2011, pp. 2–3.) NIOSH stated that although average shift production rates rose approximately 53%, dramatic reductions in average dust levels, between 20% and 58%, were realized at each face sampling location when dust levels were compared to a 1990s study. (Rider et al., 2011, p. 7.)

However, despite these improvements, like non-longwall operations, MSHA has found that there are numerous instances involving mine operators using dust control technologies that were not in proper working order and using improper work practices, both of which have contributed to miners' exposure to excessive respirable coal mine dust. For example, MSHA has found instances where air being directed into the mine is lost before it reaches the face due to inadequate curtains and stoppings, miners were improperly positioned in the return air, and inadequate maintenance resulted in excessive dust levels.

NIOSH has also found instances involving mine operators using dust control technologies that were not in proper working order or improper work practices, both of which have contributed to miners' exposure to excessive respirable coal mine dust. NIOSH observed: (1) Longwall operations with improperly maintained brattice curtain behind the hydraulic support legs resulting in large voids with air escaping into the gob; (2) shearer operators located inby, rather than outby, the headgate drum exposed to elevated dust levels when the headgate drum cut into the headgate entry; and (3) an improperly angled hydraulically adjustable splitter arm allowed dust to migrate over the top of the splitter arm and into the walkway. (NIOSH IC 9517, 2010, pp. 23–24, 30.)

In addition, NIOSH notes that unidirectional cutting may allow for greater flexibility to place workers upstream of the dust sources than bidirectional cutting. Depending on roof conditions, this may allow the operators to modify the cut sequence so that shields are only advanced downwind of the shearer. Activating shield advance as close to the tailgate drum as possible and keeping jack setters upwind of the advancing shields may protect the jack setters from elevated dust levels by keeping them in a clean air envelope created by the shearer's directional spray system. (NIOSH IC 9517, 2010, p. 34.)

Based on MSHA's experience with and NIOSH's analysis of dust control techniques, MSHA concludes that it is technologically feasible for mine operators to meet the 1.5 mg/m³ standard for longwall underground coal mining operations using engineering controls along with proper work practices on each shift.

f. Underground Coal Mining in the Presence of Silica

Some commenters expressed concern about the feasibility of meeting reduced

dust standards due to the presence of silica. The available dust controls discussed previously are effective in reducing the amount of respirable coal mine dust, including silica, in the mine atmosphere. In addition, NIOSH recommends that if roof rock must be cut, it is often beneficial to cut the coal beneath the rock first and then back the continuous mining machine up to cut the remaining rock. This method of cutting leaves the rock in place until it can be cut out to a free, unconfined space, which creates less respirable dust (especially silica dust). (NIOSH IC 9517, 2010, p. 53.) NIOSH also notes that if the continuous mining machine operator works downwind of the roof bolting machine, as much as 25% of the continuous mining machine operator's quartz dust exposure can be attributed to dust from the bolting operation. NIOSH notes that the problem is usually a lack of maintenance of the dust controls on the roof bolting machine. (NIOSH IC 9517, 2010, p. 60.)

4. Economic Feasibility of Complying with the Final Rule

MSHA has traditionally used a revenue screening test—whether the yearly costs of a rule are less than 1 percent of revenues, or are negative (i.e., provide net cost savings)—to establish presumptively that compliance with the regulation is economically feasible for the mining industry. Recent Census Bureau data show that mining in general has operating profits greater than 17 percent of sales and corresponding after tax profits of approximately 10 percent.[58] The Agency believes that with these average profit levels, when the cost of a regulation has less than a 1 percent impact on the affected industry's revenues, it is generally appropriate to conclude that the regulation is feasible.

In estimating costs of a rule, it is important to distinguish between compliance costs (costs that the affected industry incur to comply with the rule) and transfer payments. As a result of additional citations that MSHA estimates will be issued under the final rule, operators will incur penalty payments. Penalty payments are considered transfer payments from the affected party to the Federal government resulting from violations of the final rule; transfer payments are not considered compliance costs. However, transfer payments are important for describing the distributional effects of a rule. Therefore, to determine whether

---

[58] Most recent Census Bureau data can be found at *http://www2.census.gov/econ/qfr/current/mmw1.xls* on the line for Mining.

---

the final rule is economically feasible, MSHA has included as total costs the estimated compliance costs and penalty payments.

Using the screening test noted above, MSHA has concluded that the requirements of the final rule are economically feasible. MSHA estimates that the annualized costs of the final rule, including transfer payments, to underground coal mine operators is $27.1 million ($26.2 million of compliance costs and $0.9 million of penalty payments), which is approximately 0.13 percent of total annual revenue of $20.2 billion ($27.1 million/$20.2 billion) for all underground coal mines.

MSHA estimates that annualized costs of the final rule, including transfer payments, to surface coal mine operators is $4.02 million ($4.0 million of compliance costs and $24,900 of penalty payments), which is approximately 0.02 percent of total annual revenue of $17.9 billion ($4.02 million/$17.9 billion) for all surface coal mines.

5. Conclusion

MSHA has concluded that the final rule is technologically feasible both in terms of sampling respirable dust concentrations with the CPDM and the availability of engineering controls to meet the respirable coal mine dust standards of 1.5 mg/m³ and 0.5 mg/m³ for intake air and part 90 miners. The CPDM is accurate, reliable, and ergonomically correct. In addition, current dust levels for most sampled occupations and locations were typically found to be below the applicable standards. Existing engineering controls including ventilation, water sprays and environmentally controlled cabs along with proper work practices can be used to further reduce dust levels. Mine operators are not maintaining optimal dust controls at all times. MSHA and NIOSH both have found instances where air being directed into the mine is lost before it reaches the face due to operators' failing to maintain ventilation controls with proper curtains and stoppings, miners are improperly positioned in the return air, and there is inadequate maintenance, all resulting in excessive dust levels. Correcting existing problems will allow mine operators to further reduce dust levels without having to make substantial additional expenditures in dust controls.

Since the compliance cost estimates for both underground and surface coal mines are below one percent of their estimated annual revenue, MSHA

concludes that compliance with the provisions of the final rule will be economically feasible for the coal industry.

**IV. Section-by-Section Analysis**

*A. 30 CFR Part 70—Mandatory Health Standards—Underground Coal Mines*

1. Section 70.1   Scope

Final § 70.1, like the proposal, states that part 70 sets forth mandatory health standards for each underground coal mine subject to the Federal Mine Safety and Health Act of 1977, as amended.

MSHA received several comments requesting that the Agency extend the scope of the rule to various facilities, contractors, and contract employees. The final rule, like existing § 70.1, applies to all underground coal mine operators and protects the health of all miners working in underground coal mines.

2. Section 70.2   Definitions

The final rule does not include the proposed definitions for *Weekly Accumulated Exposure* and *Weekly Permissible Accumulated Exposure* that would have applied when operators use a CPDM to collect respirable dust samples under proposed part 70. These two definitions are not needed since the proposed weekly sampling requirements are not included in the final rule.

Act

The final rule, like the proposal, defines Act as the Federal Mine Safety and Health Act of 1977, Public Law 91–173, as amended by Public Law 95–164 and Public Law 109–236.

Active Workings

Final § 70.2, like the proposal, makes no change to the existing definition of active workings.

Approved Sampling Device

The final rule, like the proposal, defines an *approved sampling device* as a sampling device approved by the Secretary and Secretary of Health and Human Services (HHS) under part 74 of this title. Whenever a sampling device is used by operators to comply with the requirements of part 70, the device must be approved for use in coal mines under part 74 (Coal Mine Dust Sampling Devices). MSHA did not receive any comments on the proposed definition and the definition is finalized as proposed.

Certified Person

Final § 70.2 makes nonsubstantive changes to the existing definition of certified person. It does not include the

parenthetical text following the references to §§ 70.202 and 70.203.

Coal Mine Dust Personal Sampler Unit (CMDPSU)

The final rule, like the proposal, defines a coal mine dust personal sampler unit (CMPDSU) as a personal sampling device approved under 30 CFR part 74, subpart B. This definition is included to distinguish between the two types of coal mine dust monitoring technology approved under part 74 and to clarify the applicability of the final rule to each approved sampling device. The existing gravimetric sampling device used by operators is a CMDPSU. MSHA did not receive any comments on the proposed definition and the definition is finalized as proposed.

Concentration

Final § 70.2, like the proposal, makes no change to the existing definition of concentration.

Continuous Personal Dust Monitor (CPDM)

The final rule, like the proposal, defines a *continuous personal dust monitor* as a personal sampling device approved under 30 CFR part 74, subpart C. This definition is included to distinguish between the two types of coal mine dust monitoring technology approved under part 74 and to clarify the applicability of the final rule to each approved sampling device. MSHA did not receive any comments on the proposed definition and the definition is finalized as proposed.

Designated Area (DA)

The final rule is similar to the proposal. It defines *designated area* (DA) as a specific location in the mine identified by the operator in the mine ventilation plan under § 75.371(t) of this title where samples will be collected to measure respirable dust generation sources in active workings; approved by the District Manager; and assigned a four-digit identification number by MSHA. The proposal would have defined the DA as an area of a mine identified by the operator in the mine ventilation plan. The final definition includes a specific reference to § 75.371(t). This is consistent with the existing definition. In addition, like the proposal, the definition includes language from existing § 70.208(e) regarding how DAs are denoted. MSHA did not receive any comments on the proposed definition.

Designated Occupation

Final § 70.2 includes a nonsubstantive change to the existing definition of

designated occupation. It includes the abbreviation MMU for mechanized mining unit.

District Manager

Final § 70.2, like the proposal, makes no change to the existing definition of District Manager.

Equivalent Concentration

The final rule is changed from the proposal. Under the final rule, equivalent concentration is defined as the concentration of respirable coal mine dust, including quartz, expressed in milligrams per cubic meter of air (mg/m³) as measured with an approved sampling device, determined by dividing the weight of dust in milligrams collected on the filter of an approved sampling device by the volume of air in cubic meters passing through the filter (sampling time in minutes (t) times the sampling airflow rate in cubic meters per minute), and then converting that concentration to an equivalent concentration as measured by the Mining Research Establishment (MRE) instrument. When the approved sampling device is:

(1) The CMDPSU, the equivalent concentration is determined by multiplying the concentration of respirable coal mine dust by the constant factor prescribed by the Secretary.

(2) The CPDM, the device shall be programmed to automatically report end-of-shift concentration measurements as MRE-equivalent concentrations.

Like the proposal, the introductory paragraph in the definition under the final rule provides that dust concentration measurements from an approved sampling device will be converted to MRE-equivalent concentrations. Unlike the proposal, the final rule includes quartz in the definition as that is also an adjusted MRE-equivalent concentration. Also, the final definition, unlike the proposal, does not adjust the MRE-equivalent concentration for shifts longer or shorter than 8 hours to an 8-hour equivalent concentration.

Final paragraph (1), like the proposal, applies when the approved sampling device is the CMDPSU and is derived from existing § 70.206 which describes converting a concentration of respirable dust as measured with the CMDPSU. For the CMDPSU, the constant factor is 1.38. This compensates for the difference in the dust collection characteristics and makes the measurements equivalent to what would be obtained using an MRE instrument.

Final paragraph (2) of the definition applies when the approved sampling device is the CPDM. It states that when using the CPDM, the device must be programmed to automatically report end-of-shift concentration measurements as MRE-equivalent concentrations.

The manufacturer's programming will use the constant factor determined by the Secretary for HHS specific to this approved sampling device to provide an MRE-equivalent concentration.

MSHA acknowledges that working conditions for miners have changed in recent decades with the result that miners, on average, work longer hours over the course of a shift, week, year and/or lifetime. In an attempt to address the additional exposure that comes from such a change in working conditions, the proposal would have required the respirable coal mine dust sample results to be expressed in terms of an 8-hour equivalent concentration for shifts longer than 8 hours, regardless of how many hours the miners worked over the course of a week, a month, or a lifetime to capture the effect of longer shifts. In addition, MSHA requested comment on the recommendation in the 1995 NIOSH Criteria Document to lower exposure to 1.0 mg/m³ for up to a 10-hour work shift over a 40-hour workweek.

Some commenters stated that the effect of the 8-hour conversion would be that, for miners working the same number of hours per week, miners who worked 8 hours could be exposed to more respirable dust than miners who worked longer shifts. One commenter pointed out that, for the same 40-hour week, a miner working five 8-hour shifts could be exposed to more dust than a miner working four 10-hour shifts. Some of the commenters expressed concern that the 8-hour conversion, when applied to shift lengths of 10 or 12 hours, would result in concentration limits well below the 8-hour concentration limit. They stated that this would force them to reduce the lengths of their shifts in order to comply with the limit, decreasing the efficiency of their mines. Another commenter stated that the 8-hour conversion formula was too complicated and confusing for miners who work extended shifts and that miners would not be able to figure out their exposure limits. The commenter stated that they appreciated the Agency taking into account the fact that most miners work more than an 8-hour shift, but urged MSHA to adopt a simplified approach.

MSHA reviewed its data on shift length and hours worked. The data show that the majority of miners currently work longer than 40 hours per

week, whether they are working 8-hour shifts or longer shifts. The data also show that some miners are working 8-hour shifts 6 days per week, while some miners are working 10-hour shifts 4 or 5 days per week.

MSHA also reviewed the available data on health outcomes as a function of the respirable dust dose over a single shift. As stated above in the discussion regarding the QRA, the data show disease causation with long-term exposures. As noted in NIOSH's CIB, "although no epidemiological data exists that implicate longer hours as a contributory causative factor for CWP, working longer hours leads to the inhalation of more dust into the lungs." However, as stated above, shift length cannot predict the number of hours miners are exposed to respirable coal mine dust in the long-term. While it is possible that shift length could contribute to disease, the available evidence is insufficient to support a linkage at this time. As such, MSHA believes that the link between longer shifts and resulting disease requires further examination and study. MSHA did not receive comments to support this linkage.

After consideration of the relevant data and in response to comments, MSHA believes a concentration limit, with sampling performed for a full shift, is the most appropriate approach to account for the longer total exposure to which miners now on average are exposed. MSHA believes that this approach, which captures increased exposures regardless of shift length, accomplishes some of the purpose of the 8-hour equivalent concentration. Accordingly, MSHA has not included the conversion to an 8-hour concentration in the final "equivalent concentration" definition. By not including the 8-hour conversion in the final rule, MSHA is preserving the status quo. However, the final rule requires operators to sample during the entire shift that a miner works and is exposed to respirable coal mine dust, even if the shift exceeds 8 hours. Full-shift sampling will provide additional health protection over and above what is currently provided for miners who work longer than 8-hour shifts.

In the future, MSHA intends to evaluate samples taken on shifts longer than 8 hours, additional studies, data, literature, and any other relevant information to determine whether an 8-hour equivalent concentration is necessary to protect miners who work longer shifts.

### Mechanized Mining Unit (MMU)

The final definition of a mechanized mining unit (MMU) is clarified from the proposal. It is defined as a unit of mining equipment including hand loading equipment used for the production of material; or a specialized unit which uses mining equipment other than specified in § 70.206(b) or in § 70.208(b) of this part. It further provides that each MMU will be assigned a four-digit identification number by MSHA, which is retained by the MMU regardless of where the unit relocates within the mine. It also provides that the:

(1) Two sets of mining equipment are used in a series of working places within the same working section and only one production crew is employed at any given time on either set of mining equipment, the two sets of equipment shall be identified as a single MMU.

(2) Two or more sets of mining equipment are simultaneously engaged in cutting, mining, or loading coal or rock from working places within the same working section, each set of mining equipment shall be identified as a separate MMU.

Several commenters stated that the proposed definition was confusing and unclear or that it conflicted with the requirements of proposed § 75.332 pertaining to working sections and working places. In response to these comments, the final definition includes several clarifications. The definition includes references to final § 70.206(b) concerning bimonthly sampling and § 70.208(b) concerning quarterly sampling to clarify when a specialized unit is an MMU, i.e., when directed by the District Manager in accordance with §§ 70.206(b) or 70.208(b). The proposed definition included a reference to § 70.207(b), which is redesignated in the final rule.

The definition also includes the statement that the four-digit identification number is retained by the MMU "regardless of where the unit relocates in the mine." This language is similar to the existing sampling requirements for MMUs under § 70.207(f)(1), which contains identical language.

Paragraphs (1) and (2) further clarifies that two sets of equipment will be identified as a single MMU when only one production crew is employed "at any given time on either set of mining equipment" or when two sets of mining equipment are "simultaneously engaged in cutting, mining, or loading coal or rock from working places." Paragraphs (1) and (2) are similar to the existing sampling requirements for MMUs under § 70.207(f)(2), which contains similar language.

### MRE Instrument

Final § 70.2, like the proposal, makes no change to the existing definition of MRE instrument.

### MSHA

Final § 70.2, like the proposal, makes no change to the existing definition of MSHA.

### Normal Production Shift

The final rule is changed from the proposal. It defines *normal production shift* as a production shift during which the amount of material produced by an MMU is at least equal to 80 percent of the average production recorded by the operator for (1) the most recent 30 production shifts or (2) for all production shifts if fewer than 30 shifts of production data are available.

The proposal would have defined normal production shift as the amount of material produced by an MMU that is at least equal to the average production recorded by the operator for the most recent 30 production shifts or for all production shifts if fewer than 30 shifts of production data are available.

Several commenters supported the proposed definition, agreeing that exposure monitoring should be conducted during shifts that represent typical production levels. One commenter added that the proposed definition would fix a loophole that permits operators to sample for compliance with the respirable dust standard when production is very low. The commenter added that sampling under the proposed definition would result in a better understanding of the exposures occurring under normal operating conditions.

Other commenters expressed a variety of concerns, most related to the variability of production and feasibility of reaching the minimum production level contained in the proposal. They indicated that the proposed production level was too high and, as a result, more operator samples would be considered invalid and voided, and more sampling would be needed. Some of these commenters noted that dynamic factors such as equipment breakdowns or variable mining conditions could cause fluctuations in production, resulting in the sampled shifts not meeting the proposed definition. One commenter stated that the number of needed samples would probably double as a result of the averaging period and the required tonnage. Another stated that 50 percent of the company's production shifts would not meet the

proposed definition. This same commenter recommended that "normal production shift" be defined as 80 percent of the prior 30-shift average production, while another commenter suggested that MSHA should consider using 75 percent of the prior 30 days' average to reduce the number of invalid samples.

MSHA has considered all comments received and the concerns expressed regarding the feasibility of reaching the proposed minimum production level. In response, MSHA has changed the production level in the final *normal production shift* definition to 80 percent. The purpose for defining normal production shift is to achieve reliable measurements of miners' day-to-day exposures to respirable coal mine dust that occur during production under normal mining conditions. It is important for miner health and safety that operator sampling occur during shifts that represent typical production and mining conditions on the MMU. The level of coal production has a significant impact on dust generation. As production increases, the amount of generated respirable coal mine dust also increases. Samples that are collected on shifts when production is much less than what generally occurs cannot reflect typical dust concentration levels to which miners are exposed or normal mining activity on the MMU. Such measurements underestimate miners' typical dust exposures. Under the existing definition, operators are required to sample when production is at least 50 percent of the average production reported during the operator's last sampling period (i.e., last set of five valid samples). The existing 50 percent production level is not representative of typical dust concentration levels under normal mining conditions.

The Dust Advisory Committee recommended that respirable dust samples be taken when production is sufficiently close to normal production, which it stated should be defined as 90 percent of the average production of the last 30 production shifts.

In its 1995 Criteria Document, NIOSH recommended that, consistent with standard industrial hygiene practice (which requires exposure measurements be collected during typical work shifts), for a production shift to be considered a "normal production shift," it must produce at least 80 percent of the average production over the last 30 production shifts. NIOSH further stated that a production-level threshold should ensure that exposure conditions are comparable between sampled and unsampled shifts.

The final 80 percent production level responds to commenters' concerns, is the same as the recommendation in the 1995 NIOSH Criteria Document, and is consistent with the 1996 Dust Advisory Committee Report. It is also consistent with MSHA's longstanding practice that MSHA inspectors' respirable dust samples be collected when production is at least 80 percent of the average of the previous 30 production shifts. The 80 percent production level under the final definition reflects typical conditions under which miners work, particularly in combination with the final rule's requirement that operators sample miners during the entire time that miners work, which is discussed elsewhere in the preamble related to § 70.201(c). The final definition is more protective of miners than the existing definition.

Like the existing operator sampling program, if a "normal production shift" is not achieved, MSHA may void the sample collected during that shift. MSHA recognizes that under the final rule, the total number of required operator samples to be collected on the MMU will increase from that required under the existing standards. However, as discussed elsewhere in the preamble related to § 70.206(d), a valid equivalent concentration measurement that exceeds the standard by at least 0.1 mg/m³, even when production is lower than the 80 percent threshold, will be used to determine the equivalent concentration for that MMU.

Under existing practice, if an operator encounters unique mining conditions that reduce production, such as when the coal seam narrows due to a rock intrusion running through the coal bed, MSHA allows the operator to submit any relevant information to the District Manager so that average production levels can be adjusted to ensure samples are considered valid in that they represent current, normal mining conditions. This practice provides sufficient flexibility to account for unique fluctuations in the mining process. Under the final rule, MSHA will continue this practice.

Like the proposal, the final rule retains the proposed time period, that is, the most recent 30 production shifts, in determining whether a production shift is considered a *normal production shift*.

During the comment period, MSHA requested comment from the mining community on whether the average of the most recent 30 production shifts would be representative of dust levels to which miners are typically exposed. This request was made in the preamble to the proposed rule, the Agency's opening statements at the public

hearings, and a **Federal Register** notice (76 FR 12649, March 8, 2011). MSHA did not receive any comments on this proposal.

MSHA considers the time frame in the existing definition, which requires samples to be collected for the "last 5 valid samples," to be inadequate and not a representative period that reflects typical production. MSHA's existing practice for inspector sampling is to use 30 production shifts as a time period for establishing typical production. Based on agency experience and as stated in the proposed rule, using 30 production shifts provides sufficient historical data to give a reliable representation of an MMU's typical production. Averaging production over the 30 production shifts, instead of the last 5 valid samples, accounts for any fluctuations in mining cycles, including those in which production is higher than usual. In addition, both the 1995 NIOSH Criteria Document and 1996 Dust Advisory Committee Report recommended that the last 30 production shifts be used as the benchmark to gauge production levels.

Also, the final definition, like the proposal, requires that when an MMU has operated for fewer than 30 production shifts, the average production of all production shifts would be considered to determine a "normal production shift." MSHA did not receive comments on this proposed provision and it is finalized as proposed. MSHA believes it is essential to use records from all of an MMU's production shifts when it has operated for fewer than 30 shifts because this would result in the most reliable determination of the MMU's production and a miner's exposure.

One commenter who did not support the proposed definition expressed concern that operators would have to track more production shifts in order to meet the required production level. Comments on the production records required to be made to establish a "normal production shift" are discussed elsewhere in the preamble related to final § 70.201(g).

Finally, some commenters suggested that the definition of "normal production shift" could be eliminated by using personal samples to measure miner's actual exposure since it would not matter what the production was during the sampling period. Comments on personal sampling are discussed elsewhere in the preamble related to final § 70.201.

Other Designated Occupation (ODO)

The final rule includes nonsubstantive changes from the

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    **24879**

proposal. It defines other designated occupation (ODO) as an occupation on a mechanized mining unit (MMU) that is designated for sampling required by part 70 in addition to the DO. It further provides that each ODO will be identified by a four-digit identification number assigned by MSHA.

MSHA received one comment related to the proposed definition. The commenter requested that MSHA consider personal sampling of miners in lieu of sampling the ODOs. MSHA has addressed this comment elsewhere in the preamble under final § 70.201. The final rule, consistent with the Mine Act, requires environmental sampling to accomplish the objective of controlling respirable dust to protect the health of miners. The definition of ODO is finalized as proposed.

Production Shift

Final § 70.2 includes nonsubstantive changes to the existing definition of production shift. It includes the abbreviations MMU for mechanized mining unit and DA for designated areas.

Quartz

The final rule is changed from the proposal. It retains the existing definition of quartz, which is defined as crystalline silicon dioxide ($SiO_2$) not chemically combined with other substances and having a distinctive physical structure.

The proposal would have defined *quartz* to mean crystalline silicon dioxide ($SiO_2$) as measured by: (1) MSHA Analytical Method P–7: Infrared Determination of Quartz in Respirable Coal Mine Dust; or (2) Any method approved by MSHA as providing a measurement of quartz equivalent to that obtained by MSHA Analytical Method P–7.

MSHA received one comment on the proposed definition. The commenter expressed concern regarding notice of any analytical measurement method that MSHA could approve as equivalent to Analytical Method P–7. In response, MSHA has concluded that a change in the proposed definition is not necessary because the existing Analytical Method P–7 used in determining the amount of quartz in respirable coal mine dust (U.S. Department of Labor, MSHA, 2011) is sufficient.

Representative Sample

The final rule defines representative sample as a respirable dust sample, expressed as an equivalent concentration, that reflects typical dust concentration levels and (1) with regard to an MMU, normal mining activities in the active workings during which the amount of material produced is equivalent to a normal production shift; or (2) with regard to a DA, when material is produced and routine day-to-day activities are occurring.

The proposed rule would have defined "representative sample" as a respirable dust sample that reflects typical dust concentration levels and normal mining activity in the active workings during which the amount of material produced is equivalent to a normal production shift. The final definition differs from the proposed definition in two ways. First, the final definition adds the language, "expressed as an equivalent concentration" to clarify that each respirable dust sample measurement must be converted to an MRE-equivalent concentration as defined under this final § 70.2. Second, similar to the existing definition of "production shift" in § 70.2, the final definition distinguishes between a representative sample for an MMU and a representative sample for a DA. To avoid confusion and to distinguish a representative sample on an MMU from one in the DA, the final definition clarifies that, for a DA, the representative sample is based on a shift during which material is produced and routine day-to-day activities are occurring in the DA. The definition for a DA is the same as the existing definition which does not take into account the amount of material produced.

MSHA received one comment related to the proposed definition. The commenter stated that there was no need to define representative samples and that MSHA should modify its sampling methodology such that personal samples, rather than occupational samples, are taken.

With respect to the commenter's recommendation that MSHA replace the occupational sampling methodology with personal sampling, MSHA addresses this comment elsewhere in the preamble under final § 70.201. In addition, the definition for representative sample ensures that respirable dust samples accurately reflect the amount of dust to which miners are exposed. Without a definition, operators could perform sampling at times that do not represent typical production which would under-represent, or bias, miners' dust exposures. Operator sampling must be conducted when miners are in positions and physical locations performing the same tasks that they perform on non-sampling days to constitute representative samples. To be considered a representative sample, operators should ensure that sampling occurs when mining activities, such as production methods, reflect that of non-sampling days (e.g., when approved cut sequences are followed, and the sequence of mining includes the turning of multiple crosscuts). The final definition of representative samples will provide protection for miners' health by allowing MSHA to accurately evaluate the functioning of operators' dust controls and the adequacy of operators' approved plans.

Respirable Dust

The final rule makes a nonsubstantive change to the existing definition of respirable dust. It defines respirable dust as dust collected with a sampling device approved by the Secretary and the Secretary of HHS in accordance with part 74 (Coal Mine Dust Sampling Devices) of this title. The final definition deletes from the existing definition, "Sampling device approvals issued by the Secretary of the Interior and Secretary of Health, Education, and Welfare are continued in effect," because it is not needed. Approved sampling devices are approved by MSHA and NIOSH under 30 CFR part 74.

Secretary

The final rule makes a nonsubstantive change to the existing definition of Secretary. It defines Secretary as the Secretary of Labor or a delegate. It includes the gender neutral term "a" delegate rather than the existing term "his" delegate.

Valid Respirable Dust Sample

For clarification, the final rule revises the definition under existing § 70.2 for a *valid respirable dust sample* to mean a respirable dust sample collected and submitted as required by this part, including any sample for which the data were electronically transmitted to MSHA, and not voided by MSHA.

The final definition adds language to clarify that for CPDM samples, the data files are "electronically" transmitted to MSHA, and not physically transmitted like samples collected with the CMDPSU. The proposed rule did not include this clarification.

3. Section 70.100    Respirable Dust Standards

Final § 70.100(a) is changed from the proposal. It requires that each operator continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of each mine is exposed, as

measured with an approved sampling device and expressed in terms of an equivalent concentration, at or below: (1) 2.0 milligrams of respirable dust per cubic meter of air (mg/m³); and (2) 1.5 mg/m³ as of August 1, 2016.

Final paragraph (a)(1) is the same as proposed paragraph (a)(1). It retains the existing standard of 2.0 mg/m³ on the effective date of this final rule. Final paragraph (a)(2) is redesignated from proposed paragraph (a)(3) and changes the date on which the 1.5 mg/m³ standard is effective from the proposed 12 months to 24 months after the effective date of the final rule.

Unlike proposed paragraph (a)(2) and (a)(4), the final rule does not require that the standard be lowered to 1.7 mg/m³ 6 months after the effective date of the final rule, or to 1.0 mg/m³ 24 months after the effective date of the final rule.

MSHA proposed the 1.0 mg/m³ standard in accordance with Section 101(a)(1) of the Mine Act, 30 U.S.C. 811(a)(1). Section 101(a)(1) of the Mine Act requires that the Secretary take certain action when a recommendation to issue a rule, accompanied by a Criteria Document, is received from NIOSH. The Secretary must refer the recommendation to an advisory committee, or publish the recommendation as a proposed rule, or publish in the **Federal Register** the determination and reasons not to do so.

In 1995, NIOSH published and submitted to MSHA a Criteria Document on *Occupational Exposure to Respirable Coal Mine Dust*. Consistent with Section 101(a)(1) of the Mine Act, the Secretary referred the NIOSH Criteria Document to an advisory committee (Dust Advisory Committee).

In the Criteria Document, NIOSH recommended that respirable dust exposures be limited to 1.0 mg/m³ as a TWA concentration for up to 10 hours per day during a 40-hour work week as measured according to existing MSHA methods. This recommended exposure level (REL) was based on exposure-response studies of U.S. coal miners participating in the National Coal Workers' Health Surveillance Program (NCWHSP) and sampling data collected by the Bureau of Mines from 1969–1971 and MSHA from 1985–1988. NIOSH used an average concentration of 0.5 mg/m³ of respirable dust in its disease risk estimates because, at that time, it constituted the lower range of the exposure data. NIOSH determined that extrapolations beyond the range of the existing exposure data would have carried considerable uncertainty. NIOSH found that, at a mean concentration of 0.5 mg/m³, the excess risk of morbidity from progressive

massive fibrosis at age 65 exceeded 1/1,000 for all durations of exposure and coal ranks evaluated, including 15 years of exposure to medium/low-rank coal, believed to be least toxic. NIOSH expected that long-term average dust concentrations would be below 0.5 mg/m³ if miners' daily exposures were kept below the recommended exposure limit (REL) of 1.0 mg/m³ (NIOSH 1995). NIOSH also recommended that the 1.0 mg/m³ REL should apply to surface coal mines.

In 1996, the Dust Advisory Committee also recognized that overexposure to respirable coal mine dust remained a problem and recommended unanimously that MSHA consider lowering the allowable level of exposure to coal mine dust. The Committee reviewed MSHA monitoring data and scientific studies provided by NIOSH, including the NIOSH 1995 Criteria Document. The Committee concluded that

there is substantial evidence that either a significant number of miners are currently being exposed to coal mine dust at levels well in excess of 2.0 mg/m³ or that the current exposure limit for coal mine dust is insufficiently protective.

MSHA's QRA to the proposed rule used respirable dust exposure data collected from 2004 through 2008 and published quantitative studies on coal workers' morbidity from black lung (Attfield and Seixas, 1995), mortality from nonmalignant respiratory diseases (Attfield and Kuempel, 2008) and severe emphysema (Kuempel et al., 2009a) to estimate excess disease risks in U.S. miners. The QRA estimated disease risks after 45 years of single-shift occupational exposure at exposure levels under the existing standard. The QRA results indicated that, in every exposure category, exposure under the existing standards places miners at a significant risk of material impairment of health. In addition, MSHA found that average dust concentrations exceed the proposed respirable dust standard of 1.0 mg/m³ at a number of work locations in every occupational category. The percentage of work locations that would exceed the proposed respirable dust standard of 1.0 mg/m³ ranges from less than 1 percent for a few surface occupations to more than 70 percent for miners working on the longwall tailgate. The percentages are generally greater for underground occupations than for surface occupations. A statistically significant percentage of surface work locations (generally cleaning plant operations and surface drilling) have average dust concentrations exceeding the proposed exposure standard. For

part 90 miners, the average dust concentration exceeds the proposed standard of 0.5 mg/m³ at more than 20 percent of the work locations.

On March 8, 2011, MSHA issued a **Federal Register** notice (76 FR 12648) requesting comments on the proposed respirable dust concentration limits and requested alternatives. In addition, MSHA stated that the Agency received comments that some aspects of the proposed rule may not be feasible for particular mining applications and that MSHA is interested in comments.

MSHA received many comments on the proposed 1.0 mg/m³ standard and the proposed phase-in periods of 24 months for the proposed 1.0 mg/m³ standard and 12 months for the proposed 1.5 mg/m³ standard. Many commenters supported the proposed 1.0 mg/m³ standard. Other commenters suggested that MSHA, NIOSH, industry, and labor conduct a nationwide study using the CPDM to determine what dust concentrations are protective and achievable. MSHA intends to conduct a retrospective study that evaluates the 1.5 mg/m³ respirable dust standard to determine if the standard should be further lowered to protect miners' health.

The final rule responds to commenters' concerns by establishing feasible dust standards and a uniform, longer 24-month implementation date for the final respirable coal mine dust standards. In addition, the final 1.5 mg/m³ standard affirms MSHA's initial determination, set out in the proposal, that exposures at existing respirable dust levels are associated with coal workers' pneumoconiosis (CWP), chronic obstructive pulmonary disease (COPD) including severe emphysema, and death due to non-malignant respiratory disease (NMRD). All of these outcomes constitute material impairments to a miner's health or functional capacity. However, the final 1.5 mg/m³ standard comports with MSHA's initial conclusion in the preamble to the proposed rule that some mine operators may encounter engineering control implementation issues as they attempt to comply with the proposed 1.0 mg/m³ standard.

The final 1.5 mg/m³ standard is projected to have a greater impact on risk for underground miners than for surface miners. Surveillance and exposure data have been collected on U.S. underground coal miners for over 40 years; there are few comparable studies on surface coal miners. The QRA to the final rule shows that surface work locations exceed the final 1.5 mg/m³ standard on relatively few shifts and that the final 1.5 mg/m³ standard is

216

projected to have relatively little impact for surface workers who are exposed to average concentrations below 0.5 mg/m³. However, the data also show that certain surface occupations are exposed to concentrations of respirable dust exceeding the final 1.5 mg/m³ standard. Table 28 of the QRA for the final rule contains more details on the projected reduction in the health risks for each occupational category.

The final 1.5 mg/m³ and 0.5 mg/m³ standards and single shift sampling evaluated in the QRA for the final rule, and other requirements of the final rule will reduce respirable dust levels for miners. These other requirements include: (1) Sampling for a full shift, (2) changing the definition of normal production shift, (3) requiring the use of CPDMs for sampling, (4) revising the sampling program, (5) requiring more timely corrective action on a single, full-shift operator sample, (6) changing the averaging method to determine compliance on operator samples, and (7) requiring records of on-shift examinations and corrective actions taken to assure compliance with the respirable dust control parameters. Collectively, MSHA expects these requirements will reduce respirable dust levels that miners face, further protect miners from the debilitating effects of occupational respiratory disease, and result in improvements that would be greater than those shown in Table 28.

MSHA will continue to examine closely the 1.5 mg/m³ standard. This will include evaluation of miners' exposure to respirable coal mine dust under exposure hours that are in excess of 8 hours per shift, changes to the definition of normal production shift, and while using a CPDM. MSHA intends to work closely with all segments of the mining community in its continuing assessment of the 1.5 mg/m³ standard to determine whether the final rule achieves MSHA's goals to lower and maintain respirable dust levels to protect miners' health.

MSHA gave serious consideration to establishing a 1.0 mg/m³ standard, as proposed, based on its determination that there is a significant risk to miners of material impairment of health when exposures meet or exceed the proposed standard. MSHA has concluded, however, that additional sampling and experience may be warranted for underground coal mines while other provisions of the final rule are in effect, including full-shift sampling, the revised definition of normal production shift, and use of the CPDM, and that comparable experience is warranted for surface coal mines, before considering a standard lower than 1.5 mg/m³.

MSHA's technological feasibility analysis of the 1.5 mg/m³ standard and comments on the technological feasibility of the proposed 1.0 mg/m³ standard are discussed elsewhere in this preamble under Section III.C., concerning the Technological Feasibility of Achieving the Required Dust Standards.

Some commenters stated that the proposed 1.0 mg/m³ standard is not based on the best available evidence but rather is based on faulty science and medical data. These comments and the underlying evidence, science, and medical data in support of the final 1.5 mg/m³ standard are addressed in Section III.A. of this preamble, concerning Health Effects.

Some commenters stated their calculations showed that, as opposed to fewer than 200 citations per year for violations of the current 2.0 mg/m³ standard, a 1.0 mg/m³ standard based on a single, full-shift measurement could result in more than 230,000 citations annually. In addition, some commenters stated that MSHA failed to consider that each violation would require abatement, a penalty, and mine plan amendments, and would likely result in mine interruptions until plan approvals can be obtained and abatement accomplished. Some commenters also stated that MSHA overestimated the number of citations for excessive dust that would be issued under the proposed rule. They anticipated that a citation would be issued for every sample that met or exceeded the ECV and for every sample that met or exceeded the WPAE (weekly permissible accumulated exposure). As clarified by MSHA at the final public hearing, it was never the Agency's intent to issue multiple citations for excessive dust on single samples taken for the same entity and also issue a citation when the WPAE was exceeded. Based on MSHA's evaluation of public comments and changes included in the final rule, MSHA has revised its projections for the number of citations that will be issued for excessive dust as a result of the final rule; these projections are discussed in Appendix A of the REA.

Regarding the proposed phase-in periods, some commenters stated that if black lung is a problem, then the Agency needs to act quickly. Other commenters stated that lowering the standard within these time periods was not achievable and asked for more time. The 24-month implementation date for the final 1.5 mg/m³ standard will allow the mining community the opportunity to identify and implement feasible engineering controls; train miners and

mine management in new technology and control measures; and improve their overall dust control program. The Dust Advisory Committee unanimously recommended a phase-in period for any reduction to the existing standard. MSHA believes that 24 months will provide an appropriate amount of time for mine operators to feasibly come into compliance with the final respirable dust standard.

A few commenters stated that the results of respirable dust sampling suggest that the average dust concentration in many District 1 mines is under the proposed 1.0 mg/m³ standard. These commenters requested that anthracite mines be exempt from the final rule since overexposure to respirable dust above 1.0 mg/m³ is not a problem in these mines for various reasons: Low production, work shifts over 7 hours/day are not common, and the mines are very wet.

In response, MSHA's QRA for the final rule identifies NMRD mortality hazards not only for anthracite, but also for regions identified with high rank bituminous and low rank coal. Therefore, anthracite mines are not exempt from the dust standards in the final rule. Additional discussion on the health effects from exposure to respirable coal dust in anthracite mines is in Section III.B. of this preamble concerning the QRA.

Final § 70.100(b), is substantially the same as proposed § 70.100(b). It requires that each operator must continuously maintain the average concentration of respirable dust within 200 feet outby the working faces of each section in the intake airways, as measured with an approved sampling device and expressed in terms of an equivalent concentration at or below: (1) 1.0 mg/m³, and (2) 0.5 mg/m³ as of August 1, 2016.

Final paragraph (b)(1), like the proposal, requires that each operator maintain the concentration of respirable coal mine dust at or below 1.0 mg/m³. This standard is consistent with existing § 70.100(b).

Final paragraph (b)(2), like the proposal, requires that each operator maintain the concentration of respirable coal mine dust at or below 0.5 mg/m³ but, in response to comments, MSHA changed the implementation period from the proposed 6-month period to 24 months after the effective date of the final rule.

Proposed § 70.100(b)(2) would have provided a 6-month period for lowering the respirable dust standard in intake airways. MSHA proposed a 6-month period for the 0.5 mg/m³ standard because, based on Agency data for these

areas of the mine, MSHA believed this period would have provided an appropriate amount of time for mine operators to feasibly come into compliance. The proposed 6-month period for the proposed 0.5 mg/m³ standard was independent of proposed § 70.100(a)(2) regarding a 6-month period for the proposed 1.7 mg/m³ interim standard.

During the public comment period, MSHA solicited comment on the proposed phase-in period for lowering the dust standard for intake air courses. Commenters expressed concern that the proposed 6-month period was not sufficient for mine operators to develop, implement, and assess control measures necessary to meet the proposed 0.5 mg/m³ standard. In response to these comments, in the final rule MSHA changed the proposed 6-month period to 24 months after the effective date of the rule. The 24-month period is consistent with the period in final paragraph (a)(2). Like the 24-month period in final paragraph (a)(2), it will allow mine operators sufficient time to comply with the final 0.5 mg/m³ standard in paragraph (b)(2).

One commenter stated that sampling within 200 feet outby the working face is too close to locate the measuring point and that the best location to sample intake air is in the intake air course opposite the loading point.

MSHA has historically required that a lower dust standard be maintained in intake airways within 200 feet of the working faces (45 FR 23990, April 8, 1980). The purpose of the existing respirable dust standard for intake air is to ensure that the air ventilating working faces is sufficiently uncontaminated to assist in controlling respirable dust at the working faces (45 FR 23994). The final 0.5 mg/m³ standard will ensure that intake air ventilating the working faces is sufficiently clean before it reaches the working faces where major dust generating sources are located and where miners work. The required location of the sampling point, within 200 feet of the working face, is consistent with existing § 70.100, which has been in existence since 1980. The location provides an accurate sampling point for measuring respirable dust in intake airways. Similarly, under the final rule, maintaining the average concentration of respirable dust within 200 feet outby the working faces of each section in the intake airways at or below 0.5 mg/m³ ensures that relatively clean air is used to ventilate the face and where miners work. The lower standard will improve health protection for miners. Also, maintaining the lower

dust level using available engineering controls makes it more likely that an operator can maintain compliance with respirable dust standards in the MMU.

One commenter stated that the proposed 0.5 mg/m³ standard is unattainable. MSHA has concluded that this standard is feasible. Of the more than 8,200 samples taken by MSHA inspectors in underground coal operations during 2008 and 2009, less than 6% exceeded 0.5 mg/m³. The feasibility of the 0.5 mg/m³ standard is discussed in more detail elsewhere in this preamble under Section III. C., concerning the Technological Feasibility of Achieving the Required Dust Standards.

One commenter suggested that the rock dust application requirements of the Emergency Temporary Standard published in September 2010 (75 FR 57849) and finalized in June 2011 (76 FR 35968) affect the levels of respirable dust in the intake airway to which miners are exposed and would make compliance with the proposed standard problematic. This comment is addressed elsewhere in this preamble under § 70.101.

4. Section 70.101 Respirable Dust Standard When Quartz is Present

Final § 70.101(a), like proposed § 70.101(a), requires that each operator must continuously maintain the average concentration of respirable quartz dust in the mine atmosphere during each shift to which each miner in the active workings of each mine is exposed at or below 0.1 mg/m³ (100 micrograms per cubic meter of air or μg/m³) as measured with an approved sampling device and expressed in terms of an equivalent concentration.

Final § 70.101(b), like proposed § 70.101(b), requires that when the equivalent concentration of respirable quartz dust exceeds 100 μg/m³, the operator must continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed as measured with an approved sampling device and in terms of an equivalent concentration at or below the applicable respirable dust standard. It also states that the applicable dust standard is computed by dividing the percent of quartz into the number 10. It further requires that the application of this formula must not result in an applicable dust standard that exceeds the standard established by § 70.100(a).

Some commenters stated that they supported a separate standard for silica to better protect miners. One commenter suggested that MSHA develop a

program to reduce miners' exposures to silica that would include training, engineering and administrative controls, and respiratory protection. Some commenters who supported a separate silica standard did not support the proposal which would reduce the respirable coal mine dust standard when silica is present. Some of these commenters stated that the proposed formula should be changed and should be based on the percentage of quartz as a percentage of the standard rather than a percentage of the total weight of the sample. In addition, some of these commenters stated that it may not be feasible for certain mining operations to continue to operate if they are on a reduced respirable dust standard that could be as low as, or lower than, 0.5 mg/m³.

Final § 70.101(a) and (b), like the proposal, do not change the existing respirable dust standard when quartz is present and is consistent with existing § 70.101. Existing § 70.101 protects miners from exposure to respirable quartz by requiring a reduced respirable dust standard when the respirable dust in the mine atmosphere of the active workings contains more than 5 percent quartz. Existing § 70.101 is based on a formula that was prescribed by the Department of Health, Education and Welfare (now DHHS). The formula, which applies when a respirable coal mine dust sample contains more than 5.0 percent quartz, is computed by dividing 10 by the concentration of quartz, expressed as a percentage. The formula results in a continuous reduction in the respirable dust standard as the quartz content of the respirable dust increases over 5 percent (i.e., the higher the percentage of quartz, the lower the reduced respirable dust standard).

The standard in final paragraph (a) is based on the formula in existing § 70.101. Final paragraph (a), like existing § 70.101, is designed to limit a miner's exposure to respirable quartz to 0.1 mg/m³ (100 μg/m³-MRE), based on the existing 2.0 mg/m³ respirable dust standard.

The question of revising the existing respirable dust standard when quartz is present by establishing a separate standard for silica will be considered for a separate rulemaking. In addition, comments on the feasibility of meeting reduced respirable coal mine dust standards due to the presence of silica are discussed elsewhere in this preamble under Section III.C. regarding Feasibility.

Some commenters suggested that the rock dust application requirements of the Emergency Temporary Standard

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    **24883**

published in September 2010 (75 FR 57849) and finalized in June 2011 (76 FR 35968) affect the levels of silica to which miners are exposed and would make compliance with the proposed standard problematic. These commenters stated that applying rock dust introduces quartz into the sampling air stream thereby contributing to the total amount of respirable dust being measured and is a major source of weight gain in many samples.

If the rock dust used to maintain the incombustible content of the combined coal dust, rock dust, and other dust, meets the definition of rock dust under § 75.2, the applied rock dust does not need to contain a large portion of respirable dust and is allowed to contain a limited amount of silica. Mine operators can work with their suppliers to ensure the rock dust purchased contains a low percentage of respirable dust and very little, if any free silica. Limiting the percentage of respirable material and exercising care in the application of rock dust to limit the exposure of miners working downwind will reduce or eliminate the potential impact on respirable coal mine dust levels.

5. Section 70.201 Sampling; General and Technical Requirements

Final § 70.201 addresses general and technical sampling requirements concerning operator sampling. It includes requirements for sampling with the CPDM. Final § 70.201 is consistent with the Dust Advisory Committee's unanimous recommendation that CPDM technology, when verified, be broadly used along with other sampling methods for evaluation of dust controls at all MMUs and other high risk locations. The Committee further recommended that once verified as reliable, MSHA should use CPDM data for assessing operator compliance in controlling miner exposures and should consider use of CPDM data in compliance determinations. NIOSH has conducted the necessary scientific studies, whose results were published in a peer-reviewed document, which adequately demonstrated the CPDM to be an accurate instrument by meeting the long-standing NIOSH Accuracy Criterion. The recent MSHA and NIOSH approval of the CPDM, as meeting the intrinsic safety and accuracy requirements of 30 CFR part 74, shows that the CPDM is ready to be used as a compliance sampling device in coal mines.

Some commenters stated that operator sampling is not credible and that MSHA

should be responsible for all compliance sampling.

The Dust Advisory Committee recommended that MSHA secure adequate resources to carry out compliance sampling but, in the interim, operator compliance sampling should continue with substantial improvement to increase credibility of the program.

In 2009, MSHA conducted a targeted enforcement initiative that focused on miners' exposures to respirable coal mine dust at selected underground coal mines. As a result of the lessons MSHA learned during this initiative, MSHA instructed underground coal mine operators to conduct audits of their respirable dust monitoring and control programs and address any deficiencies. A mine operator is responsible for providing a safe and healthful mining workplace and must design an adequate plan, implement and monitor it, and revise it, as needed. MSHA prepared specific information for miners and mine operators to use as a tool for ending black lung disease. The information provided specific instructions on actions that could be taken to respond to MSHA's program, End Black Lung Act—Now!

Following the 2009 enforcement initiative, MSHA conducted a weeklong dust control emphasis program. During this program, every coal mine inspector dedicated a part of each inspection to health-related activities and applied the lessons learned during the enforcement initiative. Based on these lessons learned, MSHA reviewed the quality of dust controls stipulated in approved ventilation plans, focusing on the primacy of engineering controls and evaluated respirable dust practices during regular inspections. In addition, MSHA training specialists monitored the quality of training provided by industry personnel on the risks of, and methods to prevent, black lung. MSHA is continuing its dust emphasis program in order to increase surveillance of operator sampling and take appropriate action to ensure that an effective system is in place to investigate practices or actions which would cause unrepresentative dust samples to be submitted. MSHA is also continuing to use a national group of MSHA health specialists to conduct focused health inspections. These inspections emphasize the importance of maintaining dust controls to protect miners.

Some commenters stated that existing sampling procedures do not reflect accurate measurements of miners' exposure to respirable coal mine dust. The accuracy of the CMDPSU and the

CPDM is discussed in the section-by-section analysis concerning § 72.800 Single, Full-shift Measurement of Respirable Coal Mine Dust and Section III.C., Feasibility, respectively, of this preamble.

Some commenters stated that only the miner needs to be sampled to get a miner's exposure. This comment is addressed elsewhere in this preamble under § 70.201(c).

Final paragraph (a) is changed and clarified from the proposal. It requires that an approved CMDPSU be used to take bimonthly samples of the concentration of respirable coal mine dust from the designated occupation (DO) in each MMU until January 31, 2016. It also requires that, effective February 1, 2016, DOs in each MMU must be sampled quarterly with an approved CPDM as required by this part and an approved CMDPSU must not be used, unless notified by the Secretary to continue to use an approved CMDPSU to conduct quarterly sampling.

Final paragraph (a) changes the proposed implementation period for using the CPDM from 12 to 18 months after the final rule is effective. Paragraph (a) clarifies that during the 18-month period, an operator must take bimonthly samples of the DO in each MMU using a CMDPSU. It further clarifies that, after the 18-month period, bimonthly sampling will cease and the DO in each MMU must be sampled quarterly with an approved CPDM instead of a CMDPSU, unless the Secretary provides notification to continue using a CMDPSU for quarterly sampling.

On October 14, 2009, MSHA published a request for information (74 FR 52708) on the use of the CPDM as a sampling device to measure a miner's exposure to respirable coal mine dust. All commenters generally agreed that the required use of a CPDM would enhance the protection of miners' health.

On March 8, 2011, MSHA issued in the **Federal Register** a request for comments (76 FR 12648) and stated that in the proposal, MSHA also planned to phase in the use of CPDMs to sample production areas of underground mines and part 90 miners. MSHA solicited comments on the proposed phasing in of CPDMs, including time periods and any information with respect to their availability. MSHA requested commenters to provide the rationale if they recommended shorter or longer time frames (76 FR 12649).

Some commenters suggested that the proposed 12-month period should be lengthened; others suggested that it be shortened. A few commenters suggested that MSHA should extend the phase-in

**24884**    Federal Register / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations

period and allow the use of both, the CMDPSU and the CPDM, during the phase-in period because limiting the type of equipment when there is a new technology available can result in problems.

In response to the comments, final paragraph (a) extends the time after which only a CPDM can be used to conduct operator sampling, from 12 to 18 months to allow operators additional time to obtain CPDMs and train miners in the use of these devices. In addition, the requirement that a CMDPSU used to conduct sampling during the 18 months following the effective date of the final rule addresses commenters' concerns that the proposed sampling provisions were too confusing. Final paragraph (a) simplifies the proposed sampling requirements by requiring that all operators continue to sample production areas bimonthly with the CMDPSU for the first 18 months after the effective date of the rule and that the operators stop sampling bimonthly and switch to quarterly sampling with the CPDM after the 18-month period. Additionally, maintaining operators' existing bimonthly sampling with a CMDPSU during the 18 months following the effective date of the rule allows operators time to concentrate on their dust control systems, train miners on the new sampling requirements, and learn how to operate the CPDM and certify persons to handle the CPDM.

MSHA is aware that the CPDM will be in demand and there is currently only one manufacturer of the device. MSHA has contacted the manufacturer and discussed the amount of time needed to produce the necessary quantity of CPDMs. In addition, MSHA considered the amount of time it would take for the Agency and operators to train necessary personnel in the use and care of the device. An 18-month period after the effective date of the final rule should be a sufficient amount of time for production of the CPDM and training on the use of the CPDM. Under the final rule, the amount of sampling and, thus, the number of CPDMs needed are significantly reduced from what the proposal would have required. However, if MSHA determines that there are logistical or feasibility issues concerning availability of the CPDM, MSHA will publish a notice in the **Federal Register** to continue to use an approved CMDPSU to conduct quarterly sampling. In addition, assuming no technological issues arise concerning the use and manufacture of CPDMs, and depending on manufacturer projections, if CPDMs are not available in sufficient quantities, MSHA will accept, as good faith evidence of compliance with the

final rule, a valid, bona fide, written purchase order with a firm delivery date for the CPDMs.

Some commenters stated that MSHA underestimated the number of CPDMs needed to comply with the proposal. In the development of the final rule, MSHA discovered an error in MSHA's estimates for the number of CPDMs that would have been required to sample ODOs under the proposed rule. Chapter IV of the REA for the final rule discusses MSHA's underestimation and provides a revised calculation of the number of CPDMs that would have been needed under the proposal.

Final paragraph (b) is changed from the proposal. It requires that an approved CMDPSU be used to take bimonthly samples of the concentration of respirable coal mine dust from each designated area (DA) as required by this part until January 31, 2016. The proposal would have required quarterly sampling of the DA on the effective date of the final rule. The bimonthly sampling requirement of DAs for the first 18 months after the effective date of the final rule is consistent with the bimonthly sampling required by existing § 70.201. Continuing the existing bimonthly sampling of DAs during the 18-month period is also consistent with the bimonthly sampling of DOs in each MMU required by final paragraph (a). As discussed above, the 18-month period, after which the use of CPDMs is required, will provide sufficient time for manufacturers to produce the necessary quantity of units and for MSHA and operators to train personnel in the use and care of the CPDM. On February 1, 2016, final paragraph (b)(1) requires that DAs associated with an MMU be redesignated as Other Designated Occupations (ODO). Paragraph (b)(1) clarifies that ODOs must be sampled quarterly with an approved CPDM as required by this part and an approved CMDPSU must not be used, unless notified by the Secretary to continue to use an approved CMDPSU to conduct quarterly sampling. Final paragraph (b)(1) is derived from proposed paragraphs (b) and (c).

A few commenters stated that requiring existing DAs associated with an MMU to be redesignated as ODOs will not result in any increased protection for miners because the DO is the occupation that is most exposed to respirable dust. These commenters stated that the additional sampling is too burdensome and costly especially on small mine operators.

Existing DAs associated with an MMU are to be designated as ODOs because the sampling would be used to measure

respirable dust exposure of occupations on an MMU rather than areas associated with an MMU. Examples of DAs associated with an MMU that would be designated as ODOs and an explanation of the frequency of sampling ODOs are in final § 70.208(b) concerning quarterly sampling. The final rule will help ensure that the sample reflects an accurate measurement of the occupation monitored and will provide comparable protection for ODOs and DOs. For example, ODOs identified by the District Manager would be based on MSHA's historical sampling data on the MMU. Sampling of ODOs such as shuttle car operators on MMUs using blowing face ventilation would be required because MSHA's data show that sampling only the DOs does not always adequately protect other miners in the MMU. In response to commenters' concerns, under § 70.208 of the final rule, operators will sample each DO and each ODO each calendar quarter until 15 valid representative samples are collected for each. The total number of samples required from the DO and ODO is less than the total proposed 24/7 sampling of the DO and sampling of the ODO for 14 shifts. The required sampling for a typical MMU using blowing face ventilation will have 1 DO and 2 ODOs and, under the final rule, will require sampling until 15 valid representative samples are collected each from that DO and each ODO during the calendar quarter. Sampling of an ODO must follow completion of sampling for the DO, and sampling of a second ODO must follow completion of sampling for the first ODO. Additional discussion of sampling ODOs that are redesignated from existing DAs is provided in § 70.208 regarding quarterly sampling of MMUs.

Final paragraph (b)(2) is similar to proposed paragraph (d). On February 1, 2016, final paragraph (b)(2) requires that DAs identified by the operator under § 75.371(t) of this chapter be sampled quarterly with an approved CMDPSU as required by part 70, unless the operator notifies the District Manager in writing that an approved CPDM will be used for all DA sampling at the mine. The notification must be received at least 90 days before the beginning of the quarter in which CPDMs will be used to collect the DA samples.

Paragraph (b)(2) clarifies that the quarterly sampling of the DAs applies to those DAs that are identified by the operators under § 75.371(t). In addition, paragraph (b)(2) clarifies that the operators may use the CMDPSU while conducting DA sampling but, if operators plan to conduct DA sampling using the CPDM rather than the

CMDPSU, operators must notify MSHA of their intent to do so. This clarification ensures that operators do not switch between sampling devices on successive quarterly sampling periods, or use both sampling devices during the same sampling period. The 90-day notification period allows MSHA sufficient time to modify MSHA's health computer system to accept CPDM electronic records for all DAs located at the mine.

One commenter stated that DA sampling should be eliminated because MSHA stated that using the CPDM is not the best use for sampling a DA. DA sampling provides important information needed to evaluate the dust controls used in the DA so that the mine operator can ensure that miners working in these areas are protected. Because the CMDPSU reports of sample results provide the necessary information for these area samples, and because the CPDM is designed to be worn, the final rule provides that a mine operator must use CMDPSUs for sampling DAs. However, a mine operator may, upon notifying the District Manager, use CPDMs for sampling all DAs in a mine.

Final paragraph (c) is the same as proposed paragraph (e). Like the proposal, it requires that sampling devices be worn or carried directly to and from the MMU or DA to be sampled and be operated portal-to-portal. In addition, it requires that sampling devices remain with the occupation or DA being sampled and be operational during the entire shift, which includes the total time spent in the MMU or DA and while traveling to and from the mining section or area being sampled.

Several commenters supported the proposal that sampling devices be operational while traveling to and from the mining section or area being sampled. Paragraph (c) clarifies the existing requirement that the sampling device be operated portal-to-portal. Miners are exposed to respirable dust while traveling to and from the working section or area being sampled. Many miners ride mantrips onto the section, some for as long as an hour, during which time miners are exposed to respirable dust. Sampling during travel time provides an accurate measurement of respirable dust exposures during usual work conditions because it accounts for all the time that a miner works and is exposed to respirable coal mine dust.

Many commenters expressed support for full-shift sampling. Some of these commenters indicated that it is not uncommon today for miners to work longer than the traditional 8-hour work shift and agreed that it is appropriate to

determine miners' respirable dust exposure based on their full work shift. Other commenters acknowledged that turning off a sampler after 8 hours is not representative of the time that miners work and the respirable dust conditions in which they work.

MSHA agrees with commenters and believes that it is more appropriate to determine miners' daily exposures based on their full work shift. Full-shift sampling will provide operators with the opportunity to manage miners' exposure to coal mine dust so that miners will be adequately protected. MSHA estimates that the average work shift on active mining units is approximately 9 hours for non-longwall mining and 10 hours for longwall mining. Working shifts longer than 8 hours increases exposure to respirable coal mine dust, resulting in increased health risks to miners, both in terms of incidence and severity. In addition, limiting the sampling duration to 8 hours, when a miner's work shift may be 10 hours, 12 hours, or longer, does not provide an adequate assessment of the respirable dust exposure during the full shift. According to NIOSH's Current Intelligence Bulletin 64 ("CIB 64"), Coal Mine Dust Exposures and Associated Health Outcomes—A Review of Information Published Since 1995 (2011): "U.S. coal miners are working longer hours, which leads to the inhalation of more respirable coal mine dust into the lungs."

Final paragraph (c) is consistent with the 1996 Advisory Committee's Report, the 1995 NIOSH Criteria Document, and the conclusions of the 1992 Coal Mine Respirable Dust Task Group Report. This final provision is also consistent with generally accepted industrial hygiene principles today, which take into consideration all of the time a worker is exposed to an airborne contaminant, even if it exceeds 8 hours a day.

Therefore, final paragraph (c) requires operators to sample during the entire shift as discussed above, portal to portal, rather than a maximum of 8 hours. This will account for all the time that a miner works and allow more representative measurement of miners' exposures to respirable coal mine dust.

Final paragraph (c), like the proposal, continues the area sampling requirement of existing § 70.201(b). Under the final rule, the sampling device must remain with the occupation or DA being sampled during the entire shift to ensure that respirable dust concentration levels are continuously being monitored. If a miner in an occupation being sampled changes from one occupation to another during the

production shift, the sampling device must remain with the occupation designated for sampling. For example, if using a CPDM to sample a DO (continuous mining machine operator) on a continuous mining section and the duties of the machine operator are divided equally between Miner 1 and Miner 2, the dust sampler must be worn for half the shift by Miner 1 and the other half by Miner 2, while each is operating the continuous mining machine. Similarly, a dust sampler must remain at the DA during the entire shift. Once sampling results are available, mine operators and MSHA would analyze the data to determine if adjustments need to be made (e.g., re-designating DOs or modifying dust control parameters).

In the March 8, 2011, request for comments (76 FR 12650), MSHA stated that some commenters suggested during the rulemaking hearings that, for compliance purposes, respirable dust samples should be taken only on individual miners in underground coal mines. MSHA further stated that, under the existing rule, MSHA enforces an environmental standard, that is, the Agency samples the average concentration of respirable dust in the mine atmosphere. MSHA also stated that the proposed rule would continue the existing practice that samples be collected from designated high-risk occupations associated with respirable dust exposure and from designated areas associated with dust generation sources in underground mines. MSHA solicited comments on the sampling strategy in the proposed rule, any specific alternatives, supporting rationale, and how such alternatives would protect miners' health.

Some commenters supported the continuation of area sampling. One of these commenters preferred area sampling or personal sampling stating that personal sampling would necessitate that every miner be sampled. This commenter also stated that a miner's activities, e.g., lunch break, should be considered as part of his normal activity and count towards normal exposure. Another commenter stated that area sampling makes sense only when using the CMDPSU.

Many commenters stated that they preferred personal sampling, particularly when using the CPDM, because the CPDM provides an accurate measurement of an individual miner's exposure rather than potential exposure at a single work location. Many of these commenters stated that the CPDM was designed and tested for personal sampling and personal exposure and that using it for area sampling defeated

its designated purpose because it was not designed to be hung and left unattended. These commenters also stated that the CPDM was designed to provide immediate information to the miner so that the miner could make immediate adjustments in behavior, tactical positioning in relation to dust sources, or mining procedures. A few commenters stated that not conducting personal sampling hinders an operator's ability to rotate miners to reduce exposures. Some commenters suggested that full-shift personal sampling of the highest risk miner on all production shifts would provide a valuable data base for researchers to use to pinpoint areas in need of improvement and provide miners with real time data that they could use to prevent overexposure resulting in reduced exposure to dust concentrations without any need to reduce the existing permissible level. Some commenters stated that area sampling is an antiquated practice and adds to sampling complexity by requiring new plan approvals and irrelevant details. Other commenters stated that passing the pump from miner to miner as is required during area sampling causes measurement errors and does not result in a true representation of the miner's exposure. A few commenters stated that individual sampling is preferred by industrial hygienists, and one commenter noted that personal sampling is consistent with the NIOSH recommendation and OSHA's sampling approach. A number of commenters stated that the final rule should provide for sampling underneath a respirator, in the miner's immediate breathing zone, instead of requiring atmospheric sampling.

The Advisory Committee recommended a mix of samples—personal, occupational, and area—to be a reasonable, systematic approach for the determination of miners' respirable dust exposure and subsequent control of exposure. The NIOSH Criteria Document stated that personal sampling is preferable and that area sampling should be substituted for personal sampling only where area sampling has been shown to measure an equivalent or higher concentration. However, the NIOSH Criteria Document also stated area sampling is sufficient under Section 202(b) of the Mine Act.

An area sample is one taken at a fixed location. It measures the concentration of respirable dust in that location and not necessarily the exposure of any individual. Area sampling under existing § 70.201(b) involves sampling the occupation or DA and has been in use by MSHA since 1970. Section

202(b)(2) of the Mine Act requires an operator to ''. . . continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed. . . .'' The purpose of this provision, as set forth in Section 201(b) of the Mine Act, is to ensure that ''the working conditions in each underground coal mine are sufficiently free of respirable dust concentrations in the mine atmosphere to permit each miner the opportunity to work underground during the period of his entire adult working life without incurring any disability from pneumoconiosis or any other occupation-related disease during or at the end of such period.'' 30 U.S.C. 841(b). The area sampling requirement of the final rule is consistent with sections 201(b) and 202(b)(2) of the Mine Act. Rather than measuring the exposure of any individual miner for the duration of a shift, area sampling allows an operator to monitor the mine atmosphere with the greatest concentration of respirable dust in the areas where miners are working or traveling and to take corrective measures that protect each miner working or traveling in the area. For example, based on the various dust generating sources and the manner in which the face is ventilated, the area by the continuous mining machine operator on a continuous mining MMU is the area on a continuous mining MMU with the greatest concentration of respirable dust. Since miners are required to work in this area, operators are required to maintain the mine atmosphere in this area or location in compliance with the dust standard on each shift. By doing so, other miners in less risky occupations are protected from excessive dust concentrations.

While area sampling does not show a particular miner's dust exposure, the area sampling results will show whether miners are exposed to excessive dust concentrations. The objective of area sampling is to control the concentration of respirable dust to which miners are exposed in the workplace. In *American Mining Congress* v. *Secretary of Labor*, 671 F.2d 1251 (10th Cir. 1982), the Court found that area sampling was reasonable and consistent with the Mine Act.

If placed in a fixed location, the CPDM will provide an accurate measurement of the respirable dust in the atmosphere where miners work or travel. In addition, it will provide immediate information to the miners working in that location so that the mine operator could make immediate adjustments in controls in relation to

dust sources to reduce dust generation or suppress, dilute, divert, or capture the generated dust. Compared with administrative controls or respirators, well-designed engineering controls provide consistent and reliable protection to all workers because the controls are less dependent on individual human performance, supervision, or intervention to function as intended. Area sampling with the CPDM will also provide information on miners' exposure in areas with the highest concentration of dust. This will give the mine operator and MSHA valuable data to pinpoint areas in need of improvement.

Passing the CPDM from miner to miner will not cause measurement errors because passing the CPDM is done in conjunction with a certified person. The certified person will ensure that the CPDM is properly handled when passed from one miner to the next. In addition, MSHA has not received any notification on dust data cards indicating any significant issues encountered during the switching of the existing CMDPSU since 1981. Area sampling effectively achieves the purpose of the Mine Act to protect the health of miners by requiring operators to maintain good air quality in the mine.

Final paragraph (c)(1) is the same as proposed paragraph (e)(1). It requires that when using a CMDPSU and the work shift to be sampled is longer than 12 hours, the operator must switch-out the unit's sampling pump prior to the 13th hour of operation.

Final paragraph (c)(2) is the same as proposed paragraph (e)(2). It requires that the operator switch-out the CPDM with a fully charged device prior to the 13th hour of operation, if the work shift to be sampled is longer than 12 hours.

In the March 8, 2011, request for comments (76 FR 12649), MSHA stated that the Agency understands that some work shifts are longer than 12 hours, and that dust sampling devices generally last for approximately 12 hours. MSHA solicited comments on appropriate time frames to switch-out sampling devices, CMDPSUs or CPDMs, to ensure continued operation and uninterrupted protection for miners for the entire shift.

Some commenters stated that switching out the pump prior to the 13th hour is financially burdensome to the operator because it will require purchasing additional pumps. Other commenters stated that until the CPDMs are available, the CMDPSU should only be used for 8 hours because mechanical problems may require a miner to work over 12 hours and additional samplers may not be readily available. Some

Federal Register / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations    **24887**

commenters stated that it would probably be best to change the sampling device after the end of an eight-hour shift to make certain the unit has enough battery life to cover the number of hours a miner works and the results of the samples could then be combined.

The CMDPSU manufacturer's instructional manual states that the typical battery-pack service life varies from a minimum of 8 hours to a maximum of 11.5 hours. However, the manufacturer's testing parameters are more rigorous than the conditions in the mine. The pumps are tested in extreme levels of coal mine dust which cause large amounts of dust to accumulate on the filter. This leads to high back pressure, requiring the pump to work harder, and resulting in a shorter battery life. With the use of proper dust controls, the pump will not have to work as hard, thereby prolonging the battery life. To address shifts greater than 12 hours, the final rule requires that the unit be switched-out prior to the 13th hour to prevent disruption in operation and to provide continued protection for miners. Mine operators who have knowledge that their sampling pumps will not last more than 12 hours should change them out sooner to ensure the full sampling period is covered. If the battery is depleted before the end of the shift, the sample would be voided.

NIOSH's Report of Investigations 9669, Laboratory and Field Performance of a Continuously Measuring Personal Respirable Dust Monitor (Volkwein et al., NIOSH (2006)) suggests that 12 hours of battery power be provided to the CPDM. In addition, 30 CFR 74.7(i) requires the CPDM to have sufficient battery capacity to operate for 12 hours. The final rule is consistent with NIOSH's report and the existing CPDM approval requirements in 30 CFR part 74. It requires that the CPDM be switched-out prior to the 13th hour to prevent disruption in operation and to provide continued protection for miners.

Final paragraph (d) is substantially the same as proposed paragraph (f). It requires that, if using a CMDPSU, one control filter be used for each shift of sampling. Each control filter must: (1) Have the same pre-weight date (noted on the dust data card) as the filters used for sampling; (2) Remain plugged at all times; (3) Be used for the same amount of time, and exposed to the same temperature and handling conditions as the filters used for sampling; and (4) Be kept with the exposed samples after sampling and in the same mailing container when transmitted to MSHA.

MSHA did not receive comments on the proposed control filter requirements.

Final paragraph (d), which requires an operator to use control filters when sampling, is consistent with accepted industrial hygiene principles and practice. A control filter is an unexposed filter of the same design as the filter used for sampling and is pre and post-weighed on the same day as the filter used for sampling. MSHA first began using control filters in its enforcement program in May 1998 and continues this practice today. Control filters improve measurement accuracy by eliminating the effect of differences in pre- and post-exposure laboratory conditions, or changes introduced during storage and handling of the filter cassettes. The final rule extends the program in effect since July 2007, which allows operators to use control filters in the optional quartz sampling program, to the entire sampling program. The control filter must be used for all operator sampling to adjust the resulting weight gain obtained on each exposed filter by subtracting any change in the weight of the control filter from the change in weight of each exposed filter. This is especially important since that filter cassettes to be used by operators would be pre-weighed by the manufacturer and post-weighed by MSHA. To ensure the precision and accuracy of the pre-weight of filters, MSHA audits the daily production of filter cassettes. The program conforms to ANSI/ASQ Z1.4–2008, "Sampling Procedures and Tables for Inspection by Attributes," which defines the criteria currently used to monitor the quality of the operator bimonthly sampling program.

Since the control filter would be used to adjust the resulting weight gain obtained on each exposed filter cassette, the control filter must have the same pre-weight date as the filter cassette to be used for sampling on the same shift. The pre-weight date is noted on the dust data card. To prevent exposure to the mine environment, the plugs attached to the inlet and outlet side of the cassette must not be removed. Also, it is important that the control filter be used for the same amount of time, and exposed to the same temperature and handling conditions as the ones that are used for sampling, i.e., carry the control filter in a shirt or overall pocket while underground. While the control filter can be carried by any miner assigned to the MMU being sampled, it would be preferable if that miner performed the job of the DO. Finally, the control filter cassette must be kept together with the exposed samples after sampling and should be treated in the same manner as

the exposed filters prior to being transmitted to MSHA. Failure to follow these instructions would be cause for voiding the sampling results.

Final paragraph (d)(4) requires that the control filter must be in the same mailing container as the exposed samples when transmitted to MSHA. This provision is new and will ensure that the control filter and the sample are linked during processing of the sample that is being submitted to MSHA.

Final paragraph (e) is the same as proposed paragraph (g). It requires that records showing the length of each production shift for each MMU be made and retained for at least six months and be made available for inspection by authorized representatives of the Secretary and the representative of miners, and submitted to the District Manager when requested in writing.

One commenter stated that production shift records should be retained for 12 months. A few commenters stated that the production shift records are unnecessary and excessively burdensome.

Under the final rule, mine operators need to know the length of the production shift to enter this information into the CPDM or record it on the CMDPSU dust card. The information is also necessary for MSHA to verify that an operator is accurately recording the production shift lengths for sampling. The 6-month retention period will give MSHA adequate time to review the records. Although some commenters suggested longer retention periods for production records, the Agency does not believe that a longer period is justified in light of the record's purpose.

Final paragraph (f) is the same as proposed paragraph (h). It requires that upon request from the District Manager, the operator must submit the date and time any respirable dust sampling required by this part will begin, and that this information be submitted at least 48 hours prior to scheduled sampling.

One commenter supported the proposal. Another commenter stated that the proposed requirement to submit information to MSHA 48 hours prior to scheduled sampling creates a burden on MSHA. One commenter suggested that less than 48 hours notice should be allowed for legitimate reasons provided the District Manager is notified of the change. The 48-hour notification requirement does not create a burden on MSHA; rather it provides MSHA with the opportunity to observe and monitor operator sampling to ensure that both operating conditions and sampling requirements are met. MSHA will consider mitigating circumstances if

223

conditions or activities outside the operator's control interfere with meeting the 48-hour requirement. Under those circumstances, however, the mine operator would need to notify the District Manager of any changes to the sampling schedule as soon as possible.

Final paragraph (g) is the same as proposed paragraph (i). It requires that to establish a normal production shift, the operator record the amount of run-of-mine material produced by each MMU during each shift to determine the average production for the most recent 30 production shifts, or for all the production shifts if fewer than 30 shifts of production data are available. It further requires that production records be retained for at least six months and be made available for inspection by authorized representatives of the Secretary and the miners' representative.

The final rule is consistent with the Dust Advisory Committee's recommendation that MSHA require the mine operator to maintain the appropriate production records. MSHA currently relies on production information provided by the operator to determine at what production level the mine ventilation plan should be evaluated. No production records are required for each MMU. Although operators must submit production data on a quarterly basis, the data are compiled for the entire mine. In addition, quarterly reports provide information on the amount of clean coal produced, which is much lower than the tonnage of total run-of-mine material produced, and is not useful for establishing what constitutes a normal production shift for each MMU for sampling.

MSHA will use the production records to establish a normal production level. If there were no records indicating typical production levels in the mine, MSHA would be unable to determine whether an operator's sampling of dust concentrations occurred during a shift that reasonably represented typical production levels and mining conditions.

One commenter stated that production records to establish a normal production shift would not be necessary once operators were required to sample with CPDMs every production shift, 7 days per week, 52 weeks per year. The final rule does not require 24/7 continuous sampling. This commenter also stated that, under the revised definition of an MMU, it would be difficult to separate production between two sets of equipment because shuttle cars may pull coal from different continuous mining machines.

The MMU production is associated with the amount of material cut and loaded by the mining machine (continuous mining machine, loading machine, etc.). The mine operator must relate the production of material to the MMU. Which shuttle cars are pulling from a specific MMU does not determine the amount of material produced by each MMU. MMU-specific information is available through various methods and MSHA believes that the majority of mines currently track production on a per-MMU basis.

One commenter requested a 12-month record retention period. The 6-month period will allow MSHA sufficient time to review the production records and, therefore, a longer retention period is not necessary. The 6-month time allows MSHA adequate time to be at the mine and have access to sampling data to determine if the samples are representative samples.

Final paragraph (h) is substantially similar to proposed paragraph (j). It requires that mine operators using CPDMs provide training to all miners expected to wear a CPDM. The training must be completed prior to a miner being required to wear a CPDM, and then every 12 months thereafter. This training must be provided to each miner working in a position as a DO or ODO. In addition, if a CPDM is used for DA sampling, and the DA location for the sample is on the miner performing specific tasks, the training must be provided to the miner that will be wearing the CPDM.

Many commenters supported initial and annual retraining requirements on the CPDM and indicated that the knowledge was necessary to help reduce dust exposure. One commenter generally stated that the proposed training requirements are burdensome for the mine operator. One commenter recommended that refresher CPDM training be provided every 6 months. A few commenters indicated that the 12-month retraining requirement is extensive and does not achieve any safety benefit for miners who only wear the CPDM and do not set it up.

The Mine Act recognizes the importance of miner training and education in the prevention of injury and disease. In accordance with Section 115(b) of the Mine Act, training must be provided during normal working hours and miners must be paid at their normal rate of pay while they take such training. In addition, if the training is provided at a location other than the normal place of work, miners must be compensated for the additional costs they may incur in attending such training sessions. 30 U.S.C. 825.

Initial training is appropriate to ensure miners wearing CPDMs understand the function and purpose of the equipment they are wearing and the importance of monitoring dust concentrations. Although certified persons set up the CPDMs, a miner who is trained on the use and operation of the sampler and information displayed on the CPDM is more likely to recognize potential problems and respond to them appropriately. Based on MSHA's experience and consistent with other 30 CFR training requirements, training is most effective when provided close to the time when the miner is expected to wear the CPDM and then reinforced every 12 months. It is essential that miners who wear a CPDM have a fundamental understanding of its operation even if they are not setting up the CPDM for sampling. Usage of the CPDM by miners, such as accessing information and collecting short-term samples, is discussed below concerning paragraphs (h)(3) and (h)(4).

MSHA received several comments both for and against including CPDM training in part 48 training. Several commenters suggested that the training should be included in part 48 new miner training, experienced miner training and annual refresher training. Other commenters stated that the initial and annual CPDM training should not be incorporated into part 48 training, generally stating that part 48 training already includes too much information, making it difficult for miners to retain all that is given. They indicated that it is important to give miners the needed time to learn about the CPDM.

After reviewing all the comments, MSHA determined that additional training should not be added to part 48 training. MSHA considered whether training on the operation and use of the CPDM could be adequately covered under part 48 training, taking into account the other subjects that part 48 is required to address. MSHA determined that it is impractical to include the proposed comprehensive training on CPDMs within the prescribed time limits under part 48. Additional time should be allotted for CPDM training under part 48. However, operators may choose to provide CPDM training separately from training under part 48, or may provide CPDM training on days that part 48 training is held as long as additional time is designated to ensure that training on the CPDM required under the final rule is sufficient.

Final paragraphs (h)(1)–(4) are similar to proposed paragraphs (j)(1)–(5). Proposed paragraph (j)(2) would have required all miners to be instructed on

224

how to set up the CPDM for compliance sampling. Some commenters stated this was unnecessary and were concerned that it could lead to persons who are not certified performing functions that require certification.

In response to the comments, the final rule requires mine operators to have certified persons set up the CPDM for compliance. Therefore, it is not necessary to train miners on the set up of the CPDM. Miners who are not certified persons are, however, required to be trained on topics that pertain to shift sampling under final paragraph (h). Final paragraph (h)(1) is similar to proposed (j)(5). It requires that the training include the importance of monitoring dust concentrations and properly wearing the CPDM. Final paragraph (h)(1) includes a conforming change. The proposal would have required training on the importance of "continuously" monitoring dust concentrations. Since continuous monitoring is not required by the final rule, the term "continuously" is not included in paragraph (h)(1). Commenters generally agreed that miners need to be trained on the importance of monitoring dust and how to wear the CPDM.

Final paragraph (h)(2) is the same as proposed (j)(1). It requires that training include explaining the basic features and capabilities of the CPDM. One commenter indicated that training miners in all functions of the CPDM may result in an uncertified person activating functions that only a person certified in sampling, maintenance, and calibration should be able to access. Most commenters supported the proposed requirement, noting that miners have a right to know the features and functions of the equipment, and its capabilities, as well as what the collected information means.

It is vital that miners are properly trained on the operation of CPDMs to ensure the integrity and credibility of the sampling process. For the sampling program to be effective, miners must understand the proper use of the CPDM and its operation. Well-informed miners are more likely to make the most of the capabilities of the new CPDM technology.

Final paragraph (h)(3) is similar to proposed paragraph (j)(3). Like the proposal, it requires that training include discussing the various types of information displayed by the CPDM and how to access that information. This training will provide a miner with an understanding of how to use the displayed data to assess any concerns of overexposure to respirable dust. Several commenters expressed concern about

training on how to access information on a CPDM. One commenter stated that only persons certified in sampling, maintenance, and calibration should be able to access data that are not readily displayed during use. The commenter added that if miners access data, it would have negative effects on the sampling process.

To clarify, this training is limited to accessing information that is readily available by pushing a button located on the CPDM. This only changes the information provided on the display screen and does not affect programming of the CPDM to collect a full-shift sample. The training is necessary to provide users with an understanding of how to access the various screens and data displayed on these screens, but not to change the settings on the CPDM.

Final paragraph (h)(4) is the same as proposed paragraph (j)(4). It requires that training include how to start and stop a short-term sample run during compliance sampling. A short-term sample is an engineering evaluation, which runs for a term shorter than the full-shift sampling, and provides information on respirable dust levels in a particular location.

One commenter stated that it is not necessary to train a miner, who simply is going to wear the unit for sampling, on how to start, stop, reset, or to do any function that is required to be performed by a certified person.

It is important that miners be able to conduct, access, and view short-term sampling. This would not interfere with an ongoing compliance sampling run and would not change any programmed settings entered by a certified person. Short-term samples can provide a miner with immediate information regarding the real-time dust levels in his work location. As changes are made in dust controls on the MMU, or in the miner's physical location, short-term sampling will provide data concerning the miner's exposure to respirable dust. These data will be useful to the miner in making adjustments to his work practices. Miners do not need to be certified in sampling to be able to conduct the short term sampling.

Final paragraph (i) is similar to proposed paragraph (k). It requires that an operator keep a record of training at the mine site for 24 months after completion of the training. It also provides that an operator may keep the record elsewhere if the record is immediately accessible from the mine site by electronic transmission. It further requires that, upon request by an authorized representative of the Secretary, Secretary of HHS, or representative of miners, the operator

must promptly provide access to any such training records. Final paragraphs (i)(1)–(3) require the record to include the date of training, the names of miners trained, and the subjects included in the training.

Final paragraph (i) makes a non-substantive change by replacing the proposed term "2 years" with "24 months."

Final paragraphs (i)(1)–(3) are new; they were added to clarify that the record must contain sufficient information for an authorized representative of the Secretary, Secretary of HHS, or miners' representative to determine that the operator has provided CPDM training in accordance with requirements in paragraph (h). This is the type of information that is generally required for all training records to establish that the training has occurred.

One commenter stated that the proposed requirement to keep records is burdensome. Another commenter favored the proposed retention period. Record retention for the 24-month period is important so that MSHA can determine that the required initial and retraining has been provided.

Final paragraph (j) is new. It provides that an anthracite mine using the full box, open breast, or slant breast mining method may use either a CPDM or a CMDPSU to conduct the required sampling. It requires that the mine operator notify the District Manager in writing of its decision to not use a CPDM. Final paragraph (j) is added in response to comments that the CPDM will be damaged or destroyed by miners going up and down the pitch in an anthracite mine. In addition to damage to the unit, MSHA has concluded from its experience with anthracite mines, that miners may also be injured due to the particular configuration of such mines. Therefore, final paragraph (j) allows operators to use either sampling device due to the potential hazards to the miner associated with mining in such confined spaces with extremely pitching coal seams.

Final paragraph (k) is similar to proposed § 70.209(h) and moved to this final § 70.201. It provides that MSHA's approval of the dust control portion of the operator's mine ventilation plan may be revoked based upon samples taken by MSHA or in accordance with this part 70. Paragraph (k) is consistent with existing § 70.208(f) and is moved to final § 70.201 to clarify that, consistent with existing enforcement policy, its provisions apply to all underground sampling entities and not just DAs.

One commenter stated that proposed § 70.209(h), which stated that MSHA

approval of the operator's ventilation system and methane and dust control plan may be revoked based on samples taken by MSHA or the operator, is excessive. The commenter stated that a ventilation plan is not inadequate because a sample exceeds the proposed ECV or the WAE exceeds the WPAE. The commenter further stated that the District Manager should be required to follow the procedures in MSHA's Program Policy Manual, Volume V, page 6, MSHA Initiated Plan Changes, to revoke the ventilation plan. Another commenter stated that mine operators have no effective remedy in plan disputes. This commenter stated that MSHA opposes expedited hearings before the Federal Mine Safety and Health Review Commission on this sort of issue, and that the backlog of cases precludes actual expedited consideration.

In response to comments, paragraph (k) clarifies that MSHA may revoke the respirable dust control portion of the ventilation plan based on sample results, but not the entire ventilation plan. MSHA intends to notify the operator, in the citation issued for excessive dust, of the revoked dust control portion of the approved ventilation plan. Final paragraph (k) ensures that respirable dust controls are updated timely to ensure miners' exposures to excessive respirable dust are controlled on each and every shift.

6. Sections 70.202 Certified Person; Sampling and 70.203 Certified Person; Maintenance and Calibration

Final §§ 70.202 and 70.203, like the proposal, retain the requirements in existing §§ 70.202(a) and 70.203(a) that respirable dust sampling be performed by a person certified to collect dust samples and handle dust samplers while they are in operation, and that maintenance and calibration of approved samplers be performed by a person certified to perform such tasks.

Although the proposal did not include revisions to the existing requirements in §§ 70.202(a) and 70.203(a), one commenter recommended that MSHA eliminate the requirement that dust sampling and maintenance and calibration of approved sampling devices be performed by certified persons. The commenter stated that restricting dust sampling collection to certified persons does nothing to further the quality of the sampling process and that certification does not ensure that dust sampling is any better than if conducted by a non-certified person.

Certification ensures the validity of collected samples and the integrity of

the dust sampling program. The collection of respirable dust samples by untrained persons, or with sampling devices that are not maintained as approved or calibrated in accordance with required procedures, would significantly affect the accuracy and quality of dust samples. Under that scenario, the entire dust program would be undermined and the protections from dust exposure afforded coal miners under the standards would be reduced. To maintain the integrity of MSHA's dust program, there must be competency standards for those entrusted with administering the program.

One commenter questioned the need for certified industrial hygienists to become MSHA-certified in sampling, stating that certified industrial hygienists are qualified to conduct respirable dust sampling and do not need further instruction or a separate certification. The commenter also pointed out that MSHA certification in such cases is costly.

MSHA recognizes that industrial hygienists have to meet certain educational and experience-based thresholds to become professionally certified and maintain certification as industrial hygienists. However, an independent MSHA certification process is needed for MSHA's dust sampling program. In general, industrial hygienists must demonstrate a basic technical understanding of industrial hygiene practices in a broad number of subject matters in order to become certified. However, the comprehensive nature of the industrial hygienist certification examination does not ensure that the individual has knowledge of MSHA-specific requirements that are necessary to carry out MSHA's dust monitoring program. A certification process specifically directed at evaluating familiarity with the intricacies of the dust sampling requirements is needed to maintain the quality of MSHA's dust program. For example, MSHA's certification process tests knowledge of key dust-related standards contained in 30 CFR; sampling and calibration equipment to be used; and procedures used for maintenance and calibration of this equipment. It also requires satisfactory completion of hands-on demonstrations of certain performance criteria. Each certification applicant must be explicitly aware of the responsibilities and the importance associated with sampling and maintenance and calibration certification, as well as the potential for civil and criminal sanctions that may apply if certified persons do not perform their duties

properly. These specific requirements and issues are not part of the certification process for industrial hygienists.

Final §§ 70.202(b) and 70.203(b), like the proposal, retain the existing requirements that candidates for certification pass an MSHA-administered examination to demonstrate competency in respirable dust sampling procedures and in maintenance and calibration procedures, as appropriate. Also like the proposal, final §§ 70.202(b) and 70.203(b) add new provisions that require candidates for certification to complete an MSHA course of instruction prior to examination and certification. The instructional course requirements under final §§ 70.202(b) and 70.203(b) are consistent with the recommendation of the 1992 Coal Mine Respirable Dust Task Group.

MSHA received a number of comments on this provision. One commenter expressed support for the proposed requirement that persons complete a course of instruction prior to becoming certified. Another commenter recommended that the final rule include a provision requiring each mine to have a minimum of two persons trained in sampling at any given time.

Mine operators are in the best position to determine how many persons should be trained and certified in sampling and in maintenance and calibration to ensure the continuity of their operations given the operational demands of the mine, as well as the number of miners employed by the operator. Accordingly, the final rule does not specify how many persons that a mine operator must have trained or certified.

One commenter suggested that a single certification should permit a person to collect dust samples and perform maintenance and calibration of approved sampling devices.

Given the differences in duties between persons certified in sampling and those certified in maintenance and calibration, separate certifications are necessary.

One commenter found the exception in proposed § 70.203(b) that would allow maintenance of CMDPSU sampling head assemblies to be performed by persons certified either in sampling or maintenance and calibration to be confusing. As MSHA explained in the proposal, "maintenance of the head assembly does not require a person to open, handle, disassemble, or reassemble the sampling device's internal components." As such, maintenance of the head assembly would not affect

226

**Federal Register** / Vol. 79, No. 84 / Thursday, May 1, 2014 / Rules and Regulations **24891**

electrical components and other intrinsic safety features that must be maintained in order for the CMDPSU to retain its approval under part 74. Therefore, the final rule, like the proposal, continues to reflect that necessary head assembly maintenance may be performed by persons certified in sampling, as well as those certified in maintenance and calibration.

Some commenters recommended a requirement that certified persons take regular refresher training. One of these commenters stated that certified persons should be required to receive training on sampling or maintenance and calibration of the CPDM every 6 months. Other commenters stated that certified persons should be retrained if they are unable to pass the recertification exam required every three years by proposed §§ 70.202(c) and 70.203(c). One of these commenters added that retraining should also be mandated when necessitated by equipment or procedural modifications. An additional commenter stated that the final rule should restrict certified persons' sampling or maintenance and calibration certification to the specific CPDM model on which the person received classroom instruction and examination.

To become certified under final §§ 70.202(b) and 70.203(b), each person seeking initial certification will have to complete both an MSHA course of instruction and pass an MSHA examination for the certification that the person is seeking. As explained in the proposal, it is essential for each person seeking initial certification in accordance with this rule to take classroom training prior to taking the MSHA competency examination. These requirements also strengthen the overall certification process. Like the proposed rule, final §§ 70.202(b) and 70.203(b) do not include provisions that would mandate periodic retaking of the applicable MSHA course of instruction once a person has received certification or has failed a subsequent competency examination. MSHA does not believe that there would be added value to require candidates for recertification to periodically retake the instructional course. They are able to review procedures and regulatory requirements on their own and will have had the benefit of regular, hands-on experience in either sampling, or maintenance and calibration procedures. Their competency will be adequately evaluated by whether they pass or fail the examination. To maintain certification in the tasks the certified person performs, every three years, a person must pass the applicable MSHA

examination demonstrating competency in sampling procedures under final § 70.202(c) or competency in maintenance and calibration under final § 70.203(c). Accordingly, there is a continuing obligation that certified persons have to remain proficient in the use, handling, and/or maintenance and calibration practices of the approved device in use at their mine.

In addition, MSHA expects that any equipment or procedural modifications to the CPDM would be minor and would not necessitate requiring a certified person to repeat the instructional course. Given the expectation that CPDM design developments will be occasional and are unlikely to be drastic, there is no need to require retraining due to equipment or procedural modifications. For example, in MSHA's experience, design changes over the years to the CMDPSU, the approved respirable dust sampling device currently used in coal mines, has not necessitated limiting the person's certification to a particular CMDPSU model. Furthermore, MSHA does not anticipate technological advances in respirable dust sampling instrumentation so frequently or to such a degree that would warrant limiting certification to a particular CPDM model. MSHA understands that the current approved CPDM manufacturer offers various training opportunities for those in need of training on its products. Finally, MSHA believes that the periodic re-examinations required by final §§ 70.202(c) and 70.203(c) will ensure that certified persons are knowledgeable and maintain competency on the device in use at their particular mine. For this reason, final §§ 70.202(b) and 70.203(b) do not require persons seeking recertification to retake the courses of instruction prior to taking the periodic competency examinations required under final §§ 70.202(c) and 70.203(c).

To maintain certification, final §§ 70.202(c) and 70.203(c), like the proposal, require persons certified in dust sampling procedures or maintenance and calibration procedures to pass the applicable MSHA examination demonstrating competency in sampling procedures or maintenance and calibration procedures every three years. A certified person who fails the MSHA examination is no longer certified and is not permitted to perform the duties of a certified person. Also, a person who is certified on the effective date of the final rule will be required to retake and pass the applicable MSHA examination within three years of that date.

Commenters varied in opinion as to the need and practicality of re-examination. One commenter stated that the three-year re-examination frequency is too long a period of time, while other commenters believed it was too onerous. One of these commenters suggested that a five-year interval would be more appropriate, while another suggested allowing continuing education units as a more desirable alternative to re-examination.

After considering these comments, MSHA continues to believe that the proposed three-year re-examination interval is reasonable. MSHA recognizes the importance of routinely demonstrating, without too much passage of time, that certified persons remain competent in performing the essential skills required of them. Requiring persons to be re-examined at regular intervals as a condition of maintaining a valid certification will ensure that certified persons have a minimum threshold of proficiency at all times, as familiarity with proper procedures is integral to protecting the health of miners. To allow more than three years to pass, however, before re-testing certified persons could permit an inordinate period to elapse during which inadvertent, improper or erroneous sampling or maintenance and calibration practices might occur and go unchecked. MSHA also believes that testing more frequently than at three-year intervals could be unreasonably burdensome on operators and certified persons.

Another commenter recommended elimination of the re-examination provision. This commenter stated that certified persons should simply be permitted to sign an annual ethics statement. MSHA has not included this suggestion because merely signing an ethics statement does nothing to objectively demonstrate that a person maintains the proficiency needed to conduct respirable dust sampling or maintain and calibrate approved sampling devices. An annual self-certification pledge is akin to certifying persons for life, the very practice that MSHA has found to be deficient in ensuring that certified persons are qualified to perform the required sampling, and maintenance and calibration tasks. Certifying persons for life can result in diminished aptitude or proficiency in skills that can affect a person's competence to perform required tasks. It is absolutely critical that persons who are designated to perform dust sampling and maintenance and calibration of dust sampling equipment maintain the necessary competency to do so. Periodic re-

227

examination under final §§ 70.202(c) and 70.203(c) will ensure that certified persons maintain their knowledge, skills, and abilities to competently perform their duties.

Another commenter stated that it would be administratively impossible for MSHA to schedule and provide the number of re-examinations that would be required by proposed §§ 70.202(c) and 70.203(c). The commenter expressed concern that MSHA does not currently have the staff to instruct and administer tests to this many people and with such recurring frequency. Although MSHA understands the commenter's concern, the Agency will make arrangements to assemble and prepare the needed resources to carry out its administrative functions under the final rule.

Final §§ 70.202(d) and 70.203(d) are derived and clarified from the proposal. They provide that MSHA may revoke a person's certification for failing to properly carry out required sampling procedures or maintenance and calibration procedures, as appropriate. These final provisions are consistent with the Dust Advisory Committee's recommendation that MSHA consider a retraining and/or decertification procedure for certified persons who fail to perform their duties properly.

Final §§ 70.202(d) and 70.203(d) do not include the proposed provision that MSHA may revoke a person's certification for failing to pass the MSHA examination. The proposed provisions would have given MSHA discretion to revoke a person's certification for failing to pass the examination which is inconsistent with final §§ 70.202(c) and 70.203(c) which require that, to maintain certification, a person must pass the examination every three years.

MSHA received two comments on this provision. One commenter suggested that revocation should be mandatory in those cases where certified persons execute their duties improperly. MSHA has not adopted the suggestion. Because of the seriousness of decertification, each case should be judged on a case-by-case basis. In certain circumstances, decertification, or even criminal referral, may be appropriate. In other cases, however, decertification may not be warranted. In any event, it is important to permit the certified person the opportunity to present mitigating circumstances or otherwise rebut any evidence that MSHA would use in order to justify the person's decertification.

The second commenter suggested that, because MSHA seldom uses its decertification authority, MSHA should

eliminate the revocation provisions. This commenter also suggested that MSHA should perform all respirable dust sampling in lieu of certifying and decertifying persons. MSHA has not adopted these suggestions. The authority to decertify a person is a significant factor in safeguarding the integrity of the sampling and maintenance and calibration processes, providing a healthful environment for miners, and maintaining miners' confidence and support for the dust program. MSHA's current decertification procedures and procedures regarding appeals of revocation are addressed in MSHA's Program Policy Letter (PPL) No. P12–V–01, March 8, 2012 (Reissue of P09–V–08—Procedures for Revoking MSHA Certifications to Take Respirable Dust Samples or to Maintain and Calibrate Approved Dust Sampling Devices). In addition, as explained elsewhere in this preamble, the responsibility to provide a safe and healthful environment for miners is primarily the operator's obligation.

Final §§ 70.202 and 70.203, like the proposal, does not include paragraph (c) in both existing §§ 70.202 and 70.203, which permit MSHA to temporarily certify a person to collect respirable dust samples or to maintain and calibrate approved sampling devices if the person has received specific instruction from an authorized representative of the Secretary. MSHA is not including the existing temporary certification provisions because MSHA's experience has been that people seek permanent certification, rather than temporary certification. MSHA received no comment on the proposed deletions of paragraphs(c) in existing §§ 70.202 and 70.203.

### 7. Section 70.204   Approved Sampling Devices; Maintenance and Calibration

Final § 70.204(a), like the proposal, requires that approved sampling devices be maintained as approved under 30 CFR part 74 and calibrated in accordance with MSHA Informational Report IR 1240 (1996) ''Calibration and Maintenance Procedures for Coal Mine Respirable Dust Samplers'' or in accordance with the manufacturer's recommendations, if using a CPDM.

Final paragraph (a) is similar to the proposal and clarifies that only persons certified in maintenance and calibration can perform maintenance work on ''the CPDM or the pump unit of the CMDPSU'' rather than ''the pump unit of approved sampling devices'' because the CPDM is a sealed unit. MSHA's experience with the CMDPSU is that maintenance and calibration of the

pump unit requires a person to open, handle, disassemble, or reassemble the sampling device's internal components. Additionally, maintenance of the pump unit could affect the electrical components or other intrinsic safety features that must be maintained for the device to retain its approval and not become a source of possible ignition of a methane and oxygen atmosphere. Persons trained and certified in maintenance and calibration procedures on the CMDPSU have been determined to be competent and knowledgeable to properly perform pump unit maintenance on the CMDPSU. Final paragraph (a) clarifies that only persons certified in maintenance and calibration can perform maintenance on the CPDM. The CPDM is a new sampling device which is a sealed unit. To ensure proper performance of the CPDM and the integrity of the samples, it is critical that only persons trained and certified in maintenance and calibration be allowed to perform maintenance work on the CPDM.

One commenter generally supported the proposed provision; another one did not. The latter commenter questioned whether requiring maintenance and calibration be done according to the manufacturer's instructions was equivalent to open-ended incorporation by reference.

As required in other 30 CFR provisions, it is prudent and reasonable to require that the CPDM be calibrated according to manufacturer's recommendations. The CPDM is a new sampling device and the manufacturer has the knowledge and expertise to determine how the unit is to be calibrated. Maintaining the CPDM according to the manufacturer's recommendations will ensure that it is maintained as approved under 30 CFR part 74.

Final § 70.204(b) is substantially similar to proposed § 70.204(b). It requires that sampling devices be calibrated at the flowrate of 2.0 liters of air per minute (L/min) if using a CMDPSU, or 2.2 L/min if using a CPDM, or at a different flowrate recommended by the manufacturer, before they are put into service and, thereafter, at time intervals recommended by the manufacturer or prescribed by the Secretary or Secretary of HHS. As a clarification regarding the calibration of flowrate, final paragraph (b) includes the phrase ''if using a CMDPSU, or at 2.2 L/min if using a CPDM,'' and does not include the phrase ''or prescribed by the Secretary or Secretary of HHS for the particular device.'' Calibration is determined by approval of the sampling device based

on the performance of the unit. The manufacturer must establish, for a device meeting part 74 requirements, the flowrate that produces a sample that measures respirable coal mine dust. In addition, like the proposal, final paragraph (b) allows the time intervals between calibrations to be performed according to the manufacturer's recommendations, as well as prescribed by the Secretary or Secretary of HHS. This will allow the Secretaries to establish a different calibration schedule when necessary to address problems associated with a particular sampling unit.

One commenter understood the flowrate provision in proposed paragraph (b) to mean that the manufacturer could change the flowrate and it would change the concentration measured. MSHA clarified at a public hearing that the flowrate is recommended by the manufacturer and approved by MSHA and NIOSH. Calibration of the sampling device is done following the manufacturer's specifications, but how the sampler is used in the field to collect samples is specified by NIOSH and MSHA.

Final paragraph (c), like the proposal, requires that if a CMDPSU is used to sample, it must be examined and tested by a person certified in sampling or in maintenance and calibration within 3 hours before the start of the shift on which the approved sampling devices will be used to collect respirable dust samples. This will ensure that the sampling device is clean and in proper working condition prior to use.

One commenter suggested that the preshift check could be done anytime before the start of the shift, not within 3 hours of the start as specified in the proposed rule.

The requirement to examine and test the CMDPSU within 3 hours before the start of the shift is consistent with MSHA's existing policy. Since the 1980s, MSHA has interpreted the language "immediately before each sampling shift" required by existing §§ 70.204(d), 71.204(d), and 90.204(d) as being equal to no more than 3 hours (U.S. DOL, MSHA, MSHA Policy Memorandum No. 81–17 C, 1981; U.S. DOL, MSHA Program Information Bulletin No. P09–31, 08/25/2009). The 3-hour time frame in the final paragraph (c) provides operators transparency regarding their responsibilities for testing and examining sampling devices, flexibility, and assurance that the sampling devices work effectively during the next shift. This time frame also ensures that the sampling device is not assembled and exposed for extended

periods to possible contamination and mishandling on coal mine property.

The examination and testing requirements for a CMDPSU are specified in paragraphs (c)(1) through (c)(5). Final paragraphs (c)(1) through (c)(4) are identical to the proposed rule. Final paragraph (c)(1) requires a thorough examination of all components of the cyclone assembly, including the interior of the connector barrel, vortex finder, cyclone body, and grit pot, to assure that they are clean and free of dust and dirt. Final paragraph (c)(2) requires the examination of the inner surface of the cyclone body to assure that it is free of scoring or scratch marks on the inner surface of the cyclone where the air flow is directed by the vortex finder into the cyclone body. Final paragraph (c)(3) requires examination of the external hose connecting the pump unit to the sampling head assembly to assure that it is clean and free of leaks. Final paragraph (c)(4) requires examination of the clamping and positioning of the cyclone body, vortex finder, and cassette to assure that they are rigid, in alignment, firmly in contact, and airtight. Final paragraph (c)(5), like the proposal, requires testing the voltage of each battery while under actual load to assure the battery is fully charged. This requires that a fully assembled and examined sampling head assembly be attached to the pump inlet with the pump unit running when the voltage check is made. The final requirement in (c)(5) is simplified by modifying the proposed language related to CMDPSU batteries. The proposal would have required that the voltage for nickel cadmium cell batteries must not be lower than the product of the number of cells in the battery multiplied by 1.25, and the voltage for other than nickel cadmium cell batteries must not be lower than the product of the number of cells in the battery multiplied by the manufacturer's nominal voltage per cell value. The final provision requires that the voltage for the batteries used in the CMDPSU must not be lower than the product of the number of cells in the battery multiplied by the manufacturer's nominal voltage per cell value. This revision allows replacement batteries of different designs to be used once approved. No comments were received on paragraphs (c)(1) through (c)(5).

Final paragraph (d)(1) requires that if using a CPDM, the person certified in sampling or in maintenance and calibration must follow the pre-operational examinations, testing, and set-up procedures, and perform necessary maintenance recommended by the manufacturer to assure its

operational readiness within 3 hours before the start of the shift on which the device will be used to collect respirable dust samples. Final paragraph (d)(2) requires the certified person to perform other required scheduled examinations and maintenance procedures recommended by the manufacturer.

Final paragraphs (d)(1) and (2) are similar to proposed § 70.206(b)(2), (5), and (6). Proposed § 70.206 would have provided requirements for a CPDM Performance Plan. Proposed § 70.206(b)(2), (5) and (6) would have required the approved CPDM Performance Plan to include the names or titles of the responsible mine officials who are designated by the operator and the following information: The pre-operational examinations, testing and set-up procedures to verify the operational readiness of the sampling device before each sampling shift; the routine daily and other required scheduled maintenance; and procedures or methods for verifying the calibration of each CPDM. The proposed CPDM Performance Plan has not been included in this final rule. Additional discussion is provided in § 70.206 of this preamble concerning "Bimonthly sampling; mechanized mining units."

One commenter on the proposed CPDM Performance Plan requirements pointed out that proposed § 70.206(b)(5) would have required scheduled maintenance procedures but that those procedures come with the CPDM from the manufacturer and should not need to be submitted to MSHA as part of a plan. MSHA agrees and has not included this operator submission requirement in the final rule. Existing § 74.10 requires that manufacturers include operating and storage instructions and a maintenance and service life plan with each new CPDM device sold. Final paragraph (d) requires that such operating, maintenance, and calibration instructions be followed. The certified person must perform scheduled examinations and maintenance procedures recommended by the manufacturer.

Furthermore, final paragraphs (d)(1) and (2) are parallel to those requirements for the CMDPSU under final paragraph (c), except the certified person needs to follow the manufacturer's specifications for sampling or for maintenance and calibrations. Mine operators are in the best position to maintain equipment, tools, and instruments that they use to comply with the Mine Act and related standards. Under the existing standards, operators are responsible for ensuring that their CMDPSUs are properly maintained, and MSHA believes

application of this practice to the CPDM is reasonable.

Final paragraph (e), like the proposal and existing standard, incorporates by reference MSHA Informational Report IR 1240 (1996) referenced in final paragraph (a) of these sections. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy is available on the MSHA Web site at *http://www.msha.gov* and may be inspected or obtained at MSHA, Coal Mine Safety and Health, 1100 Wilson Blvd., Room 2424, Arlington, Virginia 22209–3939 and at each MSHA Coal Mine Safety and Health District Office. Copies may be inspected at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*. No comments were received on the proposal.

8. Section 70.205   Approved Sampling Devices; Operation; Air Flowrate

Final § 70.205(a) requires that approved sampling devices be operated at the flowrate of 2.0 L/min if using a CMDPSU, or at 2.2 L/min if using a CPDM, or at a different flowrate recommended by the manufacturer. The language was changed from the proposal to be consistent with final § 70.204(b), and the language "if using a CMDPSU, or at 2.2 L/min if using a CPDM," was added to the final provision.

One commenter understood the flowrate provision to mean the manufacturer could change the flowrate and this would change the concentration measured. This comment is addressed elsewhere in the preamble under § 70.204(b).

Final paragraph (b), like the proposal, requires that if a CMDPSU is used, each device be examined during each sampling shift by a person certified in sampling. Like the existing standards, the purpose of the on-shift CPDM examinations required by final paragraph (b) is to verify that the device remains in the proper location and continues to operate properly.

Final paragraph (b)(1), like the proposal, requires that the CMDPSU be examined during the second hour of a sampling shift to assure it is in the proper location, operating properly, and at the proper flowrate. It further requires that if the proper flowrate is not maintained, the certified person must make the necessary corrective adjustments. In addition, final paragraph (b)(1), similar to the proposal,

provides that the examination is not required if the approved CMDPSU is being operated in an anthracite coal mine using the full box, open breast, or slant breast mining method. Proposed paragraph (b)(1) would not have required the examination if the sampling device was operated in a breast or chamber of an anthracite coal mine where only the full box mining method was used.

One commenter questioned whether the on-shift examination of the sampling device should be required for anthracite mines. Based on MSHA's experience with anthracite mines, MSHA has determined that in the full box mining method, as well as open breast and slant breast mining methods, which are used only in certain anthracite mines, there is limited space for the certified person and that conducting this examination is potentially unsafe. Under the final rule, operators of anthracite coal mines are not required to perform the examination of the sampling device during the second hour of operation when the device is operated where these mining methods are used.

Final paragraph (b)(2), like the proposal, requires that the certified person check the CMDPSU during the last hour of operation to assure that it continues to operate properly, including at the proper flowrate. This provision also requires that, if the proper flowrate is not maintained, the respirable dust sample must be transmitted to MSHA with a notation on the back of the dust data card stating that the proper flowrate was not maintained. It further requires that other events occurring during the collection of the respirable dust sample that may affect the validity of the sample, such as dropping of the sampling head assembly onto the mine floor, must be noted on the back of the dust data card. No comments were received on the proposal.

Final paragraph (c) is changed from the proposal. It is similar to proposed § 70.206(b)(1) and (7). It requires that if a CPDM is used, the person certified in sampling must monitor the dust concentrations and the sampling status conditions being reported by the CPDM at mid-shift or more frequently as specified in the approved mine ventilation plan to assure that: The sampling device is in the proper location and is operating properly; and the work environment of the occupation or DA being sampled remains in compliance with the standard at the end of the shift. The language "status conditions" as it relates to CPDM sampling is terminology used in the approved CPDM manufacturer's literature.

Proposed § 70.206(b)(1) and (7) relating to the proposed CPDM Performance Plan would have required identifying information on the occupations, locations, and miners being sampled, and that the designated mine official monitor the frequency with which dust concentrations are reported by the CPDM during each sampling shift. Under the proposal, monitoring intervals would have been determined, in part, based on considerations such as the occupation being monitored, geologic conditions, the location in the mine from which the sample would have been taken, production levels, past exposure levels and similarity to current conditions, and mine experience.

The majority of comments on the proposed CPDM Performance Plan stated that another mine plan was not necessary. MSHA has determined that the CPDM Performance Plan would have been duplicative of many requirements in existing mine ventilation plans. Therefore, the proposed CPDM Performance Plan is not included in the final rule. Additional discussion on the proposed CPDM Performance Plan is located under final § 70.206 of this preamble.

Final paragraph (c) is similar to proposed § 70.206(b)(7) which would have required the CPDM Performance Plan to include reasonable monitoring intervals based on the conditions at each mine. Routine monitoring of dust concentrations during the sampling shift is important. It ensures that MSHA, mine operators, and miners know the dust concentrations where samples were taken so that timely corrective action can be taken as necessary. As such, final paragraph (c) requires that when a CPDM is in use, the certified person must monitor the dust concentration being reported by the device at mid-shift or more frequently as specified in the operator's approved mine ventilation plan. Mid-shift means the middle of the shift for whatever specific shift length worked. In addition, specifying the monitoring frequency as part of the approved ventilation plan will also allow the District Manager to assess the need, if any, for more frequent monitoring of dust concentrations on a mine-by-mine basis. For example, the District Manager may require the operator to more frequently monitor dust concentrations during the shift when CPDM sampling at the DO has shown repeated overexposures.

For the same reason discussed under final paragraph (b), final paragraph (c) does not require on-shift monitoring under this section when CPDMs are

operated in certain anthracite mining operations.

**9. Section 70.206   Bimonthly Sampling of Mechanized Mining Units**

Final § 70.206   regarding bimonthly sampling of mechanized mining units (MMUs) is similar to proposed § 70.207 regarding sampling of MMUs when using a CMDPSU. Unlike proposed § 70.206, the final rule does not include requirements for a CPDM Performance Plan. Proposed § 70.206 would have required each operator to develop and submit for approval a CPDM Performance Plan prior to sampling with the CPDM. The Plan would have required specific information on CPDMs and approval procedures for the Plan.

MSHA received many comments on the proposed CPDM Performance Plan. The majority of comments stated that another mine plan was not necessary. MSHA has determined that the CPDM Performance Plan would have been duplicative of many of the requirements in existing mine ventilation plans. In addition, the information that is needed to ensure the proper use of a CPDM is addressed by other provisions of this final rule or will be incorporated into each operator's ventilation plan. For example, certain provisions that would have been required under the CPDM Performance Plan are included in final §§ 70.204(d)(1) and (d)(2), and 70.205(c) and are discussed elsewhere in this preamble. As many of the requirements in the proposed CPDM Performance Plan are redundant with existing mine ventilation plans and most of the requirements of this final rule, MSHA determined that the CPDM Performance Plan is unnecessary. Miners will be adequately protected by the requirements of a mine's ventilation plan and this final rule. Accordingly, the proposed CPDM Performance Plan is not included in this final rule.

The title of § 70.206 is changed from proposed § 70.207. It does not include the term "CMDPSU" to avoid confusion with the sampling device required for bimonthly sampling of MMUs under this section and quarterly sampling of MMUs under final § 70.208. Final § 70.201(a) addresses the required sampling devices.

Final § 70.206 includes language that bimonthly sampling of MMUs is required until January 31, 2016 . This change clarifies that bimonthly sampling ceases 18 months after the effective date of the final rule.

Final paragraph (a) is redesignated from proposed § 70.207(a) and, like the proposal, requires that each operator take five valid representative samples from the DO in each MMU during each

bimonthly period. The term "representative samples" replaces the term "respirable dust samples" that is used in the existing standard. The term "valid representative samples" used here and throughout the preamble and rule is a short form reference to the terms "valid respirable dust sample" and "representative samples." Requiring "valid representative samples" ensures that samples taken by the operator reflect typical dust concentrations and conditions at the mine during normal mining activity. MSHA received one comment on the definition of representative samples. That comment is discussed elsewhere in this preamble under § 70.2.

Paragraph (a) further requires that DO samples be collected on consecutive normal production shifts or normal production shifts each of which is worked on consecutive days. This is consistent with the existing standard. MSHA received several comments on the definition of "normal production shift." Those comments are addressed elsewhere in this preamble under § 70.2.

Final paragraph (a), like the proposal, provides that the bimonthly sampling periods are: (1) January 1—February 28 (29); (2) March 1—April 30; (3) May 1—June 30; (4) July 1—August 31; (5) September 1—October 31; and (6) November 1—December 31. The bimonthly sampling periods are identical to the existing standard.

Some commenters suggested that MSHA include a provision addressing malfunctions, suspected tampering and environmental conditions that could affect measurement of respirable dust levels. These commenters stated that mine operators should not be required to commit to long-term ventilation plan approvals for short-term issues due to environmental conditions when those conditions are not representative of the normal mining conditions used in the development of ventilation plans.

Mine operators have always had the opportunity to submit information on the back of dust data cards when they knew that a respirable dust sample collected to fulfill the requirements of part 70, 71, or 90 was not representative of normal conditions. The information submitted has been and will continue to be used to determine if the sample submitted by the operator is a valid sample. To clarify the responsibilities of the certified person responsible for collecting respirable dust samples, MSHA has included requirements for the submission of information on the back of dust data cards in final §§ 70.205(b)(2), 71.205(b)(2) and 90.205(b)(2).

Final paragraph (b) is redesignated from proposed § 70.207(b) and, like the proposal, requires that unless otherwise directed by the District Manager, the DO samples must be taken by placing the approved sampling device as specified in paragraphs (b)(1) through (10) of this section. The DOs specified in paragraphs (b)(1) through (10) are unchanged from the existing standard.

On March 8, 2011, MSHA issued in the **Federal Register** a request for comments (76 FR 12648, 12650) and stated that the proposed rule addresses: (1) Which occupations must be sampled using CPDMs, and (2) which work positions and areas could be sampled using either CPDMs or CMDPSUs. MSHA solicited comments on the proposed sampling occupations and locations, and on whether there are other positions or areas where it may be appropriate to require the use of CPDMs. MSHA also requested comments on whether the proposed CPDM sampling of ODOs on the MMU is sufficient to address different mining techniques, potential overexposures, and ineffective use of approved dust controls. MSHA did not receive comments on proposed § 70.207(b).

Final § 70.206(c) is redesignated from proposed § 70.207(c). It requires that when the applicable dust standard changes in accordance with final § 70.101 (Respirable dust standard when quartz is present), the standard will become effective 7 calendar days after the date of notification of the change by MSHA. The rationale for paragraph (c) is discussed elsewhere in this preamble under § 70.208(c).

Final paragraph (c) does not include the requirements in proposed § 70.207(c)(1) and (c)(2). Proposed § 70.207(c)(1) would have required that if all samples from the most recent bimonthly sampling period do not exceed the new standard, the operator would begin sampling on the affected MMU on the first production shift during the next bimonthly period following receipt from MSHA of the change in the standard. Proposed § 70.207(c)(2) would have required that if any sample from the most recent bimonthly sampling period exceeds the new standard (reduced due to the presence of quartz), the operator would have to make necessary adjustments to the dust control parameters in the mine ventilation plan within three days, and then collect samples from the affected MMU on consecutive normal production shifts until five valid representative samples are collected. It further provided that the samples collected would be treated as normal bimonthly samples under this part.

One commenter stated that one overweight sample was not an indication of a problem and that the ventilation plan did not need to be changed when one sample was high or the average of five samples was over the concentration standard. Other commenters stated that an operator cannot make ventilation plan changes without MSHA approval and that three days was too short a time period for the operator to resubmit the ventilation plan for changes.

After reviewing the comments, MSHA has determined to not include proposed paragraphs (c)(1) and (c)(2) in the final rule. The proposal would have required additional sampling requirements before the operator became aware of the new reduced standard. For consistency between the sampling requirements of the final rule, final paragraph (c) is the same as final § 70.207(b) regarding bimonthly sampling of DAs, § 70.208(c) regarding quarterly sampling of MMUs, § 70.209(b) regarding quarterly sampling of DAs, § 71.206(b) regarding quarterly sampling, and § 90.207(b) regarding quarterly sampling.

Final paragraph (d) is redesignated from proposed § 70.207(d) and makes non-substantive changes. Like the proposal, it requires that if a normal production shift is not achieved, the DO sample for that shift may be voided by MSHA. It further requires that any sample that, regardless of production, exceeds the standard by at least 0.1 mg/m³ must be used in the determination of the equivalent concentration for that MMU. Paragraph (d) is similar to and consistent with final § 70.208(d) regarding quarterly sampling of MMUs.

One commenter stated that it was unfair for MSHA to count a sample that was over the standard when normal production was not achieved without giving the operator some credit for a sample that was below the standard when normal production was not achieved. The commenter also stated that if production is not met on a given shift and the sample is under the standard, it is still an indication of the miner's exposure.

Final paragraph (d) ensures that respirable dust sampling is representative of the activities that occur when sampling is not being conducted and dust generation sources are active. If normal production is not achieved, the samples can be expected to reflect an unrealistically lower reading of respirable dust levels in the mine atmosphere than what would be expected during typical mining conditions at the location where the miner is working. Without normal production, an accurate determination

of the effectiveness of the dust control parameters in the approved ventilation plan cannot be established. If samples collected are in compliance with the respirable dust standard when normal production levels are achieved and the ventilation plan is followed, miners have a reasonable expectation that on shifts when samples are not collected, the respirable dust levels are in compliance with the respirable dust standard. Any sample that exceeds the standard while production is less than normal should be used to determine the respirable dust concentration of the MMU since operating at a higher production would likely increase miners' respirable dust exposure even more.

The above rationale is consistent with the 1995 NIOSH Criteria Document, the 1996 Dust Advisory Committee Report, and the 1992 Coal Mine Respirable Dust Task Group Report, all of which emphasized the need for mine operators to achieve normal production levels when evaluating the respirable dust parameters contained in the approved ventilation plan.

Another commenter expressed concern that MSHA would use an overly restrictive approach in evaluating samples, adding that, in the past, MSHA refused to void samples with oversized particles if there was a specific weight gain. To illustrate, the commenter stated that a sampling device could be dropped and filled with non-respirable dust from the mine floor and MSHA would not void the sample because it had a specific weight gain.

MSHA will continue to use the criteria listed in MSHA Method P–19 for evaluating samples for oversized particles (U.S. Department of Labor, MSHA Method P–19, 2012). Samples with net weight gains greater than 1.4 mg are opened and visually inspected for oversized particles. If this examination reveals the presence of foreign materials or other abnormalities, the sample is voided as contaminated. Any sample with a net weight gain of 6.0 mg or greater is subjected to further examination. The procedures used by MSHA's Pittsburgh Safety and Health Technology Center in MSHA Method P–19 are available on request. It is the operator's responsibility to submit samples that are collected according to the requirements of Title 30 of the CFR. As stated earlier, the operator has always had the opportunity to note on the back of the dust data card events that may make a sample non-representative. MSHA has incorporated the requirements for the operator to make notations on the back of the dust

data card in final §§ 70.205(b)(2), 71.205(b)(2) and 90.205(b)(2).

Another commenter suggested that the word "may" in the proposal ought to be changed to "must" in the final rule so that DO samples would always be voided if a normal production shift is not achieved. MSHA is using "may" instead of "must" to allow samples that exceed the standard to be included in the average of samples submitted to fulfill the sampling requirements of final § 70.206. If normal production levels are not achieved and the sample collected nevertheless exceeds the standard by at least 0.1 mg/m³, MSHA will use the sample to determine the equivalent concentration.

Final paragraph (e) is similar to proposed § 70.207(g) and (i). It requires that when a valid representative sample taken in accordance with this section meets or exceeds the excessive concentration value (ECV) in Table 70–1 that corresponds to the applicable standard and particular sampling device used, the operator must: (1) Make approved respiratory equipment available; (2) Immediately take corrective action; and (3) Record the corrective actions. The actions required by paragraph (e) are similar to those in proposed § 70.207(g) and (i).

Proposed § 70.207(g) would have required that, during the time for abatement fixed in a citation, the operator: (1) Make approved respiratory equipment available to affected miners in accordance with § 72.700; (2) submit to the District Manager for approval proposed corrective actions to lower the concentration of respirable dust to within the standard; and (3) upon approval by the District Manager, implement the proposed corrective actions and then sample the environment of the affected occupation in the MMU in the citation on each normal production shift until five valid representative samples are taken.

Proposed § 70.207(i) would have required that when the equivalent concentration of one or more valid samples collected by the operator exceeds the standard but is less than the ECV in proposed Table 70–1, the operator would have to: (1) Make approved respiratory equipment available to affected miners in accordance with proposed § 72.700; (2) take corrective action to lower the respirable dust concentration to at or below the standard; and (3) record the corrective actions taken in the same manner as the records for hazardous conditions required by existing § 75.363.

In the March 8, 2011, request for comments (76 FR 12648), MSHA stated that the Agency received comments that

the proposed rule should not require mine operators to record corrective actions or excessive dust concentrations as § 75.363 hazardous conditions. MSHA further stated that it "would like to clarify that the proposal would require that operators record both excessive dust concentrations and corrective actions in the same manner as conditions are recorded under § 75.363" and that "MSHA would not consider excessive dust concentrations or corrective actions to be hazardous conditions, since the proposed requirement is not a section 75.363 required record" (76 FR 12650).

Some commenters supported the requirements of proposed § 70.207(i) and some did not. Most commenters stated that a 1.0 mg/m³ dust concentration is not a hazardous condition and a single shift sample should not require an operator to take action under proposed § 70.207(i).

In response to the comments, final paragraph (e) is changed from the proposal. It does not require action if the dust sample exceeds the standard but is less than the ECV in Table 70–1. Rather, it requires an operator to take certain actions when a respirable dust sample meets or exceeds the ECV in Table 70–1. The rationale for final paragraph (e) is the same as that for final §§ 70.207(d), 70.208(e), and 70.209(c) and is discussed elsewhere in this preamble under § 70.208(e) of this preamble.

Final paragraph (e)(1), like proposed § 70.207(g)(1) and (i)(1), requires that the operator make approved respirators available to affected miners in accordance with § 72.700. Some commenters expressed concern that it is inconsistent for MSHA to allow the use of respiratory equipment after a violation of the standard, but not allow respiratory equipment during other times to control miners' exposure. Other commenters, who generally supported requiring operators to make respiratory equipment available at the miner's request, stated that respirators should not be allowed while the operator is attempting to achieve compliance with the standard.

Final paragraph (e)(1) is derived from existing § 70.300, which requires an operator to make respirators available to all persons whenever exposed to concentrations of respirable dust in excess of the levels required to be maintained. The use of approved respiratory equipment should be encouraged until the operator determines the cause of the overexposure and takes corrective actions. Additional discussion on the use of respirators to control exposure to

respirable coal mine dust is elsewhere in this preamble under § 72.700.

Final paragraph (e)(2) is similar to proposed § 70.207(g)(3) and (i)(2). It requires that the operator immediately take corrective action to lower the concentration of respirable coal mine dust to at or below the standard. Paragraph (e)(2) is consistent with existing § 70.201(d), which requires a mine operator to take corrective action to lower the concentration of respirable dust. Paragraph (e)(2) clarifies that corrective action must be taken immediately to protect miners from overexposures.

Corrective actions include, for example, engineering or environmental controls that control the level of respirable coal mine dust by: (1) Reducing dust generation at the source with the dust controls on the mining equipment; (2) suppressing the dust with water sprays, wetting agents, foams or water infusion; (3) using ventilation to dilute the dust; (4) capturing the dust with machine-mounted dust collectors; and (5) diverting the dust being generated by the mining process with shearer clearer or passive barriers. This provision will protect miners' health because the operator will be required to review the dust control parameters and determine what factors may have contributed to the overexposure. To avoid confusion with the proposal's timeframes as to when corrective action needs to be taken, final paragraph (e)(2) requires that the action needs to be taken immediately. MSHA will assess, on a case-by-case basis, the action that must be taken immediately and the appropriate timeframe within which it must occur. For example, under circumstances involving a relatively minor correction, "immediately" would mean before the next shift. Under circumstances involving the purchase of additional equipment or parts, MSHA will accept a bona fide purchase order as immediate corrective action. The purchase order must show the date of purchase and expected delivery, and the equipment or part must be installed as soon as it is delivered.

Final paragraph (e)(3) is similar to proposed § 70.207(i)(3). Final paragraph (e)(3) requires the mine operator to make a record of the corrective actions taken. The record must be certified by the mine foreman or equivalent mine official no later than the end of the mine foreman's or equivalent mine official's next regularly scheduled working shift. It also requires that the record be made in a secure book that is not susceptible to alteration or electronically in a computer system so as to be secure and not susceptible to alteration. It further

requires that the records be retained at a surface location at the mine for at least 1 year and be made available for inspection by authorized representatives of the Secretary and the representative of miners.

One commenter supported proposed § 70.207(i)(3) which would have required the mine operator to make a record of the corrective action taken in the same manner as required by existing § 75.363. Other commenters stated that the proposal was unnecessary and costly. One commenter stated that entering the corrective actions in the book of hazards sets up the operator for an unwarrantable failure order because the operator would be required to document the circumstances as a hazard and then could fail to correct the hazard if the corrective actions did not reduce the dust levels to meet the standard. Other commenters stated that examinations conducted under § 75.363 are for hazardous conditions found during the shift by the certified person conducting the examination. They further stated that hazardous conditions found during the § 75.363 examination must be corrected immediately, but any violation of the respirable dust standard cannot be corrected immediately because the overexposure is not known until after the shift is over and the District Manager must first approve the corrective action.

As stated previously, "MSHA would not consider excessive dust concentrations or corrective actions to be hazardous conditions, since the proposed requirement is not a section 75.363 required record." To avoid confusion with the existing requirements at § 75.363 regarding "Hazardous conditions; posting, correcting and recording," final paragraph (e) does not contain any reference to § 75.363 or the term "hazardous conditions." However, the certification and record retention requirements of final paragraph (e)(3) are similar to those required for records under existing § 75.363. Under § 75.363(c), the record must be made by the certified person or verified by the certified person and must be countersigned by the mine foreman or equivalent mine official. Paragraph (e)(3) is necessary because it provides useful information to a mine operator, miners, and MSHA regarding the corrective actions taken and whether the dust control parameters in the approved ventilation plan are adequate. The record of the corrective actions taken should be made by a responsible mine official, such as the mine foreman or equivalent mine official. Records and certification of corrective action taken

help identify excessive dust concentrations so they can be addressed appropriately to better ensure miners' health. In addition, retaining records at the mine for at least one year is consistent with many existing MSHA record retention standards, particularly the proposal's incorporation of existing § 75.363(d). Record retention is necessary to help the mine operator, MSHA, and the miners' representative identify problems with dust controls and ensure that excessive dust concentrations are corrected. The cost associated with the record requirement is shown in Chapter IV of the Regulatory Economic Analysis (REA).

Unlike proposed § 70.207(g)(2), final paragraph (e) does not require the submission of corrective actions to the District Manager for approval. Comments on proposed § 70.207(g)(2) are discussed under final paragraph (h)(4).

For consistency between the sampling requirements of the final rule, final paragraphs (e)(1)–(3) are identical to final § 70.207(d)(1)–(3) regarding bimonthly sampling of designated areas, § 70.208(e)(1)–(3) regarding quarterly sampling of MMUs, § 70.209(c)(1)–(3) regarding quarterly sampling of designated areas, § 71.206(h)(1)–(3) regarding quarterly sampling, and except for conforming changes, to § 90.207(c)(1)–(3) regarding quarterly sampling.

Final paragraph (f) is redesignated and changed from proposed § 70.207(e). Paragraph (f)(1) is similar to proposed § 70.207(e) regarding sampling of MMUs when using a CMDPSU and paragraph (f)(2) is similar to proposed § 70.208(e) regarding sampling of MMUs when using a CPDM. Paragraph (f) states that noncompliance with the standard is demonstrated during the sampling period when: (1) Two or more valid representative samples meet or exceed the excessive concentration value (ECV) in Table 70–1 that corresponds to the applicable standard and particular sampling device used; or (2) The average for all valid representative samples meets or exceeds the ECV in Table 70–2 that corresponds to the applicable standard and particular sampling device used.

In the March 8, 2011, request for comments (76 FR 12649), MSHA stated that the Agency is interested in commenters' views on what actions should be taken by MSHA and the mine operator when a single shift respirable dust sample meets or exceeds the ECV. MSHA also requested comments on alternative actions, other than those contained in the proposal, for MSHA and the operator to take if operators use

a CPDM. MSHA further stated that it is particularly interested in alternatives and how such alternatives would be protective of miners.

Many commenters expressed concern that compliance determinations would be made on the basis of a single-shift measurement. Proposed § 70.207(e) would have required that when using a CMDPSU, no valid single-shift sample equivalent concentration meet or exceed the ECV that corresponds to the applicable standard in proposed Table 70–1.

In response to comments, final paragraph (f) provides two different methods by which compliance determinations can be made. The rationale for final paragraphs (f)(1) and (2) is the same as that for final §§ 70.207(e)(1) and (2), 70.208(f)(1) and (2), 70.209(d)(1) and (2), 71.206(i)(1) and (2), and 90.207(d)(1) and (2), and is discussed elsewhere in this preamble under § 70.208(f)(1) and (2).

For consistency between the sampling requirements of the final rule, final paragraphs (f)(1) and (2) are the same as final §§ 70.207(e)(1) and (2), 70.208(f)(1) and (2), 70.209(d)(1) and (2) and, except for conforming changes, final §§ 71.206(i)(1) and (2), and 90.207(d)(1) and (2).

Comments on the ECVs in proposed Table 70–1 are discussed elsewhere in this preamble under § 70.208(f). In addition, a detailed discussion on the derivation of the ECVs in both final Tables 70–1 and 70–2 is included in Appendix A of the preamble. Comments that questioned the accuracy of a single sample in making a compliance determination are addressed elsewhere in this preamble under § 72.800.

Final paragraph (g) is changed and redesignated from proposed § 70.207(f). It requires that unless otherwise directed by the District Manager, upon issuance of a citation for a violation of the standard involving a DO in an MMU, paragraph (a) of this section will not apply to that MMU until the violation is abated and the citation is terminated in accordance with paragraphs (h) and (i) of this section.

Final paragraph (g) includes an exception to allow the District Manager flexibility to address extenuating circumstances that would affect sampling. An example of extenuating circumstances would occur when an uncorrected violation would require abatement sampling that continues into the next sampling period.

In addition, final paragraph (g) clarifies that a violation must be abated and the citation must be terminated, in accordance with final paragraphs (h) and (i), before resuming bimonthly

sampling. Final paragraphs (h) and (i) are discussed below. Final paragraph (g) is similar to existing § 70.207(c). MSHA did not receive comments on the proposal.

For consistency between the sampling requirements of the final rule, except for conforming changes, final paragraph (g) is the same as final §§ 70.207(f), 70.208(g), § 70.209(e), 71.206(j), and 90.207(e).

Final paragraph (h) is redesignated from and is similar to proposed § 70.207(g). It requires that upon issuance of a citation for violation of the standard, the operator must take the following actions sequentially: (1) Make approved respiratory equipment available; (2) immediately take corrective action; (3) record the corrective actions; and (4) conduct additional sampling. The actions required by paragraph (h) are similar to those in proposed § 70.207(g)(1)–(3) and (i)(3) discussed under final paragraph (e). Paragraph (h) includes the term "sequentially" to ensure that corrective actions are taken in the order they are listed.

Final paragraph (h)(1), like proposed § 70.207(g)(1), requires that the mine operator make approved respiratory equipment available to affected miners in accordance with § 72.700 of this chapter. Comments on proposed § 70.207(g)(1), together with the rationale for final paragraph (h)(1), are discussed under final paragraph (e).

Final paragraph (h)(2) is similar to proposed § 70.207(g)(3). It requires that the operator immediately take corrective action to lower the concentration of respirable coal mine dust to at or below the standard. Paragraph (h)(2) is similar to proposed § 70.207(g)(3) which would have required a mine operator to implement the proposed corrective actions. The types of corrective actions that could be taken are discussed under paragraph (e)(2). The rationale for final paragraph (h)(2) is the same as that for final paragraph (e)(2). As explained for final paragraph (e)(2), in the event of extenuating circumstances in which corrective actions cannot be taken immediately, i.e., the corrective action involves the purchase of additional equipment or parts, MSHA will accept a bona fide purchase order as immediate corrective action. The purchase order must show the date of purchase and expected delivery, and the equipment or part must be installed as soon as it is delivered. Under those circumstances, MSHA will extend the timeframe in which additional sampling is to begin in accordance with paragraph (h)(4).

Final paragraph (h)(3) is similar to proposed § 70.207(i)(3) and is the same

as final paragraph (e)(3). It requires that the operator make a record of the corrective actions taken. The record must be certified by the mine foreman or equivalent mine official no later than the end of the mine foreman's or equivalent mine official's next regularly scheduled working shift. It also requires that the record must be made in a secure book that is not susceptible to alteration or electronically in a computer system so as to be secure and not susceptible to alteration. It further requires that the records must be retained at a surface location at the mine for at least 1 year and be made available for inspection by authorized representatives of the Secretary and the representative of miners. Comments on proposed § 70.207(i)(3) and the rationale for paragraph (h)(3) are discussed under paragraph (e)(3).

Final paragraph (h)(4) is similar to proposed § 70.207(g)(3). It requires that the mine operator begin sampling, within 8 calendar days after the date the citation is issued, the environment of the affected occupation in the MMU on consecutive normal production shifts until five valid representative samples are taken. Paragraph (h)(4) is consistent with existing § 70.201(d), which requires a mine operator to sample each production shift until five valid respirable dust samples are taken. In addition, it requires that the sampling must begin within 8 calendar days after the issuance of the citation. The 8 calendar days allow sufficient time for the operator to receive the citation and take corrective actions. Under proposed § 70.207(g)(2) and (3), sampling would have begun after submission to and approval by the District Manager of the corrective actions taken.

One commenter stated that the proposal is unfair to mine operators because MSHA Districts will not be able to process corrective action submissions in a timely manner. The commenter also stated that the requirement is too burdensome because it could result in many needless revisions to the ventilation plan by mine operators and that the approved corrective actions could be different from what is approved in the mine ventilation plan.

In response to the comments, final paragraph (h) does not include the proposed requirement that the operator submit corrective actions to the District Manager for approval before corrective action can be taken. In reevaluating the requirements of proposed § 70.207(g), MSHA determined that final paragraph (h) will allow for faster abatement of a citation because immediate action must be taken to correct the violation. The sampling conducted under paragraph

(h)(4) will ensure that the corrective actions taken by the mine operator are effective in lowering the concentration of respirable dust to at or below the standard. However, to ensure that the sampling begins promptly after the operator implements the corrective actions, paragraph (h)(4) clarifies that the sampling must begin within 8 calendar days after the date the citation is issued.

For consistency between the sampling requirements of the final rule, except for conforming changes, final paragraph (h) is the same as final §§ 70.207(g), 70.208(h), 70.209(f), 71.206(k), and 90.207(f).

Final paragraph (i) is redesignated from and is substantially similar to proposed § 70.207(h). Paragraph (i) contains nonsubstantive and organizational changes from the proposal. It provides that a citation for a violation of the standard will be terminated by MSHA when: (1) Each of the five valid representative samples is at or below the standard; and (2) the operator has submitted to the District Manager revised dust control parameters as part of the mine ventilation plan that applies to the MMU in the citation, and the changes have been approved by the District Manager. It further provides that the revised parameters must reflect the control measures used by the operator to abate the violation.

Some commenters expressed concern with the proposed requirement that all five of the operator's samples must be at or below the standard for terminating a citation.

Requiring that each sample be at or below the standard provides MSHA with a stronger indication that the corrective actions were effective in continuously maintaining the average respirable dust levels in the mine atmosphere during each shift to which each miner in the active workings is exposed.

Several commenters stated coal mines should not be required to commit to long-term ventilation plan approvals for short-term issues particularly when those conditions are not representative of normal mining conditions when considering the development of ventilation plans.

The final rule, like the existing standards, requires that each operator must continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings is exposed at or below the respirable dust standard. Like the existing standards, the revisions to the dust control parameters that are

required to be submitted to MSHA by the operator under the final rule are parameters that the operator believes will result in compliance with the dust standard. If the operator encounters conditions where the existing dust control parameters are not effective in controlling the dust levels to at or below the respirable dust standard, the operator must adjust the dust control parameters as necessary to control the dust concentrations to at or below the standard.

Several commenters stated that submission of a change to the mine's approved ventilation plan is unfair and burdensome to mine operators. These commenters stated that the plan approval process places mine operators at a disadvantage because MSHA can shut down the MMU if the Agency does not get exactly what it wants and it is almost impossible for a mine operator to get an expedited hearing. They also stated that the proposal can result in considerable downtime for production because MSHA does not have the personnel to review and process revisions to the ventilation plans. They further stated that requiring different dust control parameters for each MMU creates a paperwork burden for mine operators and MSHA.

Mine ventilation plans are a long recognized means for addressing safety and health issues that are mine-specific. Individually tailored plans, with commonly accepted practices, are an effective method of regulating such complex matters as dust control. Existing § 75.370, regarding the submission and approval of mine ventilation plans, requires that each mine operator develop and follow a ventilation plan that is approved by MSHA and that is designed to control methane and respirable dust in the mine. Section 75.370 further requires that the plan be suitable to the conditions and mining system at the mine. It establishes the procedures for submittal, review, and approval of the plan to ensure that the plan for each mine addresses the conditions in that mine.

Requiring revisions to the dust control parameters as part of the mine ventilation plan for the MMU in the citation provides the necessary latitude to address the diversity of mining conditions found in coal mines nationwide. Details must be shown in the plan and must be specific to the conditions at each MMU. The paperwork burden associated with final paragraph (i) is shown in Chapter VIII of the REA.

MSHA is committed to the timely processing of plan revisions. The

Agency believes that the plan approval system will not result in considerable downtime for operators while MSHA reviews the plans. Circumstances that require expedited action are handled by the District Manager on a case-by-case basis. Generally, the District Manager is guided by whether the condition, if uncorrected, could result in a health or safety hazard or an imminent stoppage of production in the mine or an area of the mine. In addition, a mine operator may take action necessary to abate an imminent danger or hazardous condition, or to safeguard persons and equipment. In order to take such action, the operator would have to make a determination of the cause of the problem.

For consistency with the sampling requirements of the final rule, except for conforming changes, final paragraphs (i)(1) and (2) are the same as final §§ 70.207(h)(1) and (2), 70.208(i)(1) and (2), and 70.209(g)(1) and (2).

10. Section 70.207 Bimonthly Sampling; Designated Areas

Final § 70.207 is new, but is consistent with existing standards. It requires bimonthly sampling of DAs until January 31, 2016, which is 18 months after the effective date of the final rule. This section is included in the final rule to make the bimonthly sampling period for Designated Areas (DAs) the same as the bimonthly sampling period for MMUs under § 70.206. It is similar to proposed § 70.207 regarding bimonthly sampling of MMUs when using a CMDPSU, proposed § 70.208 regarding quarterly sampling of MMUs when using a CPDM, and proposed § 70.209 regarding quarterly sampling of DAs when using either a CMDPSU or CPDM. It is consistent with existing § 70.207 which requires bimonthly sampling of MMUs and existing § 70.208 which requires bimonthly sampling of DAs.

The proposal would have required that DAs be sampled quarterly and MMUs be sampled bimonthly on the effective date of the rule. Under the final rule, both MMUs under § 70.206 and DAs under this § 70.207 will continue the existing bimonthly sampling frequency and the existing number of required samples for a period of 18 months following the effective date of the rule. On February 1, 2016, quarterly sampling under §§ 70.208 for MMUs and 70.209 for DAs is required. This preserves the status quo for the first 18 months in order to provide operators time to concentrate on sampling changes related to full-shift sampling and taking representative samples, as that term is defined in final § 70.2. It also allows them more time to establish procedures for a new sampling frequency, and to upgrade existing controls, or to take additional measures to meet the increase in samples required after the 18-month period. Final § 70.201(b) addresses the sampling devices required for bimonthly sampling of DAs under this provision and for quarterly sampling of DAs under final § 70.209.

Final paragraph (a) is similar to proposed § 70.207(a) concerning bimonthly sampling of MMUs. It requires that each operator take one valid representative sample from each designated area (DA) on a production shift during each bimonthly period. Except for conforming changes, the periods for bimonthly sampling of DAs in paragraph (a) are the same as those in existing § 70.208(a). The bimonthly periods are: (1) February–March 31; (2) April 1–May 31; (3) June 1–July 31; (4) August 1–September 30; (5) October 1–November 30; and, (6) December 1–January 31.

Final paragraph (b) is similar to proposed §§ 70.207(c), 70.208(c), and 70.209(b) concerning when the respirable dust standard is changed when quartz is present. It requires that when the respirable dust standard is changed in accordance with § 70.101, the new standard will become effective 7 calendar days after the date of the notification of the change by MSHA. Paragraph (b) is essentially the same as existing §§ 70.207(b) and 70.208(b), but includes a clarification on the effective date of the new standard when there is a change in the applicable standard. The rationale for final paragraph (b) is the same as that for final § 70.208(c) and is discussed elsewhere in this preamble under § 70.208(c).

For consistency in the sampling requirements of the final rule, paragraph (b) is identical to § 70.206(c) regarding bimonthly sampling of MMUs, § 70.208(c) regarding quarterly sampling of MMUs, § 70.209(b) regarding quarterly sampling of DAs, § 71.206(b) regarding quarterly sampling, and § 90.207(b) regarding quarterly sampling.

Final paragraph (c) is essentially the same as existing § 70.208(c). It requires that upon notification from MSHA that any valid sample taken from a DA to meet the requirements of paragraph (a) of this section exceeds the standard, the operator must take five valid representative samples from that DA within 15 calendar days. It further requires that the operator must begin sampling of the DA on the first day on which there is a production shift following the day of receipt of notification. As stated previously, final paragraph (c) preserves the status quo for the first 18 months following the effective date of the final rule.

Final paragraph (d) is similar to proposed §§ 70.207(i)(1)–(3) and (g)(1)–(3). Final paragraph (d) requires that when a valid representative sample taken in accordance with this section meets or exceeds the ECV in Table 70–1 that corresponds to the applicable standard and particular sampling device used, the operator must: (1) Make approved respiratory equipment available to affected miners in accordance with § 72.700 of this chapter; (2) Immediately take corrective action to lower the concentration of respirable coal mine dust to at or below the standard; and (3) Make a record of the corrective actions taken. The record must be certified by the mine foreman or equivalent mine official no later than the end of the mine foreman's or equivalent mine official's next regularly scheduled working shift. Paragraph (d)(3) further requires that the record must be made in a secure book that is not susceptible to alteration or electronically in a computer system so as to be secure and not susceptible to alteration. It also requires that the records must be retained at a surface location at the mine for at least 1 year and be made available for inspection by authorized representatives of the Secretary and the representative of miners.

The rationale for final paragraphs (d)(1)–(3) is the same as that for final §§ 70.206(e)(1)–(3), 70.208(e)(1)–(3), and 70.209(c)(1)–(3), and is discussed elsewhere in this preamble under final § 70.208(e)(1)–(3).

For consistency between the sampling requirements of the final rule, final paragraphs (d)(1)–(3) are the same as final § 70.206(e)(1)–(3) regarding bimonthly sampling of MMUs, § 70.208(e)(1)–(3) regarding quarterly sampling of MMUs, § 70.209(c)(1)–(3) regarding quarterly sampling of designated areas, § 71.206(h)(1)–(3) regarding quarterly sampling, and except for conforming changes, § 90.207(c)(1)–(3) regarding quarterly sampling.

Final paragraph (e) provides two different methods by which compliance determinations can be made. Paragraphs (e)(1) and (2) provide that noncompliance with the standard is demonstrated during the sampling period when: (1) Two or more valid representative samples meet or exceed the ECV in final Table 70–1 that corresponds to the applicable standard and the particular sampling device used; or (2) The average for all valid

representative samples meets or exceeds the ECV in final Table 70–2 that corresponds to the applicable standard and the particular sampling device used. Paragraph (e)(1) is similar to proposed §§ 70.207(e), 70.208(d), and 70.209(c) regarding compliance based on a single sample measurement. Paragraph (e)(2) is similar to proposed § 70.208(e) regarding weekly permissible accumulated exposure. The rationale for final paragraphs (e)(1) and (2) is the same as that for final §§ 70.206(f)(1) and (2), 70.208(f)(1) and (2), and 70.209(d)(1) and (2), and is discussed elsewhere in this preamble under § 70.208(f)(1) and (2).

For consistency between the sampling requirements of the final rule, final paragraphs (e)(1) and (2) are the same as final §§ 70.206(f)(1) and (2), 70.208(f)(1) and (2), 70.209(d)(1) and (2), and, except for conforming changes, 71.206(i)(1) and (2), and, 90.207(d)(1) and (2).

Final paragraph (f) is derived and changed from proposed § 70.209(d). It requires that unless otherwise directed by the District Manager, upon issuance of a citation for a violation of the standard, paragraph (a) of this section will not apply to that DA until the violation is abated and the citation is terminated in accordance with paragraphs (g) and (h) of this section. Final paragraphs (h) and (i) are discussed below.

Final paragraph (f) includes an exception to allow the District Manager flexibility to address extenuating circumstances that would affect sampling. An example of extenuating circumstances would occur when an uncorrected violation would require abatement sampling that continues into the next sampling period.

Final paragraph (f) is similar to existing § 70.208(d). MSHA did not receive comments on the proposal.

In addition, for consistency between the sampling requirements of the final rule, except for conforming changes, final paragraph (f) is the same as final §§ 70.206(g), 70.208(g), 70.209(e), 71.206(j), and 90.207(e).

Final paragraph (g) is similar to proposed §§ 70.207(i)(3) and 70.209(e). It requires that upon issuance of a citation for a violation of the standard, the operator must take the following actions sequentially: (1) Make approved respiratory equipment available to affected miners in accordance with § 72.700 of this chapter; (2) immediately take corrective action to lower the concentration of respirable coal mine dust to at or below the standard; (3) make a record of the corrective actions taken. The record must be certified by the mine foreman or equivalent mine

official no later than the end of the mine foreman's or equivalent mine official's next regularly scheduled working shift. Paragraph (g)(3) further requires that the record must be made in a secure book that is not susceptible to alteration or electronically in a computer system so as to be secure and not susceptible to alteration. It also requires that the records must be retained at a surface location at the mine for at least 1 year and be made available for inspection by authorized representatives of the Secretary and the representative of miners.

Paragraph (g)(4) requires that the operator must begin sampling within 8 calendar days after the date the citation is issued, the environment of the affected DA on consecutive normal production shifts until five valid representative samples are taken. In addition, paragraph (g) includes the term "sequentially" to ensure that corrective actions are taken in the order they are listed.

The rationale for final paragraphs (g)(1)–(4) is the same as that for final §§ 70.206(h)(1)–(4), 70.208(h)(1)–(4), and 70.209(f)(1)–(4), and is discussed elsewhere in this preamble under § 70.206(h)(1)–(4).

For consistency between the sampling requirements of the final rule, except for conforming changes, final paragraphs (g)(1)–(4) are the same as final § 70.206(h) regarding bimonthly sampling of MMUs, § 70.208(h) regarding quarterly sampling of MMUs, § 70.209(f) regarding quarterly sampling of designated areas, § 71.206(k) regarding quarterly sampling, and § 90.207(f) regarding quarterly sampling.

Final paragraph (h) is similar to proposed § 70.209(f). It provides that MSHA will terminate a citation for a violation of the standard when the conditions listed in paragraphs (1) and (2) are met. Paragraph (h)(1) requires that each of the five valid representative samples taken must be at or below the standard. Paragraph (h)(2) requires that the operator has submitted to the District Manager revised dust control parameters as part of the mine ventilation plan for the DA in the citation, and the changes have been approved by the District Manager. It further requires that the revised parameters reflect the control measures used by the operator to abate the violation. The rationale for final paragraphs (h)(1) and (2) is discussed elsewhere in this preamble under § 70.206(i).

For consistency between the sampling requirements of the final rule, final paragraphs (h)(1) and (2) are identical, except for conforming changes, to final

§§ 70.206(i)(1) and (2), 70.208(i)(1) and (2), and 70.209(g)(1) and (2).

## 11. Section 70.208   Quarterly Sampling; Mechanized Mining Units

Final § 70.208, like the proposal, addresses sampling of mechanized mining units (MMUs). To be consistent with final § 70.201(a), it includes a clarification that the sampling requirements of this section start on February 1, 2016, which is 18 months after the effective date of the final rule. The title of the section is changed from the proposal by adding "quarterly" to distinguish the required sampling periods for MMUs under this section from final § 70.206, which requires bimonthly sampling for MMUs. It also does not include the term "CPDM" to avoid confusion with the sampling device required. Specifically, in accordance with final § 70.201(a), the operator is required to take quarterly samples of the DO and ODO in each MMU with an approved CPDM on February 1, 2016, unless directed by the Secretary to use the CMDPSU to collect quarterly samples.

Final paragraphs (a)(1) and (2) are changed from the proposal. Paragraph (a)(1) requires the mine operator to sample each calendar quarter: The designated occupation (DO) in each MMU on consecutive normal production shifts until 15 valid representative samples are taken. It further provides that the DM may require additional groups of 15 valid representative samples when information indicates that the operator has not followed the approved ventilation plan for any MMU.

Final paragraph (a)(2) requires that the operator sample each calendar quarter: Each other designated occupation (ODO) specified in paragraphs (b)(1) through (10) of this section in each MMU or specified by the District Manager and identified in the approved mine ventilation plan on consecutive normal production shifts until 15 valid representative samples are taken. It also requires sampling of each ODO type to begin after fulfilling the sampling requirements of paragraph (a)(1) of this section. It further requires that when the operator is required to sample more than one ODO type, each ODO type must be sampled over separate time periods during the calendar quarter.

Final paragraph (a)(3) is redesignated from proposed § 70.208(a)(2). It establishes the quarterly periods as: (1) January 1–March 31; (2) April 1–June 30; (3) July 1–September 30; and (4) October 1–December 31.

On March 8, 2011, MSHA issued in the **Federal Register** a request for comments (76 FR 12648). MSHA stated that the proposed rule addresses the frequency of respirable dust sampling when using a CPDM, and MSHA solicited comments on the proposed sampling frequencies and any suggested alternatives. MSHA asked if sampling of DOs were less frequent than proposed, what alternative sampling frequency would be appropriate. MSHA also requested that commenters address a sampling strategy in case of noncompliance with the respirable dust standard and provide a rationale for the strategy. In addition, MSHA asked whether CPDM sampling of ODOs should be more or less frequent than 14 calendar days each quarter, and whether the proposed CPDM sampling of ODOs on the MMU is sufficient to address different mining techniques, potential overexposures, and ineffective use of approved dust controls. Some commenters suggested that MSHA conduct the DO sampling on all shifts on which coal is produced during a calendar week. Several commenters opposed the proposed frequency of DO sampling, which would have required mine operators who use CPDMs to sample the DO in each MMU during each production shift, 7 days per week (Sunday through Saturday), 52 weeks per year. These commenters stated that the proposal was too expensive because it would require mine operators to purchase an unreasonably large number of CPDMs due to the number of MMUs in each mine. Some commenters stated that sampling every DO on every production shift was excessive and was not needed to objectively determine miners' exposure.

One commenter stated that proper control of respirable coal mine dust to below the standard will not assure operators that they will not be issued a violation for false overexposures due to the proposed sampling strategy and use of 24/7 continuous sampling on all shifts. Some commenters suggested that a miner should be allowed to request additional sampling not already designated for sampling by MSHA if the miner has reason to believe that miners are being exposed to excessive respirable dust. Another commenter suggested that the sampling should be a full-shift weekly dose not to exceed an average of 2.0 mg/m³ for a 40-hour week.

One commenter stated that the proposed frequency of ODO sampling was confusing. This commenter stated that the proposal, which would have required sampling of ODOs in each MMU during each production shift for

14 consecutive days during each quarterly period, could not be accomplished because ODO personnel do not work 14 consecutive days. Another commenter suggested that ODOs should be sampled the same as DOs, 7 days a week, 52 weeks a year.

After considering all the comments, and based on MSHA's years' of experience, MSHA concludes that sampling on consecutive normal production shifts until 15 valid representative samples are taken is sufficient to provide samples that are representative of normal mining activities for DOs and ODOs during the production shifts. The proposal would have required sampling of ODOs in each MMU during each production shift for 14 consecutive days during each quarterly period. The 14-day period was intended to indicate the completion of multiple mining cycles. Subsequent to the proposal, MSHA surveyed its coal districts and found that, under normal mining conditions, the majority of MMUs should be able to complete at least two complete mining cycles while 15 representative samples are collected. A mining cycle consists of cutting straight entries and crosscuts or multiple passes with a longwall shearer in 15 shifts. If the mine produces coal on only one shift a day, the sampling period for a DO or ODO could be 15 consecutive normal production days. The sampling period for a DO or ODO could be as short as 8 consecutive normal production days, if the mine produces coal on two shifts a day. Sampling in accordance with paragraphs (a)(1) and (2) will provide representative measurements of respirable dust concentrations in the DO and ODO's work environment and allow both the operator and MSHA to evaluate the effectiveness of the dust controls being used. Accordingly, MSHA determined that DO sampling on every shift, every day, by each mine operator as proposed is not necessary. Miners will be adequately protected by the sampling requirements of paragraphs (a)(1) and (2) because the sampling results will provide mine operators with information to evaluate the dust controls specified in their approved ventilation plan and determine whether the controls are being maintained. As long as dust controls are properly maintained to ensure continuing compliance with the respirable dust standard, miners will be protected from overexposures.

If information indicates that a mine operator has not followed the approved mine ventilation plan for any MMU, (for example, mining when the ventilation curtains are not properly maintained, or

water sprays are operated with inadequate pressure or some are inoperable), paragraph (a)(1) provides that the District Manager may require additional sampling of DOs by that operator. The additional sampling under paragraph (a)(1) is intended to ensure that miners are provided adequate protection from overexposure to respirable coal mine dust without requiring all mine operators to sample DOs each production shift, 7 days per week, 52 weeks per year as proposed.

Paragraph (a)(2) does not permit sampling of ODOs until after sampling of DOs under paragraph (a)(1) is completed. However, additional sampling of the DO, such as abatement sampling, will not affect the ODO sampling required under this paragraph (a)(2). Paragraph (a)(2) also does not permit simultaneous sampling of multiple ODO types. In doing so, paragraphs (a)(1) and (2) establish monitoring that protects miners through a longer period of sequential sampling. Sequentially sampling the DOs and ODOs spreads the sampling over a period that will ensure sufficient representative samples. Under paragraph (a)(2), sampling of a specific ODO, such as a shuttle car operator, will require all shuttle car operators on an MMU to be sampled during the same time period until the 15 representative samples are collected on each ODO. Sampling of the shuttle car operator cannot begin until sampling of the DO under paragraph (a)(1) is completed. For example: an MMU has a DO, and the following ODOs: One return air side roof bolting machine operator and two shuttle car operators. The DO is sampled until 15 representative samples are collected. Once the DO sampling is completed, then the return air side roof bolting machine operator is sampled until 15 representative samples are collected. When sampling of the roof bolting machine operator is completed, the 2 shuttle car operators are both sampled until 15 representative samples are collected on each. The shuttle car operators must be sampled at the same time so both shuttle car operators are carrying sampling units over the same time period.

The final rule's alternatives to the proposed sampling requirements for DOs and ODOs described above significantly reduce the quantity of CPDMs that operators will need to conduct MMU sampling. The proposal would have required sampling of DOs every shift, every day, and sampling of ODOs 14 consecutive days each quarter. Under the final rule, DOs are sampled less frequently than under the proposed rule, and under the final rule's

<div align="center">238</div>

sequential sampling, DOs are sampled first, followed by sampling each ODO type over separate time periods. This sequential sampling allows a mine operator to use the same CPDM to conduct most MMU sampling.

Final paragraph (b) is similar to the proposal and requires that unless otherwise directed by the District Manager, the approved sampling device must be worn by the miner assigned to perform the duties of the DO or ODO specified in paragraphs (b)(1) through (b)(10) of this section or by the District Manager for each type of MMU. Depending on mine or physical conditions (e.g., mining height, no operating cab on the mining equipment to attach the sampling unit), the District Manager may designate an alternate sampling location than specified in paragraph (b). Paragraph (b) includes the term "an approved sampling device" as a clarification. Under the final rule, an operator is required to take quarterly samples of DOs in each MMU with an approved CPDM, unless directed by the Secretary to use the CMDPSU.

Paragraphs (b)(1) through (10) are substantially similar to the proposal. They identify the DOs that are required to be sampled under paragraph (a)(1) and the ODOs that are required to be sampled under paragraph (a)(2) for each specified MMU.

Paragraph (b)(1), like the proposal, requires that on a conventional section using a cutting machine, the DO on the MMU is the cutting machine operator.

Paragraph (b)(2), like the proposal, requires that on a conventional section blasting off the solid, the DO on the MMU is the loading machine operator.

Paragraph (b)(3) is changed from the proposal. It requires that on a continuous mining section other than auger-type, the DO on the MMU is the continuous mining machine operator or mobile bridge operator when using continuous haulage. The ODOs for this type of MMU are revised as follows: The roof bolting machine operator who works nearest the working face on the return air side of the continuous mining machine; the face haulage operators on MMUs using blowing face ventilation; the face haulage operators on MMUs ventilated by split intake air ("fishtail ventilation") as part of a super-section; and the face haulage equipment operators where two continuous mining machines are operated on an MMU. The term "shuttle car" in the proposed rule is replaced with "face haulage" in the final rule. This clarifies the Agency's intent that any type of haulage on the MMU in this mining situation is required to be monitored for respirable

dust exposure in the environment of the face haulage operator. The proposal used the most common haulage vehicle—shuttle car—when the intent was to cover all haulage operators including those on shuttle cars, ramcars, scoops, etc. Moreover, the proposal provided that the District Manager had the discretion to designate ODOs other than those specifically listed in proposed § 70.208(b). Face haulage operators are included in final paragraph (b)(3) because they frequently experience exposure to high dust levels. For example, some operators have two continuous mining machines on a single MMU but do not operate them at the same time. Starting operation of the second continuous mining machine after the first continuous mining machine stops mining subjects the MMU face haulage operators to respirable dust that has not cleared the entries of the MMU. Historically, mine operators who use a common dumping point for two MMUs will use face haulage equipment from either MMU as needed. Creating ODOs on face haulage equipment operators for this type of mining configuration will provide better protection from exposures to respirable dust for face haulage equipment operators. Finally, face haulage operators are included in final paragraph (b)(3) in response to comments on proposed § 75.332(a)(1), which would have required mine operators to provide separate intake air to each MMU on each working section. Comments on proposed § 75.332(a)(1) regarding split intake ventilation are discussed elsewhere in this preamble under § 75.332.

Paragraph (b)(4), like the proposal, requires that on a continuous mining section using auger-type machines, the DO on the MMU is the jacksetter working nearest the working face on the return air side of the continuous mining machine.

Paragraph (b)(5), like the proposal, requires that on a scoop section using a cutting machine, the DO on the MMU is the cutting machine operator.

Paragraph (b)(6), like the proposal, requires that on a scoop section blasting off the solid, the DO on the MMU is the coal drill operator.

Paragraph (b)(7), like the proposal, requires that on a longwall section, the DO on the MMU is the longwall operator working on the tailgate side of the longwall mining machine. The ODOs are the jacksetter who works nearest to the return air side of the longwall working face, and the mechanic.

Paragraph (b)(8), like the proposal, requires that on a hand loading section

with a cutting machine, the DO on the MMU will be the cutting machine operator.

Paragraph (b)(9), like the proposal, requires that on a hand loading section blasting off the solid, the DO on the MMU will be the hand loader exposed to the greatest dust concentration.

Paragraph (b)(10), like the proposal, requires that on anthracite mine sections, the DO on the MMU will be the hand loader exposed to the greatest dust concentration.

In the March 8, 2011, request for comments (76 FR 12650), MSHA stated that the proposed rule addresses: (1) Which occupations must be sampled using CPDMs, and (2) which work positions and areas could be sampled using either CPDMs or CMDPSUs. MSHA solicited comments on the proposed sampling occupations and locations. For example, MSHA requested comment on whether there are other positions or areas where it may be appropriate to require the use of CPDMs. MSHA also asked whether the proposed CPDM sampling of ODOs on the MMU is sufficient to address different mining techniques, potential overexposures, and ineffective use of approved dust controls.

Some commenters stated that individual occupations with the highest potential for exposure should be sampled and MSHA should evaluate and determine if additional occupations need to be sampled. The final rule is based on historical sampling data on MMUs. The DOs and ODOs included in paragraphs (b)(1) through (10) are those occupations with the highest potential for exposure. Therefore, sampling these DOs and ODOs is the most effective method for protecting all miners from excess exposure to respirable coal mine dust.

One commenter expressed concern over giving the District Manager too much discretion in determining the ODOs to sample because the rules could change every time a determination was made by the District Manager. In response, MSHA notes that allowing the District Manager to identify ODOs is consistent with MSHA's existing policy concerning the designation of sampling entities under the existing standards for DAs and will continue to be based on MSHA's historical sampling data on MMUs.

One commenter recommended that if a mine operator must sample shuttle car operators on blowing type face ventilation, then shuttle car operators on exhausting type face ventilation should be sampled also. From MSHA's sampling experience, haulage operators working with exhausting face

239

ventilation position themselves in intake air when coal is being loaded by the continuous mining machine. By positioning themselves in this manner, the haulage operators are in a more protected environment during the time of greatest potential for exposure to respirable dust.

One commenter stated that other outby areas should be sampled such as conveyor belt entries, belt heads, and dumping points. MSHA recognizes that dust concentrations in the active workings of the mine can vary from location to location, even within a small area near a miner. MSHA will continue to require operator sampling of outby DAs. The requirements for DA sampling are contained in final §§ 70.207 and 70.209, which are discussed elsewhere in this preamble. Limiting the dust concentration in outby areas ensures that no miner in the active workings will be exposed to excessive respirable dust.

Final paragraph (c) is similar to proposed § 70.208(c) and clarifies the time frame for implementation when there is a change in the applicable standard. It requires that when the respirable dust standard is changed in accordance with § 70.101 (Respirable dust standard when quartz is present), the new standard will become effective 7 calendar days after the date of the notification of the change by MSHA. The "date of notification" is the date on the data mailer that MSHA currently sends, via U.S mail, to operators informing them of the quartz analyses that may result in a change in the respirable dust standard. Under proposed § 70.208(c), a new standard would have gone into effect on the first production shift following the operator's receipt of notification that the respirable dust standard is changed in accordance with § 70.101. However, MSHA may not always know the date that the operator received the notification. By allowing the new standard to become effective 7 days after the date of the notification of the change, i.e., the date on the data mailer, instead of requiring the standard to become effective on the next production shift, MSHA will maintain the existing, historical practice of providing 7 days for mailing before the new standard is effective. It protects miners by ensuring the prompt implementation of the reduced standard when high concentrations of quartz are present and also allows for a uniform application of a new respirable dust standard regardless of the physical location of a mine.

Final paragraph (d) is new. It is similar to proposed § 70.207(d) and existing § 70.207(d) regarding bimonthly sampling in mechanized mining units. It requires that if a normal production shift is not achieved, the DO or ODO sample for that shift may be voided by MSHA. It further provides that any sample that, regardless of production, exceeds the standard by at least 0.1 mg/m³ will be used in the determination of the equivalent concentration for that occupation.

Proposed § 70.207(d), concerning sampling of MMUs with a CMDPSU, provided that if a normal production shift is not achieved, the DO sample for that shift may be voided by MSHA. It further provided that any sample, regardless of production, that exceeds the standard by at least 0.1 mg/m³ would be used to determine the equivalent concentration for that MMU. As explained in the preamble for proposed § 70.207(d), voiding samples that indicate miners were exposed to a concentration of respirable dust in excess of the standard does not provide miners the intended health protection. For example, an MMU is on a reduced standard of 0.5 mg/m³ due to the presence of quartz. A sample taken on the MMU when a normal production shift was not achieved shows the respirable dust concentration is 2.3 mg/m³. The existing standard provides that any sample, regardless of production, with a concentration greater than 2.5 mg/m³ will be used to determine the average concentration. Under the existing standard, the 2.3 mg/m³ sample would not be used to determine the average concentration for that MMU. However, MSHA believes that any sample that exceeds the standard while production is less than normal should be used to determine the respirable dust concentration of the MMU since operating at a higher production would likely increase miners' respirable dust exposure (75 FR 64432, October 19, 2010).

The 2.5 mg/m³ value in the existing standard was based on: (1) An earlier sampling and processing methodology that was less accurate than the existing program; (2) a 2.0 mg/m³ standard; and (3) did not take quartz into consideration. However, the accuracy of the CPDM and the improvement in the accuracy of the CMDPSU has allowed MSHA to establish the final 0.1 mg/m³ value, which also takes into consideration the reduced standard due to quartz.

Under proposed § 70.208 concerning sampling of MMUs with a CPDM, the level of coal production would not have been a concern because the proposal would have required sampling on each production shift, 7 days per week, and 52 weeks per year, regardless of

production. Because compliance under the proposed rule would have been based on 24/7 continuous sampling and single sample determinations, there was no reason to have a provision to void a sample or to require the use of a sample that exceeded the standard when production was low for determining compliance based on averaging multiple samples. However, under final paragraph (d), the sampling methodology is modified from the proposal and, therefore, coal production levels and representative sampling are as important for CPDM sampling as for CMDPSU sampling. Under final § 70.208, sampling is required on 15 consecutive shifts on a quarterly basis, which is necessary to ensure that the operator collects samples that are representative of normal mining activity. When a sample exceeds the standard while production is less than normal, it should be used to determine the respirable dust concentration of the MMU since operating at a higher production would likely increase miners' respirable dust exposure. For these reasons, final paragraph (d) includes the same criteria that apply to voiding DO samples collected with a CPDM as that required by final § 70.206(d) when sampling with a CMDPSU.

Therefore, final paragraph (d) includes requirements that, with the exception of conforming changes, are the same as proposed § 70.207(d) and existing § 70.207(d) regarding samples that may be voided by MSHA based on production. The rationale for final paragraph (d) is the same as that for final § 70.206(d) and is discussed elsewhere in this preamble under § 70.206(d).

Final paragraph (e) is similar to proposed § 70.208(f) and (g). It requires that when a valid representative sample taken in accordance with this section meets or exceeds the ECV in Table 70–1 that corresponds to the applicable standard and particular sampling device used, the operator must: (1) Make approved respiratory equipment available; (2) Immediately take corrective action; and (3) Record the corrective actions. The actions required by final paragraph (e) are similar to those in proposed § 70.208(g).

Proposed § 70.208(f)(1)–(5) would have required that when a valid end-of-shift measurement meets or exceeds the applicable ECV or a weekly accumulated exposure exceeds the weekly permissible accumulated exposure, the operator must take the following actions before production begins on the next shift: (1) Make approved respiratory equipment

240